IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| | § | |
| In re: | § | **Chapter 11** |
| | § | |
| **MEMORIAL PRODUCTION** | § | **Case No. 17-_____ (___)** |
| **PARTNERS LP,** *et al.*, | § | |
| | § | **(Joint Administration Requested)** |
| **Debtors.[1]** | § | **(Emergency Hearing Requested)** |
| | § | |

**DECLARATION OF ROBERT L. STILLWELL, JR. IN SUPPORT OF
THE DEBTORS' CHAPTER 11 PETITIONS AND RELATED REQUESTS FOR RELIEF**

I, Robert L. Stillwell, Jr., pursuant to section 1746 of title 28 of the United States Code, hereby declare that the following is true to the best of my knowledge, information, and belief:

1.      I am Vice President and Chief Financial Officer of Memorial Production Partners GP LLC (the "**General Partner**" or "**MEMP GP**"), the general partner and a wholly owned subsidiary of Memorial Production Partners LP ("**MEMP**").  On January 16, 2017 (the "**Petition Date**"), MEMP and certain of its debtor subsidiaries (collectively with MEMP, the "**Debtors**," and together with their non-Debtor affiliates, "**Memorial**") commenced in this Court voluntary cases under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"). I am knowledgeable about and familiar with Memorial's business and financial affairs.  I submit this declaration in support of the Debtors' voluntary petitions for relief and motions filed

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Memorial Production Partners LP (6667); Memorial Production Partners GP LLC; MEMP Services LLC (1887); Memorial Production Operating LLC; Memorial Production Finance Corporation (3356); WHT Energy Partners LLC; WHT Carthage LLC; Memorial Midstream LLC; Beta Operating Company, LLC; Columbus Energy, LLC; Rise Energy Operating, LLC; Rise Energy Minerals, LLC; Rise Energy Beta, LLC; San Pedro Bay Pipeline Company (1234); and Memorial Energy Services LLC.  The Debtors' mailing address is 500 Dallas Street, Suite 1600, Houston, Texas 77002.

concurrently herewith (the "**First Day Motions**").  I am authorized to submit this declaration on behalf of the Debtors.

2.     I have served as the General Partner's Vice President and Chief Financial Officer since January 2015.  Before then, I served as the General Partner's Vice President, Finance from July 2014 through January 2015 and Treasurer of MEMP's former parent company, Memorial Resource Development LLC, from June 2012 through July 2014.  From January 2011 through June 2012, I served as an investment banker in the Global Energy Group at Citigroup where I focused on the upstream oil and gas industry and worked on, among other things, MEMP's initial public offering.  Prior to that time, I worked in investment banking at UBS and at Scotia Waterous and in the corporate finance group at EXCO Resources, Inc.  I hold a Bachelor's degree in finance from the University of Texas at Austin and a Master's degree from the Jesse H. Jones Graduate School of Business at Rice University.

3.     Except as otherwise indicated, the facts set forth in this declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by employees working under my supervision, or my opinion based upon experience, knowledge, and information concerning the Debtors' operations and financial condition.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.

4.     Before commencing cases under chapter 11, the Debtors entered into plan support agreements with the overwhelming majority of their major creditor constituencies: 100% of the RBL Credit Facility Lenders and members of the Ad Hoc Group (the "**Consenting Noteholders**") holding approximately 67.6% of the Debtors' Unsecured Notes (each capitalized term as defined below).  In light of the plan support agreements, the Debtors expect that the votes tabulated and received from at least two of the classes entitled to vote will be sufficient to

confirm the *Debtors' Joint Plan of Reorganization of Memorial Production Partners LP, et al.*
*Under Chapter 11 of the Bankruptcy Code* (the "**Plan**"), which has been filed
contemporaneously herewith.  With respect to the third class of voting creditors—those holding
Beta Trust Claims (as defined below)—the Plan provides that such Claims will either receive the
indubitable equivalent of their claims or will be unimpaired.

      5.     As described in further detail below, the proposed Plan provides for,
among other things, an unsecured-debt-for-equity exchange and an amendment to the Debtors'
secured credit facility that together would substantially deleverage the Debtors' balance sheet:[2]

- The Debtors' RBL Credit Facility (as defined below) would be amended such that the new borrowing base would permit the reorganized Debtors adequate liquidity.  The size of the RBL Credit Facility has already been reduced prepetition through the consensual liquidation of derivatives contracts (each, a "**Hedge**") and application of the proceeds to amounts outstanding under the RBL Credit Facility.  Certain Hedges, however, remain in place to provide commodity price protection to the reorganized Debtors during the next two years.  Under the RBL Plan Support Agreement, 100% of RBL Credit Facility Lenders agreed to elect the first-out tranche of the amended RBL Credit Facility.

- The Debtors' Unsecured Notes (as defined below) would be cancelled, and the holders thereof would receive 98% of the equity in the corporation that will become the reorganized Debtors (subject to certain dilutive equity issuances specified in the Plan).

- Holders of Beta Trust Claims would receive payment in full, either through a subordinated lien in the proceeds of a surety bond equal to 100% of their claims, or through unimpairment of their claims, at the election of the Debtors.

- Holders of other general unsecured claims would be unimpaired.

- Holders of equity interests in the Debtors would be cancelled, and holders of MEMP's limited partnership units would receive, on account of such units, 2% of the equity in the reorganized Debtors and five-year cashless warrants to acquire up to 8% of the New Common Shares (as defined in the Plan) at a per share exercise price equal to the principal and interest accrued on the Unsecured Notes as of December

---

[2] Capitalized terms used in this Declaration, but not herein defined, have the meanings ascribed to such terms in the Plan, file contemporaneously with this Declaration.  To the extent any inconsistencies exist between this Declaration and the Plan, the Plan shall govern.

31, 2016 divided by the number of issued and outstanding New Common Shares, as determined in accordance in the Plan and subject to certain dilutive equity issuances specified in the Plan.

In short, the Plan represents a comprehensive restructuring of the Debtors' finances. I am advised that, if the Plan is not unanimously accepted by the voting classes, the Plan nevertheless satisfies the requirements of the Bankruptcy Code and can be confirmed.

6. This declaration has been organized into five sections. The first provides background information on the Debtors' organizational structure and business. The second describes the Debtors' capital structure. The third describes the events leading to the filing of these chapter 11 cases and the Debtors' prepetition restructuring efforts. The fourth describes the terms of the Debtors' proposed prenegotiated restructuring. The fifth section summarizes the relief requested in, and the legal and factual bases supporting, the First Day Motions (as defined below).

## The Debtors' Business

### A. Overview of the Debtors' Business Operations

7. MEMP and the other Debtors operate an energy business focused on the acquisition, development, exploitation, and production of oil and natural gas properties. The Debtors' primary business objective has been to generate stable cash flows that would allow them to deliver sustainable quarterly cash distributions to their unitholders and, over time, to increase those quarterly cash distributions as market conditions dictate. Their oil and natural gas assets consist primarily of producing oil and natural gas properties located in Texas, Louisiana, Wyoming, and offshore Southern California. Most of the Debtors' oil and natural gas properties are located in large, mature oil and natural gas reservoirs with well-known geologic characteristics and long-lived, predictable production profiles and modest capital requirements. The following map illustrates the locations of the Debtors' oil and natural gas properties:



8.      As of the date hereof, the Debtors had leasehold working interests in approximately 2,433 producing oil and gas wells and owned interests in approximately 399,000 gross acres.   The Debtors employ approximately 291 employees.   The Debtors maintain operational control over approximately 96% of their proved reserves.

9.      For the fiscal year ended December 31, 2015, the Debtors' total revenues were approximately $358.1 million, representing a 36.7% decrease in year-over-year revenues from 2014.  Further, for the nine months ended September 30, 2016, the Debtors' total revenues were approximately $203.2 million, representing a 27.2% decrease in year-over-year revenues from the same period in 2015.  These decreases were driven primarily by declines in the prices of crude oil and natural gas in recent years.

10.      The Debtors are subject to the local, state, and federal laws and regulations in the jurisdictions in which they operate.  The laws and regulations that impact the Debtors' operations include those relating to the operation of drilling units, environmental protection, and health and safety, as well as restrictions on oil and natural gas exploration and development.

**B.      The Debtors' Organizational Structure**

11.      MEMP was formed in April 2011 as a subsidiary of its then-parent company Memorial Resource Development LLC ("**Memorial Resource**") to own, acquire, and exploit oil and natural gas properties in North America.   On December 14, 2011, MEMP completed its initial public offering and began to operate as a master limited partnership listed on the NASDAQ Global Select Market ("**NASDAQ**") under the ticker "MEMP".   Today, MEMP is owned 100% by its limited partners and MEMP GP owns a non-economic general partner interest in MEMP.   Accordingly, MEMP GP's Board of Directors (the "**Board**") functions as the Debtors' governing board with respect to the decision-making underlying these chapter 11 cases.

12.      MEMP GP is governed by a five-member Board, the membership of which is as follows:

| Name | Appointment to Board | Position |
|------|---------------------|----------|
| Jonathan M. Clarkson | December 2011 | Chairman |
| John A. Weinzierl | April 2011 | Director |
| W. Donald Brunson | December 2014 | Director |
| P. Michael Highum | March 2012 | Director |
| William J. Scarff | March 2016 | Director |

The Debtors also have highly experienced managers, both in their headquarters and in their field operations.   The Debtors' senior management team consists of the following individuals:

| Name | Position |
|------|----------|
| William J. Scarff | President and Chief Executive Officer |
| Christopher S. Cooper | Senior Vice President and Chief Operating Officer |
| Robert L. Stillwell, Jr. | Vice President and Chief Financial Officer |
| Jason M. Childress | Vice President, General Counsel and Corporate Secretary |

13.      Collectively, the Debtors consist of 15 entities registered under the laws of Delaware, Texas, Louisiana, Wyoming, and California.   The Debtors also have two non-Debtor

affiliates incorporated in New York.  A chart illustrating the Debtors' organizational structure as of the Petition Date is attached as **Exhibit A** to this declaration.

### C.    The Debtors' Business Segments

14.    The Debtors' business operates in four main regions corresponding to geographical basins: (i) East Texas, (ii) South Texas, (iii) the Rockies, and (iv) Offshore California in federal waters.  Each of these is described below.

15.    ***East Texas***.  The Debtors' East Texas assets consist principally of interests in the Joaquin, Carthage, and Henderson fields of the Cotton Valley and Travis Peak formations in east Texas and north Louisiana.  The Debtors have interests in approximately 260,000 gross acres[3] in this region.  The East Texas assets are approximately 71% gas and 29% liquids, with 65% of such assets by value being proved developed reserves[4] and 35% being proved undeveloped reserves.  The Debtors have interests in approximately 1,543 gross and 911 net wells,[5] with an average working interest of 59%.  A map of the East Texas assets is below:

---

[3] "Gross acres" or "gross wells" means the total acres or wells, as the case may be, in which the Debtors have a working interest.

[4] "Proved developed reserves" means proved reserves that can be expected to be recovered from existing wells with existing equipment and operating methods.  For further explanation of these terms, see MEMP's Quarterly Report on Form 10-Q for the fiscal quarter ended September 30, 2016, filed with the SEC on November 2, 2016.

[5] "Net wells" means the Debtors' aggregate fractional working interests in gross wells.



16. ***South Texas***. The Debtors' South Texas assets consist principally of interests in the Eagle Ford shale play and the Northeast Thompsonville, Laredo, and East Seven Sisters fields in South Texas. The Debtors have interests in approximately 115,000 gross acres in this region, including 15,000 gross acres in the Eagle Ford play. The South Texas assets are approximately 68% gas and 32% liquids, with 90% of such assets by value being proved developed reserves and 10% being proved undeveloped reserves. The Debtors have interests in approximately 719 gross and 420 net wells, with an average working interest of 58%. A map of the South Texas assets is below:



17.   *Rockies*.  The Debtors' Rockies assets consist principally of interests in the Lost Soldier and Wertz fields near Bairoil, Wyoming.   The Debtors have interests in approximately 7,000 gross acres in this region.   The Rockies assets are approximately 75% oil and 25% natural gas liquids, with 56% of such assets by value being proved developed reserves and 44% being proved undeveloped reserves.   The Debtors have interests in approximately 116 gross and 116 net wells, with an average working interest of 100%.   A map of the Rockies assets is below:



18.    ***Offshore California***.  The Debtors' Offshore California assets consist principally of interests in the Beta Field, approximately 11 miles off the coast of the Port of Long Beach, California in federal waters.  The Debtors have two wellhead platforms, each with a permanent drilling rig, one processing platform, and associated pipelines and onshore facilities. The Debtors have interests in approximately 17,000 gross acres in this region.  The Offshore California assets are approximately 100% oil, with 61% of such assets by value being proved developed reserves and 39% being proved undeveloped reserves.  The Debtors have interests in approximately 55 gross and 55 net wells, with an average working interest of 100%.  A map of the Offshore California assets is below:



19.     The Debtors' production from the Offshore California region is transported to a processing facility via the San Pedro Pipeline, a federally regulated pipeline that is wholly owned by Debtor San Pedro Pipeline Company.  The Debtors' operations in Offshore California are regulated generally by the federal Bureau of Ocean Energy Management ("**BOEM**").

20.     The Debtors are co-liable with the predecessor owners of the Offshore California assets for the Beta P&A Obligations.  The following parties are the predecessor owners of the Offshore California assets (collectively, the "**Beta Previous Owners**"): Aera Energy LLC ("**Aera**"); SWEPI LP ("**SWEPI**"); and Noble Energy, Inc. ("**Noble**").  In addition to the Beta Previous Owners, Pacific Energy Resources, Ltd. ("**PERL**") and SP Beta Properties, LLC ("**SP Beta**") previously owned the Offshore California assets; however, (i) PERL liquidated in a chapter 11 bankruptcy case styled *In re Pacific Energy Resources Ltd.*, Ch. 11 Case No. 09-10785 (KJC) (Bankr. D. Del.) that was closed by order of the United States Bankruptcy Court for the District of Delaware on December 18, 2012 (ECF No. 2413), and (ii) in November 2015,

after selling its interest in the Offshore California assets to Debtor Rise Energy Beta, LLC ("**Rise**"), SP Beta merged with and into Rise.  As a result, the Debtors believe that the only remaining parties that are co-liable with the Debtors for the Beta P&A Obligations are the Beta Previous Owners.

        21.    The Debtors' obligations on account of the Beta P&A Obligations are currently supported by approximately $152 million in cash held in a trust account with U.S. Bank National Association, as trustee, to which the Debtors are the successor settlor (the "**Beta Trust**").  BOEM is the beneficiary of the Beta Trust.  Aera, SWEPI, and Noble hold security interests and other rights with respect to the corpus of the Beta Trust that are subordinate to BOEM's interest as direct beneficiary of the Beta Trust (such claims, the "**Beta Trust Claims**"). Pursuant to the Plan, the Debtors seek to release a portion of cash from the Beta Trust in exchange for coverage of the Beta P&A Obligations by a surety bond, all as more fully described in the *Disclosure Statement for Joint Plan of Reorganization of Memorial Production Partners LP, et al. Under Chapter 11 of the Bankruptcy Code* (the "**Disclosure Statement**"), which has been filed contemporaneously herewith.

**D.**      **The Debtors' Operations in Recent Years**

        22.    To remain competitive in current industry conditions, the Debtors have recently focused significant efforts on reducing their lease operating expenses ("**LOE**") and maximizing the efficiency of their operations.  The Debtors' strategy included renegotiation of terms with service providers, a reduction in the size of the Debtors' workforce, reduction in lease operating costs, and reduced capital spending and development activity in response to current commodity prices.  As a result, the Debtors achieved a 30% year-over-year LOE reduction from the third quarter of 2015 to the third quarter of 2016.  In addition, the Debtors have reduced their

capital expenditures by approximately two-thirds (2/3) since calendar year 2015, partly on account of greater operational efficiency and partly on account of reduced development activity.

**E.      The Debtors' Hedge Portfolio**

23.      In addition to their interests in oil and gas reserves, a significant asset of the Debtors is their portfolio of in-the-money Hedges.  Maintaining a robust Hedge portfolio has been a significant strategy of the Debtors since their inception.  In accordance with the terms of the RBL Credit Agreement and its own Commodity Risk Management Policy, the Debtors entered into the Hedges to protect against the risk of declines in the prices of oil and natural gas and fluctuations in interest rates.  The RBL Credit Facility Lenders and their affiliates were historically the Debtors' counterparties to the vast majority of the Hedges.  In addition to the Debtors' oil and gas properties, the Hedges and their proceeds generally constitute the RBL Credit Facility Lenders' collateral and were given credit toward the calculation of the borrowing base under the RBL Credit Agreement.

24.      As of the filing of the Debtors' most recent Form 10-Q on November 2, 2016, the Debtors' commodity Hedge portfolio had a mark-to-market value of approximately $458 million.  As discussed below, in furtherance of the Debtors' prepackaged restructuring, the Debtors and their Hedge counterparties consensually monetized approximately $283 million in commodity Hedges prior to the Petition Date and used a significant portion of the proceeds to reduce amounts outstanding under their prepetition RBL Credit Facility.

<u>**Capital Structure and Prepetition Indebtedness**</u>

25.      The following description of the Debtors' capital structure is for informational purposes only and is qualified in its entirety by reference to the documents setting forth the specific terms of such obligations and their respective related agreements.  As of the

date hereof, the Debtors had outstanding funded debt obligations in the aggregate amount of approximately $ 1.6 billion, which amount consists of (i) approximately $455 million in secured borrowings under the Debtors' RBL Credit Facility and $2.4 million of outstanding letters of credit and (ii) approximately $1.1 billion in aggregate principal amount of Unsecured Notes.

26.    ***RBL Credit Facility***.   The Debtors are parties to that certain *Credit Agreement*, dated as of December 14, 2011, by and among Memorial Production Operating LLC ("**MPO**"), as borrower, MEMP, as parent guarantor, Wells Fargo Bank, National Association (the "**RBL Credit Facility Agent**"), as administrative agent, and the lenders party thereto (the "**RBL Credit Facility Lenders**"; such agreement, as amended from time to time, the "**RBL Credit Agreement**" and the revolving credit facility thereunder, the "**RBL Credit Facility**"), and the other parties thereto.  The RBL Credit Agreement provides for a $2 billion maximum reserve-based revolving credit facility with a current borrowing base of $457.2 million.  The RBL Credit Agreement is scheduled to mature in March 2018.

27.    The borrowing base under the RBL Credit Agreement is redetermined by the RBL Credit Facility Agent every April and October, with the RBL Credit Facility Lenders and the Debtors each having the right to one interim unscheduled redetermination between each semiannual redetermination.  The value of the borrowing base is derived from an engineering report with respect to the Debtors' estimated oil, natural gas, and natural gas liquid reserves.  The engineering report takes into account, among other things, the prevailing oil, natural gas, and natural gas liquid prices at such time.  The value of the borrowing base is also adjusted based on other factors, including the value of the Hedges.

28.    The Debtors' obligations under the RBL Credit Agreement are secured pursuant to that certain *Pledge and Security Agreement*, dated as of December 14, 2011, by and

among the Debtors, as grantors, and the RBL Credit Facility Agent, as administrative agent (as amended from time to time, the "**Security Agreement**"), and numerous mortgages and deeds of trust with respect to the Debtors' oil and gas leases.  Pursuant to the Security Agreement, each of the Debtors granted a first-priority lien on substantially all of its property and the proceeds of such property (the "**Collateral**") in favor of the RBL Credit Facility Agent and the RBL Credit Facility Lenders.

29.     On October 28, 2016, the Debtors entered into the Eleventh Amendment to the RBL Credit Agreement (the "**11th RBL Amendment**") which, among other things, (i) decreased the borrowing base from $925 million to $740 million, effective as of October 28, 2016, and scheduled a further decrease of the borrowing base to $720 million, effective as of December 1, 2016; and (ii) amended the RBL Credit Agreement to add a new event of default limiting the Debtors' ability to call, make, or offer to make any redemption of, or make any other payments in respect of, the Unsecured Notes if, on a pro forma basis, the Debtors' aggregate liquidity (unrestricted cash and cash equivalents plus amounts available to be drawn under the RBL Credit Agreement), were less than $30 million.  As of October 28, 2016, the aggregate principal amount outstanding under the RBL Credit Facility was $714 million.

30.     On November 1, 2016, the Debtors entered into a Limited Waiver and Twelfth Amendment to the RBL Credit Agreement (the "**Limited Waiver**").  Pursuant to the Limited Waiver, the RBL Credit Facility Lenders agreed to waive certain defaults and events of default that had occurred or would have occurred under the RBL Credit Agreement as a result of the Debtors' election to utilize the 30-day grace period applicable to an interest payment on their 7.625% Senior Unsecured Notes (as defined below) due on November 1, 2016.  From the date thereof until November 30, 2016 (the "**Waiver Period**"), the Debtors agreed to pay 100% of the

net cash proceeds of any asset sale, transfer, or other disposition (including with respect to notes receivable and accounts receivable), and from the liquidation of any Hedge with an RBL Lender or its affiliate, in each case, to the RBL Credit Facility Agent for the ratable account of each RBL Lender to reduce amounts outstanding under the RBL Credit Facility.  Amounts so applied would also reduce the RBL Credit Facility Lenders' aggregate commitments dollar for dollar. The Debtors also agreed to additional restrictive covenants during the Waiver Period.  Finally, the Debtors agreed to increase, from 90% to 95% (or such lesser amount agreed to by the RBL Credit Facility Agent in its sole discretion but not less than 92%), the percentage of the total value of the Debtors' oil and gas properties subject to a mortgage or similar instrument in favor of the RBL Credit Facility Agent for the benefit of the RBL Credit Facility Lenders.

31.     On November 30, 2016, the Debtors and the RBL Credit Facility Agent and RBL Credit Facility Lenders entered into the First Amendment to Limited Waiver extending the Waiver Period to December 16, 2016.  On December 16, 2016, the Debtors and the RBL Credit Facility Agent and RBL Credit Facility Lenders entered into the Second Amendment to Limited Waiver further extending the Waiver Period to January 13, 2017.  On January 13, 2017, the Debtors, the RBL Credit Facility Agent, and the RBL Credit Facility Lenders entered into the Third Amendment to Limited Waiver further extending the Waiver Period to January 16, 2017.

32.     As of the date hereof, the aggregate principal amount outstanding under the RBL Credit Agreement is approximately $455 million of loan advances and $2.4 million of outstanding letters of credit, plus any applicable interest, fees, and other amounts.

33.     *7.625% Senior Unsecured Notes*.  The Debtors are parties to that certain *Indenture*, dated as of April 17, 2013, by and among MEMP, Memorial Production Financial Corporation ("**Finance Corp.**"), each of the other Debtors, and Wilmington Trust, National

Association, as successor indenture trustee ("**Wilmington Trust**"), for the issuance of 7.625% senior unsecured notes due 2021 (the "**7.625% Senior Unsecured Notes**" and such indenture, as amended or supplemented from time to time, the "**7.625% Senior Unsecured Notes Indenture**"). Pursuant to the 7.625% Senior Unsecured Notes Indenture, the Debtors issued the 7.625% Senior Unsecured Notes in three tranches: (i) $300 million in principal amount on April 17, 2013; (ii) $100 million in principal amount on May 23, 2013; and (iii) $300 million in principal amount on October 10, 2013.

34.     The 7.625% Senior Unsecured Notes bear interest at a rate of 7.625% per annum with interest payable semiannually in cash and in arrears on May 1 and November 1. The 7.625% Senior Unsecured Notes are unsecured obligations of the Debtors and are *pari passu* in right of payment with the Debtors' other unsecured indebtedness. The 7.625% Senior Unsecured Notes are jointly and severally guaranteed on an unsecured basis by all of the Debtors other than MEMP and Finance Corp., which issued the 7.625% Senior Unsecured Notes.

35.     During the nine months ended September 30, 2016, the Debtors repurchased an aggregate principal amount of approximately $53.7 million of the 7.625% Senior Unsecured Notes at a weighted average price of 49.09% of their face value. As of the date hereof, the aggregate principal amount outstanding under the 7.625% Senior Unsecured Notes Indenture was approximately $646.3 million, plus any applicable interest, fees, and other amounts.

36.     On November 1, 2016, a semiannual interest payment of approximately $24 million came due. The Debtors did not make this interest payment, instead (as discussed below) determining to utilize the 30-day grace period available under the 7.625% Senior Unsecured Notes Indenture to advance restructuring discussions with their stakeholders. On

December 1, 2016, the Debtors obtained a forbearance from a majority of holders of the 7.625% Senior Unsecured Notes through December 7, 2016. The forbearance was subsequently extended to December 16, 2016 and then to January 13, 2017.

37. ***6.875% Senior Unsecured Notes***. The Debtors are parties to that certain *Indenture*, dated as of July 17, 2014, by and among MEMP, Finance Corp., each of the other Debtors, and Wilmington Trust, as successor indenture trustee, for the issuance of 6.875% senior unsecured notes due 2022 (the "**6.875% Senior Unsecured Notes**" and such indenture, as amended or supplemented from time to time, the "**6.875% Senior Unsecured Notes Indenture**"; collectively with the 7.625% Senior Unsecured Notes and the 7.625% Senior Unsecured Notes Indenture, the "**Unsecured Notes**" and the "**Unsecured Notes Indentures**," respectively). Pursuant to the 6.875% Senior Unsecured Notes Indenture, the Debtors issued $500 million in aggregate principal amount of 6.875% Senior Unsecured Notes on July 17, 2014.

38. The 6.875% Senior Unsecured Notes bear interest at a rate of 6.875% per annum with interest payable semiannually in cash and in arrears on February 1 and August 1. The 6.875% Senior Unsecured Notes are unsecured obligations of the Debtors and are *pari passu* in right of payment with the Debtors' other unsecured indebtedness. The 6.875% Senior Unsecured Notes are jointly and severally guaranteed on an unsecured basis by all of the Debtors other than MEMP and Finance Corp., which issued the 6.875% Senior Unsecured Notes.

39. During the nine months ended September 30, 2016, the Debtors repurchased an aggregate principal amount of approximately $32 million of the 6.875% Senior Unsecured Notes at a weighted average price of 46.5% of their face value. As of the date hereof, the aggregate principal amount outstanding under the 6.875% Senior Unsecured Notes Indenture was approximately $465 million, plus any applicable interest, fees, and other amounts.

40.     On November 1, 2016, the Debtors determined not to make an interest payment on the 7.625% Senior Unsecured Notes.  On December 1, 2016, the Debtors obtained a forbearance from a majority of holders of the 6.875% Senior Unsecured Notes through December 7, 2016 in connection with the end of the grace period with respect to an interest payment on the 7.625% Senior Unsecured Notes due November 1, 2016.  The forbearance was subsequently extended to December 16, 2016, and then to January 13, 2017.

41.     *Equity Interests*.  Common units representing limited partner interests in MEMP are publicly traded on the NASDAQ Global Select Market under the ticker symbol "MEMP".  As of January 16, 2017, approximately 83,809,045 common units were issued and outstanding and, as of the close of trading on January 13, 2017, the units were trading at a price of approximately $0.23 USD.

## Key Events Leading to Chapter 11

### A.     Collapse in Commodity Prices

42.     As a result of decisions of members of the Organization of the Petroleum Exporting Countries not to curtail supply, growth of unconventional production in the United States, and weakening demand in emerging markets, the prices of crude oil and natural gas have declined dramatically since mid-year 2014.  In early 2016, crude oil and natural gas spot prices reached multi-year lows of approximately $26 per Bbl[6] and $1.50 per MMBtu,[7] respectively, in early 2016.  This represented a decline in oil prices of more than 75% from the peak of over $105 per Bbl in mid-year 2014.  In addition, the Debtors have hedged only a portion of their

---

[6] "Bbl" means one stock tank barrel, or 42 U.S. gallons liquid volume, and is used herein in reference to crude oil or other liquid hydrocarbons.

[7] "MMBtu" means one million British thermal units, which is the heat required to raise the temperature of a one-pound mass of water from 58.5 to 59.5 degrees Fahrenheit.

anticipated oil and gas production.  If commodity prices were to remain at current levels, the unhedged portion of its revenues and cash flows would remain severely depressed and the value of its RBL Credit Facility would likely continue to decline, significantly impacting its access to liquidity and ability to run the business.

43.     Despite the Debtors' operational cost-reduction measures described above and out-of-court restructuring efforts discussed below, the Debtors determined that, with their current capital structure, they are unable to withstand the ongoing and precipitous decline in commodity prices and the corresponding decline in the Debtors' revenues and cash flows.  Based on current market conditions, the Debtors believe that a reduction in their long-term debt and cash interest obligations is immediately necessary to improve their financial position and flexibility.

**B.      2016 Restructuring Efforts**

44.     In the months leading up to the Petition Date, the Debtors attempted to address their mounting financial pressures through certain transactions and used the proceeds of such transactions to reduce their long-term debt.  For example, the Debtors scaled back their production and development efforts and lowered costs to generate positive free cash flow from their base assets.  Ultimately, the Debtors reduced their operating costs by over 30% and lowered their capital expenditures by over two-thirds (2/3) from 2015 levels.

45.     The Debtors also decreased quarterly cash distributions to unitholders. Whereas the Debtors' August 2015 and November 2015 unitholder distributions were $0.55 per unit and $0.30 per unit, respectively, the Debtors' distributions in February 2016 were $0.10 per unit, and their distributions in May and August 2016 were each $0.03 per unit.

46.     In addition, the Debtors divested certain non-core assets.  In July 2016, the Debtors closed a transaction to divest certain assets located in Colorado and Wyoming for a total

price of approximately $16.9 million, including estimated post-closing adjustments.   In June 2016, the Debtors closed a transaction to divest assets located in the Permian Basin for a total purchase price of approximately $36.9 million.   The Debtors used the proceeds from the divestitures to reduce amounts outstanding under the RBL Credit Facility.

47.   Finally, the Debtors monetized a portion of their portfolio of Hedges. During the nine months ended September 30, 2016, the Debtors terminated certain "in-the-money" commodity Hedges scheduled to settle in 2016.   The Debtors received cash settlements of approximately $39.3 million from monetizing such Hedges.   The Debtors used the proceeds from the settlements to repurchase at a significant discount a portion of their outstanding Unsecured Notes.   As a result of all of the foregoing restructuring steps, the Debtors managed to reduce their total debt by $197 million through free cash flow generation, asset sales, Hedge monetization, and debt repurchases.   Specifically, these transactions enabled the Debtors to (i) pay down $113 million on the outstanding balance on the RBL Credit Facility and (ii) retire $84 million in Unsecured Notes.

48.   Despite the best efforts of the Debtors and their senior management to actively manage their capital structure to reduce their debt obligations and increase liquidity, however, the significant and sustained drop in oil prices and related decrease in the Debtors' revenues and cash flows from operations caused significant uncertainty regarding the viability of the Debtors' current leveraged capital structure.   Among other things, the Debtors have been severely cash constrained.   If the Debtors were unable to restructure now, they would almost certainly default under financial covenants in their RBL Credit Agreement in the first quarter of 2017, if not sooner.   Accordingly, the Debtors began to explore potential transactions that would

allow the Debtors to deleverage their capital structure and better position themselves for long-term success.

49.     Specifically, in the fourth quarter of 2015, the Debtors engaged Evercore Partners for a strategic alternative process geared towards deleveraging the company and increasing the Debtors' liquidity.  Strategic options considered during the process included (i) raising outside capital, (ii) divesting core assets, and (iii) engaging in debt-for-equity exchanges.  Ultimately, the Debtors determined that none of these options would have been impactful enough to resolve the Debtors' liquidity and balance sheet concerns.

50.     In September 2016, after exploring all other strategic alternatives mentioned above, the Debtors retained Weil, Gotshal & Manges LLP as counsel and Perella Weinberg Partners LP as investment banker to assist them in developing and implementing a comprehensive restructuring plan.  In October 2016, the Debtors retained AlixPartners, LLP as financial advisor to assist them in conducting a prepetition review of the RBL Credit Facility Lenders' collateral coverage and to assist them in preparing their operations for a potential chapter 11 restructuring.

C.     **Prepetition Negotiations with the RBL Credit Facility Agent and the Ad Hoc Group**

51.     Having retained restructuring advisors, the Debtors immediately commenced negotiations with the RBL Credit Facility Agent in an effort to extend the date on which the RBL Credit Facility Agent redetermined the borrowing base under the RBL Credit Agreement.  Such discussions resulted in the Debtors' entry into the 11th RBL Amendment and the Limited Waiver, delaying a reduction in the borrowing base from its then-current level of $925 million to $740 million to late October 2016 and delaying a further reduction in the borrowing base to $720 million to December 1, 2016.  Contemporaneously with such discussions, and in a break with the Debtors' strategy since inception to pay regular quarterly

cash distributions to unitholders, the Debtors determined to suspend or eliminate distributions to unitholders, saving approximately $2 million in cash per quarter that would otherwise have been distributed to unitholders in early November 2016.

52.     With the prospect of an immediate liquidity crisis held in abeyance through the end of November, the Debtors utilized the grace period with respect to an interest payment of approximately $24 million on the 7.625% Senior Unsecured Notes.  During this period, the Debtors also entered into confidentiality agreements with the advisors (Davis Polk & Wardwell LLP and Miller Buckfire & Co., LLC) to an ad hoc group of holders of approximately 50% in aggregate principal amount of Unsecured Notes (the "**Ad Hoc Group**").  Following several calls and meetings with the advisors to the Ad Hoc Group, the Debtors similarly entered into confidentiality agreements with certain members of the Ad Hoc Group, including affiliates of Fir Tree Partners, Brigade Capital Management, Citadel, and TAM Asset Management (collectively, the "**Restricted Members**").  On November 7, 2016, the Debtors and their advisors met with the Restricted Members and their advisors to discuss the Debtors' business operations and a potential framework for a restructuring transaction.  The meeting was productive and led to the Debtors' making a restructuring transaction proposal and the Restricted Members making a counterproposal.

53.     On November 30, 2016, the Debtors and the RBL Credit Facility Agent and RBL Credit Facility Lenders entered into the First Amendment to Limited Waiver extending the Waiver Period to December 16, 2016.

54.     On December 1, 2016, the Debtors obtained a forbearance from a majority of holders of the 7.625% Senior Unsecured Notes and 6.875% Senior Unsecured Notes through

December 7, 2016.  The forbearances were subsequently extended to December 16, 2016 and January 13, 2017.

55.     On December 16, 2016, the Debtors and the RBL Credit Facility Agent and RBL Credit Facility Lenders entered into the Second Amendment to Limited Waiver further extending the Waiver Period to January 13, 2017.  On January 13, 2017, the Debtors entered into the Third Amendment to Limited Waiver further extending the Waiver Period to January 16, 2017.

56.     Significantly, following numerous discussions in good faith and at arms' length, the Debtors entered into (i) that certain Plan Support Agreement, dated as of December 22, 2016 (the "**Unsecured Noteholder Plan Support Agreement**") with certain creditors holding approximately 50.2% of the outstanding principal amount of the Debtors' Unsecured Notes (the "**Requisite Noteholders**") and (ii) that certain Plan Support Agreement, dated as of January 13, 2017 (the "**RBL Plan Support Agreement**") with the RBL Credit Facility Agent and lenders holding 100% of the loans under the RBL Credit Facility.  Subsequently, the Ad Hoc Group increased in size to approximately 69% of the aggregate principal amount of holders of Unsecured Notes, all of which have agreed to the terms of the Unsecured Noteholder Plan Support Agreement.  Copies of the Unsecured Noteholder Plan Support Agreement and the RBL Plan Support Agreement, with individual holdings redacted from the signature pages, are attached as **Exhibit A** and **Exhibit B**, respectively, to the Plan.

57.     The Unsecured Noteholder Plan Support Agreement and the RBL Plan Support Agreement provide terms of a financial restructuring that is expected to eliminate more than $1.3 billion of debt from the Debtors' balance sheet (the "**Restructuring**").  The terms of the Restructuring are set forth in the restructuring term sheets attached as **Exhibit A** to the

Unsecured Noteholder Plan Support Agreement and **Exhibit A** to the RBL Plan Support Agreement (such term sheets, the "**Restructuring Term Sheets**").  Subject to entry of an order granting the relief requested in the *Motion of Debtors for Order (I) Approving the Adequacy of Disclosure Statement, (II) Approving the Solicitation and Notice Procedures with Respect to Confirmation of the Debtors' Proposed Joint Plan of Reorganization, (III) Approving the Form of Ballots and Notices in Connection Therewith, (IV) Scheduling Certain Dates with Respect Thereto, and (V) Granting Related Relief* filed contemporaneously herewith (the "**Scheduling and Solicitation Motion**"), the Debtors intend to commence solicitation of votes on the Plan as early as February 27, 2017.

### The Plan and These Prenegotiated Chapter 11 Cases

58.     As discussed above, the restructuring transaction embodied in the Plan will enable the Debtors to leave their business intact and substantially delevered, eliminating approximately $1.3 billion from the Debtors' balance sheet.  Pursuant to the Plan, the Debtors' proposed restructuring transaction includes the following principal components:

- <u>RBL Credit Facility Claims</u>.  On the Effective Date, each holder of an Allowed RBL Credit Facility Claim shall receive, in full and final satisfaction of such Claim, (i) its Pro Rata share of Cash in an amount equal to all accrued and unpaid interest (calculated in the manner described in the Cash Collateral Orders and subject to the rights of the RBL Credit Facility Agent and the other RBL Credit Facility Secured Parties to seek cash payment of the Rate Differential (as defined in the Cash Collateral Orders) and/or additional interest from and after the Petition Date on the Prepetition Indebtedness (as defined in the Cash Collateral Orders) at the post-default rate of two percent (2%) as provided in Section 3.02(c) of the RBL Credit Facility, all as more fully set forth in the Cash Collateral Orders), fees, and other amounts (excluding amounts owed for principal or undrawn letters of credit) owing under the RBL Credit Facility through the Effective Date as set forth in the RBL Credit Facility Loan Documents, to the extent not previously paid, (ii) its Pro Rata share of the Exit Credit Facility as a first lien, second-out term loan under the Exit Credit Agreement; <u>provided</u>, <u>that</u> each holder of an Allowed RBL Credit Facility Claim that elects to participate in the Exit Credit Facility as an Exit Credit Facility Revolver Lender shall receive its Pro Rata share of first lien, first-out revolving loans under the Exit Credit Agreement and letter of credit participations under the Exit Credit Agreement, and

(iii) Cash in an amount equal to claims for indemnities, expense reimbursements and any other amounts (excluding amounts owed for principal or undrawn letters of credit) due and owing under the RBL Credit Facility Loan Documents through the Effective Date as set forth in the Cash Collateral Orders, the RBL Plan Support Agreement, the Secured Swap Agreements, the agreements with Bank Products Providers (as defined in the RBL Credit Facility), or the other RBL Credit Facility Loan Documents, to the extent not previously paid.

- <u>Beta Trust Claims</u>.  On the Effective Date, in the Debtors' sole discretion, (i)(A) each holder of a Beta Trust Claim shall receive continuing interests in Beta Trust Pre-Existing Cash Deposit and (B)(i) the Debtors shall maintain or renew, as applicable, the Beta Replacement Sureties for the benefit of the Beta Trust Direct Beneficiary and (ii) the Debtors shall grant to the Beta Previous Owners a lien in the proceeds of the Beta Replacement Sureties, which lien shall be subordinated in all respects to the rights of the Beta Direct Beneficiary with respect to such proceeds; <u>provided</u>, that, to the extent that the Debtors obtain new sureties to secure performance of the Beta P&A Obligations (in addition to the Beta Replacement Sureties), the Beta Trust Pre-Existing Cash Deposit shall be reduced on a dollar-for-dollar basis for the purpose of granting the continuing interests under clause (b)(i)(A) and the Debtors shall grant to the Beta Previous Owners a lien in the proceeds of such additional replacement sureties, which lien shall also be subordinated in all respects to the rights of the Beta Direct Beneficiary with respect to such proceeds, or (ii) each holder of a Beta Trust Claim shall receive such other treatment as will render Class 3A or 3B to be Unimpaired.  For the avoidance of doubt, holders of Beta Trust Claims will not have any continuing interest or right with respect to the Beta Trust Memorial Cash Deposit or, if the Debtors obtain new sureties in addition to the Beta Replacement Sureties, that portion of the Beta Trust Pre-Existing Cash Deposit equal to the amount of such additional sureties.

- <u>Unsecured Note Claims</u>.  On the Effective Date, pursuant to the terms of the Restructuring Transactions, (i) each holder of an Allowed Unsecured Notes Claim (other than the Contributed Notes Claims) will be entitled to receive, in full and final satisfaction of such Allowed Unsecured Notes Claim, its Pro Rata share (based on all Allowed Unsecured Notes Claims, including the Contributed Notes Claims) of (A) New Common Shares representing in the aggregate 98% of the total outstanding shares of Memorial Parent NewCo on the Effective Date, subject to dilution by the Management Incentive Plan and the Memorial Limited Partner Warrants, and (B) if elected by the Requisite Noteholders no later than the Plan voting deadline, in their sole discretion the Unsecured Noteholder Cash Distribution Amount, and (ii) AcquisitionCo, as the holder of the Contributed Notes Claims, will be entitled to receive, in full and final satisfaction of such Claims and in consideration for the shares to be distributed to holders of Allowed Unsecured Notes Claims (other than the Contributed Notes Claims) pursuant to the preceding clause and shares and warrants to be distributed to the Memorial Limited Partners, (A) all of the assets of Memorial Parent (other than Cash distributable on the Effective Date pursuant to the Plan), subject to any liabilities of Memorial Parent not discharged, satisfied or otherwise provided for pursuant to the Plan and (B) if elected by the Requisite

Noteholders no later than the Plan voting deadline, in their sole discretion, its Pro Rata share (based on all Allowed Unsecured Notes Claims, including the Contributed Notes Claims) of the Unsecured Noteholder Cash Distribution Amount.

Accordingly, each holder of an Allowed Unsecured Notes Claim immediately prior to the Restructuring Transactions will, immediately after the Restructuring Transactions, own (directly or indirectly) a Pro Rata Share of New Common Shares representing in the aggregate 98% of the total outstanding shares of Memorial Parent NewCo on the Effective Date, subject to dilution by the Management Incentive Plan and the Memorial Limited Partner Warrants and receive (directly or indirectly) at the election of the Requisite Noteholders no later than the Plan voting deadline, in their sole discretion, its Pro Rata share of the Unsecured Noteholder Cash Distribution Amount.

Distributions to each holder of an Allowed Unsecured Notes Claim shall be subject to the rights and terms of the Unsecured Notes Indentures and the rights of the Unsecured Notes Trustee to assert its Unsecured Notes Trustee Charging Lien against distributions made to holders of Allowed Unsecured Notes Claims.

- General Unsecured Claims.  Except to the extent that a holder of an Allowed General Unsecured Claim against any of the Debtors has agreed to different treatment of such Claim, the legal, equitable, and contractual rights of the holders of General Unsecured Claims are unaltered by the Plan.  On and after the Effective Date, except to the extent that a holder of a General Unsecured Claim agrees to different treatment, the Debtors or Reorganized Debtors, as applicable, shall continue to pay or dispute each General Unsecured Claim in the ordinary course of business as if the Chapter 11 Cases had never been commenced.

- Memorial Parent Interests.  On the Effective Date, all Memorial Parent Interests shall be cancelled and, shall be of no further force and effect, whether surrendered for cancellation or otherwise.  Pursuant to the terms of the Restructuring Transactions, each Memorial Limited Partner will receive, on account of, and in full and final satisfaction of, its Memorial Parent Interests, and for the releases given by such Memorial Limited Partner to the Released Parties pursuant to Section 10.7 of the Plan, its Pro Rata share of:  (i) the Memorial Limited Partner New Common Shares; and (ii) the Memorial Limited Partner Warrants.  Notwithstanding anything in the Plan to the contrary, any restricted units of Memorial Parent issued pursuant to the Memorial Production Partners GP LLC Long-Term Incentive Plan shall vest immediately prior to the Effective Date.

59.    In addition to the foregoing, the Debtors' extensive and hard-fought negotiations with the RBL Credit Facility Agent resulted in an agreement with the RBL Credit Facility Agent and RBL Credit Facility Lenders to permit the Debtors' consensual use of cash collateral during the pendency of these chapter 11 cases (such agreement, the "**Interim Cash**

**Collateral Order**").  The arrangements proposed in the Interim Cash Collateral Order represent a flexible, interim solution to the Debtors' near-term liquidity needs, preserving the status quo while providing the Debtors with sufficient liquidity to fund their business and to pursue and consummate a successful restructuring.  The agreement embodied in the Interim Cash Collateral Order is described in more detail below.

60.  Significantly, the proposed restructuring transaction provides for a distribution of approximately $6 million to $12 million to holders of the Debtors' prepetition equity interests, even though the holders of Allowed Unsecured Notes Claims will recover only between 22% and 40% of the value of their claims.  The Plan accounts for this distribution to equity because the Debtors' management and the Ad Hoc Group worked hard to negotiate terms that were favorable to the existing unitholders and that granted them some recovery, even though the existing unitholders would not otherwise be entitled to any recovery.  The Debtors' management and the Ad Hoc Group negotiated these favorable terms in order to avoid any costly and time-consuming litigation on valuation issues and to ensure prompt confirmation of the Plan. In particular, a key objective of the Debtors was to negotiate terms that minimized any adverse tax consequences to their existing unitholders under the Plan.

61.  In addition to having the overwhelming support of the RBL Credit Facility Lenders and the Unsecured Noteholders, the proposed Plan provides for continued protection of the Beta Previous Owners' interests, payment in full to the Debtors' trade creditors, and distributions, in the form of common stock and warrants, to holders of the Debtors' prepetition equity interests.  Such treatment would not otherwise be available absent the overwhelming support of the RBL Credit Facility Lenders and the Unsecured Noteholders.  After extensive

efforts on the part of the Debtors and their stakeholders, the Debtors believe that the Plan (along with its related transactions) represents the best outcome available in these chapter 11 cases.

## The First Day Motions

62.     The First Day Motions seek relief to allow the Debtors to meet necessary obligations and fulfill their duties as debtors in possession.  I am familiar with the contents of each First Day Motion and believe that the relief sought in each First Day Motion is necessary to enable the Debtors to operate in chapter 11 with minimal disruption or loss of productivity and value, constitutes a critical element in achieving a successful reorganization of the Debtors, and best serves the Debtors' estates and creditors' interests.  The facts set forth in each First Day Motion are incorporated herein by reference.  Capitalized terms used but not otherwise defined in this section of the Declaration shall have the meanings ascribed to them in the relevant First Day Motions.  Below is an overview of each of the First Day Motions.

### A.       Joint Administration Motion

63.     Pursuant to the *Emergency Motion of Debtors Pursuant to Bankruptcy Rule 1015(b) and Local Rule 1015-1 for Order Directing Joint Administration of Chapter 11 Cases* filed concurrently herewith, the Debtors request entry of an order directing consolidation of these chapter 11 cases for procedural purposes only.  There are 15 Debtors, and I have been informed that there are thousands of creditors and other parties in interest in these cases.  I believe that joint administration of these cases would save the Debtors and their estates substantial time and expense because it would remove the need to prepare, replicate, file, and serve duplicative notices, applications, motions, and orders.  Further, I believe that joint administration would relieve the Court of entering duplicative orders and maintaining duplicative files and dockets.  The United States Trustee for Region 7 (the "**U.S. Trustee**") and other parties

29

in interest would similarly benefit from joint administration of these cases, sparing them the time and effort of reviewing duplicative pleadings and papers.

64.     I believe that joint administration would not adversely affect any creditors' rights because the Debtors' motion requests only the administrative consolidation of these cases for procedural purposes.  It does not seek substantive consolidation of the Debtors' estates. Accordingly, I believe that joint administration of these chapter 11 cases is in the best interests of the Debtors, their estates, and all other parties in interest and should be granted in all respects.

**B.      Schedule Extension Motion**

65.     Pursuant to the *Emergency Motion of Debtors Pursuant to 11 U.S.C. § 521 and Fed. R. Bankr. P. 1007(C) for Extension of Time to File (I) Schedules of Assets and Liabilities; (II) Schedules of Current Income and Expenditures; (III) Schedules of Executory Contracts and Unexpired Leases; and (IV) Statements of Financial Affairs* filed concurrently herewith (the "**Schedules Motion**"), the Debtors request an extension of the deadline by which the Debtors must file their (i) schedules of assets and liabilities, (ii) schedules of current income and expenditures, (iii) schedules of executory contracts and unexpired leases, and (iv) statements of financial affairs (collectively, the "**Schedules and Statements**") by 45 days, for a total of 59 days from the Petition Date, through and including March 16, 2017, without prejudice to the Debtors' ability to request additional extensions for cause shown.

66.     I believe that the Court's grant of an extension of time to file the Schedules and Statements is appropriate under the circumstances of these chapter 11 cases. First, to prepare their Statements and Schedules, the Debtors will have to compile information from books, records, and documents relating to a large number of claims, assets, and contracts. This information is voluminous and not centrally located in the Debtors' organization. Accordingly, collecting the necessary information would require an enormous expenditure of time and effort

on the part of the Debtors, their employees, and their professional advisors. Second, no party in interest will experience prejudice by the Court granting the Debtors' request for an extension.

67.     I therefore believe that the relief requested in the Schedules Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will preserve the assets of the Debtors' estates during the chapter 11 process without prejudice to any party in interest.  Accordingly, I believe that the Court should approve the Schedules Motion.

**C.     Motion to File Consolidated List of Creditors/Form of Notice**

68.     Pursuant to the *Emergency Motion of Debtors Pursuant to Fed. R. Bankr. P. 1007(a)(1),(d) and 2002(a) for (I) Authority to File a Consolidated List of Creditors; (II) Authority to File a Consolidated List of 30 Largest Unsecured Creditors; (III) Approval of the Form and Manner of Notifying Creditors of the Commencement of These Chapter 11 Cases and Other Information; and (IV) Related Relief* filed concurrently herewith (the "**Creditor List Motion**"), the Debtors seek entry of an order authorizing the Debtors to (a) file a consolidated creditor matrix and list of the 30 largest general unsecured creditors in lieu of submitting separate mailing matrices and creditor lists for each Debtor and (b) redact certain personal identification information for individual creditors, and approving the form and manner of notice of commencement of these chapter 11 cases and the scheduling of the meeting of creditors under section 341 of the Bankruptcy Code.

69.     I am advised that Bankruptcy Rule 1007(a)(1) requires a debtor to file "a list containing the name and address of each entity included or to be included on  Schedules D, E, F, G, and H . . ."  I understand that, although a list of creditors is usually filed on a debtor-by-debtor basis, in a complex chapter 11 bankruptcy case involving more than one debtor, the debtors may file a consolidated creditor matrix (a "**Consolidated Creditor Matrix**").  Because the preparation of separate lists of creditors for each Debtor would be unduly expensive, time

consuming, and administratively burdensome, the Debtors request authority to file a single consolidated creditor matrix for all Debtors.

70.     Further, I am advised that, pursuant to Bankruptcy Rule 1007(d), a debtor generally must file "a list containing the name, address and claim of the creditors that hold the 20 largest unsecured claims, excluding insiders . . . ."  Because a large number of creditors may be shared among the Debtors, the Debtors request authority to file a single consolidated list of the top 30 unsecured creditors for all Debtors collectively.  Such a list would help alleviate undue administrative burdens, costs, and the possibility of duplicative service.

71.     Finally, I am advised that section 107(c)(1)(A) of the Bankruptcy Code provides that the Court "for cause, may protect an individual, with respect to the following types of information to the extent the court finds that disclosure of such information would create undue risk of identity theft[: a]ny means of identification . . . contained in a paper filed, or to be filed, in a case under" the Bankruptcy Code.  Here, I believe that cause exists to authorize the Debtors to redact address information of individual creditors and interest holders from the Consolidated Creditor Matrix because such information could be used to perpetrate identity theft.

**D.     Cash Collateral Motion**

72.     Pursuant to the *Emergency Motion of Debtors Pursuant to 11 U.S.C. §§ 105, 361, 362, 363 and 507, Bankruptcy Rules 2002, 4001, 6003, 6004, and 9014 and Bankruptcy Local Rule 4001-1, Inter Alia, (I) Authorizing Debtors' Limited Use of Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Modifying the Automatic Stay, and (IV) Scheduling a Final Hearing* filed concurrently herewith (the "**Cash Collateral Motion**"), the Debtors request entry of an interim and final orders (each, a "**Cash Collateral Order**"):

a. authorizing the Debtors, pursuant to Bankruptcy Code sections 105, 361, 362, 363 and 507 to (i) use cash collateral, as such term is defined in section 363(a) of the Bankruptcy Code ("**Cash Collateral**"), and all other Collateral, solely in accordance with the terms of the Cash Collateral Orders, including the 13-week cash disbursements and receipts budget annexed thereto, and (ii) provide adequate protection to the Prepetition Agent (as defined in the Cash Collateral Orders), and the other Prepetition Secured Parties (as defined in the Cash Collateral Orders);

b. subject to entry of the final Cash Collateral Order, authorizing the Debtors to grant adequate protection liens on the proceeds and property recovered in respect of the Debtors' claims and causes of action (but not on the actual claims and causes of action) arising under Bankruptcy Code sections 544, 545, 547, 548, 549 and 550 or any other similar state or federal law;

c. modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the Cash Collateral Orders;

d. subject to entry of the final Cash Collateral Order, except to the extent of the Carve Out (as defined in the Cash Collateral Orders), waiving all rights to surcharge any Prepetition Collateral or Collateral (as defined in the Cash Collateral Orders) under sections 506(c) or 552(b) of the Bankruptcy Code or any other applicable principle of equity or law; and

e. waiving any applicable stay with respect to the effectiveness and enforceability of the Cash Collateral Orders (including a waiver pursuant to Bankruptcy Rule 6004(h)).

73.    The Debtors require immediate access to liquidity to ensure that they are able to continue operating during these chapter 11 cases and to preserve the value of their estates for the benefit of all parties in interest.  Substantially all of the Debtors' total cash on hand as of the Petition Date, approximately $31.5 million, is subject to the liens of the Prepetition Secured Parties and thus constitutes Cash Collateral.[8]  I have determined that this existing cash, together with cash generated from operations, will be sufficient to operate the Debtors' business and continue paying their debts as they come due.  However, without a prompt grant of authority to use their cash according to these terms, the Debtors will be unable to satisfy trade payables

---

[8] The Debtors also have access to approximately $8.6 million in cash held by non-debtor affiliates.

incurred in the ordinary course of business, preserve and maximize the value of their estates, or administer these chapter 11 cases, which would cause immediate and irreparable harm to the value of the Debtors' estates to the detriment of all stakeholders. Conversely, I believe that immediate access to Cash Collateral will permit the Debtors to operate as they did prepetition and will restore the confidence of their vendors, customers, employees, and other stakeholders at this critical stage of their restructuring. For these and other reasons, I have determined that the use of Cash Collateral in accordance with the terms of the interim Cash Collateral Order is essential to the Debtors' ability to minimize disruptions and avoid irreparable harm to their business.

74. The arrangements for the consensual use of Cash Collateral authorized under the interim Cash Collateral Order represent a flexible, interim solution to the Debtors' near-term liquidity needs. The consensual use of Cash Collateral preserves the status quo while providing the Debtors with sufficient liquidity to fund their business and to pursue and consummate a successful restructuring. I believe that the proposed Adequate Protection Package (as defined in the Cash Collateral Motion) is necessary and sufficient for the Debtors to continue to use Cash Collateral. Further, the Prepetition Agent has agreed to the Adequate Protection Package provided in the interim Cash Collateral Order. It is also my belief, and the Debtors' conclusion, in an exercise of their business judgment and following weeks of good-faith, arms' length negotiations, that the Prepetition Agent would only consent to the Debtors' use of Cash Collateral subject to the terms and protections included in the Cash Collateral Orders, including the Significant Provisions (as defined in the Cash Collateral Motion). The consensual use of

Cash Collateral in accordance with such terms is unquestionably the Debtors' best postpetition financing option available.[9]

75.     It is my belief that an orderly transition into chapter 11 is critical to the viability of the Debtors' business operations.  Any delay in granting the relief requested in the Cash Collateral Motion could hinder the Debtors' business operations, cause immediate, irreparable harm to the Debtors' estates, and thereby threaten the Debtors' ability to reorganize successfully.

**E.     Hedging Motion**

76.     Pursuant to the *Emergency Motion of Debtors Pursuant to 11 U.S.C. §§ 105, 362, 363 and 364, Bankruptcy Rules 2002, 4001, 6003, 6004, and 9014, and Bankruptcy Local Rule 4001-1, for Interim and Final Orders (I) Authorizing the Debtors to Enter into Amended and Restated Swap Agreements and Honor Obligations Thereunder, (II) Granting Liens and Superpriority Claims, and (III) Granting Related Relief* filed concurrently herewith (the "**Hedging Motion**"), the Debtors request entry of interim and final orders authorizing:

   f.   the Debtors to:

        i.   enter into amended and restated swap agreements (the "**Amended and Restated Swap Agreements**") with certain of the Prepetition Secured Parties (as defined in the Cash Collateral Orders) (collectively, the "**Continuing Hedging Lenders**");

        ii.  maintain outstanding prepetition Hedging Positions (as defined in the Hedging Motion) and enter into postpetition Hedging Positions with the Continuing Hedging Lenders during the pendency of the chapter 11 cases pursuant to the Amended and Restated Swap Agreements;

        iii. perform under and honor, pay, or otherwise satisfy all obligations and indebtedness of the Debtors with respect to prepetition Hedging Positions

---

[9] Notably, the proposed interim Cash Collateral Order does not permit or otherwise provide for the Debtors' use of any cash released from the Beta Trust during these chapter 11 cases.  Further, the Debtors do not, by the Cash Collateral Motion, seek authority to use such cash.

and postpetition Hedging Positions under the Amended and Restated Swap Agreements (such obligations and indebtedness with respect to the prepetition and postpetition Hedging Positions under the Amended and Restated Swap Agreements, the "**Swap Obligations**") as they come due;

    iv.  grant Adequate Protection Liens (as defined in the Cash Collateral Orders) to the Prepetition Agent (as defined in the Cash Collateral Orders) for the benefit of the Continuing Hedging Lenders, to secure all Swap Obligations; and

    v.  grant allowed Adequate Protection Claims (as defined in the Cash Collateral Orders) to the Continuing Hedging Lenders on account of the Swap Obligations;

g.  the Prepetition Agent to exercise all rights and remedies with respect to the Collateral (as defined in the Cash Collateral Orders) for the benefit of the Continuing Hedging Lenders in accordance with the Cash Collateral Orders following the occurrence and during the continuation of an Event of Default or a Termination Event under, and as defined in, the Amended and Restated Swap Agreements; and

h.  the Continuing Hedging Lenders to offset, net, and apply any payment amounts that such Continuing Hedging Lenders would otherwise be obligated to pay to any Debtor under the Amended and Restated Swap Agreements in accordance with the terms of such Amended and Restated Swap Agreement to reduce permanently the Prepetition Indebtedness (as defined in the Cash Collateral Orders).

77.    As is customary in the Debtors' industry, in the ordinary course of business, Memorial Production Operating LLC ("**MPO**") enters into Hedging Positions pursuant to Swap Agreements (as defined in the Hedging Motion) to hedge the Debtors' exposure to commodity price risks in accordance with an established Commodity Risk Management Policy (as defined below). I believe that the Debtors' Swap Agreements are vital to the success of the Debtors' business and directly affect the ability of the Debtors to generate stable cash flows to fund their operating and corporate expenses. Through the Swap Agreements, the Debtors are able to hedge against adverse oil and gas price fluctuations, provide long-term cash flow predictability to manage their business, and thereby protect the economic value of their operations by preventing substantial declines in cash flows. The Debtors have historically done

so as an integral part of their liquidity management.  Further, companies in the Debtors' industry routinely enter into hedging transactions like the Hedging Positions under the Swap Agreements.

78.     Historically, the Debtors have hedged their crude oil, natural gas, and natural gas liquids production with Hedging Positions that include commodity swaps, basis swaps, and collars (as further described in the Hedging Motion).[10]  As of the Petition Date, the Debtors have 21 Hedging Positions summarized as follows:  three natural gas swaps, two natural gas collars, nine oil swaps, two oil collars, and five natural gas liquids swaps.  The Debtors estimate the aggregate mark-to-market value of the foregoing Hedging Positions, calculated using standard industry valuation processes and as of January 12, 2017, to be approximately $75 million.

79.     The Debtors' entry into Hedging Positions is governed by their internal risk management policy, (the "**Commodity Risk Management Policy**").  The Commodity Risk Management Policy is a set of guidelines that the Debtors follow to ensure that Hedging Positions are closely monitored and are in the best interests of the Debtors' economic stakeholders.  The Debtors' Commodity Risk Management Policy is conservative in nature, and permits the Debtors to enter into Hedging Positions with the limited purpose of stabilizing exposure to commodity price fluctuations and managing risks associated with oil and gas production and delivery.  Use of guidelines like the Commodity Risk Management Policy is common among companies in the oil and gas industry.  The three main principles of the Commodity Risk Management Policy are described below.

---

[10] The Debtors have also historically entered into interest-rate swaps.  As of the Petition Date, the Debtors' Hedging Positions did not include any interest-rate swaps, and the Debtors do not intend to enter into any interest-rate swaps during these chapter 11 cases.

80.     Approval and Monitoring.    Entry into a Hedging Position requires approval from the Debtors' Chief Executive Officer, President, or myself, the Chief Financial Officer, after consultation with members of the management team.  The Debtors' Treasurer and I, as Chief Financial Officer, are responsible for monitoring the derivative contracts to ensure that the terms and type of contract are consistent with the forecasted production volumes being hedged.

81.     Creditworthy Counterparties.    Pursuant to the Commodity Risk Management Policy, the Debtors enter into derivative contracts only with creditworthy counterparties, deemed by management to be competent and competitive market makers.  The Debtors' Treasurer and I, as Chief Financial Officer, are responsible for monitoring the Debtors' financial exposure to counterparties and for notifying management if any appear to be experiencing financial difficulty or otherwise creating a material risk to the Debtors.  All of the counterparties to the Debtors' Hedging Positions are lenders or affiliates of lenders under the Prepetition Credit Facility.

82.     No Speculative Hedging.    The Debtors do not engage in speculative hedging.  The Debtors' Hedging Positions are directly tied to the Debtors' forecasted future oil and gas production levels.  The Debtors have historically hedged commodity price exposure by entering into Hedging Positions such that approximately 65% to 85% of their estimated production from total proved reserves over a three-to-six-year period are fully hedged at any one time.  The economic terms of the Hedging Positions depend upon, among other things, current and expected oil and natural gas prices at the time the Debtors enter into such transactions.  I believe that the continuation of the Debtors' hedging subject to the Commodity Risk Management Policy is critical to maximizing the value of the Debtors' estates.

83.     Prepetition, the Swap Agreements and Hedging Positions provided the Debtors with cash flow protections and significant liquidity.  However, I have been advised of the protections the Bankruptcy Code provides to non-debtor counterparties to derivatives contracts.  In light of these protections, I believe the Debtors faced the potential risk of losing their Swap Agreement assets and related liquidity following the commencement of these chapter 11 cases.  As a result, the Debtors engaged in extensive negotiations with the Continuing Hedging Lenders regarding the Debtors' ability to continue hedging during these chapter 11 cases.  These negotiations resulted in an agreed form of order (the "**Interim Hedging Order**") and form of Amended and Restated Swap Agreement attached to the Interim Hedging Order, whereby the Continuing Hedging Lenders have agreed to forbear from exercising certain rights or remedies under the Swap Agreements.  In exchange for this forbearance, and as an inducement for the Continuing Hedging Lenders to maintain the Swap Agreements and enter into postpetition Hedging Positions with the Debtors, the Debtors agreed to amend and restate their existing Swap Agreements in the form of the Amended and Restated Swap Agreements and to seek authority (i) to secure and otherwise ensure payment of all Swap Obligations with (a) Adequate Protection Claims against each of the Debtors, jointly and severally, and (b) Adequate Protection Liens on the Collateral that rank *pari passu* with the Adequate Protection Liens granted pursuant to the Cash Collateral Orders, and (ii) for other protections in the Interim Hedging Order that are customary in orders regarding the continuation of prepetition derivatives contracts and entry into new derivatives contracts postpetition.

84.     Importantly, the RBL Credit Facility Agent, on behalf of the RBL Credit Facility Lenders, the prepetition liens of which will be primed by the Adequate Protection Liens, has consented to this relief in order to permit the Debtors to continue hedging with the

Continuing Hedging Lenders.  Were the Debtors to seek postpetition hedging arrangements with third parties, any such counterparties would insist on being similarly secured (consistent with typical practice in hedging arrangements).  I do not believe that they would be able to provide such a priming lien consensually.

85.    The terms of the RBL Plan Support Agreement and the Amended and Restated Swap Agreements and the protections afforded under the Interim Hedging Order reflect the result of the Debtors' arms' length, good faith negotiations with the Continuing Hedging Lenders.  Absent the Continuing Hedging Lenders' agreement to continue hedging, the Debtors would be exposed to significantly greater commodity price risk during these chapter 11 cases. As a result, I believe that the hedging arrangement set forth in the Interim Hedging Order is in the best interest of the Debtors' estates and economic stakeholders.

**F.    Cash Management Motion**

86.    Pursuant to the *Emergency Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a), 345(b), 363(b)(1), 363(c)(1), and 364(a) and Fed. R. Bankr. P. 6003 and 6004 for Interim and Final Orders (I) Authorizing Debtors to (A) Continue Existing Cash Management System, (B) Maintain Business Forms and Existing Bank Accounts, (C) Continue Intercompany Arrangements, and (D) Continue Using Corporate Payment Cards; (II) Extending Time to Comply with, or Seek Waiver of, the Requirements of 11 U.S.C. § 345(b); (III) Waiving the Requirements of Rule 7B of the Procedures for Complex Chapter 11 Bankruptcy Cases; and (IV) Granting Related Relief* filed contemporaneously herewith (the "**Cash Management Motion**"), the Debtors request (i) interim and final authority to (a) continue to operate their existing cash management system (the "**Cash Management System**"), (b) maintain their business forms and existing bank accounts (the "**Bank Accounts**"); (c) continue their intercompany arrangements; and (d) continue using their corporate payment cards; (ii) an

extension of time to comply with, or seek waiver of, the requirements of section 345(b) of the Bankruptcy Code; and (iii) related relief.

87.     As described more fully in the Cash Management Motion, the Debtors rely on the Cash Management System to fund their operations and the operations of certain of their non-Debtor affiliates.  The Cash Management System is tailored to meet the Debtors' operating needs as a manager of oil and natural gas producing properties.  It allows the Debtors to efficiently collect and transfer the cash generated by their business and pay their financial obligations.  It also enables the Debtors to facilitate their cash forecasting and reporting, monitor their collection and disbursement of funds, and maintain control over the administration of the Bank Accounts.

88.     The Cash Management System includes eleven Bank Accounts that are held by four entities: (i) MPO (such accounts, the "**MPO Accounts**"); (ii) Beta Operating Company, LLC ("**Beta**"; such accounts, the "**Beta Accounts**"); (iii) San Pedro Bay Pipeline Company; and (iv) MEMP Services LLC.  Of those eleven Bank Accounts, the MPO Operating Account (the "**MPO Operating Account**"), held by MPO, serves as the Debtors' main operating account; one account is a restricted money market account, held by MPO, which serves to cash collateralize the Debtors' obligations with respect to the Debtors' use of Corporate Credit Cards; and the remaining nine Bank Accounts are zero-balance accounts (each, a "**Zero-Balance Account**") that are used principally to make disbursements to third parties and, in one case, to collect receipts from the Debtors' Offshore California operations.[11]  As described more fully in the Cash Management Motion, the Debtors use the MPO Operating Account to collect most of the Debtors' cash receipts and disburse funds to the Zero-Balance Accounts as necessary to

_____

[11] The Bank Accounts do not include two deposit accounts maintained by the Debtors' non-Debtor affiliates MEMP S-1, Inc. and MEMP S-2, Inc., respectively.

satisfy the Debtors' payment obligations.  The MPO Operating Account also serves as the central concentration account to which all funds from the Zero-Balance Accounts are swept at the end of each day.  All of the Bank Accounts are maintained with Wells Fargo, an authorized bank depository under the Operating Guidelines and Reporting Requirements for Debtors in Possession and Trustees published by the U.S. Trustee.

89.     In addition, the Debtors maintain Corporate Payment Cards (as defined in the Cash Management Motion) which are used by the Debtors and, in some instances, by the Debtors' Employees, to pay for business-related expenses such as travel, lodging, meals, fuel, vehicle maintenance, and other reasonable and documented expenses incurred in the ordinary course of operating the Debtors' business.  As more fully described in the Cash Management Motion, the Debtors request authority to continue using the Corporate Payment Cards and to pay all obligations, including prepetition obligations, related thereto.

90.     I am advised by the Debtors' attorneys that the Bank Accounts are required to comply with section 345(b) of the Bankruptcy Code unless the Court orders otherwise for "cause."  I believe that "cause" exists under section 345(b) to waive the requirements therein because, among other reasons, (i) all of the active and material Bank Accounts are maintained with Wells Fargo, a highly rated, federally chartered bank subject to supervision by federal banking regulators, (ii) the cost associated with satisfying the requirements of section 345 is unduly burdensome, and (iii) the process of satisfying such requirements would lead to needless inefficiencies in the management of the Debtors' business.  Moreover, I understand that a bond secured by the undertaking of a corporate surety would be prohibitively expensive, if such a bond were available at all.  Accordingly, by way of the Cash Management Motion, the Debtors seek an extension of 45 days (or such additional

term) to comply with section 345(b), make other acceptable arrangements, or seek a waiver of section 345(b), subject to the Court's approval.

91.     I am also advised by the Debtors' counsel that the *Procedures for Complex Chapter 11 Bankruptcy Cases for the United States Bankruptcy Court for the Southern District of Texas* (the "**Complex Case Procedures**") require, among other things, that debtors who own or operate oil, gas, or mineral leases maintain a segregated account for funds received after the petition date that are attributable to overriding royalties, working interest owners, and third parties (the "**Royalty Payments**").   As more fully described in the Cash Management Motion, requiring the Debtors to implement new procedures for the segregation of all Royalty Payments at this early and critical stage would be expensive, impose needless administrative burdens, and cause undue disruption to the Debtors and their estates.  Any such disruption would adversely, and perhaps irreparably, impact the Debtors' ability to reorganize and maximize value of their estates for the benefit of the Debtors' creditors and other parties in interest.  Accordingly, the Debtors request a waiver of Rule 7(b) of the Complex Case Procedures.

92.     The Debtors further request that the Court authorize Wells Fargo and all banks and other financial institutions to receive, process, honor, and pay, at the Debtors' direction and to the extent of funds on deposit, any and all checks drawn or electronic fund transfers requested or to be requested by the Debtors relating to the relief sought in the First Day Motions.  Without the ability to transfer funds through banks and financial institutions, the Debtors will not be able to operate or reorganize.

93.     I believe that any disruption to the Debtors' Cash Management System would have a severe and adverse impact upon the Debtors' reorganization efforts.  Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Cash Management

Motion is in the best interests of the Debtors' estates and all parties in interest and should be granted.

**G.      Employee Wages and Benefits Motion**

94.      Pursuant to the *Emergency Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a), 363(b), and 507 and Fed. R. Bankr. P. 6003 and 6004 for Interim and Final Orders (I) Authorizing Debtors to (A) Pay Prepetition Wages, Salaries, Employee Benefits, and Other Compensation and (B) Maintain Employee Benefit Programs and Pay Related Obligations; and (II) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers* filed concurrently herewith (the "**Wages Motion**"), the Debtors request interim and final orders (i) authorizing the Debtors to (i) pay, in their sole discretion, all prepetition amounts required under or related to Base Compensation Obligations, Incentive Program Obligations, Reimbursement Obligations, Employee Benefit Plan Obligations, Severance Obligations, and Contractor Obligations (each as defined in the Wages Motion and together with all fees, costs, and expenses incident thereto, including amounts owed to third-party administrators, the "**Employee Obligations**"); and (ii) maintain, and continue honoring and paying, in their sole discretion, all amounts with respect to the Debtors' business practices, programs, and policies for their Employees (as defined below; such programs, the "**Benefits Programs**") as such were in effect as of the Petition Date and as such may be modified in the ordinary course of business.

95.      As described more fully in the Wage and Benefit Motion, compensation of the Debtors' approximately 291 employees (the "**Employees**") and the Debtors' Contractors (as defined below) is critical to the Debtors' continued operations and reorganization.   All Employees are employed by MEMP Services LLC.  The Employees are located in Texas (152), California (98), and Wyoming (41).  The Employees perform a wide variety of critical services for the Debtors, including field operations, engineering, pipeline operations, procurement,

geological and geophysical assessment, mechanical and electrical repairs and maintenance, land and resource management, accounting, marketing, safety training, engineering, logistics, tax and governmental compliance, and company management and administration.  In addition to their Employees, the Debtors rely on services from a supplemental and temporary workforce composed of certain independent and agency-supplied contractors (the "**Contractors**").

96.     The Debtors' workforce is the most important part of their business.  I believe that any delay in paying or failure to pay prepetition Employee Obligations could irreparably impair the morale of the Debtors' workforce at the time when their dedication, confidence, retention, and cooperation are most crucial.  Failure to pay the Employee Obligations could also inflict a significant financial hardship on the Employees' and Contractors' families. The Debtors cannot risk such a substantial disruption to their business operations, and it is inequitable to put Employees or Contractors at risk of such hardship.  Without this relief, otherwise-loyal Employees or Contractors may seek other work opportunities, thereby putting at risk the Debtors' continued operation as a reorganized enterprise.  Payment of these obligations in the ordinary course of business would enable the Debtors to focus on completing a successful reorganization, which would benefit all parties in interest.

97.     I believe that payment of prepetition Reimbursement Obligations (as defined in the Wages Motion) is necessary because any other treatment of Employees or Contractors would be highly inequitable and risk alienation of the Debtors' workforce. Employees or Contractors who have incurred Reimbursable Expenses should not be forced personally to bear the cost, especially because those Employees or Contractors incurred the Reimbursable Expenses for the Debtors' benefit, in the course of their employment by the Debtors, and with the understanding that they would be reimbursed for doing so.

98.     In the ordinary course of business, the Debtors are required by law to withhold from Employees' salaries and wages, or pay additional amounts, related to federal, state, and local income taxes, social security taxes, Medicare taxes, and taxes imposed by the law (collectively, the "**Payroll Tax Obligations**") and to remit any such withheld amounts to the appropriate taxing authorities.  I believe that payment of Payroll Tax Obligations would not prejudice other creditors because I have been informed by counsel that such obligations generally give rise to priority claims under section 507(a)(8) of the Bankruptcy Code.

99.     The Debtors also make the Benefits Programs available to eligible Employees.  The Benefits Programs fall within the following categories: (i) paid time off, including vacation and other leave; (ii) medical, prescription drug, dental, and vision benefits; (iii) life insurance, accidental death and dismemberment insurance, short-term disability, and long-term disability benefits; and (iv) 401(k) plan benefits.  Although most eligible Employees participate in the Benefits Programs, certain Employees elect to opt-out of particular programs.  I believe that maintaining the Benefits Programs are critical for maintaining Employee morale during these chapter 11 cases, and to prevent Employees from seeking employment from other companies which offer similar benefits.

100.     As described in the Wages Motion, the Debtors pay fees to third-party administrators and servicers of Employee Wages and the Benefit Programs.  The third-party administrators provide, among other things, payroll processing, tax computation, payment preparation, payroll transfer administration, and various other administrative services in connection with Employee Wages and also the Benefits Programs.  I believe that continued payment to the third-party administrators is necessary, and without the continued service of these

administrators, the Debtors will be unable to continue honoring their obligations to Employees in an efficient and cost-effective manner.

101.    I believe that only six Employees are owed prepetition amounts exceeding the $12,850 cap imposed by section 507(a)(4) of the Bankruptcy Code and, accordingly, the Debtors are not seeking relief to pay prepetition Employee Obligations to any individual Employee or Contractor in excess of such cap on an interim basis, but seek such relief on a final basis.  Furthermore, although there is a legacy retention program for certain non-insiders, I am advised that the Debtors are not seeking authority to pay any amounts that are subject to the restrictions of section 503(c) of the Bankruptcy Code.[12]  I believe that the total amount sought to be paid by the Wages Motion is modest compared to the magnitude of the Debtors' overall business.  Furthermore, the Debtors have sufficient funds to pay the Employee Obligations in the ordinary course using cash maintained by the Debtors and cash generated through operations.  Accordingly, I believe the relief requested in the Wages Motion is necessary to avoid immediate and irreparable harm and is in the best interests of the Debtors, their estates, and all parties in interest.

## H.      Insurance and Surety Bond Motion

102.    Pursuant to the *Emergency Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a), 362(a), 363(b), and 503(b) and Fed. R. Bankr. P. 4001, 6003, and 6004 for Interim and Final Orders (I) Authorizing the Debtors to (A) Continue Insurance Programs and Surety Bond Program and (B) Pay All* Obligations with Respect Thereto; and (II) *Granting Relief from the Automatic Stay with Respect to Workers' Compensation Claims* filed contemporaneously

---

[12] As discussed in paragraph 14 of the Wages Motion, the Debtors have a legacy retention program for approximately 11 non-insider Employees from when they acquired Debtor Beta Operating Company, LLC.  The program does not include "insiders" (as such term is defined in section 101(31) of the Bankruptcy Code), because none of the Employees have corporate decision-making authority.

herewith (the "**Insurance and Surety Bond Motion**"), the Debtors request interim and final orders (i) authorizing the Debtors (a) to continue their Insurance Programs (as described below) and their Surety Bond Program (as described below) and (b) to pay all obligations with respect thereto; and (ii) granting relief from the automatic stay with respect to any workers' compensation claims.

103.    In the ordinary course of business the Debtors maintain workers' compensation insurance and participate in various liability, property, and other insurance programs (collectively, the "**Insurance Programs**," and all premiums and other obligations related thereto, including any broker or advisor fees, taxes, or other fees, collectively, the "**Insurance Obligations**") through several insurance carriers (each, an "**Insurance Carrier**"). Each of these is described below and more fully in the Insurance and Surety Bond Motion.

104.    The Debtors maintain workers' compensation insurance coverage (the "**Workers' Compensation Programs**") for claims arising from or related to employment by the Debtors (the "**Workers' Compensation Claims**").  In many instances, applicable law in the states in which the Debtors operate requires that the Debtors maintain Workers' Compensation Programs.  The Workers' Compensation Programs cover, among other things, workers' compensation and employer liability for Employees' accidents, death, and disease.  To the best of their knowledge, the Debtors do not owe any prepetition amounts on account of the Workers' Compensation Programs; however, I understand that, under applicable workers' compensation laws, the Debtors or their applicable Insurance Carriers may be obligated to pay all or part of a workers' compensation claim directly to an employee, his or her medical providers, or his or her heirs or legal representatives.  Although unlikely, it is possible that an event giving rise to an obligation of the Debtors to make such a payment—for example, injury or disease of an

employee—could have occurred prepetition without the Debtors' knowledge.  Accordingly, pursuant to the Insurance and Surety Bond Motion, the Debtors seek relief from the automatic stay with respect to payment of Workers' Compensation Claims.

105.    The Debtors also maintain various liability and property insurance policies that provide the Debtors with insurance coverage for general commercial claims, property damage, crime, pollution-related claims, well blowouts, collision and other liabilities arising from company-owned vehicles, claims relating to the administration of employee benefit plans and the Debtors' employment practices, directors' and officers' liability, and other property-related and general liabilities, as well as excess policies related to the same (collectively, the "**Liability and Property Insurance Programs**").  The Debtors maintain the Liability and Property Insurance Programs to help manage the various risks associated with their business.  To the best of their knowledge, the Debtors do not owe any prepetition amounts, including deductibles, on account of the Liability and Property Insurance Programs.

106.    The Debtors retain Wortham Insurance, R K Harrison, and JH Blades to serve as their insurance brokers and consultants for the Insurance Programs (each in such capacity, an "**Insurance Broker**").  The Debtors pay the Insurance Brokers commissions as policies are renewed each year based on the aggregate amount of the Debtors' insurance premiums.  As of the Petition Date, the Debtors do not owe any prepetition commissions to the Insurance Brokers.

107.    The Debtors are required to provide surety bonds to certain third parties, including governmental units and other public agencies, to secure the Debtors' payment or enforcement of certain obligations (collectively, the "**Surety Bond Program**").  These obligations relate to, among other things, (i) conservation; (ii) oil and natural gas drilling and

exploration operations; (iii) rights-of-way; (iv) land use; (v) taxes; and (vi) utilities. In accordance with the Surety Bond Program, the Debtors generally agree to indemnify the sureties from any loss, cost, or expense that the sureties may incur on account of the issuance of any bonds on behalf of the Debtors (the "**Indemnity Obligations**"). Sureties are also generally permitted to request collateral security from the Debtors from time to time in connection with the Indemnity Obligations. The premiums for the surety bonds (the "**Surety Premiums**" and, together with the Indemnity Obligations, the "**Surety Bond Obligations**") are generally determined on an annual basis. The Debtors remit payment when the bonds are issued and annually upon each renewal. As of the Petition Date, the Debtors have approximately $78 million in outstanding surety bonds. Certain surety bonds in the Surety Bond Program are scheduled to expire and renew within the next six months. Accordingly, the Debtors anticipate the Surety Bond Obligations over the next six months will amount to approximately $915,000.

108.    In light of the risks applicable to the Debtors' operations and the critical need for the Debtors to protect their assets from such risks, I believe it essential that the Debtors maintain the Insurance Programs and the Surety Bond Program, and that they obtain authority to pay all obligations related thereto, including outstanding payments to the Insurance Brokers. Without authority to maintain and pay amounts owed in connection with the Insurance Programs and the Surety Bond Program, the ability of the Debtors to conduct business operations in many locations would come to a halt to the detriment and prejudice of all parties in interest. Additionally, based on the Debtors' current circumstances, I believe it is unlikely that the Debtors would be able to renew or replace their existing Insurance Programs or the Surety Bond Program on more favorable terms. Furthermore, I understand that the Debtors must maintain most or all of the Insurance Programs and the Surety Program to comply with the U.S. Trustee's

operating guidelines, applicable state and federal laws, and other prepetition contracts.  Based on the foregoing, I believe that the relief requested in the Insurance and Surety Bond Motion is in the best interests of the Debtors, their estates, and all other parties in interest and should be granted in all respects.

I.      **JIB/E&P Payables Motion**

109.    Pursuant to the *Emergency* Motion *of Debtors Pursuant to 11 U.S.C. §§ 105(a) and 363(b) for Interim and Final Orders (I) Authorizing Debtors to Pay Joint Interest Billings, Interest Owner Payments, and E&P Operating Expenses in the Ordinary Course, and (II) Authorizing Financial Institutions to Honor and Process Checks and Transfers Related to Such Obligations* (the "**JIB/E&P Payables Motion**") filed contemporaneously herewith, the Debtors request authority to pay in the ordinary course of business their undisputed, liquidated amounts owing to (i) operators for unpaid joint interest billings and related obligations (the "**JIB Payments**"), (ii) holders of royalty, working, and other interests as required by the Debtors' various leases and related agreements including, without limitation, Royalties, ORRI Payments, Non-Operating Working Interest Payments, and Suspense Obligations (each as herein defined, and collectively, the "**Interest Owner Payments**"), and (iii) third parties for certain lease operating expenses, other exploration and production costs, capital expenditures, and related costs (the "**E&P Operating Expenses**" and, together with the JIB Payments and Interest-Owner Payments, the "**Obligations**"), including vendors, contractors, subcontractors, drillers, haulers, and suppliers of oil- and gas-related services, supplies, and materials who may have, or may be entitled to, liens under applicable state law (collectively, the "**E&P Claimants**").

110.    As of the Petition Date, the Debtors estimate the aggregate amount of prepetition Obligations is approximately $64.6 million, of which approximately $36.3 million

will come due prior to a final hearing on the motion.  The various components of the Obligations are briefly described below.

111.    <u>Joint Interest Billings</u>.  The Debtors hold Working Interests in various oil and gas fields throughout the United States.  As is standard in the industry to address the speculative nature of such business, the Debtors became joint interest holders of working interests in oil and gas leases—sharing pro rata in both the revenues and costs associated with production from such leases.  Parties that jointly own an oil and gas lease enter into an operating agreement that governs the relationship among such parties (an "**Operating Agreement**").  The Operating Agreement designates one of the joint interest holders as the operator of the oil and gas lease (as such, the "**Operator**") and allocates the costs and revenues associated with the operation of the oil and gas lease among those parties.  The Operator assumes responsibility for the physical operation and control of a well, conducting the day-to-day business of extracting oil and gas from the wells and initially covering expenses incurred in such operations.  The Operator then seeks repayment from the other parties to the Operating Agreement.  The other parties to the Operating Agreement hold non-operating working interests in the oil and gas lease (each such party, a "**Non-Operator**").  The primary obligation of a Non-Operator is to pay its pro rata share of the lease operating expenses and drilling and completion costs under the Operating Agreement to the Operator.  These reimbursement arrangements are known as joint interest billings ("**JIBs**")

112.    It is my understanding from the Debtors' operative Operating Agreements and the advice of the Debtors' attorneys that, where the Debtors hold a non-operating working interest, the Operating Agreements and/or applicable state law typically grant the operator the right to assert contractual or statutory liens to secure the obligations owed to the operator based upon the Debtors' interest in the oil and gas lease

113.    In the 12 months preceding the Petition Date, the Debtors paid approximately $23.5 million in aggregate JIB Payments.  Many of the JIB Payments vary in amount and are not easily predictable each month.  Nonetheless, failure to pay the JIB Payments timely may provide grounds for contractual or statutory lien rights in favor of Operators against the Debtors' non-operating working interests or the Debtors' pro rata share of the production therefrom.

114.    I understand that as of the Petition Date, approximately $5.3 million in prepetition Joint Interest Billings remain outstanding, $2.2 million of which will become due and payable within the next 30 days.  Payment of the Joint Interest Billings is necessary to prevent operators from ceasing or altering their revenue payments to the Debtors and asserting liens against the Debtors' Non-Operating Working Interests or their share of revenues from production.  Joint Interest Billings payments are also necessary to maintain strong working relationships with these important joint partners both during and after the pendency of these chapter 11 cases.

115.    Royalties and Other Interest Owner Payments.  Pursuant to various Operating Agreements, oil and gas leases, and other contractual obligations and arrangements, the Debtors market and sell production from their operated wells and pay the various interest holders their share of sale proceeds.  Pursuant to their oil and gas leases, the owners of the mineral rights leased by the Debtors (the "**Royalty Interest Owners**") retain a share of the production on their respective leases, free from any of the expenses of production (the "**Royalties**"), which the Debtors are obligated to remit.  In addition, as a result of certain assignments of working interests in the oil and gas leases, additional rights to share in production, free from expenses of production, have been created, and are known as overriding

royalty interests ("**ORRI**").  The Debtors are obligated to remit to owners of ORRI (the "**ORRI Owners**") their share of proceeds from production attributable to the ORRI (the "**ORRI Payments**").  Furthermore, third parties may also own non-operating interests in the working interests in the leases and wells operated by the Debtors under joint operating agreements (the "Non-Operating Working Interest Owners" and collectively with the ORRI Owners and Royalty Interest Owners, the "**Interest Owners**").  Non-Operating Working Interest Owners may be contractually entitled to receive a share of the production, subject to the expenses of production (the "**Non-Operating Working Interest Payments**").

116.    As more fully described in the motion, the Debtors make Interest Owner Payments to various Interest Owners each month.  As of the Petition Date, the Debtors estimate that they owe approximately $31.2 million to Interest Owners on account of accrued and undisputed Interest Owner Payments, of which approximately $13.7 million will come due within the first 30 days of these chapter 11 cases.

117.    E&P Operating Expenses.  As more fully described in the motion, the Debtors serve as Operators of certain oil and gas leases and contract with the E&P Claimants, which provide goods and services necessary to operate wells.  As a result, the Debtors incur E&P Operating Expenses in connection with their operating interests, including amounts related to gathering, transportation, and processing expenses ("**GTP Expenses**"), capital expenditures ("**Capex**"), surface use and land-related payments, and lease operating expenses ("**LOEs**").  In accordance with the terms of their Operating Agreements, the Debtors are reimbursed for the Non-Operators' shares of the pro rata costs of production through the payment of JIBs or by netting a Non-Operator's share of production revenue against its share of E&P Operating Expenses under the Operating Agreement.  I am advised by the Debtors' attorneys that, under

applicable state law, E&P Claimants may be entitled to assert liens against the Debtors' property (or even the property of other parties to the Operating Agreements) to secure payment from the Debtors.

118.    If the E&P Claimants were able to assert liens against the Debtors in the course of these chapter 11 cases, the results would be detrimental to the Debtors and their estates. It is my understanding that the E&P Claimants could potentially place liens on the wells, the production therefrom, or the Debtors' Operating Interests.  Further, I have been advised from the Debtors' attorneys that in Louisiana, one of the states in which the Debtors have Operating Interests, the lien can attach to any of the gas proceeds, property interests, or other property described in the state's lien statute—including property actually owned by third party Non-Operating Working Interests with whom the Debtors must work cooperatively during and after these chapter 11 cases.  I believe that the Debtors' revenues and their relationships with co-working interest owners could be placed in jeopardy absent the relief requested in the motion.

119.    As of the Petition Date, the Debtors estimate they have approximately $28.1 million in outstanding prepetition E&P Operating Expenses, including approximately $7.5 million in GTP Expenses, $5.9 million in Capex, and $14.7 million in LOEs.  To avoid the potential incurrence of unnecessary statutory liens, and eliminate the risk of pervasive litigation over the potential existence of statutory liens, lien priorities, and the amounts of claims of the various E&P Claimants, the Debtors are requesting the authority to (i) pay the E&P Operating Expenses that accrued prepetition, and (ii) continue to make payments to E&P Claimants in the ordinary course of business, which are necessary to preserve the Debtors' ongoing operations and the value of their business.

120.    For the reasons set forth above and in the JIB/E&P Payables Motion, I believe payment of the E&P Obligations is necessary to preserve the Debtors' operations and to successfully reorganize.  During the initial stages of these chapter 11 cases, the Debtors and their professionals will be focused on stabilizing operations and refining a long-term business plan, and their attention should not be diverted by the significant risks and severe consequences attendant by (i) Operators withholding the Debtors' revenues on account of non-payment of the Joint Interest Billings, (ii) E&P Claimants attempting to coerce payment by denying supplies or services going forward on account of non-payment of the E&P Operating Expenses, or  (iii) E&P Claimants asserting liens on the Debtor's property or the property of the Debtors' third-party working interest partners.

121.    Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the JIB/E&P Payables Motion is in the best interests of the Debtors' estates, and should be granted.

**J.        Ordinary Course Professionals Motion**

122.    Pursuant to the *Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a), 327, 328, and 330 for Order Authorizing Debtors to Employ Professionals Used in the Ordinary Course of Business Effective as of the Petition Date* filed contemporaneously herewith (the "**OCP Motion**"), the Debtors seek authority to employ professionals retained in the ordinary course of business (the "**Ordinary Course of Professionals**"), effective as of the Petition Date, without the submission of separate employment applications or the issuance of separate retention orders for each professional.

123.    The Ordinary Course Professionals provide a range of services to the Debtors relating to, among other things, litigation, regulatory, environmental, securities, compensation, general corporate, transactional, real estate, tax, and other matters that have a

direct and significant impact on the Debtors' day-to-day operations.  In light of the additional costs associated with the potential preparation of employment applications for Ordinary Course Professionals that will receive otherwise relatively modest fees, I believe it would be impractical and costly for the Debtors to submit individual applications and proposed retention orders for each Ordinary Course Professional as would otherwise be required by the Bankruptcy Rules (as explained to me by the Debtors' counsel).  As more fully described in the OCP Motion, the Debtors request that the court approve a set of streamlined procedures, according to which they will employ and pay the monthly compensation of the Ordinary Course Professionals.

124.    Continued employment of the Ordinary Course Professionals is essential to avoid disruption to the Debtors' normal business operations.  Accordingly, I believe the relief requested in the OCP Motion is in the best interests of the Debtors' estates and, on behalf of the Debtors, I respectfully request that the OCP Motion be granted in all respects.

## K.    Taxes Motion

125.    Pursuant to the *Emergency Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a), 363(b), 507(a), and 541(d) and Fed. R. Bankr. P. 6003 and 6004 for Interim and Final Orders (I) Authorizing Debtors to Pay Certain Prepetition Taxes and Assessments, and (II) Authorizing Financial Institutions to Receive, Process, Honor, and Pay All Checks Presented for Payment and to Honor All Fund Transfer Requests Related to Such Obligations* (the "**Taxes Motion**") filed concurrently herewith, the Debtors request (i) interim and final authority to satisfy all Taxes (as defined below) due and owing to various local, state, and federal taxing and governmental authorities (collectively, the "**Taxing Authorities**") that arose prior to the Petition Date, including all Taxes subsequently determined by audit or otherwise to be owed for periods prior to the Petition Date, and (ii) that the Court authorize, but not direct, the Banks to receive,

honor, process, and pay all checks issued or to be issued and electronic fund transfers requested or to be requested relating to the above.

126.     I understand that the Taxes the Debtors typically incur generally fall into the following categories: Franchise Taxes, Severance Taxes, Property Taxes, and Regulatory Assessments (collectively the "**Taxes**").  I understand that approximately $31,300 in Franchise Taxes, $2 million in Severance Taxes, $2 million in Property Taxes, and up to $550,000 in Regulatory Assessments will come due in the 30 days following the Petition Date.  I understand that substantially all of those amounts are on account of prepetition obligations.

127.     Further, I understand that failure to pay the aforementioned Taxes may cause the Taxing Authorities to take precipitous action, including, but not limited to, filing liens, preventing the Debtors from conducting business in the ordinary course in the applicable jurisdictions in which they operate, and potentially holding directors and officers personally liable, all of which would disrupt the Debtors' day-to-day business operations, potentially impose significant costs of the Debtors' estates and their creditors, and hinder the Debtors' efforts to successfully reorganize.  Based on the foregoing, I believe that the relief requested in the tax motion is in the best interests of the Debtors, their estates, and all parties in interest and should be approved.

## L.     Utilities Motion

128.     Pursuant to the *Emergency Motion of Debtors' Pursuant to 11 U.S.C. §§ 366 and 105(a) and Fed. R. Bank. P. 6004 for Interim and Final Orders (I) Authorizing the Debtors' Proposed Form of Adequate Assurance of Payment to Utility Companies, (II) Establishing Procedures for Resolving Objections by Utility Companies, and (III) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Service* filed contemporaneously herewith (the "**Utilities Motion**"), the Debtors request interim and final

orders (i) authorizing the Debtors' proposed form of adequate assurance of payment to Utility Companies (as defined below); (ii) establishing procedures for resolving objections by Utility Companies relating to the adequacy of the proposed adequate assurance; and (iii) prohibiting the Utility Companies from altering, refusing, or discontinuing service to the Debtors.

129.    As more fully described in the motion, the Debtors obtain electricity, internet, cable, waste disposal, water, gas, and other utility services (collectively, the "**Utility Services**") from various utility companies (collectively, the "**Utility Companies**"). I believe that uninterrupted Utility Services are essential to the Debtors' ongoing operations and the success of these chapter 11 cases. The Debtors' business involves Utility Services-intensive operations such as exploring for, developing, producing, and marketing oil and natural gas. Among other things, the Debtors employ directional drilling techniques from the ground surface and must maintain the ability to run their exploration and production equipment in a near constant state. The Debtors' operations also require electricity for lighting, heating, and air conditioning. In addition to the exploration and production processes conducted in the field, the Debtors maintain a corporate office and several regional and field offices that are responsible for ensuring the smooth operation of the Debtors' business. These offices require electricity, telecommunications, and internet services to operate in their respective locations. Should any Utility Company alter, refuse, or discontinue service, even briefly, the Debtors' business operations could be severely disrupted. I believe that any such disruption would jeopardize the Debtors' ability to manage their reorganization efforts. As a result, it is essential that the Utility Services continue uninterrupted during the chapter 11 cases.

130.    I believe that there are no material defaults or significant arrearages with respect to the undisputed invoices for prepetition Utility Services. Based on a monthly average

for the twelve months prior to the Petition Date, the Debtors estimate that their aggregate cost of Utility Services for the next 30 days will be approximately $1.7 million.

131.    I have been advised by the Debtors' attorneys that, pursuant to section 366 of the Bankruptcy Code, the Debtors must provide the Utility Companies with adequate assurance of payment.  To provide the Utility Companies with such adequate assurance, the Debtors propose to deposit cash in an amount equal to two weeks' payment for Utility Services, calculated using the historical average for such payments during the past 12 months (the "**Adequate Assurance Deposit**") into a newly created segregated account for the benefit of the Utility Companies (the "**Utility Deposit Account**").  As more fully described in the Utilities Motion, the Adequate Assurance Deposit would be held by the Debtors in the Utility Deposit Account for the benefit of the Utility Companies during the pendency of these chapter 11 cases. I believe that the Adequate Assurance Deposit, in conjunction with the Debtors' ability to pay for future Utility Services in the ordinary course of business (collectively, the "**Proposed Adequate Assurance**"), constitutes sufficient adequate assurance to the Utility Companies in full satisfaction of section 366 of the Bankruptcy Code as I understand the requirements of that provision.  In the event a Utility Company is not satisfied with the Proposed Adequate Assurance, the Debtors also propose certain objection procedures (the "**Adequate Assurance Procedur**es") through which a Utility Company may challenge the adequacy of the Proposed Adequate Assurance.  The Adequate Assurance Procedures are set forth in their entirety in the Utilities Motion.

132.    I believe and am advised that the Adequate Assurance Procedures are necessary to the success of the Debtors' chapter 11 cases because if such procedures are not approved, the Debtors could be forced to address numerous requests by Utility Companies for

adequate assurance in a disorganized manner during the critical first weeks of the chapter 11 cases. Moreover, a Utility Company could blindside the Debtors by unilaterally deciding—on or after the thirtieth day following the Commencement Date—that it is not adequately protected and threatening to discontinue service or making an exorbitant demand for payment to continue service. Discontinuation of Utility Service could disrupt operations and jeopardize the Debtors' reorganization efforts and, ultimately, the value of the Debtors' estates and stakeholders' recoveries.

133.    Based on the foregoing, I believe that the relief requested in the Utilities Motion would ensure the continuation of the Debtors' business at this critical juncture as the Debtors transition into chapter 11. Furthermore, I believe that the relief requested provides the Utility Companies with a fair and orderly procedure for determining requests for additional adequate assurance. Accordingly, I believe that the relief requested in the Utilities Motion should be granted in all respects.

**M.    Claims Agent Retention Application**

134.    Pursuant to *Debtors' Emergency Application Pursuant to 28 U.S.C. § 156(c), 11 U.S.C. §§ 105(a) and 327, Fed. R. Bankr. P. 2002(f), 2014(a), and 2016, and Local Rule 2014-1 for Appointment of Rust Consulting/Omni Bankruptcy as Claims, Noticing, and Solicitation Agent, Effective as of the Petition Date* filed contemporaneously herewith (the "**Claims Agent Retention Application**"), the Debtors request entry of an order appointing Rust Consulting/Omni Bankruptcy ("**Rust Omni**") as the claims, noticing, and solicitation agent ("**Claims Agent**") for the Debtors in their chapter 11 cases, effective as of the Petition Date.

135.    As more fully described in the Claims Agent Retention Application, the Claims Agent will, among other tasks, (i) serve as the noticing agent to mail notices to the estates' creditors, equity security holders, and parties in interest; (ii) provide computerized

claims, objection, solicitation, and balloting database services; and (iii) provide expertise, consultation, and assistance in claim and ballot processing and other administrative services with respect to the Debtors' bankruptcy cases, pursuant to the provisions of the Engagement Agreement (as defined in the Claims Agent Retention Application).

136.     The Debtors' counsel has informed me that, pursuant to noticing requirements, the Debtors will be required to provide notice to thousands of persons and entities during the pendency of these chapter 11 cases.  The appointment of Rust Omni as the Claims Agent will provide the most effective and efficient means of providing that notice, as well as soliciting and tabulating votes on the proposed plan of reorganization, thereby relieving the Debtors of the administrative burden associated with all of these necessary tasks.  In addition, by appointing Rust Omni as the Claims Agent in these chapter 11 cases, the distribution of notices will be expedited, and the Office of the Clerk of the Bankruptcy Court will be relieved of the administrative burden of noticing.   Accordingly, I believe the Claims Agent Retention Application should be granted in all respects.

N.     **Request for Emergency Consideration**

137.     Pursuant to the *Request for Emergency Consideration of Certain "First Day" Matters* filed concurrently herewith, the Debtors request emergency consideration of the Joint Administration Motion; the Schedule Extension Motion; the Creditor List Motion; the Cash Collateral Motion; the Hedging Motion; the Cash Management Motion; the Insurance and Surety Bond Motion; the Taxes Motion; the Wages Motion; the JIB/E&P Payables Motion; and the Claims Agent Retention Application.  I believe that, based on the complexity of these chapter 11 cases (as explained to me by the Debtors' counsel) and the Debtors' urgent need to continue operations during these cases, emergency consideration of such motions is warranted.

## Conclusion

138.    The above describes the Debtors' business and capital structure, the factors that precipitated the commencement of these chapter 11 cases, the terms of the Debtors' balance sheet restructuring, and the critical need for the Debtors to restructure their financial affairs and operations.   The provisions of the Bankruptcy Code will assist the Debtors in achieving their financial reorganization and reestablishing themselves as a healthy economic enterprise able to effectively compete in their industry for the benefit of their economic stakeholders and employees.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: January 16, 2017
       Houston, Texas

/s/ Robert L. Stillwell, Jr.
Robert L. Stillwell, Jr.
Vice President and Chief Financial Officer
Memorial Production Partners GP LLC

## Exhibit A

Organizational Chart



