**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | § | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| | § | |
| **MEMORIAL PRODUCTION** | § | **Case No. 17-30262** |
| **PARTNERS LP,** *et al.*, | § | |
| | § | **(Jointly Administered)** |
| **Debtors.**[1] | § | |
| | § | |

**NOTICE OF FILING OF SUPPLEMENT TO AMENDED
JOINT PLAN OF REORGANIZATION OF MEMORIAL PRODUCTION
PARTNERS LP,** *ET AL.* **UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

**PLEASE TAKE NOTICE** that, on January 16, 2017, Memorial Production

Partners LP and its debtor affiliates in the above-captioned cases, as debtors and debtors in

possession (collectively, the "**Debtors**"), commenced cases under chapter 11 of title 11 of the

United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the

Southern District of Texas (the "**Bankruptcy Court**").

**PLEASE TAKE FURTHER NOTICE** that, on January 17, 2017, the Debtors

filed the *Joint Plan of Reorganization of Memorial Production Partners LP, et al. under Chapter*

*11 of the Bankruptcy Code* (ECF No. 18).

**PLEASE TAKE FURTHER NOTICE** that, on February 24, 2017, the Debtors

filed the *Amended Joint Plan of Reorganization of Memorial Production Partners LP, et al.*

*under Chapter 11 of the Bankruptcy Code* (the "**Amended Plan**") (ECF No. 228).

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Memorial Production Partners LP (6667); Memorial Production Partners GP LLC; MEMP Services LLC (1887); Memorial Production Operating LLC; Memorial Production Finance Corporation (3356); WHT Energy Partners LLC; WHT Carthage LLC; Memorial Midstream LLC; Beta Operating Company, LLC; Columbus Energy, LLC; Rise Energy Operating, LLC; Rise Energy Minerals, LLC; Rise Energy Beta, LLC; San Pedro Bay Pipeline Company (1234); and Memorial Energy Services LLC. The Debtors' mailing address is 500 Dallas Street, Suite 1600, Houston, Texas 77002.

**PLEASE TAKE FURTHER NOTICE** that the Amended Plan provides, in relevant part, that the Debtors will file a plan supplement containing certain documents necessary to implement the terms of the Amended Plan (the "**Plan Supplement**").  Pursuant to the *Order (I) Approving the Adequacy of Disclosure Statement, (II) Approving the Solicitation and Notice Procedures with Respect to Confirmation of the Debtors' Proposed Joint Plan of Reorganization, (III) Approving the Form of Ballots and Notices in Connection Therewith, (IV) Scheduling Certain Dates with Respect Thereto, and (V) Granting Related Relief* (ECF No. 245), the deadline to file the Plan Supplement is **Friday, March 24, 2017**.

**PLEASE TAKE FURTHER NOTICE** that attached hereto as **Exhibit A** through **Exhibit J** are the following parts of the Plan Supplement:

| | |
|---|---|
| **Exhibit A:** | **Amended Organizational Documents** |
| **Exhibit B:** | **Exit Credit Agreement** |
| **Exhibit C:** | **New Common Shares Allocation Schedule** |
| **Exhibit D:** | **Memorial Limited Partner Warrant Agreement** |
| **Exhibit E:** | **New Stockholders Agreement** |
| **Exhibit F:** | **Registration Rights Agreement** |
| **Exhibit G:** | **Schedule of Rejected Contracts and Leases** |
| **Exhibit H:** | **Schedule of Cure Amounts** |
| **Exhibit I:** | **Management Incentive Plan** |
| **Exhibit J:** | **Directors and Officers of Reorganized Debtors** |

2

**PLEASE TAKE FURTHER NOTICE** that the documents contained in the Plan Supplement are integral to, and are considered part of, the Amended Plan.  If the Amended Plan is approved, the documents contained in the Plan Supplement will be approved by the Bankruptcy Court pursuant to the order confirming the Amended Plan.

**PLEASE TAKE FURTHER NOTICE** that a hearing to consider confirmation of the Amended Plan is scheduled for **Tuesday, April 4, 2017 at 10:00 a.m. (Central Time)**, before the Honorable Marvin Isgur, United States Bankruptcy Judge (the "**Confirmation Hearing**").

**PLEASE TAKE FURTHER NOTICE** that the Debtors intend that, upon the effective date of the Amended Plan, the parent company of the Reorganized Debtors will be named "Amplify Energy Corp."

**PLEASE TAKE FURTHER NOTICE** that, as of the date hereof, the Debtors are still engaged in negotiations with the Ad Hoc Group and RBL Credit Facility Agent (each as defined in the Amended Plan) with respect to the terms of the documents contained in the Plan Supplement.  Consequently, the form of documents filed herewith reflects the latest draft of each document as of March 24, 2017.  The Debtors, the Ad Hoc Group, and the RBL Credit Facility Agent reserve all of their respective rights with respect to the form of documents filed herewith and such documents remain subject in all respects to revision by the Debtors and review by the Ad Hoc Group, and the RBL Credit Facility Agent.  The Debtors will file Plan Supplement documents in their substantially final form before the Confirmation Hearing.

**PLEASE TAKE FURTHER NOTICE** that copies of the exhibits contained in this Plan Supplement, and all documents filed in these chapter 11 cases are available free of charge by visiting http://www.omnimgt.com/memorialpp or by calling 877-773-8184.  You may also obtain copies of the pleadings by visiting the Bankruptcy Court's website at https://ecf.txsb.uscourts.gov in accordance with the procedures and fees set forth therein.

Dated:  March 24, 2017
       Houston, Texas

          /s/ *Alfredo R. Pérez*
          WEIL, GOTSHAL & MANGES LLP
          Alfredo R. Pérez (15776275)
          700 Louisiana Street, Suite 1700
          Houston, Texas  77002
          Telephone: (713) 546-5000
          Facsimile:  (713) 224-9511

          -and-

          WEIL, GOTSHAL & MANGES LLP
          Gary T. Holtzer (admitted *pro hac vice*)
          Joseph H. Smolinsky (admitted *pro hac vice*)
          767 Fifth Avenue
          New York, New York  10153
          Telephone:  (212) 310-8000
          Facsimile:  (212) 310-8007

          *Attorneys for the Debtors and*
          *Debtors in Possession*

4

## Exhibit A

## Amended Organizational Documents

WEIL:\96067153\5\62739.0004

## Amended Organizational Documents

The following is the Amended and Restated Certificate of Incorporation and Amended and Restated Bylaws of Memorial Parent NewCo.  The Debtors are amending, or have already amended, the organizational documents of each Debtor to include a provision conforming to the requirements of section 1123(a)(6) of the Bankruptcy Code.

<u>Draft</u>: 03/24/2017

**AMENDED AND RESTATED
CERTIFICATE OF INCORPORATION
OF
AMPLIFY ENERGY CORP.**

Amplify Energy Corp. (the "**Corporation**"), a corporation organized and existing under and by virtue of the General Corporation Law of the State of Delaware (the "**DGCL**"), hereby certifies as follows pursuant to Sections 242, 245 and 303 of the DGCL:

1.  The original Certificate of Incorporation of the Corporation was filed with the Office of the Secretary of State of the State of Delaware on [●], 2017.

2.  This Amended and Restated Certificate of Incorporation amends and restates the Certificate of Incorporation of the Corporation and has been duly adopted pursuant in accordance with §§ 241 and 245 of the DGCL and in accordance with a plan of reorganization (the "**Plan**") of Memorial Production Partners LP, a Delaware limited partnership and predecessor to the Corporation, approved by order dated [●], 2017 of the United States Bankruptcy Court for the Southern District of Texas, Houston Division in *In re Memorial Production Partners LP, et al.*, under Chapter 11 of the United States Bankruptcy Code (11 U.S.C. §101-1330), as amended, which Plan is becoming effective on [●], 2017.

3.  The Certificate of Incorporation of the Corporation is hereby amended and restated to read in its entirety as follows:

ARTICLE 1
NAME

The name of the corporation is Amplify Energy Corp. (the "**Corporation**").

ARTICLE 2
REGISTERED OFFICE

The address of the registered office of the Corporation in the State of Delaware is 850 New Burton Road, Suite 201, Dover, Delaware 19904.  The name of the registered agent of the Corporation at that address is National Corporation Research, Ltd.

ARTICLE 3
CORPORATE PURPOSE

The purpose of the Corporation is to engage in any lawful act or activity for which a corporation may be organized under the General Corporation Law of the State of Delaware (the "**DGCL**"), as the same exists or may hereafter be amended from time to time.

## ARTICLE 4
### CAPITAL STOCK

Section 4.01.  *Authorized Capital Stock.*  The total number of shares of all classes of stock which the Corporation shall have authority to issue is [•] shares, consisting of [•] shares of Common Stock, par value $0.0001 per share (the "**Common Stock**"), and [•] shares of Preferred Stock, par value $0.0001 per share (the "**Preferred Stock**").

Section 4.02.  *Common Stock*.   The number of authorized shares of Common Stock may be increased or decreased (but not below the number of shares thereof then outstanding) by the affirmative vote of the holders of a majority in voting power of the outstanding shares of stock of the Corporation entitled to vote thereon irrespective of the provisions of Section 242(b)(2) of the DGCL (or any successor provision thereto), and no vote of the holders of the Common Stock or the Preferred Stock voting separately as a class, shall be required therefor.

The powers, preferences and rights of, and the qualifications, limitations and restrictions of Common Stock are as follows:

(a) Except as may otherwise be provided in this Certificate of Incorporation or by applicable law, each share of Common Stock shall have identical powers, rights and privileges in every respect, and the holders of shares of Common Stock shall be entitled to one vote for each such share, in person or by proxy, upon all questions presented to the stockholders, including the right to vote for the election of directors and for all other purposes under applicable law; *provided, however*, except as otherwise required by law, holders of shares of Common Stock, as such, shall not be entitled to vote on any amendment to this Certificate of Incorporation (including any certificate of designations relating to any class or series of Preferred Stock) that relates solely to the terms of one or more outstanding classes or series of Preferred Stock if the holders of such affected class or series are entitled, either separately or together with the holders of one or more other such classes or series, to vote thereon pursuant to this Certificate of Incorporation (including any certificate of designations relating to any class or series of Preferred Stock) or pursuant to the DGCL. Each holder of Common Stock shall be entitled to notice of any stockholders' meeting in accordance with the bylaws of the Corporation (as in effect at the time in question) and applicable law on all matters put to a vote of the stockholders of the Corporation.

(b) Subject to the rights granted to any Preferred Stock, the holders of shares of Common Stock shall be entitled to receive ratably in proportion to the number of shares of Common Stock held by them such dividends and distributions (payable in cash, stock or otherwise), if any, as may be declared thereon by the board of directors of the Corporation (the "**Board of Directors**") at any time and from time to time out of any assets or funds of the Corporation legally available therefor.

(c) In the event of any voluntary or involuntary liquidation, dissolution or winding-up of the Corporation, the holders of shares of Common Stock shall be entitled to receive all of the remaining assets of the Corporation available for distribution

2

to its stockholders, ratably in proportion to the number of shares of Common Stock held by them remaining after payment of all liquidation preferences, if any, applicable to any outstanding Preferred Stock. A liquidation, dissolution or winding-up of the Corporation, as such terms are used in this paragraph (c), shall not be deemed to be occasioned by or to include any consolidation or merger of the Corporation with or into any other corporation or corporations or other entity or a sale, lease, exchange or conveyance of all or a part of the assets of the Corporation.

Section 4.03.   *Preferred Stock.*   The Board of Directors is hereby empowered, without any action or vote by the Corporation's stockholders (except as may otherwise be provided by the terms of any class or series of Preferred Stock then outstanding, or except as otherwise set forth in the bylaws of the Corporation), to authorize by resolution or resolutions from time to time the issuance of one or more classes or series of Preferred Stock and to fix the designations, powers, preferences and relative, participating, optional or other rights, if any, and the qualifications, limitations or restrictions thereof, if any, with respect to each such class or series of Preferred Stock and the number of shares constituting each such class or series, and to increase or decrease the number of shares of any such class or series to the extent permitted by the DGCL.

Section 4.04.   *Non-voting Equity Securities.*   The Corporation shall not issue any non-voting equity securities to the extent prohibited by Section 1123(a)(6) of Title 11 of the United States Code (the "**Bankruptcy Code**") as in effect on the date of filing of this Certificate of Incorporation with the Secretary of State of the State of Delaware; *provided*, *however*, that the foregoing restriction (i) shall have such force and effect only for so long as Section 1123 of the Bankruptcy Code is in effect and applicable to the Corporation, (ii) shall not have any further force or effect beyond that required under Section 1123(a)(6), and (iii) may be amended or eliminated in accordance with applicable law as from time to time may be in effect.

Section 4.05.   *Preemptive Rights; Certain Definitions.*   (a) Subject to Section 4.05(h) of Article 4, the Corporation hereby grants to each stockholder that beneficially owns (including all shares beneficially owned by such stockholder's Affiliates (as defined below)) at least 5% of the total shares of Common Stock outstanding as of the close of business on the record date determined by the Board of Directors (each such stockholder, a "**Preemptive Rightsholder**"), which record date shall not be more than ten (10) Business Days (as defined below) prior to the Corporation's delivery of the Issuance Notice (as defined below), the right to purchase up to its pro rata portion (based on the number of shares of Common Stock beneficially owned by such stockholder as of the close of business on the record date, as a percentage of the total number of then-outstanding shares of Common Stock) of any New Equity Securities (as defined below) that the Corporation or any of its subsidiaries proposes to sell or issue at any time and from time to time after the date hereof.   The rights of Preemptive Rightsholders to purchase New Equity Securities pursuant to this Section 4.05 of Article 4 (the "**Equity Purchase Right**") shall apply at the time of issuance of any right, warrant, or option or convertible or exchangeable security that constitutes a New Equity Security, and not to the subsequent conversion, exchange or exercise of such New Equity Security in accordance with its terms.

3

(b)    As used herein, the following terms shall have the meanings set forth below:

(i)    "**Affiliate**" means with respect to any person, any other person directly or indirectly controlling, controlled by, or under common control with, such person as of the date on which, or at any time during the period for which, the determination of affiliation is being made (including any investment fund the primary investment manager or investment advisor to which is such person or its Affiliate).  For purposes of this definition, (A) the term "**control**" (including the correlative meanings of the terms "controlled by" and "under common control with"), as used with respect to any person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such person, whether through the ownership of voting securities, by contract or otherwise and (B) the term "person" means any individual, corporation, partnership, limited liability company, unincorporated association or other entity.

(ii)    "**beneficially own**" has the meaning ascribed to such term in Rule 13d-3 under the Securities Exchange Act of 1934, as amended.

(iii)    "**Business Day**" means any day other than a Saturday, Sunday or day on which commercial banks in the State of Texas or the State of New York are authorized or required by law to close for business.

(iv)    "**New Equity Securities**" means any and all (A) shares of Common Stock or other equity securities of the Corporation, (B) equity securities of any subsidiary of the Corporation, (C) securities exchangeable into, or convertible or exercisable for, shares of securities of the type specified in clause (A) and (B), and (D) options, warrants or other rights to acquire securities of the type specified in clause (A) and (B), in each case other than as issued (1) to employees, officers, directors or consultants pursuant to any equity-based compensation or incentive plans approved by the Board of Directors or included in the Corporation's plan of reorganization confirmed by the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "**Plan**"), and securities issued upon exercise or conversion of such options, warrants, convertible securities or other rights, (2) in connection with a stock split, payment of dividends or any similar recapitalization, reclassification, distribution, exchange or readjustment of shares approved by the Board of Directors, (3) pursuant to the Plan (including shares of Common Stock and up to [●] warrants), and securities issued upon exchange, conversion or exercise of such securities, (4) as consideration in any business combination, consolidation, merger or acquisition transaction or joint venture involving the Corporation or any of its subsidiaries, (5) upon the conversion or exercise of any securities convertible or exercisable for shares of securities of the type specified in (A) and (B), (6) as issuances (in one or more transactions) as a bona fide "equity kicker" in an aggregate amount with respect to all such issuances of less than 5% of the then-outstanding shares of Common Stock to one or more third party lenders who are

4

not stockholders to whom the Corporation or one or more of its subsidiaries is becoming indebted in connection with the incurrence of any indebtedness approved by the Board of Directors or (7) in an IPO (as defined below).

(c)     The Corporation shall give each Preemptive Rightsholder written notice of any proposed issuance or sale of New Equity Securities that is subject to the Equity Purchase Right, at least ten (10) Business Days prior to the proposed issuance or sale. Such notice (an "**Issuance Notice**") shall set forth the material terms and conditions of the proposed transaction, including the proposed manner of issuance or sale, a description of the New Equity Securities, the total number of New Equity Securities proposed to be issued or sold, the proposed issuance or sale date, the proposed purchase price per share, including a reasonable description of any non-cash consideration, and (if known) the name and address of the proposed purchaser of the New Equity Securities.

(d)     At any time during the ten (10) Business Days following receipt of an Issuance Notice, each Preemptive Rightsholder shall have the right, but not the obligation, to irrevocably elect, by written notice to the Corporation, to purchase its *pro rata* portion of the New Equity Securities at the purchase price set forth in the Issuance Notice and upon the other terms and conditions specified in the Issuance Notice (except that to the extent the purchase price includes non-cash consideration, a Preemptive Rightsholder shall pay the cash equivalent thereof as reasonably determined by the Board of Directors and specified in the Issuance Notice); *provided*, *however*, that no Preemptive Rightsholder shall be obligated (or permitted without the Corporation's consent) to purchase any New Equity Securities pursuant to this Section 4.05 of Article 4 unless all required regulatory approvals, if any, applicable to such purchase have been obtained. Except as provided in the next sentence, the purchase of New Equity Securities by the electing Preemptive Rightsholders shall be consummated concurrently with the consummation of the issuance or sale described in the Issuance Notice.  The closing of the purchase of New Equity Securities by any electing Preemptive Rightsholder may be extended beyond the closing of the transaction described in the Issuance Notice, to the extent necessary to (i) obtain required approvals of governmental authorities and other required regulatory approvals which such Preemptive Rightsholder shall be diligently pursuing in good faith (and the Corporation shall use its commercially reasonable efforts to obtain any approvals required to be obtained by it provided that the Corporation shall not be required to incur any out-of-pocket unreimbursed expenses in connection therewith) and (ii) permit the Preemptive Rightsholder to complete its internal capital call process following receipt of the Issuance Notice; *provided*, *however*, that the approval of the Board of Directors shall be required to extend any such closing beyond the date that is thirty (30) days after delivery of the applicable Issuance Notice.  Notwithstanding anything to the contrary contained herein, in the event that the closing of any purchase of New Equity Securities by any Preemptive Rightsholder is extended pursuant to this paragraph, such extension shall not preclude the consummation of the issuance or sale of the remaining New Equity Securities described in the Issuance Notice from occurring prior to such closing.

(e)     To the extent that one or more Preemptive Rightsholders do not fully and timely exercise their Equity Purchase Rights, in accordance with the terms and conditions

WEIL:\96057985\8\62739.0003

set forth in this Section 4.05 of Article 4, or elects to exercise such rights with respect to less than such Preemptive Rightsholder's *pro rata* portion of the New Equity Securities (the difference between such Preemptive Rightsholder's *pro rata* portion of the New Equity Securities and the number of New Equity Securities for which such Preemptive Rightsholder Holder exercised its preemptive rights under this Section 4.05 of Article 4, the "**Excess Shares**"), then the Corporation (or the applicable subsidiary) shall offer to sell to the Preemptive Rightsholders that have elected to purchase all of their *pro rata* portion of the New Equity Securities, *pro rata* and at the same price and on the same terms as those specified in the Issuance Notice, and such Preemptive Rightsholders shall have the right to acquire all or any portion of such Excess Shares within two (2) Business Days following the expiration of the period specified in Section 4.05(d) of Article 4 by delivering written notice thereof to the Corporation.

(f)     Following compliance with the terms and conditions set forth in this Section 4.05 of Article 4, the Corporation (or its applicable subsidiary) shall be free to consummate the proposed issuance or sale of all or any portion of the remaining New Equity Securities that the Preemptive Rightsholders have elected not to purchase, on terms no less favorable to the Corporation than those set forth in the Issuance Notice; *provided*, that (i) such issuance or sale is closed within ninety (90) days after the date the related Issuance Notice was given, *provided* that, if such issuance or sale is subject to regulatory approval, such 90-day period shall be extended until the expiration of five (5) Business Days after all such approvals have been received, but in no event later than one hundred and eighty (180) days after the related Issuance Notice was given, and (ii) the price at which the New Equity Securities are transferred must be equal to or higher than the purchase price described in the Issuance Notice.  In the event that the Corporation (or its applicable subsidiary) has not sold such New Equity Securities within such ninety (90)-day period, the Corporation (or its applicable subsidiary) shall not thereafter issue or sell any New Equity Securities without first again offering such securities to the stockholders entitled to preemptive rights in the manner provided in this Section 4.05 of Article 4.

(g)     The rights and obligations set forth in this Section 4.05 of Article 4 shall automatically terminate upon, and shall cease to have any force or effect following, the earlier of (i) the date the Common Stock is listed on a national securities exchange (which, for the avoidance of doubt, does not include an "over-the-counter" system or network) in the United States (a "**Listing**"), or (ii) the consummation of the first public offering and sale of Common Stock by the Corporation (other than on Forms S-4 or S-8 or their equivalent), pursuant to an effective registration statement under the Securities Act of 1933, as amended (the "**Securities Act**", and such public offering and sale, an "**IPO**").

(h)     Notwithstanding anything to the contrary contained herein, the Corporation and/or any of its subsidiaries may issue or sell New Equity Securities to any purchaser (an "**Accelerated Buyer**") without first complying with the provisions of this Section 4.05 of Article 4 if the Board of Directors determines in good faith that it is in the best interests of the Corporation to consummate such issuance or sale without having first complied with such provisions; *provided*, that in connection with any such issuance or

6

sale, the Corporation shall give the Preemptive Rightsholders written notice of such issuance or sale as promptly as practicable, which notice (an "**Accelerated Sale Notice**") shall describe in reasonable detail (a) the material terms and conditions of the issuance or sale of the New Equity Securities to the Accelerated Buyer, including the number or amount and description of the New Equity Securities issued, the issuance or sale date, the purchase price per share (including a reasonable description of any non-cash consideration), and the name and address of the Accelerated Buyer and (b) the rights of the Preemptive Rightsholders to purchase New Equity Securities, pursuant to this paragraph, in connection with such issuance or sale.  In the event of any such issuance or sale of New Equity Securities to an Accelerated Buyer, each Preemptive Rightsholder shall have the right, at any time during the ten (10) Business Days following receipt of the Accelerated Sale Notice, to elect to purchase New Equity Securities in an amount equal to all or any part of its *pro rata* portion (based upon the number of shares of Common Stock beneficially owned by such Preemptive Rightsholder as of the close of business on the record date as a percentage of the total number of shares of Common Stock then outstanding) of the New Equity Securities issued to the Accelerated Buyer, by delivering written notice of such election to the Corporation, whereupon the Corporation shall give effect to such exercise by either (i) requiring that the Accelerated Buyer sell down a portion of its New Equity Securities, or (ii) issuing additional New Equity Securities to such Preemptive Rightsholder, or a combination of (i) and (ii), so long as such action effectively provides such Preemptive Rightsholder with the same opportunity to maintain its ownership percentage of the total number of shares of Common Stock outstanding following the issuance or sale to such Preemptive Rightsholder it would have received had this paragraph not been utilized.

Section 4.06.  *Tag-Along Right*.  (a) If at any time prior to the earlier of a Listing or the consummation of an IPO, stockholders acting as a group (collectively, the "**Tag-Along Sellers**") propose to Transfer (as defined below) shares of Common Stock in a transaction or series of related transactions that constitutes a Change of Control (as defined below) (for the purposes of this Section 4.06 of Article 4, a "**Tag-Along Transfer**"), then each other stockholder that beneficially owns (including all shares beneficially owned by such stockholder's Affiliates) at least 5% of the total shares of Common Stock outstanding (collectively the "**Tag-Along Offerees**") shall have the right to exercise tag-along rights in accordance with the terms and conditions set forth in this Section 4.06 of Article 4 (any such stockholder exercising such rights, a "**Tagging Stockholder**").  As used herein, (i) "**Transfer**" means any direct or indirect, voluntary or involuntary, sale, transfer, assignment, encumbrance or other disposition by operation of law or otherwise (excluding, for the avoidance of doubt, any distribution by a stockholder solely to its members, partners or stockholders upon liquidation or dissolution of such stockholder), and (ii) "**Change of Control**" means any Transfer to a non-Affiliate transferee (including, without limitation, through any merger, consolidation or other business combination or sale(s) of capital stock of the Company or otherwise) pursuant to which holders of a majority of the Common Stock (determined on a fully-diluted basis) outstanding immediately prior to such transaction or series of transactions do not hold securities representing a majority of the total voting power represented by the voting securities of the Company outstanding immediately after such transaction or series of transactions. The rights and obligations set forth in this Section 4.06 of Article 4 shall

7

automatically terminate upon, and shall cease to have any force or effect following, the earlier of (i) a Listing and (ii) the consummation of an IPO.

(b)     The Tag-Along Sellers shall promptly give notice (a "**Tag-Along Notice**") to the Corporation, and the Corporation shall, to the extent reasonably practicable, promptly give or cause to be given notice to each Tag-Along Offeree, at least fifteen (15) Business Days prior to the consummation of the proposed Tag-Along Transfer, setting forth the number of shares of Common Stock proposed to be Transferred by the Tag-Along Sellers, the name and address of the proposed transferee, the proposed purchase price for each such share of Common Stock (the "**Tag-Along Per Share Consideration**"), and any other material terms and conditions of the Tag-Along Transfer; it being understood that such Tag-Along Notice may be given after the terms of the Tag-Along Transfer have been finalized and does not accord the Tagging Stockholder with any rights to information as to the Transfer not required to be included in the Tag-Along Notice. Each Tag-Along Offeree shall have a period of ten (10) Business Days from the date of the Tag-Along Notice within which to elect to sell up to its Tag-Along Pro Rata Portion of shares of Common Stock at a price per share equal to the Tag-Along Per Share Consideration in connection with such Tag-Along Transfer.  Any Tag-Along Offeree may exercise such right by delivery of an irrevocable written notice to the Tag-Along Sellers specifying the number of shares of Common Stock such Tag-Along Offeree desires to include in the Tag-Along Transfer.  Unless the proposed Transferee agrees to purchase all the shares of Common Stock proposed to be Transferred by the Tag-Along Sellers and the Tagging Stockholders, then the total number of shares of Common Stock proposed to be Transferred by the Tag-Along Sellers and Tagging Stockholders in such Tag-Along Transfer shall be reduced by recalculating the allocation on a *pro rata* basis set forth in this paragraph assuming such smaller number of shares is to be Transferred. As used herein, "**Tag-Along Pro Rata Portion**" means a number of shares of Common Stock determined by multiplying (i) the number of shares of Common Stock (determined on a fully-diluted basis) held by the applicable Tag-Along Offeree immediately prior to the Tag-Along Transfer <u>by</u> (ii) a fraction, the numerator of which is the number of shares of Common Stock (determined on a fully-diluted basis) proposed to be Transferred by the Tag-Along Sellers in connection with the Tag-Along Transfer and the denominator of which is the aggregate number of shares of Common Stock (determined on a fully-diluted basis) held by the Tag-Along Sellers immediately prior to the Tag-Along Transfer.

(c)     Each Tagging Stockholder shall agree (i) to make the same representations and warranties to the Transferee with respect to itself and related items as the Tag-Along Sellers make with respect to themselves and related items in connection with the Tag-Along Transfer, (ii) to the same covenants, indemnities and agreements with respect to itself and related items as agreed by the Tag-Along Sellers with respect to themselves and related items in connection with the Tag-Along Transfer, and (iii) to the same terms and conditions to the Transfer of shares of Common Stock as the Tag-Along Sellers agree (including bearing their proportionate share of any escrows, holdbacks or adjustments in purchase price.). Notwithstanding the foregoing, however, all such representations, warranties, covenants, indemnities and agreements shall be made by each Tagging Stockholder and each Tag-Along Seller severally and not jointly.

8

(d)     Notwithstanding anything contained in this Section 4.06 of Article 4, there shall be no liability on the part of the Tag-Along Sellers to the Tagging Stockholders or any other person if the Transfer of the shares of Common Stock pursuant to this Section 4.06 of Article 4 is not consummated for whatever reason.  Whether to effect a Transfer pursuant to this Section 4.06 of Article 4 by the Tag-Along Sellers is in the sole and absolute discretion of the Tag-Along Sellers.

## ARTICLE 5
### STOCKHOLDER ACTION BY WRITTEN CONSENT

Any action required or permitted to be taken at any annual or special meeting of stockholders of the Corporation may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed by the holders of shares having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted and shall be delivered to the Corporation in accordance with Section 228 of the DGCL.

## ARTICLE 6
### CORPORATE GOVERNANCE

The following provisions are inserted for the management of the business and the conduct of the affairs of the Corporation, and for further definition, limitation and regulation of the powers of the Corporation and of its directors and stockholders:

(a)     The business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors.  In addition to the powers and authority expressly conferred upon them by statute or by this Certificate of Incorporation or the bylaws of the Corporation then in effect, the directors are hereby empowered to exercise all such powers and do all such acts and things as may be exercised or done by the Corporation, subject, nevertheless, to the DGCL, this Certificate of Incorporation, and the bylaws of the Corporation.

(b)     The directors of the Corporation need not be stockholders of the Corporation, and need not be elected by written ballot unless the bylaws of the Corporation so provide.

(c)     Special meetings of the stockholders, other than those required by statute, may be called at any time as set forth in the bylaws of the Corporation, and may be called upon the written request to the Secretary by one or more stockholders holding, in the aggregate, at least a majority of the voting power of the shares entitled to vote in the election of directors of the Corporation.  Any such written request shall specify the time of such meeting and the general nature of the business proposed to be transacted and shall be delivered to the Secretary of the Corporation at the principal executive offices of the Corporation, and the Secretary shall, promptly following his or her receipt of such request, cause notice of such meeting to be given in accordance with the bylaws of the Corporation to each of the stockholders entitled to vote at such meeting.

9

(d)     An annual meeting of stockholders, for the election of directors and for the transaction of such other business as may properly come before the meeting, shall be held at such place, on such date, and at such time as the Board of Directors shall fix.

## ARTICLE 7
### BOARD OF DIRECTORS

Section 7.01.  *Number, Election and Term of Office*.  The Board of Directors shall consist of one or more directors, as more particularly set forth in the bylaws of the Corporation. The directors, other than those who may be elected by the holders of any series of Preferred Stock under specified circumstances, shall be of one class and each director shall serve until his or her successor shall have been duly elected and qualified or, if earlier, until his or her death, incapacity, resignation or removal.  At each annual meeting of stockholders, (i) directors shall be elected for a term of office to expire at the succeeding annual meeting of stockholders, with each director to hold office until his or her successor shall have been duly elected and qualified or, if earlier, until his or her death, incapacity, resignation or removal; and (ii) directors may be elected to fill any vacancy on the Board of Directors, regardless of how such vacancy shall have been created.  Vacancies on the Board of Directors may also be filled in the manner provided in the bylaws of the Corporation.

Section 7.02.  *Notice of Stockholder Nominations*.     Advance notice of stockholder nominations for the election of directors and of business to be brought by stockholders before any meeting of the stockholders of the Corporation shall be given in the manner provided in the bylaws of the Corporation.

Section 7.03.  *Removal*.  Except as otherwise required by applicable law and as provided above prior to the first election of directors, and subject to the rights of the holders of any series of Preferred Stock then outstanding, any one or more of the directors may be removed from office, with or without cause, by the affirmative vote or written consent of holders of a majority of the voting power of the shares entitled to vote generally in the election of directors of the Corporation, voting together as a single class.

## ARTICLE 8
### BYLAWS

The Board of Directors is expressly authorized to adopt, amend and repeal the bylaws of the Corporation, *provided*, that any adoption, amendment or repeal of the bylaws of the Corporation by the Board of Directors (a) shall require the approval of a majority of the Whole Board, and (b) shall be subject to such additional restrictions (which may include, without limitation, majority or supermajority stockholder approval to amend or repeal specifically enumerated provisions), if any, as are set forth in the bylaws of the Corporation as in effect at such time.  The stockholders shall also have power to adopt, amend or repeal the bylaws of the Corporation, by the affirmative vote of the holders of at least a majority of the voting power of all of the then-outstanding shares of capital stock entitled to vote generally in the election of directors of the Corporation, voting together as a single class, *provided,* that any such adoption, amendment or repeal

10

shall be subject to such additional restrictions (which may include, without limitation, supermajority stockholder approval to amend or repeal specifically enumerated provisions), if any, as are set forth in the bylaws of the Corporation as in effect at such time. As used herein, "**Whole Board**" shall mean, at any given time, the total number of directorships then authorized, whether or not any vacancies exist with respect to such directorships.

## ARTICLE 9
### SECTION 203 OF THE DGCL

The Corporation expressly elects not to be governed by Section 203 of the DGCL.

## ARTICLE 10
### LIMITATION ON DIRECTOR LIABILITY

The Corporation hereby eliminates, to the fullest extent permitted by law (as contemplated by Section 102(b)(7) of the DGCL), the personal liability of any person who serves as a director of the Corporation to the Corporation and/or its stockholders for monetary damages for breach of fiduciary duty as a director, except for liability (i) for any breach of the director's duty of loyalty to the Corporation or its stockholders, (ii) for any act or omission not in good faith or which involves intentional misconduct or a knowing violation of law, (iii) under Section 174 of the DGCL, or (iv) for any transaction from which the director derived an improper personal benefit.  If the DGCL is amended to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of the Corporation shall be eliminated or limited to the fullest extent permitted by the DGCL, as so amended.  In the event that it is determined that Delaware law does not apply, the liability of a director of the Corporation to the company or its stockholders for monetary damages shall be eliminated to the fullest extent permissible under applicable law.  Any repeal or modification of the foregoing paragraph shall not adversely affect any right or protection of a director of the Corporation existing at the time of such repeal or modification.

## ARTICLE 11
### INDEMNIFICATION OF DIRECTORS AND OFFICERS

Section 11.01. *Right to Indemnification.*  Each person who was or is made a party or is threatened to be made a party to or is otherwise involved in any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (a "**proceeding**"), by reason of the fact that he or she, or a person of whom he or she is the legal representative, is or was a director or an officer of the Corporation or is or was serving at the request of the Corporation as a director, officer, manager, employee, agent or trustee of another corporation or of a limited liability company, partnership, joint venture, trust or other enterprise, including service with respect to an employee benefit plan (hereinafter, a "**Covered Person**"), whether the basis of such proceeding is alleged action or inaction in an official capacity or in any other capacity while serving as a director, officer, manager, employee, agent or trustee, shall be

11

indemnified and held harmless by the Corporation to the fullest extent permitted by Delaware law, as the same exists or may hereafter be amended from time to time (but in the case of any such amendment, only to the extent that such amendment permits the Corporation to provide broader indemnification rights than said law permitted the Corporation to provide prior to such amendment), against all costs, charges, expenses, liabilities and losses (including attorneys' fees, judgments, fines, excise taxes payable under the Employee Retirement Income Security Act of 1974, as amended, or penalties and amounts paid or to be paid in settlement) reasonably incurred or suffered by such Covered Person in connection therewith, and that indemnification shall continue as to a Covered Person who has ceased to be a director, officer, manager, employee or agent and shall inure to the benefit of his or her heirs, executors, administrators and personal and legal representatives; *provided, however*, that, except as provided in Section 11.04 of this Article 11 with respect to proceedings to enforce rights to indemnification, the Corporation shall indemnify any such Covered Person seeking indemnification in connection with a proceeding (or part thereof) initiated by that Covered Person, only if that proceeding (or part thereof) was authorized by the Board of Directors.

Section 11.02. *Right to Advancement of Expenses.*   In addition to the right to indemnification conferred in Section 11.01 of this Article 11, a Covered Person shall also have the right to be paid by the Corporation the expenses (including attorney's fees) incurred in defending any such proceeding in advance of its final disposition (hereinafter an "**advancement of expenses**"); *provided, however*, that, if the DGCL requires, an advancement of expenses incurred by a Covered Person in his or her capacity as a director or an officer of the Corporation (and not in any other capacity in which service was or is rendered by such Covered Person, including, without limitation, service to an employee benefit plan) shall be made only upon delivery to the Corporation of an undertaking (hereinafter an "**undertaking**"), by or on behalf of such Covered Person to repay all amounts so advanced if it shall ultimately be determined by final judicial decision from which there is no further right to appeal (hereinafter a "**final adjudication**") that such Covered Person is not entitled to be indemnified for such expenses under this Section 11.02 of this Article 11 or otherwise.   No Covered Person will be required to post any bond or provide any other security with respect to any such undertaking.

Section 11.03. *Primary Indemnitor.*   The Corporation hereby acknowledges that certain Covered Persons may have rights to indemnification and advancement of expenses (directly or through insurance obtained by any such entity) provided by one or more third parties (collectively, the "**Other Indemnitors**"), and which may include third parties for whom such Covered Person serves as a manager, member, officer, employee or agent.   The Corporation hereby agrees and acknowledges that notwithstanding any such rights that a Covered Person may have with respect to any Other Indemnitor(s), (i) the Corporation is the indemnitor of first resort with respect to all Covered Persons and all obligations to indemnify and provide advancement of expenses to Covered Persons, (ii) the Corporation shall be required to indemnify and advance the full amount of expenses incurred by the Covered Persons, to the fullest extent required by law, the terms of this Certificate of Incorporation, the bylaws of the Corporation, any agreement to which the Corporation is a party, any vote of the stockholders or the Board of Directors,

12

or otherwise, without regard to any rights the Covered Persons may have against the Other Indemnitors and (iii) to the fullest extent permitted by law, the Corporation irrevocably waives, relinquishes and releases the Other Indemnitors from any and all claims for contribution, subrogation or any other recovery of any kind in respect thereof. The Corporation further agrees that no advancement or payment by the Other Indemnitors with respect to any claim for which the Covered Persons have sought indemnification from the Corporation shall affect the foregoing and the Other Indemnitors shall have a right of contribution and/or be subrogated to the extent of any such advancement or payment to all of the rights of recovery of the Covered Persons against the Corporation.  These rights shall be a contract right, and the Other Indemnitors are express third party beneficiaries of the terms of this paragraph.

Section 11.04. *Right of Claimant to Bring Suit.*  If a claim under this Article 11 is not paid in full by the Corporation within 30 days after a written claim has been received by the Corporation, except in the case of a claim for an advancement of expenses in which case the applicable period shall be 20 days, the Covered Person may at any time thereafter bring suit against the Corporation to recover the unpaid amount of the claim. To the fullest extent permitted by law, if successful in whole or in part in any such suit, or in a suit brought by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the Covered Person shall also be entitled to be paid the expense of prosecuting or defending such suit.  It shall be a defense to any suit brought by a Covered Person to enforce a right to indemnification hereunder (other than a suit brought to enforce a claim for advancement of expenses where the required undertaking, if any, has been tendered to the Corporation) that the Covered Person has failed to meet any applicable standard of conduct for indemnification set forth in the DGCL, but the burden of proving such defense shall be on the Corporation.  In any suit brought by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the Corporation shall be entitled to recover such expenses upon a final adjudication that the Covered Person has not met any applicable standard for indemnification set forth in the DGCL.  Neither the failure of the Corporation (including its Board of Directors or a committee thereof, independent legal counsel, or its stockholders) to have made a determination prior to the commencement of such suit that indemnification of the Covered Person is permissible in the circumstances because he or she has met the applicable standard of conduct set forth in the DGCL, nor an actual determination by the Corporation (including its Board of Directors or a committee thereof, independent legal counsel, or its stockholders) that the Covered Person has not met such applicable standard of conduct, shall be a defense to the suit or create a presumption that the Covered Person has not met the applicable standard of conduct or, in the case of such a suit brought by the Covered Person, be a defense to such suit).  In any suit brought by a Covered Person to enforce a right to indemnification or to an advancement of expenses hereunder, or brought by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the burden of proving that the Covered Person is not entitled to be indemnified, or to such advancement of expenses, under this Article 11 or otherwise, shall be on the Corporation.

Section 11.05. *Non-Exclusivity of Rights.*  The right to indemnification and the advancement of expenses conferred in this Article 11 shall not be exclusive of any other

13

right that any person may have or hereafter acquire under any statute, any provision of this Certificate of Incorporation, the bylaws of the Corporation, any agreement to which the Corporation is a party, any vote of the stockholders or the Board of Directors or otherwise.

Section 11.06. *Insurance.*   The Corporation may maintain insurance, at its expense, to protect itself and any director, officer, manager, employee or agent of the Corporation or another corporation, limited liability company, partnership, joint venture, trust or other enterprise against any such expense, liability or loss, whether or not the Corporation would have the power to indemnify such person against that expense, liability or loss under Delaware law.

Section 11.07. *Expenses as a Witness.*   To the extent any Covered Person is by reason of the fact that he or she is or was a director or an officer of the Corporation or is or was serving at the request of the Corporation as a director, officer, manager, employee, agent or trustee of another corporation or of a limited liability company, partnership, joint venture, trust or other enterprise, including service with respect to an employee benefit plan, a witness in any action, suit or proceeding, he or she shall be indemnified against all costs and expenses actually and reasonably incurred by him or her or on his or her behalf in connection therewith.

Section 11.08. *Indemnification of Employees and Agents.*   The Corporation may, to the extent authorized from time to time by the Board of Directors, grant rights to indemnification and to the advancement of expenses incurred in defending any proceeding in advance of its final disposition, to any employee or agent of the Corporation to the fullest extent of the provisions of this Article 11 with respect to the indemnification and advancement of expenses of directors and officers of the Corporation.

Section 11.09. *Severability.*   If any provision or provisions of this Article 11 shall be held to be invalid, illegal or unenforceable for any reason whatsoever: (i) the validity, legality and enforceability of the remaining provisions of this Article 11 (including, without limitation, each portion of any paragraph of this Article 11 containing any such provision held to be invalid, illegal or unenforceable, that is not itself held to be invalid, illegal or unenforceable) shall not in any way be affected or impaired thereby; and (ii) to the fullest extent possible, the provisions of this Article 11 (including, without limitation, each such portion of any paragraph of this Article 11 containing any such provision held to be invalid, illegal or unenforceable) shall be construed so as to give effect to the intent manifested by the provision held invalid, illegal or unenforceable.

Section 11.10. *Nature of Rights; Amendments to this Article.*   The rights conferred upon Covered Persons in this Article 11 shall be contract rights and such rights shall continue as to a Covered Person who has ceased to be a director, officer, manager, employee, agent or trustee and shall inure to the benefit of the Covered Person's heirs, executors and administrators.  Any repeal, amendment or modification of this Article 11 or any of the provisions hereof that adversely affects any right of a Covered Person or its successors hereunder shall be prospective only and shall not limit, eliminate, impair or

14

otherwise adversely affect any rights to indemnification and to the advancement of expenses of a Covered Person with respect to any proceeding involving any occurrence or alleged occurrence of any action or omission to act that took place prior to such repeal, amendment or modification.

## ARTICLE 12
### BUSINESS OPPORTUNITIES

To the fullest extent permitted by Section 122(17) of the DGCL (or any successor provision) and except as may be otherwise expressly agreed in writing by the Corporation and any Dual Role Person (as defined below), the Corporation, on behalf of itself and its subsidiaries, renounces and waives any interest or expectancy of the Corporation and its subsidiaries in, or in being offered an opportunity to participate in, directly or indirectly, any potential transactions, matters or business opportunities (including, without limitation, any business activities or lines of business that are the same as or similar to those pursued by, or competitive with, the Corporation or any of its subsidiaries or any dealings with customers or clients of the Corporation or any of its subsidiaries) that are from time to time presented to any Dual Role Person (unless first presented to a Dual Role Person in such person's capacity as an officer or director of the Corporation), even if the transaction, matter or opportunity is one that the Corporation or its subsidiaries might reasonably be deemed to have pursued or had the ability or desire to pursue if granted the opportunity to do so and no such person shall be liable to the Corporation or any of its subsidiaries or Affiliates for breach of any fiduciary or other duty, as a director or officer or otherwise, by reason of the fact that such person pursues, acquires or participates in such business opportunity, directs such business opportunity to another person or fails to present such business opportunity, or information regarding such business opportunity, to the Corporation or its subsidiaries. Without limiting the foregoing renunciation, the Corporation acknowledges that certain of the stockholders are in the business of making investments in, and have investments in, other businesses similar to and that may compete with the Corporation's businesses ("**Competing Businesses**"), and agrees that each such stockholder shall have the right to make additional investments in or have relationships with other Competing Businesses independent of its investment in the Corporation. Any person purchasing or otherwise acquiring any interest in any shares of stock of the Corporation shall be deemed to have notice of and consented to the provisions of this paragraph. Neither the alteration, amendment or repeal of this paragraph, nor the adoption of any provision of this Certificate of Incorporation inconsistent with this paragraph, nor, to the fullest extent permitted by Delaware law, any modification of law, shall eliminate or reduce the effect of this paragraph in respect of any business opportunity first identified or any other matter occurring, or any cause of action, suit or claim that, but for this paragraph, would accrue or arise, prior to such alteration, amendment, repeal, adoption or modification. If any provision or provisions of this paragraph shall be held to be invalid, illegal or unenforceable as applied to any circumstance for any reason whatsoever: (a) the validity, legality and enforceability of such provisions in any other circumstance and of the remaining provisions of this paragraph (including, without limitation, each portion of any paragraph of this paragraph containing any such provision held to be invalid, illegal or unenforceable that is not itself

15

held to be invalid, illegal or unenforceable) shall not in any way be affected or impaired thereby and (b) to the fullest extent possible, the provisions of this Article 12 (including, without limitation, each such portion of any sentence of this Article 12 containing any such provision held to be invalid, illegal or unenforceable) shall be construed so as to permit the Corporation to protect its directors, officers, employees and agents from personal liability in respect of their good faith service to or for the benefit of the Corporation to the fullest extent permitted by law.  This Article 12 shall not limit any protections or defenses available to, or indemnification or advancement rights of, any director or officer of the Corporation under this Certificate of Incorporation, the bylaws of the Corporation, or applicable law.  As used herein, "**Dual Role Person**" shall mean any individual who is a director of the Corporation and is otherwise an employee, officer or a director of a stockholder.

## ARTICLE 13
### EXCLUSIVE FORUM

Unless the Corporation consents in writing to the selection of an alternative forum, the Court of Chancery of the State of Delaware (or, if the Court of Chancery shall not have jurisdiction, another state court located within the state of Delaware, or if no state court located within the State of Delaware has jurisdiction, the federal district court for the District of Delaware), shall be the sole and exclusive forum for any stockholder of the Corporation (including a beneficial owner of stock) to bring (i) any derivative action or proceeding brought on behalf of the Corporation, (ii) any action asserting a claim of breach of a fiduciary duty owed by any director, officer or other employee of the Corporation to the Corporation or the Corporation's stockholders, (iii) any action asserting a claim against the Corporation, its directors, officers or employees arising pursuant to any provision of the DGCL or this Certificate of Incorporation or the bylaws of the Corporation, or (iv) any action asserting a claim against the Corporation, its directors, officers or employees governed by the internal affairs doctrine, except as to each of (i) through (iv) above, for any claim as to which such court determines that there is an indispensable party not subject to the jurisdiction of such court (and the indispensable party does not consent to the personal jurisdiction of such court within ten (10) days following such determination).  If any provision or provisions of this Article 13 shall be held to be invalid, illegal or unenforceable as applied to any person or entity or circumstance for any reason whatsoever, then, to the fullest extent permitted by law, the validity, legality and enforceability of such provisions in any other circumstance and of the remaining provisions of this Article 13 (including, without limitation, each portion of any sentence of this Article 13 containing any such provision held to be invalid, illegal or unenforceable that is not itself held to be invalid, illegal or unenforceable) and the application of such provision to other persons or entities and circumstances shall not in any way be affected or impaired thereby. Any person purchasing or otherwise holding any interest in shares of capital stock of the Corporation shall be deemed to have notice of and consented to the provisions of this Article 13.

16

## ARTICLE 14

### AMENDMENTS

The Corporation reserves the right to amend or repeal any provision contained in this Certificate of Incorporation in the manner prescribed by the laws of the State of Delaware and all rights conferred upon stockholders are granted subject to this reservation and the terms of the stockholders agreement dated on or about the date hereof by and among the Corporation and certain holders of the Common Stock, with the sole exception of those rights and powers conferred under Articles 10 and 11.

*[Remainder of page intentionally left blank]*

17

WEIL:\96057985\8\62739.0003

Draft: 03/24/2017

IN WITNESS WHEREOF, the Corporation has caused this Certificate of Incorporation to be signed as of _____, 2017.

AMPLIFY ENERGY CORP.

By: _____
Name:
Title:

Draft: 03/24/2017

**AMENDED AND RESTATED BYLAWS**
**OF**
**AMPLIFY ENERGY CORP.**

ARTICLE 1

STOCKHOLDERS

Section 1.01.  *Annual Meeting*.  (a) An annual meeting of the stockholders of the Corporation, for the election of directors and for the transaction of such other business as may properly come before the meeting, shall be held at such place, on such date, and at such time as the Board of Directors (as defined below) shall fix.

(b)     Subject to the certificate of incorporation of the Corporation (the "**Certificate of Incorporation**"), nominations of persons for election to the Board of Directors and proposals of business to be transacted by the stockholders may be made at an annual meeting of stockholders (i) pursuant to the Corporation's proxy materials with respect to such meeting, (ii) by or at the direction of the Board of Directors, or (iii) by any stockholder of record of the Corporation (the "**Record Stockholder**") at the time of the giving of the Record Stockholder Notice (as defined below), who is entitled to vote at the meeting and who has complied with the notice procedures set forth in this Section 1.01 of Article 1.  For the avoidance of doubt, the foregoing clause (iii) shall be the exclusive means for a stockholder to make nominations or propose business at an annual meeting of stockholders, other than, to the extent the Corporation is then subject to such Rule, business included in the Corporation's proxy materials pursuant to Rule 14a-8 under the Securities Exchange Act of 1934, as amended (such act, and the rules and regulations promulgated thereunder, the "**Exchange Act**").

(c)     For nominations of directors or proposals of business to be properly brought before an annual meeting by a Record Stockholder pursuant to clause (iii) of the immediately preceding paragraph, (i) the Record Stockholder must have given timely notice thereof in writing ("**Record Stockholder Notice**") to the Secretary of the Corporation (the "**Secretary**") and (ii) any such business must be a proper matter for stockholder action under Delaware law.  To be timely, a Record Stockholder Notice shall be received by the Secretary at the principal executive offices of the Corporation not less than 45 nor more than 75 days prior to the one-year anniversary of the date on which the Corporation first mailed its proxy materials for the preceding year's annual meeting of stockholders; *provided*, *however*, that, (A) subject to the last sentence of this Section 1.01(c) of Article 1, if the meeting is convened more than 30 days prior to or delayed by more than 30 days after the one-year anniversary of the preceding year's annual meeting, or if no annual meeting was held during the preceding year, notice by the Record Stockholder to be timely must be so received not later than the close of business on the later of (1) the 45th day before such annual meeting or (2) the 10th day following the date on which public announcement of the date of such meeting is first made and (B) in the event that the number of directors to be elected to the Board of Directors is increased and a public announcement naming all of the nominees for director or indicating the increase in the size of the Board of Directors is not made by the Corporation at least 10 days

before the last day a Record Stockholder may timely deliver a notice of nomination in accordance with the foregoing provisions of this paragraph, a Record Stockholder Notice shall also be considered timely, but only with respect to nominees for any new positions created by such increase, if it is received by the Secretary at the principal executive offices of the Corporation not later than the close of business on the 10th day following the date on which such public announcement is first made by the Corporation. Notwithstanding anything to the contrary in these bylaws of the Corporation (these "**Bylaws**"), for the first annual meeting of the stockholders after the effective date of these Bylaws, to be timely, a Record Stockholder Notice shall be delivered to the Secretary at the principal executive offices of the Corporation no earlier than the close of business on the 75th day prior to the scheduled date of such annual meeting and not later than the close of business on the later of the date that is 45 days prior to the scheduled date of such annual meeting or 10 days following the date on which public announcement of the date of such meeting is first made by the Corporation.  In no event shall an adjournment, or postponement of an annual meeting for which notice has been given, commence a new time period for the giving of a Record Stockholder Notice.

(d)     Any Record Stockholder Notice shall set forth the following information:

(i)     if such notice pertains to the nomination of directors, as to each person whom the Record Stockholder proposes to nominate for election or re-election as a director, all information relating to such person as would be required to be disclosed in a solicitation of proxies for the election of such nominee as a director pursuant to Regulation 14A under the Exchange Act, and such person's written consent to serve as a nominee and to serve as a director if elected;

(ii)     with respect to any other business that the Record Stockholder proposes to bring before the meeting, a brief description of such business, the reasons for conducting such business at the meeting, and any material interest that such Record Stockholder (and, if applicable, the beneficial owner on whose behalf the proposal is made) has in such business; and

(iii)     with respect to the Record Stockholder giving the notice and the beneficial owner, if any, on whose behalf the nomination or proposal is made (each, a "**party**"):

(A)     the name and address of each such party;

(B)     (1) the class, series, and number of shares of the Corporation that are owned, directly or indirectly, beneficially and of record by each such party, (2) any option, warrant, convertible security, stock appreciation right, or similar right with an exercise or conversion privilege or a settlement payment or mechanism at a price related to any class or series of shares of the Corporation or with a value derived in whole or in part from the value of any class or series of shares of the Corporation, whether or not such instrument or right shall be subject to settlement in the underlying class or series of capital stock of the

2

Corporation or otherwise (a "**Derivative Instrument**") directly or indirectly owned beneficially by each such party, and any other direct or indirect opportunity to profit or share in any profit derived from any increase or decrease in the value of shares of the Corporation, (3) any proxy, contract, arrangement, understanding, or relationship pursuant to which each such party has a right to vote, directly or indirectly, any shares of any security of the Corporation, (4) any short interest in any security of the Corporation held by each such party (for purposes hereof, a person shall be deemed to have a short interest in a security if such person directly or indirectly, through any contract, arrangement, understanding, relationship or otherwise, has the opportunity to profit or share in any profit derived from any decrease in the value of the subject security), (5) any rights to dividends on the shares of the Corporation owned beneficially directly or indirectly by each such party that are separated or separable from the underlying shares of the Corporation, (6) any proportionate interest in shares of the Corporation or Derivative Instruments held, directly or indirectly, by a general or limited partnership in which each such party is a general partner or, directly or indirectly, beneficially owns an interest in a general partner and (7) any performance-related fees (other than an asset-based fee) that each such party is directly or indirectly entitled to based on any increase or decrease in the value of shares of the Corporation or Derivative Instruments, if any, as of the date of such notice, and each such party shall supplement the information provided pursuant to the foregoing clauses (1) through (7), to the extent necessary, by the earlier of the 10th day after the record date for determining the stockholders entitled to vote at the meeting and the day prior to the meeting; and

(C)   any other information relating to each such party that would be required to be disclosed in a proxy statement or other filings required to be made in connection with solicitations of proxies for, as applicable, the proposal and/or the election of directors in a contested election pursuant to Section 14 of the Exchange Act.

(e)   A person shall not be eligible for election or re-election as a director at an annual meeting unless (i) the person is nominated by a Record Stockholder in accordance with Section 1.01(b)(iii) of this Article 1 or (ii) the person is nominated by or at the direction of the Board of Directors.  Only such business shall be conducted at an annual meeting of stockholders as shall have been brought before the meeting in accordance with the procedures set forth in this section.  The chairman of the meeting shall have the power and the duty to determine whether a nomination or any business proposed to be brought before the meeting has been made in accordance with the procedures set forth in these Bylaws and, if any proposed nomination or business is not in compliance with these Bylaws, to declare that such defectively proposed business or nomination shall not be presented for stockholder action at the meeting and shall be disregarded.

3

(f)     As used in these Bylaws, "**public announcement**" shall mean disclosure in a press release reported by the Dow Jones News Service, Associated Press or a comparable national news service or in a document publicly filed by the Corporation with the Securities and Exchange Commission (the "**SEC**") pursuant to Sections 13, 14 or 15(d) of the Exchange Act.

(g)     Notwithstanding the foregoing provisions of this Section 1.01 of Article 1, a stockholder shall also comply with all applicable requirements of the Exchange Act with respect to matters set forth in this Section 1.01 of Article 1.  Nothing in this Section 1.01 of Article 1 shall be deemed to affect any rights of stockholders to request inclusion of proposals in the Corporation's proxy statement pursuant to Rule 14a-8 under the Exchange Act, to the extent applicable.

Section 1.02.   *Special Meetings*.  (a) Special meetings of the stockholders, other than those required by statute, may be called at any time pursuant to a resolution adopted by the Board of Directors, or upon the written request to the Secretary by one or more stockholders holding, in the aggregate, at least a majority of the voting power of the shares entitled to vote in the election of directors of the Corporation.  Any such written request shall specify the time of such meeting and the general nature of the business proposed to be transacted and shall be delivered to the Secretary at the principal executive offices of the Corporation, and the Secretary shall, promptly following his or her receipt of such request, cause notice of such meeting to be given in accordance with these Bylaws to each of the stockholders entitled to vote at such meeting.  The Board of Directors may postpone or reschedule any previously scheduled special meeting called by the Board of Directors.

(b)     The notice of a special meeting shall include the purpose for which such meeting is called.  Only such business shall be conducted at a special meeting of stockholders as shall have been specified in the notice of such special meeting (or any supplement thereto).

(c)     Subject to the Certificate of Incorporation, nominations of persons for election to the Board of Directors may be made at a special meeting of stockholders at which directors are to be elected, as follows: (i) by or at the direction of the Board of Directors or by any stockholder of record of the Corporation who is entitled to vote at such meeting and delivers (while it is a Record Stockholder) a written notice to the Secretary setting forth the information required by Section 1.01(d)(i) and 1.01(d)(iii) of Article 1.  Nominations by stockholders of persons for election to the Board of Directors may be made at such meeting only if the Record Stockholder Notice required by the immediately preceding sentence is received by the Secretary at the principal executive offices of the Corporation not later than the close of business on the later of the 45th day prior to such special meeting and the 10th day following the date on which public announcement is first made of the date of the special meeting and of the nominees proposed by the Board of Directors to be elected at such meeting.  In no event shall an adjournment, or postponement of a special meeting for which notice has been given, commence a new time period for the giving of a Record Stockholder Notice.  A person shall not be eligible for election or re-election as a director at a special meeting of

4

stockholders unless the person is nominated in accordance with this paragraph. Notwithstanding anything in this Section 1.02(c) of Article 1 or otherwise in these Bylaws to the contrary, this Section 1.02(c) of Article 1 shall not apply to any special meetings of the stockholders called at the request of stockholders to the extent permitted by Section 1.02(a) of Article 1.

(d)     Notwithstanding the foregoing provisions of this Section 1.02 of Article 1, a stockholder shall also comply with all applicable requirements of the Exchange Act with respect to matters set forth in this Section 1.02 of Article 1.  Nothing in this Section 1.02 of Article 1 shall be deemed to affect any rights of stockholders to request inclusion of proposals in the Corporation's proxy statement pursuant to Rule 14a-8 under the Exchange Act, if the Corporation is then subject to such Rule.

Section 1.03.  *Notice of Meetings; Adjournment*.  (a)  Notice of the place, date, and time of all meetings of the stockholders, the means of remote communications, if any, by which stockholders and proxyholders may be deemed to be present in person and vote at such meeting, and the record date for determining the stockholders entitled to vote at the meeting, if such date is different from the record date for determining stockholders entitled to notice of the meeting, shall be given, not less than 10 days nor more than 60 days before the date on which the meeting is to be held, to each stockholder entitled to vote at such meeting as of the record date for determining the stockholders entitled to notice of the meeting, except as otherwise provided herein or required by law.

(b)     Any meeting of stockholders, whether annual or special, may be adjourned from time to time for any reason by either the chairman of the meeting, or by the vote of the holders of a majority in voting power of the shares present in person or represented by proxy and entitled to vote thereon, whether or not a quorum is present.  When a meeting of stockholders is adjourned to another time or place, notice need not be given of the adjourned meeting if the time and place, if any, thereof, and the means of remote communications, if any, by which stockholders and proxyholders may be deemed to be present in person and vote at such adjourned meeting and the record date for determining the stockholders entitled to vote at the meeting (if such date is different from the record date for determining stockholders entitled to notice of the meeting) are announced at the meeting at which the adjournment is taken; *provided*, *however*, that if the date of any adjourned meeting is more than 30 days after the date for which the meeting was originally noticed, notice of the adjourned meeting shall be given to each stockholder in conformity herewith.  If after the adjournment a new record date for stockholders entitled to vote at such meeting is fixed for the adjourned meeting, the Board of Directors shall fix a new record date for notice of such adjourned meeting, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board of Directors and, except as otherwise required by law, shall not be less than 10 nor more than 60 days before the date of such adjourned meeting, and shall give notice of the adjourned meeting to each Record Stockholder entitled to vote at such adjourned meeting as of the record date fixed for notice of such adjourned meeting.  At any adjourned meeting, any business may be transacted which might have been transacted at the original meeting.

5

WEIL:\96059297\5\62739.0003

Section 1.04.  *Quorum*.  (a)  At any meeting of the stockholders, the holders of a majority of the voting power of all of the shares of the stock entitled to vote at the meeting, present in person or by proxy, shall constitute a quorum for all purposes, unless or except to the extent that the presence of a larger number may be required by law or by the rules of any stock exchange upon which the Corporation's securities are listed. Where a separate vote by a class or classes or series is required, a majority of the voting power of the shares of such class or classes or series present in person or represented by proxy shall constitute a quorum entitled to take action with respect to that vote on that matter.

(b)  If a quorum shall not be present or represented at any meeting of the stockholders, the chairman of the meeting or the stockholders entitled to vote thereon, by a majority in voting power thereof, present in person or represented by proxy, may adjourn the meeting in the manner provided in Section 1.03 of Article 1, until a quorum shall be present or represented.  A quorum, once established, shall not be broken by the withdrawal of enough stockholders to leave less than a quorum.

Section 1.05.  *Organization*.  Such person as the Board of Directors may have designated or, in the absence of such a person, the Chairman of the Board or, in his or her absence, the Chief Executive Officer of the Corporation or, in his or her absence, such person as may be chosen by the holders of a majority of the voting power of the shares entitled to vote who are present, in person or by proxy, shall call to order any meeting of the stockholders and act as chairman of the meeting.  In the absence of the Secretary, the secretary of the meeting shall be such person as the chairman of the meeting appoints.

Section 1.06.  *Conduct of Business*.  The chairman of any meeting of stockholders shall determine the order of business and the procedure at the meeting, including such regulation of the manner of voting and the conduct of discussion as seem to him or her in order.  The date and time of the opening and closing of the polls for each matter upon which the stockholders will vote at the meeting shall be announced at the meeting.

Section 1.07.  *Proxies and Voting*.  (a)  At any meeting of the stockholders, every stockholder entitled to vote may vote in person or by proxy authorized by an instrument in writing or by a transmission permitted by law filed in accordance with the procedure established for the meeting.  Any copy, facsimile telecommunication or other reliable reproduction of the writing or transmission created pursuant to this paragraph may be substituted or used in lieu of the original writing or transmission for any and all purposes for which the original writing or transmission could be used, *provided,* that such copy, facsimile telecommunication or other reproduction shall be a complete reproduction of the entire original writing or transmission.

(b)  The Corporation may, and to the extent required by law, shall, in advance of any meeting of stockholders, appoint one or more inspectors to act at the meeting and make a written report thereof.  The Corporation may designate one or more alternate inspectors to replace any inspector who fails to act. If no inspector or alternate is able to act at a meeting of stockholders, the person presiding at the meeting may, and to the

6

extent required by law, shall, appoint one or more inspectors to act at the meeting.  Each inspector, before entering upon the discharge of his or her duties, shall take and sign an oath faithfully to execute the duties of inspector with strict impartiality and according to the best of his or her ability.  Every vote taken by ballots shall be counted by a duly appointed inspector or inspectors.

(c)     All elections of directors of the Corporation shall be determined by a plurality of the votes cast, and except as otherwise required by law or the rules of any stock exchange upon which the Corporation's securities are listed or as otherwise provided in these Bylaws or the Certificate of Incorporation, all other matters shall be determined by a majority of the votes cast affirmatively or negatively, on such matter.

Section 1.08.  *Stockholder List*.  (a)  The officer who has charge of the stock ledger of the Corporation shall, at least 10 days before every meeting of stockholders, prepare and make a complete list of stockholders entitled to vote at any meeting of stockholders, *provided, however,* if the record date for determining the stockholders entitled to vote is less than 10 days before the meeting date, the list shall reflect the stockholders entitled to vote as of the 10th day before the meeting date, arranged in alphabetical order and showing the address of each such stockholder and the number of shares registered in his or her name.  Such list shall be open to the examination of any stockholder for a period of at least 10 days prior to the meeting in the manner provided by law.

(b)     A stock list shall also be open to the examination of any stockholder during the whole time of the meeting as provided by law.  This list shall presumptively determine (i) the identity of the stockholders entitled to examine such stock list and to vote at the meeting and (ii) the number of shares held by each of them.

ARTICLE 2

BOARD OF DIRECTORS AND GOVERNANCE

Section 2.01.  *Number, Election and Term of Directors*.  (a)  Subject to the rights of the holders of any series of preferred stock of the Corporation to elect additional directors under specified circumstances and except as provided otherwise in the Certificate of Incorporation, the total authorized number of directors shall be fixed from time to time exclusively by the Board of Directors pursuant to a resolution adopted by a majority of the Whole Board (as defined below). The directors, other than those who may be elected by the holders of any series of preferred stock under specified circumstances, shall be of one class and each director shall serve until his or her successor shall have been duly elected and qualified or, if earlier, until his or her death, incapacity, resignation or removal. As used in these Bylaws, "**Whole Board**" shall mean, at any given time, the total number of directorships then authorized, whether or not any vacancies exist with respect to such directorships.

7

WEIL:\96059297\5\62739.0003

(b)      As of the effective date of these Bylaws, the Board of Directors shall be comprised of [seven][1] directors, who shall be [●], [●], [●], [●], [●], [●], and [●].

Section 2.02.  *Newly Created Directorships and Vacancies*.  Subject to the rights of the holders of any series of preferred stock of the Corporation then outstanding, newly created directorships resulting from any increase in the authorized number of directors or any vacancies in the Board of Directors resulting from death, incapacity, resignation, disqualification, removal from office or other cause may be filled (a) by the stockholders at a special meeting or an annual meeting, or by the written consent of holders of a majority of the voting power of the shares entitled to vote in connection with the election of the directors of the Corporation, voting together as a single class or (b) by a majority vote of the directors then in office, though less than a quorum, or by a sole remaining director. Any director elected in accordance with this Section 2.02 of Article 2 shall hold office for the remainder of the term of the director for whom the vacancy was created or occurred and until such director's successor shall have been duly elected and qualified or, if earlier, such director's death, incapacity, resignation or removal.  No decrease in the authorized number of directors shall shorten the term of any incumbent director.

Section 2.03.  *Regular Meetings*.  Regular meetings of the Board of Directors shall be held at such place or places, on such date or dates, and at such time or times as shall have been established by the Board of Directors and publicized among all directors. A notice of each regular meeting shall not be required.

Section 2.04.  *Special Meetings*.  Special meetings of the Board of Directors may be called by the Chairman of the Board or the Chief Executive Officer, or by any two or more directors and shall be held on such date and at such place and time as the person(s) calling such meeting shall fix.  At least 24 hours' notice of the place, date, and time of each such special meeting shall be given to each director by whom it is not waived and such notice will be effective (a) when received if given in a writing delivered by hand or courier, (b) when given, if by telephone or in person, or (c) when transmitted with transmission confirmed, if sent by e-mail or by facsimile to the director's residence or usual place of business, to an email address or facsimile number, as applicable to which the director has expressly consented to receive notice.  Unless otherwise indicated in the notice thereof, any and all business may be transacted at a special meeting.

Section 2.05.  *Quorum*.  A majority of the Whole Board shall constitute a quorum for all purposes at any meeting of the Board of Directors (except with respect to matters set forth in Section 8.07(iii) and (iv) of Article 8, where a majority of the disinterested directors shall constitute a quorum for such matter).  If a quorum shall fail to attend any meeting, a majority of those present may adjourn the meeting to another place, date, or time, without further notice or waiver thereof.

Section 2.06.  *Participation in Meetings by Conference Telephone*.  Members of the Board of Directors, or of any committee thereof, may participate in a meeting of such Board of Directors or committee by means of conference telephone or other

---

[1] **Note to Draft**: To be confirmed.

8

communications equipment by means of which all persons participating in the meeting can hear each other and such participation shall constitute presence in person at such meeting.

Section 2.07. *Conduct of Business*.  At any meeting of the Board of Directors, business shall be transacted in such order and manner as the Board of Directors may from time to time determine, and, except as otherwise expressly required by law or the Certificate of Incorporation, all matters shall be determined by the affirmative vote of a majority of the directors present at any meeting at which a quorum is present.  Action may be taken by the Board of Directors without a meeting if all members thereof consent thereto in writing or by electronic transmission, and the writing or writings or electronic transmission or transmissions are filed with the minutes of proceedings of the Board of Directors.  Such filing shall be in paper form if the minutes are maintained in paper form and shall be in electronic form if the minutes are maintained in electronic form.

Section 2.08. *Resignations and Removal of Directors*.  Any director of the Corporation may resign from the Board of Directors or any committee thereof at any time, by giving notice in writing to the Chairman of the Board, if there be one, or the Chief Executive Officer or the Secretary and, in the case of a committee, to the chairman of such committee, if there be one.  Such resignation shall take effect at the time therein specified or, if no time is specified, immediately; and, unless otherwise specified in such notice, the acceptance of such resignation shall not be necessary to make it effective. Except as otherwise required by applicable law and subject to the rights of the holders of any series of preferred stock of the Corporation then outstanding, directors may be removed from office with or without cause by the affirmative vote of holders of a majority of the voting power of the shares entitled to vote in connection with the election of the directors of the Corporation, voting together as a single class.  Any director serving on a committee of the Board of Directors may be removed from such committee at any time by the Board of Directors.

Section 2.09. *Compensation of Directors*.  Unless otherwise restricted by the Certificate of Incorporation, the Board of Directors shall have the authority to fix the compensation of the directors. The directors may be paid their expenses, if any, of attendance at each meeting of the Board of Directors and may be paid a fixed sum for attendance at each meeting of the Board of Directors or paid a stated salary or paid other compensation as director.  No such payment shall preclude any director from serving the Corporation in any other capacity and receiving compensation therefor. Members of special or standing committees may be allowed compensation for attending committee meetings.

ARTICLE 3

COMMITTEES

Section 3.01. *Committees of the Board of Directors*.  The Board of Directors may from time to time designate committees of the Board of Directors, with such lawfully delegable powers and duties as it thereby confers, to serve at the pleasure of the Board of Directors and shall, for those committees and any others provided for herein,

9

elect a director or directors to serve as the member or members, designating, if it desires, other directors as alternate members who may replace any absent or disqualified member at any meeting of the committee.  In the absence or disqualification of any member of any committee and any alternate member in his or her place, the member or members of the committee present at the meeting and not disqualified from voting, whether or not he or she or they constitute a quorum, may by unanimous vote appoint another member of the Board of Directors to act at the meeting in the place of the absent or disqualified member.

Section 3.02.  *Conduct of Business*.   Each committee may determine the procedural rules for meeting and conducting its business and shall act in accordance therewith, except as otherwise provided herein or required by law.  Adequate provision shall be made for notice to members of all meetings.  The presence of at least a majority of the members of the committee shall constitute a quorum for the transaction of business.  All matters shall be determined by a majority vote of the members present at any meeting at which a quorum is present.  Action may be taken by any committee without a meeting if all members thereof consent thereto in writing or by electronic transmission, and the writing or writings or electronic transmission or transmissions are filed with the minutes of the proceedings of such committee.  Such filing shall be in paper form if the minutes are maintained in paper form and shall be in electronic form if the minutes are maintained in electronic form.

ARTICLE 4

OFFICERS

Section 4.01.  *Generally*.  The Board of Directors, at its next meeting following each annual meeting of the stockholders, shall elect officers of the Corporation, including a Chief Executive Officer and a Secretary.  The Board of Directors may also from time to time elect such other officers as it may deem proper or may delegate to any elected officer of the Corporation the power to appoint and remove any such other officers and to prescribe their respective terms of office, authorities and duties.  Any Vice President may be designated Executive, Senior or Corporate, or may be given such other designation or combination of designations as the Board of Directors or the Chief Executive Officer may determine.  Any two or more offices may be held by the same person.  The Board of Directors may also elect or appoint a Chairman of the Board of Directors, who may or may not also be an officer of the Corporation.

Section 4.02.  *Terms of Office*.  All officers of the Corporation elected by the Board of Directors shall hold office for such terms as may be determined by the Board of Directors or until their respective successors are chosen and qualified or until his or her earlier death, incapacity, resignation or removal.  Any officer may be removed from office at any time either with or without cause by affirmative vote of a majority of the members of the Board of Directors then in office, or, in the case of appointed officers, by any elected officer upon whom such power of removal shall have been conferred by the Board of Directors. A vacancy in any office because of death, incapacity, resignation, removal, disqualification or otherwise shall be filled by the Board in the manner prescribed in these Bylaws for election or appointment to such office.

10

Section 4.03.  *Powers and Duties*.  Each of the officers of the Corporation elected by the Board of Directors or appointed by an officer in accordance with these Bylaws shall have the powers and duties prescribed by law, by these Bylaws or by the Board of Directors and, in the case of appointed officers, the powers and duties prescribed by the appointing officer, and, unless otherwise prescribed by these Bylaws or by the Board of Directors or such appointing officer, shall have such further powers and duties as ordinarily pertain to that office.  The Chief Executive Officer shall have authority over the general direction of the affairs of the Corporation.

Section 4.04.  *Delegation of Authority*.  The Board of Directors may from time to time delegate the powers or duties of any officer to any other officers or agents, notwithstanding any provision hereof.

Section 4.05.  *Action with Respect to Securities of Other Corporations*.  Unless otherwise directed by the Board of Directors, the Chief Executive Officer or any other officer of the Corporation authorized by the Board of Directors shall have power to vote and otherwise act on behalf of the Corporation, in person or by proxy, at any meeting of security holders of or with respect to any action of security holders of any other corporation or entity in which the Corporation may hold securities and otherwise to exercise any and all rights and powers which the Corporation may possess by reason of its ownership of securities in such other corporation or entity.

ARTICLE 5

INFORMATION RIGHTS

Section 5.01.  *Financial Statements and Periodic Reports*.  At all times when the Corporation is not obligated to file reports under Section 13 or Section 15(d) of the Exchange Act, the Corporation shall provide the following information to each holder of the Corporation's Common Stock, par value $0.0001 per share (the "**Common Stock**" and each such holder, a "**Common Stockholder**"), and shall satisfy such obligation by timely posting all such information to its website and making such information accessible to the general public, or by timely and publicly filing all such information with the SEC on Form 10-K, Form 10-Q or Form 8-K, as applicable, as if the Corporation were required to file such reports under the Exchange Act:

(a)  for each fiscal year of the Corporation ending on or after December 31, 2017, copies of an annual report on Form 10-K for such fiscal year, which report shall be delivered no later than 90 days following the end of such fiscal year and shall include the same information and disclosures as the Corporation would be required to include in such report if it were a reporting company under the Exchange Act, including, without limitation, (i) consolidated financial statements of the Corporation and its subsidiaries as of the end of such fiscal year, which financial statements shall (A) include a comparison to the prior fiscal year results, (B) be prepared in accordance with generally accepted accounting principles as in effect from time to time in the United States ("**GAAP**"), (C) be audited by a nationally recognized accounting firm approved by the Board of Directors and accompanied by a report and opinion thereon by such accounting firm prepared in accordance with GAAP and (ii) a management discussion and analysis of

11

financial condition and results of operations with respect to such financial statements (an "**MD&A**");

(b)   for each of the first 3 fiscal quarters of each fiscal year of the Corporation, copies of a quarterly report on Form 10-Q for such fiscal quarter, which report shall be delivered no later than 45 days following the end of such fiscal quarter and shall include the same information and disclosures as the Corporation would be required to include in such report if it were a reporting company under the Exchange Act, including, without limitation, (i) consolidated financial statements of the Corporation and its subsidiaries as of the end of such fiscal quarter, which statements shall (A) include year-to-date results and a comparison to the corresponding period in the prior fiscal year, (B) be prepared in accordance with GAAP, and (ii) an MD&A with respect to such financial statements; *provided*, *however*, that with respect to the first fiscal quarter following [●] 2017,[2] such quarterly report shall be delivered no later than 60 days following the end of such quarter;

(c)   from time to time after the occurrence of any event that the Corporation would be required to report on a Form 8-K if it had been a reporting company under the Exchange Act, a current report on Form 8-K containing the same information as would be required to be contained in, and within the timing required by, a Current Report on Form 8-K under the Exchange Act;

(d)   a complete transcript of each quarterly conference call hosted by the Corporation pursuant to Section 5.02 of this Article 5, which transcript shall be provided as promptly as practicable after the date of such conference call; and

(e)   such additional information as is required to ensure that sufficient "current public information" with respect to the Corporation is available on the Corporation's website to satisfy the requirements of Section 4(a)(7) (as may be amended from time to time, "**Section 4(a)(7)**" of the Securities Act of 1933, as amended (such act, and the rules and regulations promulgated thereunder, the "**Securities Act**") and Rule 144A and Rule 144(c) promulgated under the Securities Act.  As used in these Bylaws, "**Business Day**" shall mean any day other than a Saturday, Sunday or day on which commercial banks in the State of Texas or the State of New York are authorized or required by law to close for business.

Section 5.02.   *Quarterly Conference Calls.*  Except as otherwise determined by the Board of Directors with respect to any particular reporting period, the Corporation shall host, and each Common Stockholder shall have access to, quarterly conference calls with senior officers of the Corporation to discuss the results of operations for the relevant reporting period, which calls shall include a reasonable and customary question and answer session; *provided* that such obligation with respect to quarterly conference calls shall commence in connection with the Corporation's results of operations for the three months ended [●] 2017.[3]  Each such quarterly and annual call shall be hosted no later

---

[2] **Note to draft**: Include date of adoption of bylaws

[3] **Note to draft**: To refer to the quarter following adoption of the bylaws

12

than 30 days after the relevant report on Form 10-K or 10-Q has been filed or the Corporation provides the corresponding annual or quarterly financial statements to Common Stockholders in accordance with this Article.

Section 5.03.  *Rule 144, 144A and Section 4(a)(7) Information*.  With a view to making available to Common Stockholders the benefits of Section 4(a)(7), Rule 144A promulgated under the Securities Act (as may be amended from time to time, "**Rule 144A**") and Rule 144 promulgated under the Securities Act (as may be amended from time to time, "**Rule 144**") and other rules and regulations of the SEC that may at any time permit a Common Stockholder to sell shares of Common Stock to the public without registration, the Corporation shall use commercially reasonable efforts to (a) post to the Corporation's website in a timely manner all reports and other documents required, if any, to be filed by it under the Securities Act and the Exchange Act and (b) make and keep publicly available all information necessary to comply with Section 4(a)(7), Rule 144A and Rule 144 with respect to resales of shares of Common Stock, to the extent required from time to time to enable Common Stockholders to sell shares of Common Stock without registration under the Securities Act within the limitation of the exemptions provided by (x) Section 4(a)(7), Rule 144A and Rule 144 or (y) any other rules or regulations now existing or hereafter adopted by the SEC.  Upon the reasonable request of any Common Stockholder, the Corporation will deliver to such Common Stockholder a written statement as to whether it has complied with such information requirements, and, if not, the specific reasons for noncompliance.

ARTICLE 6

STOCK

Section 6.01.  *Certificates of Stock*.   The shares of capital stock of the Corporation may be in certificated or uncertificated form at the discretion of the Board of Directors. Except as otherwise provided by law, the rights and obligations of the holders of uncertificated shares and the rights and obligations of the holders of shares represented by certificates of the same class and series shall be identical. Each holder of stock represented by certificates shall be entitled to a certificate signed in such manner and by such officers as the Board of Directors may be resolution prescribe, and certifying the number of shares owned by such holder. Any or all of the signatures on the certificate may be by facsimile. If an officer, transfer agent or registrar of the Corporation who has signed or whose facsimile signature has been placed upon a certificate is no longer serving in that capacity when the certificate is issued, it may be issued by the Corporation with the same effect as if that person were still serving in that capacity at the time of issue.

Section 6.02.  *Transfers of Stock*.  Transfers of stock shall be made only upon the transfer books of the Corporation kept at an office of the Corporation or by transfer agents designated to transfer shares of the stock of the Corporation.  Except where a certificate is issued in accordance with Section 6.04 of Article 6 of these Bylaws, an outstanding certificate for the number of shares involved, if one has been issued, shall be surrendered for cancellation before a new certificate, if any, is issued therefor.

13

Section 6.03.  *Record Date*.  (a)  In order that the Corporation may determine the stockholders entitled to notice of any meeting of stockholders or any adjournment thereof, the Board of Directors may, except as otherwise required by law, fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board of Directors, and which record date shall not be less than 10 days nor more than 60 days before the date of such meeting.  If the Board of Directors so fixes a date, such date shall also be the record date for determining the stockholders entitled to vote at such meeting unless the Board of Directors determines, at the time it fixes such record date, that a later date on or before the date of the meeting shall be the date for making such determination.  If no record date is fixed by the Board of Directors, the record date for determining stockholders entitled to notice of and to vote at a meeting of stockholders shall be at the close of business on the day next preceding the day on which notice is given or, if notice is waived, at the close of business on the day next preceding the day on which the meeting is held.  A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting; *provided, however*, that the Board of Directors may fix a new record date for determination of stockholders entitled to vote at the adjourned meeting, and in such case shall also fix as the record date for stockholders entitled to notice of such adjourned meeting the same or an earlier date as that fixed for determination of stockholders entitled to vote in accordance with the foregoing provisions of this Section 6.03 of Article 6 at the adjourned meeting.

(b)    In order that the Corporation may determine the stockholders entitled to receive payment of any dividend or other distribution or allotment of any rights or the stockholders entitled to exercise any rights in respect of any change, conversion or exchange of stock, or for the purpose of any other lawful action, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted, and which record date shall be not more than 60 days prior to such action.  If no record date is fixed, the record date for determining stockholders for any such purpose shall be at the close of business on the day on which the Board of Directors adopts the resolution relating thereto.

Section 6.04.  *Lost, Stolen or Destroyed Certificates*.  In the event of the loss, theft or destruction of any certificate of stock, another certificate may be issued in its place pursuant to such regulations as the Board of Directors may establish concerning proof of such loss, theft or destruction and concerning the giving of a satisfactory bond or bonds of indemnity.

Section 6.05.  *Registered Stockholders*.  The Corporation shall be entitled to recognize the exclusive right of a person registered on its books as the owner of shares to receive dividends, and to vote as such owner, and to hold liable for calls and assessments a person registered on its books as the owner of shares, and shall not be bound to recognize any equitable or other claim to or interest in such share or shares on the part of any other person, whether or not it shall have express or other notice thereof, except as otherwise provided by the laws of the State of Delaware.

14

Section 6.06.  *Additional Regulations*.   The issue, transfer, conversion and registration of certificates of stock shall be governed by the Certificate of Incorporation and such other regulations as the Board of Directors may establish from time to time.

## ARTICLE 7
### NOTICES

Section 7.01.  *Notices*.  If mailed, notice to stockholders shall be deemed given when deposited in the mail, postage prepaid, directed to the stockholder at such stockholder's address as it appears on the records of the Corporation.  Without limiting the manner by which notice otherwise may be given effectively to stockholders, any notice to stockholders may be given by electronic transmission in the manner provided in Section 232 of the General Corporation Law of the State of Delaware (the "**DGCL**") or any successor provision thereto.

Section 7.02.  *Waivers*.  A written waiver of any notice, signed by a stockholder or director, or waiver by electronic transmission by such person, whether given before or after the time of the event for which notice is to be given, shall be deemed equivalent to the notice required to be given to such person.  Neither the business nor the purpose of any meeting need be specified in such a waiver.  Attendance of a person at any meeting, present in person or represented by proxy, shall constitute waiver of notice except attendance for the express purpose of objecting at the beginning of the meeting to the transaction of business because the meeting is not lawfully called or convened.

## ARTICLE 8
### MISCELLANEOUS

Section 8.01.  *Facsimile Signatures*.  In addition to the provisions for use of facsimile signatures elsewhere specifically authorized in these Bylaws, facsimile signatures of any officer or officers of the Corporation may be used whenever and as authorized by the Board of Directors or a committee thereof.

Section 8.02.  *Corporate Seal*.  The Board of Directors may provide a suitable seal, containing the name of the Corporation, which seal shall be in the charge of the Secretary.  If and when so directed by the Board of Directors or a committee thereof, duplicates of the seal may be kept and used by the Treasurer or by an Assistant Secretary or Assistant Treasurer.

Section 8.03.  *Reliance upon Books, Reports and Records*.  Each director, each member of any committee designated by the Board of Directors, and each officer of the Corporation shall, in the performance of his or her duties, be fully protected in relying in good faith upon the books of account or other records of the Corporation and upon such information, opinions, reports or statements presented to the Corporation by any of its officers or employees, or committees of the Board of Directors so designated, or by any other person as to matters which such director, committee member or officer reasonably believes are within such other person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Corporation.

15

Section 8.04.   *Fiscal Year*.   The fiscal year of the Corporation shall be as fixed by the Board of Directors.

Section 8.05.   *Time Periods*.   In applying any provision of these Bylaws which requires that an act be done or not be done a specified number of days prior to an event or that an act be done during a period of a specified number of days prior to an event, calendar days shall be used, the day of the doing of the act shall be excluded, and the day of the event shall be included.

Section 8.06.   *Actions Requiring Board of Directors Approval*.   Notwithstanding anything to the contrary contained in these Bylaws, under the DGCL or other applicable law (including the fact that no approval of the Board of Directors may be required for such matters), until the earlier of (a) the date the Common Stock is listed on a national securities exchange (which, for the avoidance of doubt, does not include an "over-the-counter" system or network) in the United States or (b) the consummation of the first public offering and sale of Common Stock by the Corporation (other than on Forms S-4 or S-8 or their equivalent), pursuant to an effective registration statement under the Securities Act, the Corporation shall not, and shall not permit or cause any of its subsidiaries to, cause or engage in any of the following transactions or take any of the following actions, without first obtaining the approval of a majority of the Whole Board (*provided* that in respect of clauses (viii) and (ix) below, such majority shall mean the majority of the directors who were not appointed by, or are not otherwise affiliated with, the Related Party to which the Affiliate Transaction relates or any Affiliate of such Related Party, or directors not actually involved in the transaction), and any such transaction or action shall not be authorized unless and until such approval is obtained:

(i)   any merger, consolidation, recapitalization, reorganization or other similar transaction involving the Corporation or any of its Material Subsidiaries in which the holders of the Common Stock (or equivalent securities of any subsidiary) immediately prior to such transaction hold in the aggregate less than a majority of the outstanding voting equity securities of the surviving entity immediately after such transaction (other than pursuant to any merger, consolidation, recapitalization, reorganization or similar transactions solely between wholly-owned subsidiaries of the Corporation)

(ii)   the acquisition or disposition (in one transaction or a series of related transactions) of any assets or business of the Corporation or any of its subsidiaries in excess of 5% of the consolidated assets of, or that represent 5% of the consolidated income from businesses of, the Corporation;

(iii)   the liquidation, dissolution or winding up of the Corporation, or any Material Subsidiary of the Corporation, or the taking of any action that results in the liquidation, dissolution or winding up of the Corporation or any Material Subsidiary of the Corporation;

(iv)   the incurring of any indebtedness for borrowed money (excluding trade accounts payable in the ordinary course of business), excluding

16

WEIL:\96059297\5\62739.0003

indebtedness (i) existing on the effective date of that Joint Plan of Reorganization of Memorial Production Partners LP ("**MEMP**"), *et al.* filed on January 16. 2017 in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (as amended and/or supplemented from time to time, the "**Plan**"), and (ii) under the Exit Credit Facility (as defined in the Plan);

(v)　the issuance of any shares of capital stock of any subsidiary of the Corporation other than to the Corporation, or to another subsidiary of the Corporation all of which shares of capital stock are owned, directly or indirectly, by the Corporation;

(vi)　the declaration of any dividends on any shares of capital stock of the Corporation or any subsidiary of the Corporation;

(vii)　the redemption, repurchase, acquisition or offer to redeem, repurchase or acquire any shares of capital stock of the Corporation or any subsidiary of the Corporation;

(viii)　the entry into, or consummation, amendment, modification (including by waiver) or termination of, any Affiliate Transaction or any agreement with respect thereto;

(ix)　the entry into any transaction with any director, officer or employee of the Corporation or any "associate" (as defined in Rule 12b-2 promulgated under the Exchange Act) of any such person;

(x)　the hiring, termination or changing of the compensation of any of the executive officers, including approving any option grants or stock awards to, or other incentive arrangements for, executive officers of the Corporation or its subsidiaries, other than the initial awards issued pursuant to the Corporation's [management incentive plan] upon the emergence of the Corporation from bankruptcy as contemplated in the Plan;

(xi)　the filing or amendment of any U.S. federal income tax return, information statement or schedule relating to any of MEMP, the Corporation, and their respective subsidiaries that reflects the consequences of the consummation of the Chapter 11 Plan of Reorganization of MEMP, the consequences of any acquisition or disposition of assets for which approval of the Whole Board is required, or that otherwise reflects the valuation of or tax basis in the assets of the Corporation;  or

(xii)　the entry into any contract, agreement, arrangement or commitment to do or engage in any of the foregoing.

Section 8.07.  *Certain Definitions*.  As used in these Bylaws, the following terms shall have the meanings set forth below:

17

WEIL:\96059297\5\62739.0003

"**Affiliate**" shall mean, with respect to any person, any other person directly or indirectly controlling, controlled by, or under common control with, such person as of the date on which, or at any time during the period for which, the determination of affiliation is being made (including any investment fund the primary investment manager or investment advisor to which is such person or its Affiliate).  For purposes of this definition, the term "**control**" (including the correlative meanings of the terms "**controlled by**" and "**under common control with**"), as used with respect to any person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such person, whether through the ownership of voting securities, by contract or otherwise.

"**Affiliate Transaction**" shall mean any contract, agreement, transaction or other arrangement (whether written or unwritten) between the Corporation or any of its subsidiaries, on the one hand, and any stockholder or any Affiliate (including any portfolio company or funds under management of such Stockholder or its Affiliates) of any stockholder of the Corporation, on the other hand; *provided*, that it shall not include any contract, agreement, transaction or other arrangement that is solely between the Corporation and/or any one or more of its wholly-owned subsidiaries.

"**Majority Stockholder Approval**" means, with respect to any matter, the affirmative vote or written consent of one or more stockholders then holding, in the aggregate, a majority of the voting power of all of the then-outstanding shares of capital stock entitled to vote generally in the election of directors, voting together as a single class.

"**Material Subsidiary**" shall include all significant subsidiaries, as such term is defined under Rule 1-02(w) of Regulation S-X.

## ARTICLE 9

### AMENDMENTS

Subject to the provisions of the Certificate of Incorporation, these Bylaws may be amended, altered, restated or repealed (A) by resolution adopted by a majority of the Whole Board at any annual, special or regular meeting of the Board at which a quorum is present if, in the case of such special meeting only, notice of such amendment, alteration or repeal is contained in the notice or waiver of notice of such meeting or (B) at any regular or special meeting of the stockholders upon receipt of Majority Stockholder Approval, if, in the case of such special meeting only, notice of such amendment, alteration or repeal is contained in the notice or waiver of notice of such meeting, *provided* that the provisions set forth in (i) Section 2.01 of Article 2, (ii) Article 5, (iii) Sections 8.06 and 8.07 of Article 8, (iv) Article 10 and (v) this Article 9 may not be repealed or amended in any respect without Majority Stockholder Approval.

18

## ARTICLE 10

CONFLICTS WITH CERTIFICATE OF INCORPORATION

Notwithstanding anything to the contrary contained in these Bylaws, to the extent that any provision set forth herein conflicts with or is inconsistent with any provision of the Certificate of Incorporation, the provision set forth in the Certificate of Incorporation shall take precedence and shall control, to the fullest extent permitted by applicable law.

[*Remainder of page intentionally left blank*]

19

**Exhibit B**

**Exit Credit Agreement**

WEIL:\96067153\5\62739.0004

LINKLATERS DRAFT—MARCH 24, 2017



# AMENDED AND RESTATED CREDIT AGREEMENT

**dated as of [___]**

**among**

**Amplify Energy Operating LLC,**
**as Borrower,**

**Amplify AcquisitionCo, Inc.,**
**as Parent,**

**Wells Fargo Bank, National Association,**
**as Administrative Agent,**

**and**

**The Lenders Party Hereto**

**TABLE OF CONTENTS**

**Page**

ARTICLE I
DEFINITIONS AND ACCOUNTING MATTERS

**Section 1.01   Terms Defined Above** .................................................................................**2**
**Section 1.02   Certain Defined Terms** ...............................................................................**2**
**Section 1.03   Types of Loans and Borrowings** ...............................................................**33**
**Section 1.04   Terms Generally; Rules of Construction** ..................................................**33**
**Section 1.05   Accounting Terms and Determinations; GAAP** ........................................**34**
**Section 1.06   Timing of Payment or Performance** ..........................................................**34**

ARTICLE II
THE CREDITS

**Section 2.01   Commitments** .............................................................................................**34**
**Section 2.02   Loans and Borrowings** ..............................................................................**35**
**Section 2.03   Requests for Borrowings** ...........................................................................**36**
**Section 2.04   Interest Elections** .......................................................................................**37**
**Section 2.05   Funding of Borrowings** ..............................................................................**38**
**Section 2.06   Termination and Reduction of Aggregate Maximum Credit Amounts;
                Optional Increase and Reduction of Aggregate Elected Commitment
                Amounts** .................................................................................................**39**
**Section 2.07   Borrowing Base** .........................................................................................**43**
**Section 2.08   Letters of Credit** .........................................................................................**45**
**Section 2.09   Defaulting Lenders** ....................................................................................**50**

ARTICLE III
PAYMENTS OF PRINCIPAL AND INTEREST; PREPAYMENTS; FEES

**Section 3.01   Repayment of Loans** ..................................................................................**51**
**Section 3.02   Interest** .......................................................................................................**51**
**Section 3.03   Alternate Rate of Interest** ..........................................................................**52**
**Section 3.04   Prepayments** ...............................................................................................**53**
**Section 3.05   Fees** ............................................................................................................**55**

ARTICLE IV
PAYMENTS; PRO RATA TREATMENT; SHARING OF SET-OFFS

**Section 4.01   Payments Generally; Pro Rata Treatment; Sharing of Set-offs** ...............**56**
**Section 4.02   Presumption of Payment by the Borrower** .................................................**57**
**Section 4.03   Certain Deductions by the Administrative Agent** ......................................**58**
**Section 4.04   Disposition of Proceeds** .............................................................................**58**

ARTICLE V
INCREASED COSTS; BREAK FUNDING PAYMENTS; TAXES; ILLEGALITY

**Section 5.01   Increased Costs** ..........................................................................................**58**
**Section 5.02   Break Funding Payments** ...........................................................................**60**
**Section 5.03   Taxes** ..........................................................................................................**60**

i

Section 5.04   **Mitigation Obligations; Replacement of Lenders** ................................................64
Section 5.05   **Illegality** ...............................................................................................................65

ARTICLE VI
CONDITIONS PRECEDENT

Section 6.01   **Effective Date** ......................................................................................................65
Section 6.02   **Each Credit Event** ...............................................................................................69

ARTICLE VII
REPRESENTATIONS AND WARRANTIES

Section 7.01   **Organization; Powers** .........................................................................................71
Section 7.02   **Authority; Enforceability** ....................................................................................71
Section 7.03   **Approvals; No Conflicts** ......................................................................................71
Section 7.04   **Financial Condition; No Material Adverse Change** ............................................72
Section 7.05   **Litigation** ...............................................................................................................72
Section 7.07   **Compliance with the Laws and Agreements; No Defaults or
              Borrowing Base Deficiency** ...............................................................................73
Section 7.08   **Investment Company Act** .....................................................................................74
Section 7.09   **Taxes** ......................................................................................................................74
Section 7.10   **ERISA** ....................................................................................................................74
Section 7.11   **Disclosure; No Material Misstatements** ..............................................................75
Section 7.12   **Insurance** ...............................................................................................................75
Section 7.13   **Restriction on Liens** ............................................................................................76
Section 7.14   **Subsidiaries** ..........................................................................................................76
Section 7.15   **Location of Business and Offices** ........................................................................76
Section 7.16   **Properties; Titles, Etc.** ........................................................................................76
Section 7.17   **Maintenance of Properties** ..................................................................................77
Section 7.18   **Gas Imbalances, Prepayments** ............................................................................78
Section 7.19   **Marketing of Production** ......................................................................................78
Section 7.20   **Swap Agreements and Qualified ECP Guarantor** ...............................................78
Section 7.21   **Use of Loans, Letters of Credit and Beta Freed Cash** ........................................78
Section 7.22   **Solvency** ................................................................................................................78
Section 7.23   **Anti-Corruption Laws; Anti-Money Laundering; Sanctions.** ..........................79

ARTICLE VIII
AFFIRMATIVE COVENANTS

Section 8.01   **Financial Statements; Other Information** ...........................................................79
Section 8.02   **Notices of Material Events** ..................................................................................83
Section 8.03   **Existence; Conduct of Business** ..........................................................................84
Section 8.04   **Payment of Obligations** .......................................................................................84
Section 8.05   **Performance of Obligations under Loan Documents** ..........................................84
Section 8.06   **Operation and Maintenance of Properties** ..........................................................84
Section 8.07   **Insurance** ...............................................................................................................85
Section 8.08   **Books and Records; Inspection Rights** ...............................................................85
Section 8.09   **Compliance with Laws** .........................................................................................85
Section 8.10   **Environmental Matters** ........................................................................................86
Section 8.11   **Further Assurances** ..............................................................................................87

**Page**

Section 8.12   Reserve Reports ............................................................................87
Section 8.13   Title Information............................................................................88
Section 8.14   Additional Collateral; Additional Guarantors.........................................89
Section 8.15   ERISA Compliance..........................................................................90
Section 8.16   Commodity Price Risk Management Policy................................................91
Section 8.17   Commodity Exchange Act Keepwell Provisions ........................................91
Section 8.18   Hedging Requirements ....................................................................91
Section 8.19   Deposit Accounts..........................................................................91

ARTICLE IX
NEGATIVE COVENANTS

Section 9.01   Financial Covenants.......................................................................92
Section 9.02   Debt ......................................................................................92
Section 9.03   Liens .....................................................................................93
Section 9.04   Dividends, Distributions and Repayment of Permitted Unsecured
              Debt ......................................................................................94
Section 9.05   Investments and Loans....................................................................95
Section 9.06   Nature of Business; No International Operations.......................................96
Section 9.07   Limitation on Leases .....................................................................96
Section 9.08   Proceeds of Notes ........................................................................96
Section 9.09   ERISA Compliance..........................................................................96
Section 9.10   Sale or Discount of Receivables .......................................................98
Section 9.11   Mergers, Etc. ............................................................................98
Section 9.12   Sale of Properties .......................................................................98
Section 9.13   Environmental Matters ...................................................................99
Section 9.14   Transactions with Affiliates ...........................................................100
Section 9.15   Subsidiaries..............................................................................100
Section 9.16   Negative Pledge Agreements; Dividend Restrictions...................................100
Section 9.17   Gas Imbalances, Take-or-Pay or Other Prepayments ...................................100
Section 9.18   Swap Agreements..........................................................................100
Section 9.19   [Reserved] ...............................................................................102
Section 9.20   Marketing Activities .....................................................................102
Section 9.21   Holding Company .........................................................................102
Section 9.22   Sale and Leaseback .......................................................................102
Section 9.23   Amendments to Organizational Documents; Changes in Fiscal Year
              End .......................................................................................103
Section 9.24   [Reserved] ...............................................................................103
Section 9.25   Anti-Corruption Laws; Anti-Money Laundering Laws; Sanctions...............103

ARTICLE X
EVENTS OF DEFAULT; REMEDIES

Section 10.01  Events of Default........................................................................103
Section 10.02  Remedies .................................................................................106

ARTICLE XI
THE ADMINISTRATIVE AGENT

Section 11.01  Appointment; Powers......................................................................107

**Page**

**Section 11.02  Duties and Obligations of Administrative Agent** ...................................**108**
**Section 11.03  Action by Administrative Agent** .........................................................**109**
**Section 11.04  Reliance by Administrative Agent** ......................................................**109**
**Section 11.05  Subagents** ........................................................................................**110**
**Section 11.06  Resignation of Administrative Agent** .................................................**110**
**Section 11.07  Administrative Agent as Lender** ........................................................**111**
**Section 11.08  No Reliance** .....................................................................................**111**
**Section 11.09  Administrative Agent May File Proofs of Claim** ................................**112**
**Section 11.10  Authority of Administrative Agent to Release Collateral and Liens** ............**112**
**Section 11.11  Swap Agreements** ............................................................................**113**
**Section 11.12  Intercreditor and Subordination Agreements** .....................................**114**

ARTICLE XII
MISCELLANEOUS

**Section 12.01  Notices** ............................................................................................**114**
**Section 12.02  Waivers; Amendments** .....................................................................**116**
**Section 12.03  Expenses, Indemnity; Damage Waiver** ..............................................**117**
**Section 12.04  Successors and Assigns** ....................................................................**120**
**Section 12.05  Survival; Revival; Reinstatement** ......................................................**123**
**Section 12.06  Counterparts; Integration; Effectiveness** ............................................**124**
**Section 12.07  Severability** ......................................................................................**124**
**Section 12.08  Right of Setoff** .................................................................................**124**
**Section 12.09  GOVERNING LAW; JURISDICTION; CONSENT TO SERVICE OF PROCESS** ..........................................................................................**125**
**Section 12.10  Titles and Captions** ..........................................................................**126**
**Section 12.11  Confidentiality** .................................................................................**126**
**Section 12.12  Interest Rate Limitation** ....................................................................**127**
**Section 12.13  EXCULPATION PROVISIONS** .......................................................**128**
**Section 12.14  Collateral Matters; Swap Agreements** ...............................................**129**
**Section 12.15  No Third Party Beneficiaries** ............................................................**129**
**Section 12.16  USA Patriot Act Notice** ....................................................................**129**
**Section 12.17  Acknowledgement and Consent to Bail-In of EEA Financial Institutions** ...................................................................................**129**
**Section 12.18  Amendment and Restatement** ............................................................**130**
**Section 12.19  Independent Effect of Covenants.** ......................................................**130**
**Section 12.20  Performance of Duties.** .....................................................................**130**
**Section 12.21  Inconsistencies with Other Documents.** .............................................**130**

**ANNEXES, EXHIBITS AND SCHEDULES**

Annex I                    List of Maximum Credit Amounts and Elected Commitments
Annex II                   Existing Letters of Credit
Annex III                  Terms of Subordination Agreement

Exhibit A                  Form of Note
Exhibit B                  Form of Borrowing Request
Exhibit C                  Form of Interest Election Request
Exhibit D                  Form of Compliance Certificate
Exhibit E-1                Security Instruments as of the Effective Date
Exhibit E-2                Form of Guaranty Agreement
Exhibit E-3                Form of Security Agreement
Exhibit E-4                Form of Non-Recourse Pledge Agreement
Exhibit F                  Form of Assignment and Assumption
Exhibit G-1                Form of U.S. Tax Compliance Certificate (Foreign Lenders; not partnerships)
Exhibit G-2                Form of U.S. Tax Compliance Certificate (Foreign Participants; not partnerships)
Exhibit G-3                Form of U.S. Tax Compliance Certificate (Foreign Participants; partnerships)
Exhibit G-4                Form of U.S. Tax Compliance Certificate (Foreign Lenders; partnerships)
Exhibit H                  Form of Elected Commitment Increase Certificate
Exhibit I                  Form of Additional Lender Certificate
Exhibit J                  Form of Intercompany Note

Schedule 7.05              Litigation
Schedule 7.06              Environmental Matters
Schedule 7.14              Loan Parties and Subsidiaries
Schedule 7.18              Gas Imbalances
Schedule 7.19              Marketing Contracts
Schedule 7.20              Swap Agreements
Schedule 9.05              Investments

**THIS AMENDED AND RESTATED CREDIT AGREEMENT**, dated as of [\_\_\_], is among: Amplify Energy Operating LLC (formerly known as Memorial Production Operating LLC), a limited liability company duly formed and existing under the laws of the State of Delaware (the "Prepetition RBL Borrower", and in its capacity as the borrower hereunder, the "Borrower"), Amplify AcquisitionCo, Inc., a corporation duly formed and existing under the laws of the State of Delaware (the "Parent"); each of the Lenders from time to time party hereto; and Wells Fargo Bank, National Association (in its individual capacity, "Wells Fargo"), as administrative agent for the Lenders (in such capacity, together with its successors in such capacity, the "Administrative Agent").

## R E C I T A L S

A.      On January 16, 2017, Memorial Production Partners LP ("Memorial") and certain of its Subsidiaries, including the Prepetition RBL Borrower (Memorial and such Subsidiaries in such capacity, the "Debtors") filed voluntary petitions with the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") commencing their respective cases (the "Bankruptcy Proceedings") under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

B.      The Debtors have filed a Joint Plan of Reorganization of Memorial Production Partners LP, et al., under Chapter 11 of the Bankruptcy Code (together with all exhibits and schedules thereto, the "Plan of Reorganization") with the Bankruptcy Court, pursuant to which, among other things, Memorial will transfer all of its equity interests in the Prepetition RBL Borrower to the Parent, and the Prepetition RBL Borrower will emerge from the Bankruptcy Proceedings. The Plan of Reorganization was confirmed by the Bankruptcy Court on [\_\_\_\_].

C.      The Prepetition RBL Borrower, Memorial and certain of its Subsidiaries, Wells Fargo, as administrative agent, and the lenders from time to time party thereto (the "Prepetition RBL Lenders") are parties to that certain Credit Agreement, dated as of December 14, 2011 (the "Prepetition RBL Credit Agreement"), and certain other documents executed and delivered in connection therewith, in each case, as amended, restated, supplemented or otherwise modified prior to the commencement of the Bankruptcy Proceedings.

D.      Pursuant to the Plan of Reorganization, the Prepetition RBL Lenders have agreed to continue their loans under the Prepetition RBL Credit Agreement, and provide certain extensions of credit and commitments to the Borrower subject to the terms and conditions of this Agreement.

E.      NOW THEREFORE, in consideration of the mutual covenants and agreements herein contained, and other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, and subject to the satisfaction of each condition precedent contained in Section 6.01 hereof, the parties hereto agree that the Prepetition RBL Credit Agreement is hereby amended, renewed, extended and restated in its entirety on (and subject to) the terms and conditions set forth herein. The parties hereto further agree as follows:

## ARTICLE I
## DEFINITIONS AND ACCOUNTING MATTERS

Section 1.01    Terms Defined Above.  As used in this Agreement, each term defined above has the meaning indicated above.

Section 1.02    Certain Defined Terms.  As used in this Agreement, the following terms have the meanings specified below:

"ABR", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Alternate Base Rate.

"Additional Lender" has the meaning given to such term in Section 2.06(c)(i).

"Additional Lender Certificate" has the meaning given to such term in Section 2.06(c)(ii)(G).

"Adjusted LIBO Rate" means, with respect to any Eurodollar Borrowing or ABR Borrowing for any Interest Period, the greater of (a) 0.0% and (b) an interest rate per annum (rounded upwards, if necessary, to the next 1/100 of 1%) equal to the LIBO Rate for such Interest Period multiplied by the Statutory Reserve Rate.

"Administrative Agent" has the meaning assigned to such term in the first paragraph hereof.

"Administrative Questionnaire" means an Administrative Questionnaire in a form supplied by the Administrative Agent.

"Affected Loans" has the meaning assigned such term in Section 5.05.

"Affiliate" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.  "Affiliated" shall have the correlative meaning thereto.

"Agency Fee Letter" means that certain fee letter agreement dated as of [___] among Wells Fargo and the Borrower, as the same may from time to time be amended, modified, supplemented or restated.

"Aggregate Elected Commitment Amounts" at any time shall equal the sum of the Elected Commitments, as the same may be increased, reduced or terminated pursuant to Section 2.06(c).  As of the Effective Date, the Aggregate Elected Commitment Amounts are $[492,500,000].

"Aggregate Maximum Credit Amounts" at any time shall equal the sum of the Maximum Credit Amounts, as the same may be reduced or terminated pursuant to Section 2.06.

2

"Agreement" means this Credit Agreement, as the same may from time to time be amended, modified, supplemented or restated.

"Alternate Base Rate" means, for any day, a rate per annum equal to the greatest of (a) the Prime Rate in effect on such day, (b) the Federal Funds Effective Rate in effect on such day plus ½ of 1% and (c) the Adjusted LIBO Rate for a one month Interest Period on such day (or if such day is not a Business Day, the immediately preceding Business Day) plus 1%.  Any change in the Alternate Base Rate due to a change in the Prime Rate, the Federal Funds Effective Rate or the Adjusted LIBO Rate shall be effective from and including the effective date of such change in the Prime Rate, the Federal Funds Effective Rate or the Adjusted LIBO Rate, respectively.

"Annualized Consolidated EBITDAX" means, for the purposes of calculating the financial ratios set forth in Section 9.01 for the Rolling Periods ending on or prior to March 31, 2018, the sum of (a) Consolidated EBITDAX for such Rolling Period (without giving effect to any amounts added to Consolidated Net Income in the calculation thereof pursuant to clause (k) or clause (l) of the definition thereof) multiplied by the factor for such Rolling Period set forth in the table below plus (b) any amounts added to Consolidated Net Income in the calculation of Consolidated EBITDAX pursuant to clause (k) or clause (l) of the definition thereof for such Rolling Period:

| Rolling Period Ending | Factor |
| --- | --- |
| September 30, 2017 | 4 |
| December 31, 2017 | 2 |
| March 31, 2018 | 4/3 |

"Annualized Consolidated Net Interest Expense" means, for the purposes of calculating the financial ratios set forth in Section 9.01(a) for the Rolling Periods ending on or prior to March 31, 2018, the Consolidated Net Interest Expense for such Rolling Period multiplied by the factor for such Rolling Period set forth in the table below:

| Rolling Period Ending | Factor |
| --- | --- |
| September 30, 2017 | 4 |
| December 31, 2017 | 2 |
| March 31, 2018 | 4/3 |

"Anti-Corruption Laws" means FCPA, the U.K. Bribery Act of 2010 and any laws, rules, regulations or guidelines concerning or relating to anti-bribery or anti-corruption, which in each

3

case are issued, administered or enforced by any Governmental Authority having jurisdiction over any member of the Group, or to which any member of the Group is subject.

"Anti-Money Laundering Laws" means all applicable financial recordkeeping and reporting requirements and the money laundering statutes and the rules and regulations thereunder and any related or similar rules, regulations or guidelines, which in each case are issued, administered or enforced by any Governmental Authority having jurisdiction over any member of the Group, or to which any member of the Group is subject.

"Applicable Margin" means, for any day, with respect to any ABR Loan or Eurodollar Loan, or with respect to the Commitment Fee Rate, as the case may be, the rate per annum set forth in the Total Commitments Utilization Grid below based upon the Total Commitments Utilization Percentage then in effect:

| Total Commitments Utilization Grid | | | | | |
|---|---|---|---|---|---|
| Total Commitments Utilization Percentage | ≤25% | > 25% ≤ 50% | > 50% ≤ 75% | > 75% ≤ 90% | > 90% |
| Eurodollar Loans | 3.00% | 3.25% | 3.50% | 3.75% | 4.00% |
| ABR Loans | 2.00% | 2.25% | 2.50% | 2.75% | 3.00% |
| Commitment Fee Rate | 0.50% | 0.50% | 0.50% | 0.50% | 0.50% |

Each change in the Applicable Margin shall apply during the period commencing on the effective date of such change and ending on the date immediately preceding the effective date of the next such change; *provided* that if at any time the Borrower fails to deliver a Reserve Report pursuant to Section 8.12 and such failure continues for more than 10 Business Days from the date when such Reserve Report is due, then the "Applicable Margin" means the rate per annum set forth on the grid when the Total Commitments Utilization Percentage is at its highest level until such Reserve Report is delivered.

"Applicable Percentage" means, with respect to any Lender, the percentage of the Aggregate Maximum Credit Amounts represented by such Lender's Maximum Credit Amount as such percentage is set forth on Annex I; *provided* that in the case of Section 2.09 when a Defaulting Lender shall exist, "Applicable Percentage" as used in such Section 2.09 shall mean the percentage of the Aggregate Maximum Credit Amounts (disregarding any Defaulting Lender's Maximum Credit Amounts) represented by such Lender's Maximum Credit Amount.

"Approved Counterparty" means (a) any Lender or any Affiliate of a Lender or (b) any other Person that has a long term senior unsecured debt rating of BBB+/Baa1 by S&P or Moody's (or their equivalent) or higher at the time the relevant Swap Agreement is entered into (including, for the sake of clarity, any other Person the obligations of which under Swap Agreements with Loan Parties are guaranteed by a credit support provider that has a long term senior unsecured debt rating of BBB+/Baa1 by S&P or Moody's (or their equivalent) or higher at the time such Swap Agreement is entered into).

4

"Approved Fund" means any Person (other than a natural person) that is engaged in making, purchasing, holding or investing in bank loans and similar extensions of credit in the ordinary course of its business and that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"Approved Petroleum Engineers" means (a) Netherland, Sewell & Associates, Inc., (b) Ryder Scott Company Petroleum Consultants, L.P. and (c) any other independent petroleum engineers reasonably acceptable to the Administrative Agent.

"Assignment and Assumption" means an assignment and assumption entered into by a Lender and an assignee (with the consent of any party whose consent is required by Section 12.04(a)), and accepted by the Administrative Agent, in the form of Exhibit F or any other form approved by the Administrative Agent.

"Availability" means, at any time, (a) the then effective total Commitments minus (b) the total Revolving Credit Exposures.

"Availability Period" means the period from and including the Effective Date to but excluding the Termination Date.

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"Bail-In Legislation" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"Bank Products" means any of the following bank services:  (a) commercial credit cards, (b) stored value cards, and (c) treasury management services (including, without limitation, controlled disbursement, automated clearinghouse transactions, return items, overdrafts and interstate depository network services).

"Bank Products Provider" means any Lender or Affiliate of a Lender that provides Bank Products to the Parent, the Borrower, or any other Guarantor.

"Bankruptcy Court" has the meaning assigned to such term in the Recitals hereto.

"Bankruptcy Proceedings" has the meaning assigned to such term in the Recitals hereto.

"Benefitting Guarantor" means a Guarantor for which funds or other support are required for such Guarantor to constitute an Eligible Contract Participant.

"Beta Freed Cash" means the proceeds received by the Loan Parties from the release of cash securing certain decommissioning liabilities in connection with Oil and Gas Properties located in the Beta Field offshore Southern California.

"Board of Directors" means, with respect to any Person, the board or committee of such Person serving a similar function.

"Board" means the Board of Governors of the Federal Reserve System of the United States of America or any successor Governmental Authority.

"Borrower" has the meaning assigned to such term in the first paragraph hereof.

"Borrowing" means Loans of the same Type, made, converted or continued on the same date and, in the case of Eurodollar Loans, as to which a single Interest Period is in effect.

"Borrowing Base" means, at any time, an amount equal to the amount determined in accordance with Section 2.07, as the same may be adjusted from time to time pursuant to Section 8.13(c).

"Borrowing Base Deficiency" occurs if, at any time, the total Revolving Credit Exposures exceeds the Borrowing Base then in effect.  For the sole purpose of determining whether a Borrowing Base Deficiency exists at a particular time, the amount of Revolving Credit Exposures at such time shall be reduced on a dollar for dollar basis by the amount of cash collateral held at such time by the Administrative Agent on behalf of the Lenders as provided in Section 2.08(j), solely to the extent such cash collateral was deposited pursuant to Section 3.04(c).

"Borrowing Base Value" means, with respect to any Oil and Gas Property of a Loan Party or any Swap Agreement in respect of commodities, the value the Administrative Agent attributed to such asset in connection with the most recent determination of the Borrowing Base (which Borrowing Base was approved by the requisite Lenders in accordance with Section 2.07).

"Borrowing Request" means a request by the Borrower for a Borrowing in accordance with Section 2.03.

"Business Day" means any day that is not a Saturday, Sunday or other day on which commercial banks in New York City or Houston, Texas are authorized or required by law to remain closed; and if such day relates to a Borrowing or continuation of, a payment or prepayment of principal of or interest on, or a conversion of or into, or the Interest Period for, a Eurodollar Loan or a notice by the Borrower with respect to any such Borrowing or continuation, payment, prepayment, conversion or Interest Period, any day which is also a day on which banks are open for dealings in dollar deposits in the London interbank market.

"Capital Leases" means, in respect of any Person, all leases which shall have been, or should have been, in accordance with GAAP, recorded as capital leases on the balance sheet of the Person liable for the payment of rent thereunder.

"Cash Equivalents" means Investments described in Section 9.05(c), Section 9.05(d), Section 9.05(e) and Section 9.05(f).  The "amount" of a Cash Equivalent at any time shall be deemed to be the net amount that the owner of such Cash Equivalent would receive upon the sale or liquidation thereof at such time, as determined in good faith by a Responsible Officer.

6

"Casualty Event" means any loss, casualty or other insured damage to, or any nationalization, taking under power of eminent domain or by condemnation or similar proceeding of, any Property of the Borrower or of any other Loan Party.

"Change in Control" means the occurrence of any of the following after the Effective Date:

(a)      the acquisition of ownership, directly or indirectly, beneficially or of record, by any Person or group (within the meaning of the Securities Exchange Act of 1934 and the rules of the SEC thereunder as in effect on the date hereof), other than Permitted Holders of Equity Interests representing more than 35% of the aggregate ordinary voting power represented by the issued and outstanding Equity Interests of the Public Parent;

(b)      the Public Parent shall at any time cease to own 100% of the Equity Interests of the Parent;

(c)      the Parent shall at any time cease to own 100% of the Equity Interests of the Borrower;

(d)      occupation of a majority of the seats (other than vacant seats) on (i) the Board of Directors of the Parent by individuals who were neither (A) nominated, appointed or approved by the Board of Directors of the Parent nor (B) appointed by directors so nominated, appointed or approved or (ii) the Board of Directors of the Public Parent by individuals who were neither (A) nominated, appointed or approved by the Board of Directors of the Public Parent nor (B) appointed by directors so nominated, appointed or approved;[1]

(e)      the Borrower or another Loan Party ceases to own 100% of the Equity Interests of each Guarantor (other than the Parent); or

(f)      a "change in control" (as such term or other similar term is defined in any Permitted Unsecured Debt) shall have occurred.

"Change in Law" means (a) the adoption of any law, rule or regulation after the Effective Date, (b) any change in any law, rule or regulation or in the interpretation or application thereof by any Governmental Authority after the date of this Agreement or (c) compliance by any Lender or the Issuing Bank (or, for purposes of Section 5.01(b)), by any lending office of such Lender or by such Lender's or the Issuing Bank's holding company, if any) with any request, guideline or directive (whether or not having the force of law) of any Governmental Authority made or issued after the date of this Agreement; *provided* that, notwithstanding anything herein to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States of America regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law," regardless of the date enacted, adopted or issued.

---

[1]      Subject to review of organizational documents of Parent and Public Parent.

7

"Code" means the Internal Revenue Code of 1986, as amended from time to time, and any successor statute.

"Commitment" means, with respect to each Lender, the commitment of such Lender to make Loans and to acquire participations in Letters of Credit hereunder, expressed as an amount representing the maximum aggregate amount of such Lender's Revolving Credit Exposure hereunder, as such commitment may be (a) modified from time to time pursuant to Section 2.06 and (b) modified from time to time pursuant to assignments by or to such Lender pursuant to Section 12.04(a).  The amount representing each Lender's Commitment shall at any time be the least of (i) such Lender's Maximum Credit Amount, (ii) such Lender's Applicable Percentage of the then effective Borrowing Base and (iii) such Lender's Elected Commitment.

"Commitment Fee Rate" has the meaning set forth in the definition of "Applicable Margin".

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"Consolidated EBITDAX" means, with respect to the Parent and the Consolidated Subsidiaries, for any period, Consolidated Net Income for such period plus, without duplication and to the extent reflected as a charge in the statement of such Consolidated Net Income for such period, the sum of (a) interest expense (including realized and unrealized losses on interest rate derivative contracts); (b) income tax expense; (c) depreciation, depletion and amortization expense; (d) impairment of goodwill and long-lived assets (including Oil and Gas Properties); (e) accretion of asset retirement obligations; (f) unrealized losses on commodity derivative contracts; (g) realized losses upon the early termination or other monetization of commodity derivative contracts; (h) losses on sale of assets; (i) noncash stock-based compensation expenses; (j) exploration costs; (k) fees and expenses expensed and paid in cash in connection with any registered offering of Equity Interests in the Parent and (l) costs and expenses incurred and paid in cash during the fiscal quarter ending September 30, 2017 that are associated with the Bankruptcy Proceedings and the transactions contemplated by the Plan of Reorganization in an aggregate amount not to exceed $5,000,000; *provided* that, clauses (a) through (j) shall exclude noncash items to the extent they represent an accrual of or reserve for cash expenditures in any future period, minus, without duplication and to the extent included in the statement of such Consolidated Net Income for such period, the sum of interest income (including realized and unrealized gains on interest rate derivative contracts); income tax benefit; unrealized gains on commodity derivative contracts; realized gains upon the early termination or other monetization of commodity derivative contracts; and gains on sales of assets.  For the purposes of calculating Consolidated EBITDAX for any period of four consecutive fiscal quarters (each, a "Reference Period") pursuant to any determination of the financial ratio contained in Section 9.01(a) and Section 9.01(c), (x) if during such Reference Period, the Parent or any Consolidated Subsidiary shall have made a Material Disposition or Material Acquisition, the Consolidated EBITDAX for such Reference Period shall be calculated after giving pro forma effect thereto as if such Material Disposition or Material Acquisition, as applicable, occurred on the first day of such Reference Period and (y) notwithstanding the occurrence of a Swap Liquidation in respect of any Swap Agreement, the Consolidated EBITDAX for such Reference Period shall be calculated giving pro forma effect to any gain (or loss) that would be attributable during such Reference Period to

the applicable Swap Agreement in the event such Swap Liquidation had not been consummated prior to the scheduled maturity of such Swap Agreement.  As used in this definition, "Material Acquisition" means any acquisition of Property or series of related acquisitions of Property that involves the payment of consideration by the Parent and the Consolidated Subsidiaries in excess of (1) $5,000,000 in the aggregate during a fiscal quarter or (2) $5,000,000 for any single acquisition or series of related acquisitions of Property; and "Material Disposition" means any disposition of Property or series of related dispositions of Property that yields gross proceeds to the Parent or any of the Consolidated Subsidiaries in excess of (1) $5,000,000 in the aggregate during a fiscal quarter or (2) $5,000,000 for any single disposition or series of related dispositions of Property.

"Consolidated Net Income" means, with respect to the Parent and the Consolidated Subsidiaries, for any period, the aggregate of the net income (or loss) of the Parent and the Consolidated Subsidiaries after allowances for taxes for such period determined on a consolidated basis in accordance with GAAP; *provided* that there shall be excluded from such net income (to the extent otherwise included therein) the following:  (a) the net income of any Person in which the Parent or any Consolidated Subsidiary has an interest (which interest does not cause the net income of such other Person to be consolidated with the net income of the Parent and the Consolidated Subsidiaries in accordance with GAAP), except to the extent of the amount of dividends or distributions actually paid in cash during such period by such other Person to the Parent or to a Consolidated Subsidiary, as the case may be; (b) [reserved]; (c) the net income (or loss) of any Person acquired in a pooling-of-interests transaction for any period prior to the date of such transaction so long as the assets of such Person are not included in the calculation of the Borrowing Base; (d) any extraordinary gains or losses during such period; and (e) any gains or losses attributable to writeups or writedowns of assets, including ceiling test writedowns.

"Consolidated Net Interest Expense" means, with respect to the Parent and the Consolidated Subsidiaries, for any period, the difference between (a) the sum of (i) all interest, premium payments, debt discount, fees, charges and related expenses of the Parent and the Consolidated Subsidiaries in connection with borrowed money (including capitalized interest (other than interest paid in kind)) or in connection with the deferred purchase price of assets, in each case to the extent treated as interest in accordance with GAAP, (ii) the portion of rent expense of the Parent and the Consolidated Subsidiaries with respect to such period under Capital Leases that is treated as interest in accordance with GAAP, (iii) any cash interest paid in connection with the issuance or incurrence of any new Debt permitted hereunder solely to the extent that, pursuant to ASC 470-60, such payments are not accounted for as interest expense, and (b) the sum of (i) interest income actually received in cash by the Parent and the Consolidated Subsidiaries and (ii) net amounts of realized cash on interest rate Swap Agreements, in the case of (a) and (b), for such period.

"Consolidated Subsidiaries" means each Subsidiary of the Parent (whether now existing or hereafter created or acquired), the financial statements of which shall be (or should have been) consolidated with the financial statements of the Parent in accordance with GAAP.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise

9

voting power, by contract or otherwise.  For the purposes of this definition, and without limiting the generality of the foregoing, any Person that owns, directly or indirectly, 10% or more of the Equity Interests having ordinary voting power for the election of the directors or other governing body of a Person (other than as a limited partner of such other Person) will be deemed to "control" such other Person.  "Controlling" and "Controlled" have meanings correlative thereto.

"Debt" means, for any Person, the sum of the following (without duplication):  (a) all obligations of such Person for borrowed money or evidenced by bonds, bankers' acceptances, debentures, notes or other similar instruments; (b) all obligations of such Person (whether contingent or otherwise) in respect of letters of credit, surety or other bonds and similar instruments; (c) all accounts payable and all accrued expenses, liabilities or other obligations of such Person to pay the deferred purchase price of Property or services; (d) all obligations under Capital Leases; (e) all obligations under Synthetic Leases; (f) all Debt (as defined in the other clauses of this definition) of others secured by (or for which the holder of such Debt has an existing right, contingent or otherwise, to be secured by) a Lien on any Property of such Person, whether or not such Debt is assumed by such Person; (g) all Debt (as defined in the other clauses of this definition) of others guaranteed by such Person or in which such Person otherwise assures a creditor against loss of the Debt (howsoever such assurance shall be made) to the extent of the lesser of the amount of such Debt and the maximum stated amount of such guarantee or assurance against loss; (h) all obligations or undertakings of such Person to maintain, or cause to be maintained, the financial position or covenants of others and, to the extent entered into as a means of providing credit support for the obligations of others and not primarily to enable such Person to acquire any such Property, all obligations or undertakings of such Person to purchase the Debt or Property of others; (i) obligations to deliver commodities, goods or services, including, without limitation, Hydrocarbons, in consideration of one or more advance payments, other than gas balancing arrangements in the ordinary course of business; (j) obligations to pay for goods or services even if such goods or services are not actually received or utilized by such Person; (k) any Debt (as defined in the other clauses of this definition) of a partnership for which such Person is liable either by agreement, by operation of law or by a Governmental Requirement, but only to the extent of such liability; (l) Disqualified Capital Stock; and (m) the undischarged balance of any production payment created by such Person or for the creation of which such Person directly or indirectly received payment.  The Debt of any Person shall include all obligations of such Person of the character described above to the extent such Person remains legally liable in respect thereof, notwithstanding that any such obligation is not included as a liability of such Person under GAAP.  Direct or indirect obligations of a Person in respect of Swap Agreements shall not constitute Debt.

"Debtors" has the meaning assigned to such term in the Recitals hereto.

"Default" means any event or condition which constitutes an Event of Default or which upon notice, lapse of time or both would, unless cured or waived, become an Event of Default.

"Defaulting Lender" means any Lender that (a) has failed, within two Business Days of the date required to be funded or paid, to (i) fund any portion of its Loans, (ii) fund any portion of its participations in Letters of Credit, unless such Lender notifies the Administrative Agent and the Borrower in writing that such failure is the result of such Lender's determination that one or more conditions precedent to funding (each of which conditions precedent, together with any

10

applicable default, shall be specifically identified in such writing) has not been satisfied, or (iii) pay over to any Loan Party any other amount required to be paid by it hereunder; (b) has notified the Borrower, any Loan Party, the Administrative Agent or any other Lender in writing, or has made a public statement, to the effect that it does not intend or expect to comply with any of its funding obligations under this Agreement or generally under other agreements in which it commits to extend credit (unless such writing or public statement relates to such Lender's obligation to fund a Loan hereunder and states that such position is based on such Lender's determination that a condition precedent to funding (which condition precedent, together with any applicable default, shall be specifically identified in such writing or public statement) cannot be satisfied); (c) has failed, within three Business Days after written request by the Administrative Agent or a Loan Party to provide a certification in writing from an authorized officer of such Lender that it will comply with its obligations to fund prospective Loans and participations in then outstanding Letters of Credit under this Agreement; *provided* that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon such Loan Party's receipt of such certification in form and substance satisfactory to it and the Administrative Agent; or (d) has (or whose bank holding company has) (i) been placed into receivership, conservatorship or bankruptcy (ii) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such a capacity or (iii) has (or has a direct or indirect parent company who has) become the subject of a Bail-In Action; *provided* that a Lender shall not become a Defaulting Lender solely as a result of the acquisition or maintenance of an ownership interest in such Lender or Person controlling such Lender or the exercise of control over a Lender or Person controlling such Lender by a Governmental Authority or an instrumentality thereof, so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States of America or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender; *provided*, further, that the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official by a supervisory authority or regulator with respect to a Lender or Person controlling such Lender under the Dutch Financial Supervision Act 2007 (as amended from time to time and including any successor legislation) shall not be deemed an event described in clause (d) hereof. Any determination by the Administrative Agent that a Lender is a Defaulting Lender under any one or more of clauses (a) through (d) above shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender (subject to Section 2.09) upon delivery of written notice of such determination to the Borrower and each Lender.

"Disqualified Capital Stock" means any Equity Interest that, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable) or upon the happening of any event, matures or is mandatorily redeemable for any consideration other than other Equity Interests (which would not constitute Disqualified Capital Stock), pursuant to a sinking fund obligation or otherwise, or is convertible or exchangeable for Debt or redeemable for any consideration other than other Equity Interests (which would not constitute Disqualified Capital Stock) at the option of the holder thereof, in whole or in part, on or prior to the date that is one year after the earlier of (a) the Maturity Date and (b) the date on which there are no Loans,

11

LC Exposure or other obligations hereunder outstanding and all of the Commitments are terminated.

"dollars" or "$" refers to lawful money of the United States of America.

"Domestic Subsidiary" means any Subsidiary that is organized under the laws of the United States of America or any State thereof or the District of Columbia.

"EEA Financial Institution" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Effective Date" means the date on which the conditions specified in Section 6.01 are satisfied (or waived in accordance with Section 12.02).

"Elected Commitment" means, as to each Lender, the amount set forth opposite such Lender's name on Annex I under the caption "Elected Commitment", as the same may be increased, reduced or terminated from time to time in connection with an optional increase, reduction or termination of the Aggregate Elected Commitment Amounts pursuant to Section 2.06(c).

"Elected Commitment Increase Certificate" has the meaning given to such term in Section 2.06(c)(ii)(F).

"Eligible Contract Participant" means an "eligible contract participant" as defined in the Commodity Exchange Act and the regulations thereunder.

"Emissions Credits" means any emissions reductions credits or offsets issued, sanctioned or required by a Governmental Authority with respect to various pollutants, emissions or any other environmental attributes of any nature, including, without limitation, nitrogen oxides, carbon dioxide, sulfur oxides, volatile organic compounds, carbon monoxide, particulate matter and reactive organic gases.

"Engineering Reports" has the meaning assigned such term in Section 2.07(c)(i).

"Environmental Laws" means any and all Governmental Requirements pertaining in any way to health, safety, the environment or the preservation or reclamation of natural resources or the management, Release or threatened Release of any Hazardous Materials, in effect in any and

12

all jurisdictions in which the Borrower or any of the other Loan Parties is conducting or at any time has conducted business, or where any Property of the Borrower or any of the other Loan Parties is located, including, without limitation, the Oil Pollution Act of 1990, as amended, the Clean Air Act, as amended, the Comprehensive Environmental, Response, Compensation, and Liability Act of 1980, as amended ("CERCLA"), the Federal Water Pollution Control Act, as amended, the Occupational Safety and Health Act of 1970, as amended, the Resource Conservation and Recovery Act of 1976, as amended ("RCRA"), the Safe Drinking Water Act, as amended, the Toxic Substances Control Act, as amended, the Superfund Amendments and Reauthorization Act of 1986, as amended, the Hazardous Materials Transportation Act, as amended, and other environmental conservation or protection Governmental Requirements.

"Environmental Permit" means any permit, registration, license, notice, approval, consent, exemption, variance, or other authorization required under or issued pursuant to applicable Environmental Laws.

"Equity Interests" means shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person, and any warrants, options or other rights entitling the holder thereof to purchase or acquire any such Equity Interest.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and any successor statute.

"ERISA Affiliate" means each trade or business (whether or not incorporated) which together with the Borrower or any other Loan Party would be deemed to be a "single employer" within the meaning of Section 4001(b)(1) of ERISA or subsections (b), (c), (m) or (o) of Section 414 of the Code.

"ERISA Event" means (a) a "Reportable Event" described in Section 4043 of ERISA and the regulations issued thereunder, (b) the withdrawal of the Parent, the Borrower, any other Loan Party or any ERISA Affiliate from a Plan during a plan year in which it was a "substantial employer" as defined in Section 4001(a)(2) of ERISA, (c) the filing of a notice of intent to terminate a Plan or the treatment of a Plan amendment as a termination under Section 4041 of ERISA, (d) the institution of proceedings to terminate a Plan by the PBGC, (e) receipt of a notice of withdrawal liability pursuant to Section 4202 of ERISA or (f) any other event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Plan.

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"Eurodollar", when used in reference to any Loan or Borrowing, means that such Loan is, or the Loans comprising such Borrowing are, bearing interest at a rate determined by reference to the Adjusted LIBO Rate.

"Event of Default" has the meaning assigned such term in Section 10.01.

13

"Excepted Liens" means: (a) Liens for Taxes, assessments or other governmental charges or levies which are not delinquent or which are being contested in good faith by appropriate action and for which adequate reserves have been maintained in accordance with GAAP; (b) Liens in connection with workers' compensation, unemployment insurance or other social security, old age pension or public liability obligations which are not delinquent or which are being contested in good faith by appropriate action and for which adequate reserves have been maintained in accordance with GAAP; (c) statutory landlord's liens, operators', vendors', carriers', warehousemen's, repairmen's, mechanics', suppliers', workers', materialmen's, construction or other like Liens arising by operation of law in the ordinary course of business or incident to the exploration, development, operation and maintenance of Oil and Gas Properties, each of which is in respect of obligations that are not delinquent or which are being contested in good faith by appropriate action and for which adequate reserves have been maintained in accordance with GAAP; (d) contractual Liens which arise in the ordinary course of business under operating agreements, joint venture agreements, oil and gas partnership agreements, oil and gas leases, farm-out agreements, division orders, contracts for the sale, transportation or exchange of oil and natural gas, unitization and pooling declarations and agreements, area of mutual interest agreements, overriding royalty agreements, marketing agreements, processing agreements, net profits agreements, development agreements, gas balancing or deferred production agreements, injection, repressuring and recycling agreements, salt water or other disposal agreements, seismic or other geophysical permits or agreements, and other agreements which are usual and customary in the oil and gas business and are for claims which are not delinquent or which are being contested in good faith by appropriate action and for which adequate reserves have been maintained in accordance with GAAP; *provided* that any such Lien referred to in this clause does not materially impair the use of the Property covered by such Lien for the purposes for which such Property is held by the Borrower or any of the other Loan Parties or materially impair the value of such Property subject thereto; (e) Liens arising solely by virtue of any statutory or common law provision relating to banker's liens, rights of set-off or similar rights and remedies and burdening only deposit accounts or other funds maintained with a creditor depository institution; *provided* that no such deposit account is a dedicated cash collateral account or is subject to restrictions against access by the depositor in excess of those set forth by regulations promulgated by the Board, and no such deposit account is intended by the Borrower or any of the other Loan Parties to provide collateral to the depository institution; (f) Immaterial Title Deficiencies, (g) easements, restrictions, servitudes, permits, conditions, covenants, exceptions or reservations in any Property of the Borrower or any of the other Loan Parties for the purpose of roads, pipelines, transmission lines, transportation lines, distribution lines for the removal of gas, oil, coal or other minerals or timber, and other like purposes, or for the joint or common use of real estate, rights of way, facilities and equipment, that do not secure any monetary obligations and which in the aggregate do not materially impair the use of such Property for the purposes of which such Property is held by the Borrower or any of the other Loan Parties or materially impair the value of such Property subject thereto; (h) Liens on cash or securities pledged to secure performance of tenders, surety and appeal bonds, government contracts, performance and return of money bonds, bids, trade contracts, leases, statutory obligations, regulatory obligations and other obligations of a like nature incurred in the ordinary course of business; (i) Liens in favor of the depository bank arising under documentation governing deposit accounts or in any Control Agreement (as defined in the Security Agreement) which Liens secure the payment of returned items, settlement item amounts, bank fees, or similar

14

items or fees; and (j) judgment and attachment Liens not giving rise to an Event of Default; *provided* that any appropriate legal proceedings which may have been duly initiated for the review of such judgment shall not have been finally terminated or the period within which such proceeding may be initiated shall not have expired and no action to enforce such Lien has been commenced; *provided, further* that (i) Liens described in clauses (a) through (e) shall remain "Excepted Liens" only for so long as no action to enforce such Lien has been commenced and no intention to subordinate the first priority Lien granted in favor of the Administrative Agent and the Lenders is to be hereby implied or expressed by the permitted existence of such Excepted Liens, and (ii) the term "Excepted Liens" shall not include any Lien securing Debt for borrowed money other than the Indebtedness.

"Excess Cash" means the amount of any unrestricted cash (including Beta Freed Cash) and Cash Equivalents of the Borrower and the other Loan Parties in excess of $35,000,000 in the aggregate at any time (excluding (a) cash earmarked to pay unaffiliated third-party obligations for which checks have been issued or wires or automated clearing house transfers of funds have been initiated and (b) Beta Freed Cash earmarked to make the Noteholder Distribution within 60 days of receipt of Beta Freed Cash) (the "Excess Cash Threshold"); *provided* that, the Borrower may elect to increase the Excess Cash Threshold to $50,000,000 at such time as the aggregate amount of net cash proceeds from sales of Property (including, but not limited to, dispositions of Equity Interests in Subsidiaries) exceeding any Borrowing Base Value attributable thereto equals or exceeds $15,000,000; *provided, however*, that in the event the Parent or its Subsidiaries incur Permitted Unsecured Debt in an aggregate principal amount of $10,000,000 or greater, the Borrower will no longer have the ability to increase the Excess Cash Threshold above $35,000,000 and, if the Excess Cash Threshold is greater than $35,000,000 at such time, the Excess Cash Threshold will be immediately reduced to $35,000,000.  In connection with any election to increase the Excess Cash Threshold, the Borrower shall provide to the Administrative Agent and the Lenders a certificate from a Responsible Officer of the Borrower notifying the Administrative Agent of the increase to the Excess Cash Threshold and certifying that the condition to such increase has been satisfied.

"Excluded Swap Obligation" means, with respect to any Loan Party individually determined on a Loan Party by Loan Party basis, any Indebtedness or other obligation in respect of any Swap Agreement if, and solely to the extent that, all or a portion of the guarantee of such Loan Party of, or the grant by such Loan Party of a security interest to secure, such Indebtedness or other obligation in respect of such Swap Agreement (or any guarantee thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Loan Party's failure for any reason to constitute an Eligible Contract Participant at the time such guarantee or grant of a security interest is entered into or otherwise becomes effective with respect to, or any other time such Loan Party is by virtue of such guarantee or grant of security interest otherwise deemed to enter into, such Indebtedness or other obligation in respect of such Swap Agreement (or guarantee thereof).  If such an obligation arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such obligation that is attributable to swaps the guarantee or grant of security interest for which (or for any guarantee of which) so is or becomes illegal.

15

"Excluded Taxes" means, with respect to the Administrative Agent, any Lender, the Issuing Bank or any other recipient of any payment to be made by or on account of any obligation of the Borrower or any Guarantor hereunder or under any other Loan Document, (a) Taxes imposed on (or measured by) its net income (however denominated) and franchise Taxes imposed on it, in each case, by the United States of America or such other jurisdiction under the laws of which such recipient is organized or in which its principal office is located or, in the case of any Lender, in which its applicable lending office is located, (b) any branch profits Taxes imposed by the United States of America or any similar Tax imposed by any other jurisdiction in which the Borrower or any Guarantor is located, (c) in the case of a Foreign Lender (other than an assignee pursuant to a request by the Borrower under Section 5.04(b)), any U.S. federal withholding Tax that is imposed on amounts payable to such Foreign Lender at the time such Foreign Lender becomes a party to this Agreement (or designates a new lending office) or is attributable to such Foreign Lender's failure to comply with Section 5.03(f), except to the extent that such Foreign Lender (or its assignor, if any) was entitled, at the time of designation of a new lending office (or assignment), to receive additional amounts with respect to such withholding Tax pursuant to Section 5.03(a) or Section 5.03(c) and (d) any U.S. federal withholding Taxes imposed by FATCA.

"Existing Letters of Credit" means the letters of credit listed on Annex II hereto.

"Existing Loan Documents" has the meaning given to the term "Loan Documents" in the Prepetition RBL Credit Agreement.

"FATCA" means Sections 1471 through 1474 of the Code as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code, and any applicable intergovernmental agreements (and any foreign legislation, regulations or published guidance implemented to give effect to such intergovernmental agreements) entered into to implement the foregoing.

"FCPA" means the Foreign Corrupt Practices Act of 1977, as amended.

"Federal Flood Insurance" means federally backed Flood Insurance available under the National Flood Insurance Program to owners of real property improvements located in Special Flood Hazard Areas in a community participating in the National Flood Insurance Program.

"Federal Funds Effective Rate" means, for any day, the weighted average (rounded upwards, if necessary, to the next 1/100 of 1%) of the rates on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average (rounded upwards, if necessary, to the next 1/100 of 1%) of the quotations for such day for such transactions received by the Administrative Agent from three federal funds brokers of recognized standing selected by it. Notwithstanding the foregoing, if the Federal Funds Effective Rate shall be less than zero, such rate shall be deemed to be zero for purposes of this Agreement.

"FEMA" means the Federal Emergency Management Agency, a component of the United States Department of Homeland Security that administers the National Flood Insurance Program.

"Financial Officer" means, for any Person, the chief financial officer (or prior to the appointment of a chief financial officer, the Vice President of Finance), principal accounting officer, treasurer or controller of such Person.  Unless otherwise specified, all references herein to a Financial Officer means a Financial Officer of the Parent.

"Financial Statements" means the financial statement or statements of the Parent and its Consolidated Subsidiaries referred to in Section 7.04(a).

"Flood Insurance" means, for any owned real property located in a Special Flood Hazard Area, Federal Flood Insurance or private insurance that meets or exceeds the requirements set forth by FEMA in its Mandatory Purchase of Flood Insurance Guidelines.  Flood Insurance shall be in commercially reasonable amounts not less than the minimum policy amounts required under the National Flood Insurance Program, or as otherwise required by the Administrative Agent in good faith and in the exercise of reasonable credit judgment, with deductibles not to exceed $250,000 for losses to buildings and $250,000 for losses to contents of buildings.

"Flood Insurance Regulations" means (i) the National Flood Insurance Act of 1968 as now or hereafter in effect or any successor statute thereto, (ii) the Flood Disaster Protection Act of 1973 as now or hereafter in effect or any successor statute thereto, (iii) the National Flood Insurance Reform Act of 1994 (amending 42 USC 4001, et seq.), as the same may be amended or recodified from time to time, and (iv) the Flood Insurance Reform Act of 2004 and any regulations promulgated thereunder.

"Foreign Lender" means any Lender that is organized under the laws of a jurisdiction other than that in which the Borrower is located.  For purposes of this definition, the United States of America, each State thereof and the District of Columbia shall be deemed to constitute a single jurisdiction.

"Foreign Subsidiary" means any Subsidiary that is not a Domestic Subsidiary.

"GAAP" means generally accepted accounting principles in the United States of America as in effect from time to time subject to the terms and conditions set forth in Section 1.05.

"Government Official" means (a) any officer or employee of, or any Person acting in an official capacity for or on behalf of, any Governmental Authority, any public international organization or any political party or (b) any candidate for public office.

"Governmental Authority" means the government of the United States of America, any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"Governmental Requirement" means any law, statute, code, ordinance, order, determination, rule, regulation, judgment, decree, injunction, franchise, permit, certificate,

17

license, rules of common law, authorization or other directive or requirement, whether now or hereinafter in effect, of any Governmental Authority.

"Group" means the Loan Parties and their respective Subsidiaries.

"Guarantors" means, collectively, the Parent, each Material Subsidiary and each other Domestic Subsidiary or other Person that guarantees the Indebtedness pursuant to Section 8.14(b).

"Guaranty Agreement" means each agreement executed by one or more Guarantors in substantially the form of Exhibit E-2 unconditionally guarantying, on a joint and several basis, payment of the Indebtedness, as the same may be amended, modified or supplemented from time to time.

"Hazardous Material" means any substance regulated or as to which liability might arise under any applicable Environmental Law including:  (a) any chemical, compound, material, product, byproduct, substance or waste defined as or included in the definition or meaning of "hazardous substance," "hazardous material," "hazardous waste," "solid waste," "toxic waste," "extremely hazardous substance," "toxic substance," "contaminant," "pollutant," or words of similar meaning or import found in any applicable Environmental Law; (b) Hydrocarbons, petroleum products, petroleum substances, natural gas, oil, oil and gas waste, crude oil, and any components, fractions, or derivatives thereof; and (c) radioactive materials, explosives, asbestos or asbestos containing materials, polychlorinated biphenyls, radon, infectious or medical wastes.

"Highest Lawful Rate" means, with respect to each Lender, the maximum nonusurious interest rate, if any, that at any time or from time to time may be contracted for, taken, reserved, charged or received on the Notes or on other Indebtedness under laws applicable to such Lender which are presently in effect or, to the extent allowed by law, under such applicable laws which may hereafter be in effect and which allow a higher maximum nonusurious interest rate than applicable laws allow as of the date hereof.

"Hydrocarbon Interests" means all rights, titles, interests and estates now or hereafter acquired in and to oil and gas leases, oil, gas and mineral leases, or other liquid or gaseous hydrocarbon leases, mineral fee interests, overriding royalty and royalty interests, net profit interests and production payment interests, including any reserved or residual interests of whatever nature.  Unless otherwise indicated herein, each reference to the term "Hydrocarbon Interests" shall mean Hydrocarbons of the Loan Parties.

"Hydrocarbons" means oil, gas, casinghead gas, drip gasoline, natural gasoline, condensate, distillate, liquid hydrocarbons, gaseous hydrocarbons and all products refined or separated therefrom.  Unless otherwise indicated herein, each reference to the term "Hydrocarbons" shall mean Hydrocarbons of the Loan Parties.

"Immaterial Title Deficiencies" means at any time of determination, defects or clouds on title, discrepancies in net revenue and working interest ownership percentages and other discrepancies (in each case with respect to Oil and Gas Properties, between what is shown on the most recently delivered Reserve Report and that which is set forth in the title information provided by a Loan Party to the Administrative Agent hereunder) and other Liens (other than

Excepted Liens), defects, and similar matters which do not, in the case of Oil and Gas Properties, individually or in the aggregate, affect greater than two percent (2%) of the aggregate value of all Oil and Gas Properties evaluated in the most recently delivered Reserve Report under this Agreement.

"Indebtedness" means any and all amounts owing or to be owing by the Borrower or any other Loan Party (whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising):  (a) to the Administrative Agent, the Issuing Bank or any Lender under any Loan Document including, without limitation, all interest on any of the Loans (including any interest that accrues after the commencement of any case, proceeding or other action relating to the bankruptcy, insolvency or reorganization of any Loan Party (or could accrue but for the operation of applicable bankruptcy or insolvency laws), whether or not such interest is allowed or allowable as a claim in any such case, proceeding or other action); (b) to any Secured Swap Provider under any Swap Agreement including any Swap Agreement in existence prior to the date hereof, but excluding any additional transactions or confirmations entered into (i) after such Secured Swap Provider ceases to be a Lender or an Affiliate of a Lender or (ii) after assignment by a Secured Swap Provider to a Person who is not, at the time of such assignment, a Secured Swap Provider; (c) to any Bank Products Provider in respect of Bank Products; and (d) all renewals, extensions and/or rearrangements of any of the above; *provided* that solely with respect to any Guarantor that is not an Eligible Contract Participant, Excluded Swap Obligations of such Guarantor shall in any event be excluded from "Indebtedness" owing by such Guarantor.

"Indemnified Parties" means the Administrative Agent, each other Secured Party and their respective officers, directors, employees, representatives, agents, attorneys, accountants and experts.

"Indemnified Taxes" means Taxes other than Excluded Taxes.

"Initial Reserve Report" means the initial Reserve Report(s) setting forth, as of January 1, 2017, the oil and gas reserves attributable to the Oil and Gas Properties of the Borrower and the other Loan Parties and used by the Lenders in the determination of the initial Borrowing Base.

"Intercompany Note" means the global intercompany note in the form of Exhibit J.

"Interest Election Request" means a request by the Borrower to convert or continue a Borrowing in accordance with Section 2.04.

"Interest Payment Date" means (a) with respect to any ABR Loan, the last day of each March, June, September and December, and (b) with respect to any Eurodollar Loan, the last day of the Interest Period applicable to the Borrowing of which such Loan is a part and, in the case of a Eurodollar Borrowing with an Interest Period of more than three months' duration, each day prior to the last day of such Interest Period that occurs at intervals of three months' duration after the first day of such Interest Period.

"Interest Period" means, with respect to any Eurodollar Borrowing, the period commencing on the date of such Borrowing and ending on the numerically corresponding day in the calendar month that is one, two, three or six months thereafter, as the Borrower may elect;

19

*provided* that (a) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the immediately preceding Business Day and (b) any Interest Period pertaining to a Eurodollar Borrowing that commences on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the last calendar month of such Interest Period) shall end on the last Business Day of the last calendar month of such Interest Period.  For purposes hereof, the date of a Borrowing initially shall be the date on which such Borrowing is made and thereafter shall be the effective date of the most recent conversion or continuation of such Borrowing.

"Interim Redetermination" has the meaning assigned such term in Section 2.07(b).

"Interim Redetermination Date" means the date on which a Borrowing Base that has been redetermined pursuant to an Interim Redetermination becomes effective as provided in Section 2.07(d).

"Investment" means, for any Person:  (a) the acquisition (whether for cash, Property, services or securities or otherwise) of Equity Interests of any other Person or any agreement to make any such acquisition (including, without limitation, any "short sale" or any sale of any securities at a time when such securities are not owned by the Person entering into such short sale); (b) the making of any deposit with, or advance, loan or capital contribution to, assumption of Debt of, purchase or other acquisition of any other Debt or equity participation or interest in, or other extension of credit to, any other Person (including the purchase of Property from another Person subject to an understanding or agreement, contingent or otherwise, to resell such Property to such Person, but excluding any such advance, loan or extension of credit having a term not exceeding 90 days representing the purchase price of inventory or supplies sold by such Person in the ordinary course of business); (c) the purchase or acquisition (in one or a series of transactions) of Property of another Person that constitutes a business unit; or (d) the entering into of any guarantee of, or other contingent obligation (including the deposit of any Equity Interests to be sold) with respect to, Debt or other liability of any other Person and (without duplication) any amount committed to be advanced, lent or extended to such Person.

"Issuing Bank" means Wells Fargo, in its capacity as the issuer of Letters of Credit hereunder, and its successors in such capacity as provided in Section 2.08(i).  The Issuing Bank may, in its discretion, arrange for one or more Letters of Credit to be issued by Affiliates of the Issuing Bank, in which case the term "Issuing Bank" shall include any such Affiliate with respect to Letters of Credit issued by such Affiliate.

"LC Commitment" at any time means $30,000,000.

"LC Disbursement" means a payment made by the Issuing Bank pursuant to a Letter of Credit.

"LC Exposure" means, at any time, the sum of (a) the aggregate undrawn amount of all outstanding Letters of Credit at such time plus (b) the aggregate amount of all LC Disbursements that have not yet been reimbursed by or on behalf of the Borrower at such time.  The LC

20

Exposure of any Lender at any time shall be its Applicable Percentage of the total LC Exposure at such time.

"Lenders" means the Persons listed on Annex I, any Person that shall have become a party hereto pursuant to an Assignment and Assumption, and any Person that shall have become a party hereto as an Additional Lender pursuant to Section 2.06(c), other than, in each case, any such Person that ceases to be a party hereto pursuant to an Assignment and Assumption.

"Letter of Credit" means, collectively, any standby letter of credit issued pursuant to this Agreement and any Existing Letters of Credit.

"Letter of Credit Agreements" means all letter of credit applications and other agreements (including any amendments, modifications or supplements thereto) submitted by the Borrower, or entered into by the Borrower, with the Issuing Bank relating to any Letter of Credit.

"Leverage Ratio" has the meaning assigned such term in Section 9.01(c).

"LIBO Rate" means the greater of: (a) 0% and (b) with respect to any Eurodollar Borrowing for any Interest Period, the rate determined by reference to the ICE Benchmark Administration ("ICE") (or any other Person that takes over the administration of such rate) appearing on the relevant Reuters screen page (or on any successor or substitute page of such service, or any successor to or substitute for such service, providing rate quotations comparable to those currently provided on such page of such service, as determined by the Administrative Agent from time to time for purposes of providing quotations of interest rates applicable to dollar deposits in the London interbank market) at approximately 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period, as the rate for dollar deposits with a maturity comparable to such Interest Period.  In the event that such rate is not available at such time for any reason, then the "LIBO Rate" with respect to such Eurodollar Borrowing for such Interest Period shall be determined by the Administrative Agent to be the arithmetic average of the rates per annum at which dollar deposits of an amount comparable to such Eurodollar Borrowing with maturities comparable to such Interest Period would be offered by first class banks in the London interbank market to the Administrative Agent at approximately 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period.

"Lien" means any interest in Property securing an obligation owed to, or a claim by, a Person other than the owner of the Property, whether such interest is based on the common law, statute or contract, and whether such obligation or claim is fixed or contingent, and including, but not limited to, (a) the lien or security interest arising from a mortgage, encumbrance, pledge, security agreement, conditional sale or trust receipt or a lease, consignment or bailment for security purposes or (b) production payments and the like payable out of Oil and Gas Properties. The term "Lien" shall include easements, restrictions, servitudes, permits, conditions, covenants, exceptions or reservations. For the purposes of this Agreement, the Borrower or any other Loan Party shall be deemed to be the owner of any Property which it has acquired or holds subject to a conditional sale agreement, or leases under a financing lease or other arrangement pursuant to which title to the Property has been retained by or vested in some other Person in a transaction intended to create a financing.

21

"Liquidate," "Liquidated" and "Liquidation" when used in reference to any Swap Agreement or any portion thereof have the correlative meanings to the term "Swap Liquidation".

"Liquidity" means, as of any date of determination, the sum of (a) unrestricted cash and Cash Equivalents of the Borrower and the other Loan Parties on such date (including cash and Cash Equivalents held in an account subject to the Administrative Agent's Lien securing the Loan Parties' obligations under the Loan Documents) plus (b) Availability on such date, *provided* that if a Borrowing Base Deficiency exists on such date, "Liquidity" means (x) unrestricted cash and Cash Equivalents of the Borrower and the other Loan Parties on such date (including cash and Cash Equivalents held in an account subject to the Administrative Agent's Lien securing the Loan Parties' obligations under the Loan Documents) minus (y) the Borrowing Base Deficiency on such date.

"Loan Documents" means this Agreement, the Notes, the Letter of Credit Agreements, the Letters of Credit, the Agency Fee Letter, any Subordination Agreement, the Security Instruments and any other agreement designated as a Loan Document by the Administrative Agent and the Borrower, in each case as such agreements may be amended, modified, supplemented or restated from time to time.

"Loan Parties" means the Borrower, the Parent and each other Guarantor.

"Loans" means the loans made by the Lenders to the Borrower pursuant to this Agreement.

"Majority Lenders" means, at any time while no Loans or LC Exposure is outstanding, Lenders having greater than fifty percent (50%) of the Aggregate Maximum Credit Amounts; and at any time while any Loans or LC Exposure is outstanding, Lenders holding greater than fifty percent (50%) of the outstanding aggregate principal amount of the Loans and participation interests in Letters of Credit (without regard to any sale by a Lender of a participation in any Loan under Section 12.04(c)); *provided* that the Maximum Credit Amounts and the principal amount of the Loans and participation interests in Letters of Credit of the Defaulting Lenders (if any) shall be excluded from the determination of Majority Lenders.

"Material Adverse Effect" means a material adverse change in, or material adverse effect on, (a) the business, operations, Property, or condition (financial or otherwise) of the Borrower and the other Loan Parties taken as a whole, other than as a result of the events leading up to or resulting from the commencement or continuance of the Bankruptcy Proceedings, (b) the ability of the Borrower individually, or the other Loan Parties, taken as a whole, to perform any of its or their obligations under any Loan Document, (c) the validity or enforceability of any Loan Document or (d) the rights and remedies of or benefits available to the Administrative Agent, the Issuing Bank or any Lender under any Loan Document.

"Material Indebtedness" means Debt (other than the Loans and Letters of Credit), or obligations in respect of one or more Swap Agreements, of any one or more of the Borrower and the other Loan Parties in an aggregate principal amount exceeding $15,000,000. For purposes of determining Material Indebtedness, the "principal amount" of the obligations of the Borrower or

22

any other Loan Party in respect of any Swap Agreement at any time shall be the Swap Termination Value.

"Material Subsidiary" means, as of any date, any Domestic Subsidiary that is a Wholly-Owned Subsidiary that either (a) together with its Subsidiaries, owns Property having a fair market value of $500,000 or more, or (b) otherwise becomes or is required to become a Guarantor pursuant to Section 8.14.  In no event shall the aggregate fair market value of all Property owned by all Subsidiaries that are not Material Subsidiaries exceed $500,000.

"Maturity Date" means March 19, 2021.

"Maximum Credit Amount" means, as to each Lender, the amount set forth opposite such Lender's name on Annex I under the caption "Maximum Credit Amounts," as the same may be (a) reduced or terminated from time to time in connection with a reduction or termination of the Aggregate Maximum Credit Amounts pursuant to Section 2.06(b), (b) modified from time to time pursuant to Section 2.06(c) or (c) modified from time to time pursuant to any assignment permitted by Section 12.04(a).

"Memorial" has the meaning assigned to such term in the Recitals hereto.

"Moody's" means Moody's Investors Service, Inc. and any successor thereto that is a nationally recognized rating agency.

"Mortgaged Property" means any Property owned by the Borrower or any Guarantor which is subject to the Liens existing and to exist under the terms of the Security Instruments.

"Multiemployer Plan" means a Plan which is a multiemployer plan as defined in Section 3(37) or 4001 (a)(3) of ERISA.

"National Flood Insurance Program" means the program created by the United States Congress pursuant to the Flood Insurance Regulations that mandates the purchase of flood insurance to cover real property improvements located in Special Flood Hazard Areas in participating communities and provides protection to property owners through a federal insurance program.

"New Borrowing Base Notice" has the meaning assigned such term in Section 2.07(d).

"Noteholder Distribution" means a Restricted Payment made solely from the proceeds of the Beta Freed Cash to the Noteholders in an aggregate amount not to exceed $24,639,691.88 less the amount of any cash distributions made to the Noteholders on the Effective Date pursuant to the Plan of Reorganization.[2]

"Noteholders" means the holders of the Permitted Senior Unsecured Notes (as defined in the Prepetition RBL Credit Agreement) on the effective date of the Plan of Reorganization.

---

[2]    If such payment is made to Noteholders prior to the Effective Date, provisions related to the Noteholder Distribution will be deleted.

23

"Notes" means the promissory notes of the Borrower described in Section 2.02(d) and being substantially in the form of Exhibit A, together with all amendments, modifications, replacements, extensions and rearrangements thereof.

"OFAC" means the Office of Foreign Assets Control of the United States Department of Treasury.

"Oil and Gas Properties" means (a) Hydrocarbon Interests; (b) the Properties now or hereafter pooled or unitized with Hydrocarbon Interests; (c) all presently existing or future unitization, communitization, pooling agreements and declarations of pooled units and the units created thereby (including, without limitation, all units created under orders, regulations and rules of any Governmental Authority) which may affect all or any portion of the Hydrocarbon Interests; (d) all operating agreements, contracts and other agreements, including production sharing contracts and agreements, which relate to any of the Hydrocarbon Interests or the production, sale, purchase, exchange or processing of Hydrocarbons from or attributable to such Hydrocarbon Interests; (e) all Hydrocarbons in and under and which may be produced and saved or attributable to the Hydrocarbon Interests, including all oil in tanks, and all rents, issues, profits, proceeds, products, revenues and other incomes from or attributable to the Hydrocarbon Interests; (f) all tenements, hereditaments, appurtenances and Properties in any manner appertaining, belonging, affixed or incidental to the Hydrocarbon Interests, and (g) all Properties, rights, titles, interests and estates described or referred to above, including any and all Property, real or personal, now owned or hereinafter acquired and situated upon, used, held for use or useful in connection with the operating, working or development of any of such Hydrocarbon Interests or Property (excluding drilling rigs, automotive equipment, rental equipment or other personal Property which may be on such premises for the purpose of drilling a well or for other similar temporary uses), and including any and all oil wells, gas wells, injection wells or other wells, buildings, structures, fuel separators, liquid extraction plants, plant compressors, pumps, pumping units, field gathering systems, tanks and tank batteries, fixtures, valves, fittings, machinery and parts, engines, boilers, meters, apparatus, equipment, appliances, tools, implements, cables, wires, towers, casing, tubing and rods, surface leases, rights-of-way, easements and servitudes together with all additions, substitutions, replacements, accessions and attachments to any and all of the foregoing.

"Organizational Documents" means, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"Other Connection Taxes" means, with respect to the Administrative Agent, any Lender, the Issuing Bank or any other recipient of any payment made under any Loan Document, Taxes imposed as a result of a present or former connection between such recipient and the jurisdiction

24

imposing such Tax (other than connections arising from such recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"Other Taxes" means any and all present or future stamp or documentary Taxes or any other excise or Property Taxes, charges or similar levies arising from any payment made hereunder or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement and any other Loan Document.

"Parent" has the meaning assigned to such term in the first paragraph hereof.

"Participant" has the meaning set forth in Section 12.04(c)(i).

"Participant Register" has the meaning set forth in Section 12.04(c)(i).

"Passive Holding Company" means a holding company that does not (a) conduct, transact or otherwise engage in, or commit to conduct, transact or otherwise engage in, any business, operations or activities other than those incidental to its ownership in its Subsidiaries (and, in the case of the Public Parent, its ownership of the Parent and its Subsidiaries only), (b) incur, create, assume or suffer to exist any Debt or other liabilities, (c) own, lease, manage or otherwise operate any properties or assets other than the ownership in its Subsidiaries (and, in the case of the Public Parent, its ownership of the Parent and its Subsidiaries only), (d) create, incur, assume or suffer to exist any Lien upon any of its property, whether now owned or hereafter acquired, except, in the case of the Public Parent, Liens created pursuant to the Pledge Agreement and Liens permitted thereunder and (e) have any income other than income incidental to its ownership in its Subsidiaries (and, in the case of the Public Parent, its ownership of the Parent and its Subsidiaries only).

"PBGC" means the Pension Benefit Guaranty Corporation or any successor thereto.

"Permitted Asset Swap" means the disposition of Oil and Gas Properties made by a Loan Party or any Subsidiary in exchange for other Oil and Gas Properties of similar reserve type so long as such exchange is made with a Person that is not an Affiliate of any Loan Party or any Subsidiary.

"Permitted Holders" means Brigade Capital Management LP, a [●], Citadel Equity Fund Ltd., a [●], and Fir Tree Inc., a [●].

"Permitted Unsecured Debt" means unsecured Debt incurred by the Borrower or the Parent; *provided* that:

(a)      such Debt shall be in an aggregate principal amount not to exceed $80,000,000 (*provided* that the amount of any paid in kind interest added to the principal amount of such Debt following its issuance shall not count towards the maximum aggregate principal amount set forth in this clause (a));

25

(b)      subject to Section 9.04(b)(iii), such Debt shall bear interest (excluding default interest) payable in cash at a rate no greater than 3% per annum;

(c)      such Debt shall bear interest (excluding default interest) payable in kind, together with interest payable in cash, at a rate no greater than the weighted average interest rate applicable to the Loans at the time of incurrence of such Debt;

(d)      such Debt shall not mature sooner than the date which is 180 days following the Maturity Date at the time of the incurrence of such Debt;

(e)      such Debt shall not provide for or otherwise require any scheduled payment of principal, voluntary or mandatory prepayment or other Redemption prior to the scheduled maturity date of such Debt;

(f)      the Borrower or its Loan Parties have entered into Swap Agreements on terms consistent with Section 9.18 in respect of commodities (i) with a Lender or an Affiliate of a Lender and (ii) the notional volumes for which (when aggregated with other commodity Swap Agreements then in effect other than basis differential swaps on volumes already hedged pursuant to other Swap Agreements) are no less than, as of the date of the incurrence of such Debt, 50% of the reasonably anticipated projected production of Hydrocarbons from Proved Developed Producing Reserves included in the most recent Reserve Report for each year during the three-year period following the date of such incurrence for each of crude oil, natural gas and natural gas liquids, (which, in the case of natural gas liquids, may be hedged with Swap Agreements for crude oil), each calculated separately;

(g)      such Debt is issued at par with no original issue discount or upfront fees payable in respect of such Debt; *provided* that upfront fees may be payable on the scheduled maturity date of such Debt or upon payment in full of such Debt, so long as all Indebtedness has been paid in full and the Commitments terminated prior to any payment of such upfront fees, so long as any such upfront fees are no greater than the market rates for upfront fees at the time such Debt is incurred;

(h)      immediately after giving effect to the incurrence of such Debt and the application of the proceeds thereof, no Default or Event of Default shall exist; and

(i)      such Debt shall be subject to a Subordination Agreement.

"Permitted Unsecured Debt Documents" means each indenture, credit agreement or other debt facility governing Permitted Unsecured Debt, all guarantees of Permitted Unsecured Debt and all notes, other agreements, documents or instruments executed and delivered by any Loan Party in connection with, or pursuant to the incurrence of, Permitted Unsecured Debt.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Plan" means any employee pension benefit plan, as defined in Section 3(2) of ERISA, which (a) is currently or hereafter sponsored, maintained or contributed to by the Borrower, any other Loan Party or an ERISA Affiliate or (b) was at any time during the six calendar years

26

preceding the date hereof, sponsored, maintained or contributed to by the Borrower or any other Loan Party or an ERISA Affiliate.

"Plan of Reorganization" has the meaning assigned to such term in the Recitals hereto.

"Pledge Agreement" means a Non-Recourse Pledge Agreement between the Public Parent and the Administrative Agent in substantially the form of Exhibit E-4 (or otherwise in form and substance reasonably acceptable to the Administrative Agent) granting Liens and a security interest on the Public Parent's personal property constituting Collateral (as defined therein) in favor of the Administrative Agent for the benefit of the Secured Parties to secure the Indebtedness, as the same may be amended, modified, supplemented or restated from time to time.

"Prepetition RBL Borrower" has the meaning assigned to such term in the first paragraph hereof.

"Prepetition RBL Credit Agreement" has the meaning assigned to such term in the Recitals hereto.

"Prepetition RBL Lenders" has the meaning assigned to such term in the Recitals hereto.

"Prime Rate" means the rate of interest per annum publicly announced from time to time by Wells Fargo as its prime rate in effect at its principal office in the United States of America; each change in the Prime Rate shall be effective from and including the date such change is publicly announced as being effective.  Such rate is set by the Administrative Agent as a general reference rate of interest, taking into account such factors as the Administrative Agent may deem appropriate; it being understood that many of the Administrative Agent's commercial or other loans are priced in relation to such rate, that it is not necessarily the lowest or best rate actually charged to any customer and that the Administrative Agent may make various commercial or other loans at rates of interest having no relationship to such rate.

"Property" means any interest in any kind of property or asset, whether real, personal or mixed, or tangible or intangible, including, without limitation, cash, securities, accounts and contract rights.

"Proposed Borrowing Base" has the meaning assigned to such term in Section 2.07(c)(i).

"Proposed Borrowing Base Notice" has the meaning assigned to such term in Section 2.07(c)(ii).

"Proved Developed Non-Producing Reserves" has the meaning assigned such term in the SPE Definitions.

"Proved Developed Producing Reserves" has the meaning assigned such term in the SPE Definitions.

"Proved Reserves" has the meaning assigned such term in the SPE Definitions.

27

"Proved Undeveloped Reserves" has the meaning assigned such term in the SPE Definitions.

"Public Parent" means Amplify Energy Corp., a Delaware corporation.

"Qualified ECP Guarantor" means, with respect to any Benefitting Guarantor, in respect of any Swap Agreement, each Loan Party that, at the time the guaranty by such Benefitting Guarantor of, or the grant by such Benefitting Guarantor of a security interest securing, obligations under such Swap Agreement is entered into or becomes effective with respect to, or at any other time such Benefitting Guarantor is by virtue of such guaranty or grant of a security interest otherwise deemed to enter into, such Swap Agreement, constitutes an Eligible Contract Participant and can cause such Benefitting Guarantor to qualify as an Eligible Contract Participant at such time by entering into a keepwell under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

"Redemption" means with respect to any Debt, the repurchase, redemption, prepayment, repayment, satisfaction and discharge or defeasance or any other acquisition or retirement for value (or the segregation of funds with respect to any of the foregoing) of any such Debt. "Redeem" has the correlative meaning thereto.

"Redetermination Date" means, with respect to any Scheduled Redetermination or any Interim Redetermination, the date that the redetermined Borrowing Base related thereto becomes effective pursuant to Section 2.07(d).

"Register" has the meaning assigned such term in Section 12.04(b)(iv).

"Regulation D" means Regulation D of the Board, as the same may be amended, supplemented or replaced from time to time.

"Related Parties" means, with respect to any specified Person, such Person's Affiliates and the respective directors, officers, employees, agents and advisors (including attorneys, accountants and experts) of such Person and such Person's Affiliates.

"Release" means any depositing, spilling, leaking, pumping, pouring, placing, emitting, discarding, abandoning, emptying, discharging, migrating, injecting, escaping, leaching, dumping, or disposing.

"Remedial Work" has the meaning assigned such term in Section 8.10(a).

"Required Lenders" means, at any time while no Loan or LC Exposure is outstanding, Lenders having at least sixty-six and two-thirds percent (66 2/3%) of the Aggregate Maximum Credit Amounts; and at any time while any Loan or LC Exposure is outstanding, Lenders holding at least sixty-six and two-thirds percent (66 2/3%) of the outstanding aggregate principal amount of the Loans and participation interests in Letters of Credit (without regard to any sale by a Lender of a participation in any Loan under Section 12.04(c)); *provided* that the Maximum Credit Amounts and the principal amount of the Loans and participation interests in Letters of Credit of the Defaulting Lenders (if any) shall be excluded from the determination of Required Lenders.

"Reserve Report" means a report, in form and substance reasonably satisfactory to the Administrative Agent, setting forth, as of each January 1st or July 1st (or such other date in the event of an Interim Redetermination) the oil and gas reserves attributable to the Oil and Gas Properties of the Borrower and the other Loan Parties, together with a projection of the rate of production and future net income, taxes, operating expenses and capital expenditures with respect thereto as of such date, based upon pricing assumptions consistent with SEC reporting requirements at the time of such report and reflecting Swap Agreements in place with respect to such production.

"Responsible Officer" means, as to any Person, the Chief Executive Officer, the President, any Financial Officer or any Vice President of such Person.  Unless otherwise specified, all references to a Responsible Officer herein shall mean a Responsible Officer of the Borrower.

"Restricted Payment" means any dividend or other distribution (whether in cash, securities or other Property) with respect to any Equity Interests in the Borrower or any of the other Loan Parties, or any payment (whether in cash, securities or other Property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such Equity Interests in the Borrower or any of the other Loan Parties or any option, warrant or other right to acquire any such Equity Interests in the Borrower or any of the other Loan Parties.

"Revolving Credit Exposure" means, with respect to any Lender at any time, the sum of the outstanding principal amount of such Lender's Loans and LC Exposure at such time.

"Rolling Period" means the period of four (4) consecutive fiscal quarters ending on the last day of such applicable fiscal quarter.

"S&P" means Standard & Poor's Ratings Group, a division of The McGraw-Hill Companies, Inc., and any successor thereto that is a nationally recognized rating agency.

"Sanctions" has the meaning assigned such term in Section 7.23(c).

"Scheduled Redetermination" has the meaning assigned such term in Section 2.07(b).

"Scheduled Redetermination Date" means the date on which a Borrowing Base that has been redetermined pursuant to a Scheduled Redetermination becomes effective as provided in Section 2.07(d).

"SEC" means the Securities and Exchange Commission or any successor Governmental Authority.

"Secured Parties" means each Lender, each Issuing Bank, each Secured Swap Provider, each Bank Products Provider, each Indemnified Party and their respective successors and permitted assigns.

"Secured Swap Provider" means any (a) Person that is a party to a Swap Agreement with the Parent or any of its Subsidiaries that entered into such Swap Agreement before or while such

29

Person was a Lender or an Affiliate of a Lender, whether or not such Person at any time ceases to be a Lender or an Affiliate of a Lender, as the case may be or (b) assignee of any Person described in clause (a) above so long as such assignee is a Lender or an Affiliate of a Lender.

"Security Agreement" means a Pledge and Security Agreement among the Borrower, the Guarantors and the Administrative Agent in substantially the form of Exhibit E-3 (or otherwise in form and substance reasonably acceptable to the Administrative Agent) granting Liens and a security interest on the Loan Parties' personal property constituting Collateral (as defined therein) in favor of the Administrative Agent for the benefit of the Secured Parties to secure the Indebtedness, as the same may be amended, modified, supplemented or restated from time to time.

"Security Instruments" means the Guaranty Agreement, the Security Agreement, the Pledge Agreement, mortgages, deeds of trust and other agreements, instruments or certificates described or referred to in Exhibit E-1, and any and all other agreements, instruments, consents or certificates now or hereafter executed and delivered by the Borrower or any other Loan Party as security for the payment or performance of the Indebtedness, the Notes, this Agreement, or reimbursement obligations under the Letters of Credit, as such agreements may be amended, modified, supplemented or restated from time to time.

"Solvent" and "Solvency" mean, on any date of determination, that on such date (a) the fair value of the property of the Parent and its Subsidiaries, on a consolidated basis, is greater than the total amount of liabilities, including contingent liabilities, of such Person, (b) the present fair salable value of the assets of the Parent and its Subsidiaries, on a consolidated basis, is not less than the amount that will be required to pay the probable liability of such Person on its debts as they become absolute and matured, (c) the Parent and its Subsidiaries, on a consolidated basis, do not intend to, and do not believe that they will, incur debts or liabilities beyond their ability to pay such debts and liabilities as they mature, (d) the Parent and its Subsidiaries, on a consolidated basis, are not engaged in business or a transaction, and is not about to engage in business or a transaction, for which such Person's Property would constitute an unreasonably small capital, and (e) the Parent and its Subsidiaries, on a consolidated basis, are able to pay their debts and liabilities and contingent obligations as they mature in the ordinary course of business. The amount of contingent liabilities at any time shall be computed as the amount that, in the light of all the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability.

"Special Flood Hazard Area" means an area that FEMA's current flood maps indicate has at least a one percent (1%) chance of a flood equal to or exceeding the base flood elevation (a 100-year flood) in any given year.

"SPE Definitions" means, with respect to any term, the definition thereof adopted by the Board of Directors, Society for Petroleum Engineers (SPE) Inc., March 1997.

"Statutory Reserve Rate" means a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one minus the aggregate of the maximum reserve percentages (including any marginal, special, emergency or supplemental reserves) expressed as a decimal established by the Board to which the Administrative Agent is

30

subject with respect to the Adjusted LIBO Rate, for eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D).  Such reserve percentages shall include those imposed pursuant to Regulation D.  Eurodollar Loans shall be deemed to constitute eurocurrency funding and to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to any Lender under Regulation D or any comparable regulation.  The Statutory Reserve Rate shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

"Subordination Agreement" means each subordination agreement entered into among the Borrower, the Administrative Agent and the applicable lender or administrative agent or trustee with respect to the Permitted Unsecured Debt, which agreement shall be in form and substance acceptable to the Administrative Agent and shall include the terms set forth in Annex III (or such other terms as may be agreed by the Borrower, the Administrative Agent and the Majority Lenders), in each case as the same may be amended, modified, supplemented or restated from time to time in accordance with the terms thereof.

"subsidiary" means, with respect to any Person (the "parent") at any date, any other Person the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date, as well as any other Person (a) of which Equity Interests representing more than 50% of the equity or more than 50% of the ordinary voting power (irrespective of whether or not at the time Equity Interests of any other class or classes of such Person shall have or might have voting power by reason of the happening of any contingency) or, in the case of a partnership, any general partnership interests are, as of such date, owned, controlled or held, or (b) that is, as of such date, otherwise Controlled, by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent.

"Subsidiary" means any subsidiary of the Parent.

"Subsidiary Guarantor" means any subsidiary of the Parent that is a Guarantor.

"Swap Agreement" means any agreement with respect to any swap, forward, future or derivative transaction (including floors, caps and collars) or option or similar agreement, whether exchange traded, "over-the-counter" or otherwise, involving, or settled by reference to, one or more rates, currencies, commodities (including Emissions Credits), equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions (including any agreement, contract or transaction that constitutes a "swap" within the meaning of Section 1a(47) or Section 2(e) of the Commodity Exchange Act); *provided* that no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, officers, employees or consultants of the Borrower or the other Loan Parties shall be a Swap Agreement.  Solely for the purposes of Section 9.18, the term "Swap Agreement" shall be deemed to exclude purchased put options or floors for Hydrocarbons that are not related to corresponding calls, collars or swaps and with respect to which neither the Borrower nor any other Loan Party has any payment obligation other than premiums and charges the total amount of which are fixed and known at the time such transaction is entered into.

31

"Swap Liquidation" means the sale, assignment, novation (excluding novations between Lenders and/or affiliates of Lenders), liquidation, unwind or termination of all or any part of any Swap Agreement (other than, in each case, at its scheduled maturity).

"Swap Termination Value" means, in respect of any Swap Agreement, after taking into account the effect of any close-out netting relating to such Swap Agreement, (a) for any date on or after the date such Swap Agreement has been terminated, the termination value determined and notice of such termination value delivered, each in accordance therewith and (b) for any date prior to the date referenced in clause (a), the amount determined as the mark-to-market value for such Swap Agreement, as determined by (i) the Borrower in good faith, so long as no Event of Default has occurred and is continuing or (ii) the applicable Secured Swap Provider in good faith if an Event of Default has occurred and is continuing.

"Synthetic Leases" means, in respect of any Person, all leases which shall have been, or should have been, in accordance with GAAP, treated as operating leases on the financial statements of the Person liable (whether contingently or otherwise) for the payment of rent thereunder and which were properly treated as indebtedness for borrowed money for purposes of U.S. federal income taxes, if the lessee in respect thereof is obligated to either purchase for an amount in excess of, or pay upon early termination an amount in excess of, 80% of the residual value of the Property subject to such operating lease upon expiration or early termination of such lease.

"Taxes" means any and all present or future taxes, levies, imposts, duties, deductions, charges or withholdings imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Termination Date" means the earlier of the Maturity Date and the date of termination of the Commitments pursuant to this Agreement, whether pursuant to Section 2.06(b), Section 10.02 or otherwise.

"Total Commitments Utilization Percentage" means, as of any day, the fraction expressed as a percentage, the numerator of which is the sum of the Revolving Credit Exposures of the Lenders on such day, and the denominator of which is the total Commitments of the Lenders in effect on such day.

"Total Debt" means, at any date, all Debt of the Parent and the Consolidated Subsidiaries on a consolidated basis other than (a) contingent obligations in respect of Debt described in clause (b) of the definition of "Debt" (excluding letters of credit), (b) Debt described in clauses (c), (i), (j) and (m) of the definition of "Debt", and (c) Debt described in clauses (f) or (g) of the definition of "Debt" in respect of Debt of others described in clauses (a) or (b) of this definition.

"Transactions" means, collectively (a) the substantial consummation of the Plan of Reorganization, (b) with respect to the Borrower, the execution, delivery and performance by the Borrower of this Agreement, each other Loan Document to which it is a party, the borrowing of Loans, the use of the proceeds thereof and the issuance of Letters of Credit hereunder, and the grant of Liens by the Borrower on Mortgaged Properties and other Properties pursuant to the Security Instruments and (c) with respect to each Guarantor, the execution, delivery and

32

performance by such Guarantor of each Loan Document to which it is a party, the guaranteeing of the Indebtedness and the other obligations under the Guaranty Agreement by such Guarantor and such Guarantor's grant of the security interests and provision of collateral under the Security Instruments, and the grant of Liens by such Guarantor on Mortgaged Properties and other Properties pursuant to the Security Instruments.

"Type", when used in reference to any Loan or Borrowing, refers to whether the rate of interest on such Loan, or on the Loans comprising such Borrowing, is determined by reference to the Alternate Base Rate or the Adjusted LIBO Rate.

"Unused Commitment" means (a) the then effective total Commitments minus (b) the total Revolving Credit Exposures.   With respect to each Lender, such Lender's Unused Commitment is such Lender's Applicable Percentage of the Unused Commitment.

"U.S. Tax Compliance Certificate" has the meaning set forth in Section 5.03(f)(ii)(B)(3).

"Wells Fargo" has the meaning assigned to such term in the first paragraph hereof.

"Wholly-Owned Subsidiary" means any Subsidiary of which all of the outstanding Equity Interests (other than any directors' qualifying shares mandated by applicable law), on a fully-diluted basis, are owned by the Parent or one or more of the Wholly-Owned Subsidiaries or are owned by the Parent and one or more of the Wholly-Owned Subsidiaries.

"Withholding Agent" means any Loan Party or the Administrative Agent.

"Write-Down and Conversion Powers" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

Section 1.03    Types of Loans and Borrowings.  For purposes of this Agreement, Loans and Borrowings, respectively, may be classified and referred to by Type (e.g., a "Eurodollar Loan" or a "Eurodollar Borrowing").

Section 1.04    Terms Generally; Rules of Construction.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" as used in this Agreement shall be deemed to be followed by the phrase "without limitation."  The word "will" shall be construed to have the same meaning and effect as the word "shall."  Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented, restated or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth in the Loan Documents), (b) any reference herein to any law shall be construed as referring to such law as amended, modified, codified or reenacted, in whole or in part, and in effect from time to time, (c) any reference herein to any Person shall be construed to include such Person's successors and assigns (subject to the restrictions contained in the Loan Documents), (d) the words "herein," "hereof" and

33

"hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (e) with respect to the determination of any time period, the word "from" means "from and including" and the word "to" means "to and including" and (f) any reference herein to Articles, Sections, Annexes, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Annexes, Exhibits and Schedules to, this Agreement.   No provision of this Agreement or any other Loan Document shall be interpreted or construed against any Person solely because such Person or its legal representative drafted such provision.

Section 1.05   Accounting Terms and Determinations; GAAP.   Unless otherwise specified herein, all accounting terms used herein shall be interpreted, all determinations with respect to accounting matters hereunder shall be made, and all financial statements and certificates and reports as to financial matters required to be furnished to the Administrative Agent or the Lenders hereunder shall be prepared, in accordance with GAAP, applied on a basis consistent with the Financial Statements except for changes in which Borrower's independent certified public accountants concur and which are disclosed to Administrative Agent on the next date on which financial statements are required to be delivered to the Lenders pursuant to Section 8.01(a).   If at any time any change in GAAP would affect the computation of any financial ratio set forth in any Loan Document, and either the Borrower or the Majority Lenders shall so request, the Administrative Agent, the Lenders and the Borrower shall negotiate in good faith to amend such ratio to preserve the original intent thereof in light of such change in GAAP; *provided* that, unless the Borrower and the Majority Lenders shall otherwise agree in writing, no such change shall modify or affect the manner in which compliance with the covenants contained herein is computed such that all such computations shall be conducted utilizing financial information presented consistently with prior periods.   Notwithstanding anything herein to the contrary, for the purposes of calculating any of the ratios tested under Section 9.01, and the components of each of such ratios, all Subsidiaries that are not Guarantors, and their subsidiaries (including their assets, liabilities, income, losses, cash flows, and the elements thereof) shall be excluded, except for any cash dividends or distributions actually paid by any such Person or any of its subsidiaries to the Borrower or any other Loan Party, which shall be deemed to be income to the Borrower or such Loan Party when actually received by it.

Section 1.06   Timing of Payment or Performance.   Subject to Section 4.01(a), when the payment of an obligation or the performance of any covenant, duty or obligation under any Loan Document is stated to be due or is required to be performed on a day which is not a Business Day, the date of such payment (other than as described in the definition of Interest Period) or performance shall extend to the immediately succeeding Business Day unless otherwise specified herein.

**ARTICLE II**
**THE CREDITS**

Section 2.01   Commitments.

(a)   Subject to the terms and conditions set forth herein, each Lender agrees to make Loans to the Borrower during the Availability Period in an aggregate principal amount that will not result in (i) such Lender's Revolving Credit Exposure exceeding such Lender's

34

Commitment or (ii) the total Revolving Credit Exposures exceeding the total Commitments. Within the foregoing limits and subject to the terms and conditions set forth herein, the Borrower may borrow, repay and reborrow the Loans.

(b)     The parties hereto acknowledge and agree that (i) an aggregate principal amount of "Loans" under and as defined in the Prepetition RBL Credit Agreement (the "Existing Loans") equal to $[454,798,614], remains outstanding and shall be converted into Loans hereunder as set forth in Section 2.01(c) below and (ii) the Existing Letters of Credit (with an aggregate face amount of $[2,375,000]) shall be converted into Letters of Credit hereunder as set forth in Section 2.08(b) below.

(c)     Subject to the terms and conditions set forth herein, each Lender, severally and not jointly, agrees that the Existing Loans made by such Lender under the Prepetition RBL Credit Agreement and outstanding on the Effective Date immediately prior to giving effect to this Agreement shall remain outstanding on and after the Effective Date and shall be converted into Loans in an equal principal amount deemed made pursuant to this Agreement on the Effective Date. The conversion by a Lender of all or a portion of its Existing Loans shall be deemed to satisfy, dollar for dollar, such Lender's obligation to make Loans on the Effective Date. Such Existing Loans of each Lender shall hereafter be referred to as "Loans," and on and after the Effective Date shall have all of the rights and benefits of Loans as set forth in this Agreement and the other Loan Documents. For the avoidance of doubt, such conversion of Existing Loans and Existing Letters of Credit into Loans and Letters of Credit hereunder shall be deemed a "Borrowing" for all purposes under this Agreement.

(d)     As of the Effective Date, immediately after giving effect to the conversion of Existing Loans into Loans hereunder pursuant to Section 2.01(c) and the conversion of Existing Letters of Credit into Letters of Credit hereunder pursuant to Section 2.08(b), the aggregate principal amount of the Loans outstanding is $[454,798,614] and the aggregate face amounts of Letters of Credit outstanding is $[2,375,000].

Section 2.02     Loans and Borrowings.

(a)     Borrowings; Several Obligations.  Each Loan shall be made as part of a Borrowing consisting of Loans made by the Lenders ratably in accordance with their respective Commitments.  The failure of any Lender to make any Loan required to be made by it shall not relieve any other Lender of its obligations hereunder; *provided* that the Commitments are several and no Lender shall be responsible for any other Lender's failure to make Loans as required.

(b)     Types of Loans.  Subject to Section 3.03, each Borrowing shall be comprised entirely of ABR Loans or Eurodollar Loans as the Borrower may request in accordance herewith.  Each Lender at its option may make any Eurodollar Loan by causing any domestic or foreign branch or Affiliate of such Lender to make such Loan; *provided* that any exercise of such option shall not affect the obligation of the Borrower to repay such Loan in accordance with the terms of this Agreement.

(c)     Minimum Amounts; Limitation on Number of Borrowings.  At the commencement of each Interest Period for any Eurodollar Borrowing, such Borrowing shall be

in an aggregate amount that is an integral multiple of $1,000,000. At the time that each ABR Borrowing is made, such Borrowing shall be in an aggregate amount that is an integral multiple of $500,000; *provided* that an ABR Borrowing may be in an aggregate amount that is equal to the entire unused balance of the total Commitments or that is required to finance the reimbursement of an LC Disbursement as contemplated by Section 2.08(e). Borrowings of more than one Type may be outstanding at the same time; *provided* that there shall not at any time be more than a total of ten Eurodollar Borrowings outstanding. Notwithstanding any other provision of this Agreement, the Borrower shall not be entitled to request, or to elect to convert or continue, any Borrowing if the Interest Period requested with respect thereto would end after the Maturity Date.

(d) Notes. The Loans made by each Lender shall be evidenced by a single promissory note of the Borrower in substantially the form of Exhibit A, dated, in the case of (i) any Lender party hereto as of the Effective Date, as of the date of this Agreement, (ii) any Lender that becomes a party hereto pursuant to an Assignment and Assumption, as of the effective date of the Assignment and Assumption or (iii) any Lender that increases its Elected Commitment or becomes a party hereto in connection with an increase in the Aggregate Elected Commitment Amounts pursuant to Section 2.06(c), as of the effective date of such increase, payable to such Lender in a principal amount equal to its Maximum Credit Amount as in effect on such date, and otherwise duly completed. The date, amount, Type, interest rate and, if applicable, Interest Period of each Loan made by each Lender, and all payments made on account of the principal thereof, shall be recorded by such Lender on its books for its Note, and, prior to any transfer, may be endorsed by such Lender on a schedule attached to such Note or any continuation thereof or on any separate record maintained by such Lender. Failure to make any such notation or to attach a schedule shall not affect any Lender's or the Borrower's rights or obligations in respect of such Loans or affect the validity of such transfer by any Lender of its Note.

Section 2.03 Requests for Borrowings. To request a Borrowing, the Borrower shall notify the Administrative Agent of such request by telephone (or electronic communication approved by the Administrative Agent) in the case of a Eurodollar Borrowing, not later than 12:00 noon, New York City time, three Business Days before the date of the proposed Borrowing or in the case of an ABR Borrowing, not later than 11:00 a.m., New York City time, on the date of the proposed Borrowing; *provided* that no such notice shall be required for any deemed request of an ABR Borrowing to finance the reimbursement of an LC Disbursement as provided in Section 2.08(e). Each such telephonic (or electronic communication) Borrowing Request shall be irrevocable and shall be confirmed promptly by hand delivery or telecopy to the Administrative Agent of a written Borrowing Request in substantially the form of Exhibit B and signed by the Borrower. Each such telephonic (or electronic communication) and written Borrowing Request shall specify the following information in compliance with Section 2.02:

(i) the aggregate amount of the requested Borrowing;

(ii) the date of such Borrowing, which shall be a Business Day;

(iii) whether such Borrowing is to be an ABR Borrowing or a Eurodollar Borrowing;

(iv)     in the case of a Eurodollar Borrowing, the initial Interest Period to be applicable thereto, which shall be a period contemplated by the definition of the term "Interest Period;"

(v)     the amount of the then effective Borrowing Base, the amount of the then effective Aggregate Elected Commitment Amounts, the current total Revolving Credit Exposures (without regard to the requested Borrowing) and the pro forma total Revolving Credit Exposures (giving effect to the requested Borrowing); and

(vi)     the location and number of the Borrower's account to which funds are to be disbursed, which shall comply with the requirements of <u>Section 2.05</u>.

If no election as to the Type of Borrowing is specified, then the requested Borrowing shall be an ABR Borrowing.  If no Interest Period is specified with respect to any requested Eurodollar Borrowing, then the Borrower shall be deemed to have selected an Interest Period of one month's duration.  Each Borrowing Request shall constitute a representation that the amount of the requested Borrowing shall not cause the total Revolving Credit Exposures to exceed the total Commitments (i.e., the least of (x) the Aggregate Maximum Credit Amounts, (y) the then effective Borrowing Base and (z) the Aggregate Elected Commitment Amounts).

Promptly following receipt of a Borrowing Request in accordance with this <u>Section 2.03</u>, the Administrative Agent shall advise each Lender of the details thereof and of the amount of such Lender's Loan to be made as part of the requested Borrowing.

Section 2.04    <u>Interest Elections</u>.

(a)     <u>Conversion and Continuance</u>.  Each Borrowing initially shall be of the Type specified in the applicable Borrowing Request and, in the case of a Eurodollar Borrowing, shall have an initial Interest Period as specified in such Borrowing Request.  Thereafter, the Borrower may elect to convert such Borrowing to a different Type or to continue such Borrowing and, in the case of a Eurodollar Borrowing, may elect Interest Periods therefor, all as provided in this <u>Section 2.04</u>.  The Borrower may elect different options with respect to different portions of the affected Borrowing, in which case each such portion shall be allocated ratably among the Lenders holding the Loans comprising such Borrowing, and the Loans comprising each such portion shall be considered a separate Borrowing.

(b)     <u>Interest Election Requests</u>.  To make an election pursuant to this <u>Section 2.04</u>, the Borrower shall notify the Administrative Agent of such election by telephone (or by electronic communication approved by the Administrative Agent) by the time that a Borrowing Request would be required under <u>Section 2.03</u> if the Borrower were requesting a Borrowing of the Type resulting from such election to be made on the effective date of such election.  Each such telephonic (or electronic communication) Interest Election Request shall be irrevocable and shall be confirmed promptly by hand delivery or telecopy to the Administrative Agent of a written Interest Election Request in substantially the form of Exhibit C and signed by the Borrower.

(c)    Information in Interest Election Requests.  Each telephonic (or electronic communication) and written Interest Election Request shall specify the following information in compliance with Section 2.02:

(i)    the Borrowing to which such Interest Election Request applies and, if different options are being elected with respect to different portions thereof, the portions thereof to be allocated to each resulting Borrowing (in which case the information to be specified pursuant to Section 2.04(c)(iii) and (iv) shall be specified for each resulting Borrowing);

(ii)    the effective date of the election made pursuant to such Interest Election Request, which shall be a Business Day;

(iii)    whether the resulting Borrowing is to be an ABR Borrowing or a Eurodollar Borrowing; and

(iv)    if the resulting Borrowing is a Eurodollar Borrowing, the Interest Period to be applicable thereto after giving effect to such election, which shall be a period contemplated by the definition of the term "Interest Period."

If any such Interest Election Request requests a Eurodollar Borrowing but does not specify an Interest Period, then the Borrower shall be deemed to have selected an Interest Period of one month's duration.

(d)    Notice to Lenders by the Administrative Agent.  Promptly following receipt of an Interest Election Request, the Administrative Agent shall advise each Lender of the details thereof and of such Lender's portion of each resulting Borrowing.

(e)    Effect of Failure to Deliver Timely Interest Election Request and Events of Default and Borrowing Base Deficiencies on Interest Election.  If the Borrower fails to deliver a timely Interest Election Request with respect to a Eurodollar Borrowing prior to the end of the Interest Period applicable thereto, then, unless such Borrowing is repaid as provided herein, at the end of such Interest Period such Borrowing shall be converted to an ABR Borrowing. Notwithstanding any contrary provision hereof, if an Event of Default or a Borrowing Base Deficiency has occurred and is continuing:  (i) no outstanding Borrowing may be converted to or continued as a Eurodollar Borrowing (and any Interest Election Request that requests the conversion of any Borrowing to, or continuation of any Borrowing as, a Eurodollar Borrowing shall be ineffective) and (ii) unless repaid, each Eurodollar Borrowing shall be converted to an ABR Borrowing at the end of the Interest Period applicable thereto.

Section 2.05    Funding of Borrowings.

(a)    Funding by Lenders.  Each Lender shall make each Loan to be made by it hereunder on the proposed date thereof by wire transfer of immediately available funds by 1:00 p.m., New York City time, to the account of the Administrative Agent most recently designated by it for such purpose by notice to the Lenders.  The Administrative Agent will make such Loans available to the Borrower by promptly crediting the amounts so received, in like funds, to an account of the Borrower maintained with the Administrative Agent and designated by the Borrower in the applicable Borrowing Request; provided that ABR Loans made to finance the

38

reimbursement of an LC Disbursement as provided in Section 2.08(e) shall be remitted by the Administrative Agent to the Issuing Bank. Nothing herein shall be deemed to obligate any Lender to obtain the funds for its Loan in any particular place or manner or to constitute a representation by any Lender that it has obtained or will obtain the funds for its Loan in any particular place or manner.

(b)    Presumption of Funding by the Lenders. Unless the Administrative Agent shall have received notice from a Lender prior to the proposed date of any Borrowing that such Lender will not make available to the Administrative Agent such Lender's share of such Borrowing, the Administrative Agent may assume that such Lender has made such share available on such date in accordance with Section 2.05(a) and may, in reliance upon such assumption, make available to the Borrower a corresponding amount. In such event, if a Lender has not in fact made its share of the applicable Borrowing available to the Administrative Agent, then the applicable Lender and the Borrower severally agree to pay to the Administrative Agent forthwith on demand such corresponding amount with interest thereon, for each day from and including the date such amount is made available to the Borrower to but excluding the date of payment to the Administrative Agent, at, (i) in the case of such Lender, the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation or (ii) in the case of the Borrower, the interest rate applicable to ABR Loans. If such Lender pays such amount to the Administrative Agent, then such amount shall constitute such Lender's Loan included in such Borrowing.

Section 2.06    Termination and Reduction of Aggregate Maximum Credit Amounts; Optional Increase and Reduction of Aggregate Elected Commitment Amounts.

(a)    Scheduled Termination of Commitments. Unless previously terminated, the Commitments shall terminate on the Maturity Date. If at any time the Aggregate Maximum Credit Amounts, the Borrowing Base or the Aggregate Elected Commitment Amounts is terminated or reduced to zero, then the Commitments shall terminate on the effective date of such termination or reduction.

(b)    Optional Termination and Reduction of Aggregate Credit Amounts.

(i)    The Borrower may at any time terminate, or from time to time reduce, the Aggregate Maximum Credit Amounts; *provided* that (A) each reduction of the Aggregate Maximum Credit Amounts shall be in an amount that is an integral multiple of $1,000,000 and not less than $5,000,000, (B) the Borrower shall not terminate or reduce the Aggregate Maximum Credit Amounts if (1) after giving effect to any concurrent prepayment of the Loans in accordance with Section 3.04(c), the total Revolving Credit Exposures would exceed the total Commitments or (2) the Aggregate Maximum Credit Amounts would be less than $10,000,000 (unless with respect to this clause (2), the Aggregate Maximum Credit Amounts are reduced to $0), and (C) upon any reduction of the Aggregate Maximum Credit Amounts that would otherwise result in the Aggregate Maximum Credit Amounts being less than the Aggregate Elected Commitment Amounts, the Aggregate Elected Commitment Amounts shall be automatically reduced (ratably among the Lenders in accordance with each Lender's Applicable Percentage) so that they equal the Aggregate Maximum Credit Amounts as so reduced.

(ii)     The Borrower shall notify the Administrative Agent of any election to terminate or reduce the Aggregate Maximum Credit Amounts under Section 2.06(b)(i) at least three Business Days prior to the effective date of such termination or reduction, specifying such election and the effective date thereof.  Promptly following receipt of any notice, the Administrative Agent shall advise the Lenders of the contents thereof.  Each notice delivered by the Borrower pursuant to this Section 2.06(b)(ii) shall be irrevocable; *provided* that a notice of termination of the Aggregate Maximum Credit Amounts delivered by the Borrower may state that such notice is conditioned upon the effectiveness of other credit facilities or other agreements, in which case such notice may be revoked by the Borrower (by notice to the Administrative Agent on or prior to the specified effective date) if such condition is not satisfied.  Any termination or reduction of the Aggregate Maximum Credit Amounts shall be permanent and may not be reinstated.  Each reduction of the Aggregate Maximum Credit Amounts shall be made ratably among the Lenders in accordance with each Lender's Applicable Percentage.

(c)     Increases, Reductions and Terminations of Aggregate Elected Commitment Amounts.

(i)     Subject to the conditions set forth in Section 2.06(c)(ii), the Borrower may increase the Aggregate Elected Commitment Amounts then in effect by increasing the Elected Commitment of a Lender or by causing a Person that is acceptable to the Administrative Agent that at such time is not a Lender to become a Lender (any such Person that is not at such time a Lender and becomes a Lender, an "Additional Lender").  Notwithstanding anything to the contrary contained in this Agreement, in no case shall an Additional Lender be the Parent, an Affiliate of the Parent or a natural person.

(ii)     Any increase in the Aggregate Elected Commitment Amounts shall be subject to the following additional conditions:

(A)     such increase shall not be less than $50,000,000 unless the Administrative Agent otherwise consents, and no such increase shall be permitted if after giving effect thereto the Aggregate Elected Commitment Amounts exceed the Borrowing Base then in effect;

(B)     following any Scheduled Redetermination Date, the Borrower may not increase the Aggregate Elected Commitment Amounts more than once before the next Scheduled Redetermination Date (for the sake of clarity, all increases in the Aggregate Elected Commitment Amount effective on a single date shall be deemed a single increase in the Aggregate Elected Commitment Amount for purposes of this Section 2.06(c)(ii)(B));

(C)     no Default shall have occurred and be continuing on the effective date of such increase;

(D)     on the effective date of such increase, no Eurodollar Borrowings shall be outstanding or if any Eurodollar Borrowings are outstanding, then the effective date of such increase shall be the last day of the Interest Period in respect of such Eurodollar Borrowings unless the Borrower pays compensation required by Section 5.02;

(E)  no Lender's Elected Commitment may be increased without the consent of such Lender;

(F)  if the Borrower elects to increase the Aggregate Elected Commitment Amounts by increasing the Elected Commitment of a Lender, the Borrower and such Lender shall execute and deliver to the Administrative Agent a certificate substantially in the form of Exhibit H (an "Elected Commitment Increase Certificate"); and

(G)  if the Borrower elects to increase the Aggregate Elected Commitment Amounts by causing an Additional Lender to become a party to this Agreement, then the Borrower and such Additional Lender shall execute and deliver to the Administrative Agent a certificate substantially in the form of Exhibit I (an "Additional Lender Certificate"), together with an Administrative Questionnaire and a processing and recordation fee of $3,500, and the Borrower shall (1) if requested by the Additional Lender, deliver a Note payable to the order of such Additional Lender in a principal amount equal to its Maximum Credit Amount, and otherwise duly completed and (2) pay any applicable fees as may have been agreed to between the Borrower, the Additional Lender and/or the Administrative Agent.

(iii)  Subject to acceptance and recording thereof pursuant to Section 2.06(c)(iv), from and after the effective date specified in the Elected Commitment Increase Certificate or the Additional Lender Certificate (or if any Eurodollar Borrowings are outstanding, then the last day of the Interest Period in respect of such Eurodollar Borrowings, unless the Borrower has paid compensation required by Section 5.02):  (A) the amount of the Aggregate Elected Commitment Amounts shall be increased as set forth therein, and (B) in the case of an Additional Lender Certificate, any Additional Lender party thereto shall be a party to this Agreement and have the rights and obligations of a Lender under this Agreement and the other Loan Documents.  In addition, the Lender or the Additional Lender, as applicable, shall purchase a pro rata portion of the outstanding Loans (and participation interests in Letters of Credit) of each of the other Lenders (and such Lenders hereby agree to sell and to take all such further action to effectuate such sale) such that each Lender (including any Additional Lender, if applicable) shall hold its Applicable Percentage of the outstanding Loans (and participation interests) after giving effect to the increase in the Aggregate Elected Commitment Amounts (and the resulting modifications of each Lender's Maximum Credit Amount pursuant to Section 2.06(c)(v)).

(iv)  Upon its receipt of a duly completed Elected Commitment Increase Certificate or an Additional Lender Certificate, executed by the Borrower and the Lender or by the Borrower and the Additional Lender party thereto, as applicable, the processing and recording fee referred to in Section 2.06(c)(ii), the Administrative Questionnaire referred to in Section 2.06(c)(ii) and the break-funding payments from the Borrower, if any, required by Section 5.02, if applicable, the Administrative Agent shall accept such Elected Commitment Increase Certificate or Additional Lender Certificate and record the information contained therein in the Register required to be maintained by the Administrative Agent pursuant to Section 12.04(b)(iv).  No increase in the Aggregate Elected Commitment Amounts shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this Section 2.06(c)(iv).

41

(v)     Upon any increase in the Aggregate Elected Commitment Amounts pursuant to this Section 2.06(c), (A) each Lender's Maximum Credit Amount shall be automatically deemed amended to the extent necessary so that each such Lender's Applicable Percentage equals the percentage of the Aggregate Elected Commitment Amounts represented by such Lender's Elected Commitment, in each case after giving effect to such increase, and (B) Annex I to this Agreement shall be deemed amended to reflect the Elected Commitment of each Lender (including any Additional Lender) as thereby increased, any changes in the Lenders' Maximum Credit Amounts pursuant to the foregoing clause (A), and any resulting changes in the Lenders' Applicable Percentages.

(vi)     The Borrower may from time to time terminate or reduce the Aggregate Elected Commitment Amounts; *provided* that (A) each reduction of the Aggregate Elected Commitment Amounts shall be in an amount that is an integral multiple of $1,000,000 and not less than $1,000,000 and (B) the Borrower shall not reduce the Aggregate Elected Commitment Amounts if, after giving effect to any concurrent prepayment of the Loans in accordance with Section 3.04(c), the total Revolving Credit Exposures would exceed the Aggregate Elected Commitment Amounts.

(vii)     The Borrower shall notify the Administrative Agent of any election to terminate or reduce the Aggregate Elected Commitment Amounts under Section 2.06(c)(i) at least three Business Days prior to the effective date of such termination or reduction, specifying such election and the effective date thereof.  Promptly following receipt of any notice, the Administrative Agent shall advise the Lenders of the contents thereof.  Each notice delivered by the Borrower pursuant to this Section 2.06(c)(vii) shall be irrevocable.  Any termination or reduction of the Aggregate Elected Commitment Amounts shall be permanent and may not be reinstated, except pursuant to Section 2.06(c)(i).  Each reduction of the Aggregate Elected Commitment Amounts shall be made ratably among the Lenders in accordance with each Lender's Applicable Percentage.

(viii)     Upon any redetermination or other adjustment in the Borrowing Base pursuant to this Agreement that would otherwise result in the Borrowing Base becoming less than the Aggregate Elected Commitment Amounts, the Aggregate Elected Commitment Amounts shall be automatically reduced (ratably among the Lenders in accordance with each Lender's Applicable Percentage) so that they equal such redetermined Borrowing Base (and Annex I shall be deemed amended to reflect such amendments to each Lender's Elected Commitment and the Aggregate Elected Commitment Amounts).

(ix)     Contemporaneously with any increase in the Borrowing Base pursuant to this Agreement, if (A) the Borrower elects to increase the Aggregate Elected Commitment Amount and (B) each Lender has consented to such increase in its Elected Commitment, then the Aggregate Elected Commitment Amount shall be increased (ratably among the Lenders in accordance with each Lender's Applicable Percentage) by the amount requested by the Borrower (subject to the limitations set forth in Section 2.06(c)(ii)(A)) without the requirement that any Lender deliver an Elected Commitment Increase Certificate, and Annex I shall be deemed amended to reflect such amendments to each Lender's Elected Commitment and the Aggregate Elected Commitment Amount. The Administrative Agent shall record the

information regarding such increases in the Register required to be maintained by the Administrative Agent pursuant to Section 12.04(b)(iv).

Section 2.07    Borrowing Base.

(a)    Initial Borrowing Base.  For the period from and including the Effective Date to but excluding the first Redetermination Date, the amount of the Borrowing Base shall be $[492,500,000] and such amount shall be automatically reduced by $2,500,000 on the first day of each calendar month following the Effective Date to and including November 1, 2017. Notwithstanding the foregoing, the Borrowing Base may be subject to further adjustments from time to time pursuant to Section 2.07(f) or Section 8.13(c).

(b)    Scheduled and Interim Redeterminations.  The Borrowing Base shall be redetermined semi-annually in accordance with this Section 2.07 (a "Scheduled Redetermination"), and, subject to Section 2.07(d), such redetermined Borrowing Base shall become effective and applicable to the Borrower, the Administrative Agent, the Issuing Bank and the Lenders on or about April 1st and October 1st of each year (or, in each case, such date promptly thereafter as reasonably practicable); *provided* that, notwithstanding anything in the foregoing to the contrary, the first Scheduled Redetermination shall occur on November 1, 2017. In addition, (i) the Borrower may, by notifying the Administrative Agent thereof, elect to cause the Borrowing Base to be redetermined (A) once prior to the initial Scheduled Redetermination, (B) once between each Scheduled Redetermination and (C) contemporaneously with the consummation of any Material Acquisition (as used herein with the same meaning given such term in the definition of "Consolidated EBITDAX"), and (ii) the Administrative Agent may, at the direction of the Required Lenders, by notifying the Borrower thereof, cause the Borrowing Base to be redetermined once between each Scheduled Redetermination (each redetermination in the foregoing clauses (i) and (ii), an "Interim Redetermination") in accordance with this Section 2.07.

(c)    Scheduled and Interim  Redetermination Procedure.

(i)    Each Scheduled Redetermination and each Interim Redetermination shall be effectuated as follows:  Upon receipt by the Administrative Agent of (A) the Reserve Report and the certificate required to be delivered by the Borrower to the Administrative Agent, in the case of a Scheduled Redetermination, pursuant to Section 8.12(a) and (c), and, in the case of an Interim Redetermination, pursuant to Section 8.12(b) and (c), and (B) such other reports, data and supplemental information, including, without limitation, the information provided pursuant to Section 8.12(c), as may, from time to time, be reasonably requested by the Majority Lenders (the Reserve Report, such certificate and such other reports, data and supplemental information being the "Engineering Reports"), the Administrative Agent shall evaluate the information contained in the Engineering Reports and shall, in its sole discretion, propose a new Borrowing Base (the "Proposed Borrowing Base") based upon such information and such other information (including, without limitation, the status of title information with respect to the Oil and Gas Properties as described in the Engineering Reports and the existence of any other Debt, the Loan Parties' other assets, liabilities, fixed charges, cash flow, business, properties, prospects, management and ownership, hedged and unhedged exposure to price, price and production scenarios, interest rate and operating cost changes) as the

43

Administrative Agent deems appropriate in its sole discretion and consistent with its normal and customary oil and gas lending criteria as it exists at the particular time; *provided* that (A) no Borrowing Base Value will be given to any Swap Agreement entered into between any Subsidiary of the Parent and any Person that is not a Secured Swap Provider and (B) no more than 10% of the aggregate notional volumes (with appropriate conversions for crude oil, natural gas and natural gas liquids units) under Swap Agreements given Borrowing Base Value may come from Swap Agreements with Affiliates of Lenders.  In no event shall the Proposed Borrowing Base exceed the Aggregate Maximum Credit Amounts;

(ii)     The Administrative Agent shall notify the Borrower and the Lenders of the Proposed Borrowing Base (the "Proposed Borrowing Base Notice") after the Administrative Agent has received complete Engineering Reports from the Borrower and has had a reasonable opportunity to determine the Proposed Borrowing Base in accordance with Section 2.07(c)(i); and

(iii)     Any Proposed Borrowing Base that would increase the Borrowing Base then in effect must be approved by all of the Lenders as provided in this Section 2.07(c)(iii); and any Proposed Borrowing Base that would decrease or maintain the Borrowing Base then in effect must be approved by the Required Lenders as provided in this Section 2.07(c)(iii).  Upon receipt of the Proposed Borrowing Base Notice, each Lender shall have 15 days to agree with the Proposed Borrowing Base or disagree with the Proposed Borrowing Base by proposing an alternate Borrowing Base.  If at the end of such 15-day period, all of the Lenders, in the case of a Proposed Borrowing Base that would increase the Borrowing Base then in effect, or the Required Lenders, in the case of a Proposed Borrowing Base that would decrease or maintain the Borrowing Base then in effect, have approved, as aforesaid, then the Proposed Borrowing Base shall become the new Borrowing Base, effective on the date specified in Section 2.07(d).  If, however, at the end of such 15-day period, all of the Lenders or the Required Lenders, as applicable, have not approved, as aforesaid, then the Administrative Agent shall poll the Lenders to ascertain the highest Borrowing Base then acceptable to (x) in the case of a decrease or reaffirmation, a number of Lenders sufficient to constitute the Required Lenders and (y) in the case of an increase, all of the Lenders, and such amount shall become the new Borrowing Base, effective on the date specified in Section 2.07(d).

(d)     Effectiveness of a Redetermined Borrowing Base.  After a redetermined Borrowing Base is approved by all of the Lenders or the Required Lenders, as applicable, pursuant to Section 2.07(c)(iii), the Administrative Agent shall notify the Borrower and the Lenders of the amount of the redetermined Borrowing Base (the "New Borrowing Base Notice"), and such amount shall become the new Borrowing Base, effective and applicable to the Borrower, the Administrative Agent, the Issuing Bank and the Lenders:

(i)     in the case of a Scheduled Redetermination, (A) if the Administrative Agent shall have received the Engineering Reports required to be delivered by the Borrower pursuant to Section 8.12(a) and (c) in a timely and complete manner, then on or about April 1st or October 1st (or, in each case, such date promptly thereafter as reasonably practicable), as applicable, following such notice, or (B) if the Administrative Agent shall not have received the Engineering Reports required to be delivered by the Borrower pursuant to

44

Section 8.12(a) and (c) in a timely and complete manner, then on the Business Day next succeeding delivery of such notice; and

(ii)     in the case of an Interim Redetermination, on the Business Day next succeeding delivery of such notice.

Such amount shall then become the Borrowing Base until the next Scheduled Redetermination Date, the next Interim Redetermination Date or the next adjustment to the Borrowing Base under Section 2.07(f) or Section 8.13(c), whichever occurs first.  Notwithstanding the foregoing, no Scheduled Redetermination or Interim Redetermination shall become effective until the New Borrowing Base Notice related thereto is received by the Borrower.

(e)     [Reserved].

(f)     Automatic Reduction of the Borrowing Base – Asset Dispositions or Swap Liquidations.  In addition to the other automatic reductions of the Borrowing Base set forth herein, if at any time the aggregate Borrowing Base Value of Oil and Gas Properties sold or disposed of pursuant to Section 9.12(d) or (e), together with the Swap Agreements in respect of commodities Liquidated, in any period between redeterminations of the Borrowing Base, exceeds five percent (5%) of the Borrowing Base as of the last redetermination, then the Borrowing Base shall be automatically reduced, effective immediately upon such sale, disposition or Swap Liquidation, by an amount equal to the Borrowing Base Value of such Properties sold or disposed of, and Swap Agreements in respect of commodities Liquidated and such new Borrowing Base shall be effective and applicable to the Borrower, the Administrative Agent, the Issuing Bank and the Lenders until the next redetermination or modification of the Borrowing Base pursuant to this Agreement; *provided* that for purposes of this Section 2.07(f), a Swap Agreement shall not be deemed to have been Liquidated if, (x) such Swap Agreement is novated from the existing counterparty to a Secured Swap Provider, with the Borrower or the applicable Loan Party being the "remaining party" for purposes of such novation, or (y) upon its termination, it is replaced, in a substantially contemporaneous transaction, with one or more Swap Agreements with approximately the same mark-to-market value and without cash payments to any Loan Party in connection therewith.  Such decrease in the Borrowing Base shall occur without any vote of Lenders or action by Administrative Agent.  Upon any such redetermination, the Administrative Agent shall promptly deliver a New Borrowing Base Notice to the Borrower and the Lenders.

Section 2.08   Letters of Credit.

(a)     General.  Subject to the terms and conditions set forth herein, the Borrower may request the issuance of dollar denominated Letters of Credit for its own account or for the account of any of its Subsidiaries, in a form reasonably acceptable to the Administrative Agent and the Issuing Bank, at any time and from time to time during the Availability Period; *provided* that the Borrower may not request the issuance, amendment, renewal or extension of Letters of Credit hereunder if a Borrowing Base Deficiency exists at such time or would exist as a result thereof.  In the event of any inconsistency between the terms and conditions of this Agreement and the terms and conditions of any form of letter of credit application or other agreement submitted by the Borrower to, or entered into by the Borrower

45

with, the Issuing Bank relating to any Letter of Credit, the terms and conditions of this Agreement shall control.

(b)       Notice of Issuance, Amendment, Renewal, Extension; Certain Conditions. The Existing Letters of Credit shall be deemed to have been issued hereunder as of the Effective Date.  To request the issuance of a Letter of Credit (or the amendment, renewal or extension of an outstanding Letter of Credit), the Borrower shall hand deliver or telecopy (or transmit by electronic communication, if arrangements for doing so have been approved by the Issuing Bank) to the Issuing Bank and the Administrative Agent (not less than five Business Days in advance of the requested date of issuance, amendment, renewal or extension) a notice:

(i)       requesting the issuance of a Letter of Credit or identifying the Letter of Credit to be amended, renewed or extended;

(ii)       specifying the date of issuance, amendment, renewal or extension (which shall be a Business Day);

(iii)       specifying the date on which such Letter of Credit is to expire (which shall comply with Section 2.08(c));

(iv)       specifying the amount of such Letter of Credit;

(v)       specifying the name and address of the beneficiary thereof and such other information as shall be necessary to prepare, amend, renew or extend such Letter of Credit; and

(vi)       specifying the amount of the then effective Borrowing Base and the then effective Aggregate Elected Commitment Amounts, and whether a Borrowing Base Deficiency exists at such time, the current total Revolving Credit Exposures (without regard to the requested Letter of Credit or the requested amendment, renewal or extension of an outstanding Letter of Credit) and the pro forma total Revolving Credit Exposures (giving effect to the requested Letter of Credit or the requested amendment, renewal or extension of an outstanding Letter of Credit).

Each notice shall constitute a representation by the Borrower that after giving effect to the requested issuance, amendment, renewal or extension, as applicable, (x) the LC Exposure shall not exceed the LC Commitment and (y) the total Revolving Credit Exposures shall not exceed the total Commitments (i.e., the least of (A) the Aggregate Maximum Credit Amounts, (B) the then effective Borrowing Base and (C) the Aggregate Elected Commitment Amounts).  No letter of credit issued by the Issuing Bank (if the Issuing Bank is not the Administrative Agent) shall be deemed to be a "Letter of Credit" issued under this Agreement unless the Issuing Bank has requested and received written confirmation from the Administrative Agent that the representations by Borrower contained in the foregoing clauses (x) and (y) are true and correct.

If requested by the Issuing Bank, the Borrower also shall submit a letter of credit application on the Issuing Bank's standard form in connection with any request for a Letter of Credit; *provided* that, in the event of any conflict between such application and the terms of the Loan Documents, the terms of the Loan Documents shall control.

(c)      Expiration Date.  Each Letter of Credit shall expire at or prior to the close of business on the earlier of (i) the date one year after the date of the issuance of such Letter of Credit (or, in the case of any renewal, which renewal may be provided for in the initial Letter of Credit, or extension thereof, one year after such renewal or extension) and (ii) the date that is five Business Days prior to the Maturity Date.

(d)      Participations.  By the issuance of a Letter of Credit (or an amendment to a Letter of Credit increasing the amount thereof) and without any further action on the part of the Issuing Bank or the Lenders, the Issuing Bank hereby grants to each Lender, and each Lender hereby acquires from the Issuing Bank, a participation in such Letter of Credit equal to such Lender's Applicable Percentage of the aggregate amount available to be drawn under such Letter of Credit.  In consideration and in furtherance of the foregoing, each Lender hereby absolutely and unconditionally agrees to pay to the Administrative Agent, for the account of the Issuing Bank, such Lender's Applicable Percentage of each LC Disbursement made by the Issuing Bank and not reimbursed by the Borrower on the date due as provided in Section 2.08(e), or of any reimbursement payment required to be refunded to the Borrower for any reason.  Each Lender acknowledges and agrees that its obligation to acquire participations pursuant to this Section 2.08(d) in respect of Letters of Credit is absolute and unconditional and shall not be affected by any circumstance whatsoever, including any amendment, renewal or extension of any Letter of Credit or the occurrence and continuance of a Default, the existence of a Borrowing Base Deficiency or reduction or termination of the Commitments, and that each such payment shall be made without any offset, abatement, withholding or reduction whatsoever.

(e)      Reimbursement.  If the Issuing Bank shall make any LC Disbursement in respect of a Letter of Credit, the Borrower shall reimburse such LC Disbursement by paying to the Administrative Agent an amount equal to such LC Disbursement not later than 12:00 noon, New York City time, (i) on the date that such LC Disbursement is made, if the Borrower shall have received notice of such LC Disbursement prior to 10:00 a.m., New York City time, on such date, or (ii) the Business Day immediately following the day that the Borrower receives such notice, if such notice is not received prior to such time on the day of receipt; *provided* that the Borrower shall, subject to the conditions to Borrowing set forth herein, be deemed to have requested, and the Borrower does hereby request under such circumstances, that such payment be financed with an ABR Borrowing in an equivalent amount and, to the extent so financed, the Borrower's obligation to make such payment shall be discharged and replaced by the resulting ABR Borrowing.  If the Borrower fails to make such payment when due, the Administrative Agent shall notify each Lender of the applicable LC Disbursement, the payment then due from the Borrower in respect thereof and such Lender's Applicable Percentage thereof.  Promptly following receipt of such notice, each Lender shall pay to the Administrative Agent its Applicable Percentage of the payment then due from the Borrower, in the same manner as provided in Section 2.05 with respect to Loans made by such Lender (and Section 2.05 shall apply, *mutatis mutandis*, to the payment obligations of the Lenders), and the Administrative Agent shall promptly pay to the Issuing Bank the amounts so received by it from the Lenders.  Promptly following receipt by the Administrative Agent of any payment from the Borrower pursuant to this Section 2.08(e), the Administrative Agent shall distribute such payment to the Issuing Bank or, to the extent that Lenders have made payments pursuant to this Section 2.08(e) to reimburse the Issuing Bank, then to such Lenders and the Issuing Bank as their interests may appear.  Any payment made by a Lender pursuant to this Section 2.08(e) to reimburse the Issuing

47

Bank for any LC Disbursement (other than the funding of ABR Loans as contemplated above) shall not constitute a Loan and shall not relieve the Borrower of its obligation to reimburse such LC Disbursement.

(f)    Obligations Absolute.    The Borrower's obligation to reimburse LC Disbursements as provided in Section 2.08(e) shall be absolute, unconditional and irrevocable, and shall be performed strictly in accordance with the terms of this Agreement under any and all circumstances whatsoever and irrespective of (i) any lack of validity or enforceability of any Letter of Credit, any Letter of Credit Agreement or this Agreement, or any term or provision therein, (ii) any draft or other document presented under a Letter of Credit proving to be forged, fraudulent or invalid in any respect or any statement therein being untrue or inaccurate in any respect, (iii) payment by the Issuing Bank under a Letter of Credit against presentation of a draft or other document that does not comply with the terms of such Letter of Credit or any Letter of Credit Agreement, or (iv) any other event or circumstance whatsoever, whether or not similar to any of the foregoing, that might, but for the provisions of this Section 2.08(f), constitute a legal or equitable discharge of, or provide a right of setoff against, the Borrower's obligations hereunder.  Neither the Administrative Agent, the Lenders nor the Issuing Bank, nor any of their Related Parties shall have any liability or responsibility by reason of or in connection with the issuance or transfer of any Letter of Credit or any payment or failure to make any payment thereunder (irrespective of any of the circumstances referred to in the preceding sentence), or any error, omission, interruption, loss or delay in transmission or delivery of any draft, notice or other communication under or relating to any Letter of Credit (including any document required to make a drawing thereunder), any error in interpretation of technical terms or any consequence arising from causes beyond the control of the Issuing Bank; *provided* that the foregoing shall not be construed to excuse the Issuing Bank from liability to the Borrower to the extent of any direct damages (as opposed to consequential damages, claims in respect of which are hereby waived by the Borrower to the extent permitted by applicable law) suffered by the Borrower that are caused by the Issuing Bank's failure to exercise care when determining whether drafts and other documents presented under a Letter of Credit comply with the terms thereof.  The parties hereto expressly agree that, in the absence of gross negligence or willful misconduct on the part of the Issuing Bank (as finally determined by a court of competent jurisdiction), the Issuing Bank shall be deemed to have exercised all requisite care in each such determination.  In furtherance of the foregoing and without limiting the generality thereof, the parties agree that, with respect to documents presented which appear on their face to be in substantial compliance with the terms of a Letter of Credit, the Issuing Bank may, in its sole discretion, either accept and make payment upon such documents without responsibility for further investigation, regardless of any notice or information to the contrary, or refuse to accept and make payment upon such documents if such documents are not in strict compliance with the terms of such Letter of Credit.

(g)    Disbursement Procedures.    The Issuing Bank shall, promptly following its receipt thereof, examine all documents purporting to represent a demand for payment under a Letter of Credit.  The Issuing Bank shall promptly notify the Administrative Agent and the Borrower by telephone (confirmed by telecopy) of such demand for payment and whether the Issuing Bank has made or will make an LC Disbursement thereunder; *provided* that any failure to give or delay in giving such notice shall not relieve the Borrower of its obligation to reimburse the Issuing Bank and the Lenders with respect to any such LC Disbursement.

48

(h) <u>Interim Interest</u>.  If the Issuing Bank shall make any LC Disbursement, then, until the Borrower shall have reimbursed the Issuing Bank for such LC Disbursement (either with its own funds or a Borrowing under <u>Section 2.08(e)</u>), the unpaid amount thereof shall bear interest, for each day from and including the date such LC Disbursement is made to but excluding the date that the Borrower reimburses such LC Disbursement, at the rate per annum then applicable to ABR Loans.  Interest accrued pursuant to this <u>Section 2.08(h)</u> shall be for the account of the Issuing Bank, except that interest accrued on and after the date of payment by any Lender pursuant to <u>Section 2.08(e)</u> to reimburse the Issuing Bank shall be for the account of such Lender to the extent of such payment.

(i) <u>Replacement of the Issuing Bank</u>.  The Issuing Bank may be replaced at any time by written agreement among the Borrower, the Administrative Agent, the replaced Issuing Bank and the successor Issuing Bank.  The Administrative Agent shall notify the Lenders of any such replacement of the Issuing Bank.  At the time any such replacement shall become effective, the Borrower shall pay all unpaid fees accrued for the account of the replaced Issuing Bank pursuant to <u>Section 3.05(b)</u>.  From and after the effective date of any such replacement, (i) the successor Issuing Bank shall have all the rights and obligations of the Issuing Bank under this Agreement with respect to Letters of Credit to be issued thereafter and (ii) references herein to the term "Issuing Bank" shall be deemed to refer to such successor or to any previous Issuing Bank, or to such successor and all previous Issuing Banks, as the context shall require.  After the replacement of the Issuing Bank hereunder, the replaced Issuing Bank shall remain a party hereto and shall continue to have all the rights and obligations of the Issuing Bank under this Agreement with respect to Letters of Credit issued by it prior to such replacement, but shall not be required to issue additional Letters of Credit.

(j) <u>Cash Collateralization</u>.  If (i) any Event of Default shall occur and be continuing and the Borrower receives notice from the Administrative Agent or the Majority Lenders demanding the deposit of cash collateral pursuant to this <u>Section 2.08(j)</u>, or (ii) the Borrower is required to pay to the Administrative Agent the excess attributable to an LC Exposure in connection with any prepayment pursuant to <u>Section 3.04(c)</u>, then the Borrower shall deposit, in an account with the Administrative Agent, in the name of the Administrative Agent and for the benefit of the Lenders, an amount in cash equal to, in the case of an Event of Default, the LC Exposure, and in the case of a payment required by <u>Section 3.04(c)</u>, the amount of such excess as provided in <u>Section 3.04(c)</u>, as of such date plus any accrued and unpaid interest thereon; *provided* that the obligation to deposit such cash collateral shall become effective immediately, and such deposit shall become immediately due and payable, without demand or other notice of any kind, upon the occurrence of any Event of Default with respect to the Borrower or any Loan Party described in <u>Section 10.01(h)</u> or <u>Section 10.01(i)</u>.  The Borrower hereby grants to the Administrative Agent, for the benefit of the Issuing Bank and the Lenders, an exclusive first priority and continuing perfected security interest in and Lien on such account and all cash, checks, drafts, certificates and instruments, if any, from time to time deposited or held in such account, all deposits or wire transfers made thereto, any and all investments purchased with funds deposited in such account, all interest, dividends, cash, instruments, financial assets and other Property from time to time received, receivable or otherwise payable in respect of, or in exchange for, any or all of the foregoing, and all proceeds, products, accessions, rents, profits, income and benefits therefrom, and any substitutions and replacements therefor.  The Borrower's obligation to deposit amounts pursuant to this <u>Section 2.08(j)</u> shall be absolute

49

and unconditional, without regard to whether any beneficiary of any such Letter of Credit has attempted to draw down all or a portion of such amount under the terms of a Letter of Credit, and, to the fullest extent permitted by applicable law, shall not be subject to any defense or be affected by a right of set-off, counterclaim or recoupment which the Borrower or any of its Subsidiaries may now or hereafter have against any such beneficiary, the Issuing Bank, the Administrative Agent, the Lenders or any other Person for any reason whatsoever.  Such deposit shall be held as collateral securing the payment and performance of the Borrower's and the Guarantor's obligations under this Agreement and the other Loan Documents.   The Administrative Agent shall have exclusive dominion and control, including the exclusive right of withdrawal, over such account.  Other than any interest earned on the investment of such deposits, which investments shall be made at the option and reasonable discretion of the Administrative Agent and at the Borrower's risk and expense, such deposits shall not bear interest.  Interest or profits, if any, on such investments shall accumulate in such account. Moneys in such account shall be applied by the Administrative Agent to reimburse the Issuing Bank for LC Disbursements for which it has not been reimbursed and, to the extent not so applied, shall be held for the satisfaction of the reimbursement obligations of the Borrower for the LC Exposure at such time or, if the maturity of the Loans has been accelerated, be applied to satisfy other obligations of the Borrower and the Guarantors under this Agreement or the other Loan Documents.  If the Borrower is required to provide an amount of cash collateral hereunder as a result of the occurrence of an Event of Default, and the Borrower is not otherwise required to pay to the Administrative Agent the excess attributable to an LC Exposure in connection with any prepayment pursuant to Section 3.04(c), then such amount (to the extent not applied as aforesaid) shall be returned to the Borrower within three Business Days after all Events of Default have been cured or waived.  If the Borrower is required to pay to the Administrative Agent as cash collateral the excess attributable to an LC Exposure in connection with any prepayment pursuant to Section 3.04(c), then upon the expiration or termination of any Letter of Credit, so long as no Event of Default is then continuing, and so long as the Borrower does not have any obligation at such time to deposit cash collateral pursuant to Section 2.09, the Administrative Agent shall return to the Borrower, within three Business Days after such expiration or termination, all or such portion of any such cash collateral (to the extent not previously applied as aforesaid) as exceeds the excess, if any, of the total of the then existing Revolving Credit Exposures over the total Commitments then in effect.

Section 2.09   Defaulting Lenders.  Notwithstanding any provision of this Agreement to the contrary, if any Lender becomes a Defaulting Lender, and any LC Exposure exists at the time a Lender becomes a Defaulting Lender, then:

(a)     all or any part of such LC Exposure shall be reallocated among the non-Defaulting Lenders in accordance with their respective Applicable Percentages but only to the extent (x) the sum of all non-Defaulting Lenders' Revolving Credit Exposures does not exceed the total of all non-Defaulting Lenders' Commitments and (y) the conditions set forth in Section 6.02 are satisfied at such time;

(b)     if the reallocation described in clause (a) above cannot, or can only partially, be effected, the Borrower shall within one Business Day following notice by the Administrative Agent, cash collateralize such Defaulting Lender's LC Exposure (after giving

50

effect to any partial reallocation pursuant to clause (a) above) in accordance with the procedures set forth in Section 2.08(j) for so long as such LC Exposure is outstanding;

(c)    if the Borrower cash collateralizes any portion of such Defaulting Lender's LC Exposure pursuant to this Section 2.09, the Borrower shall not be required to pay any fees to such Defaulting Lender pursuant to Section 3.05(b) with respect to such Defaulting Lender's LC Exposure during the period such Defaulting Lender's LC Exposure is cash collateralized;

(d)    if the LC Exposure of the non-Defaulting Lenders is reallocated pursuant to this Section 2.09, then the fees payable to the Lenders pursuant to Section 3.05(a) and Section 3.05(b) shall be adjusted in accordance with such non-Defaulting Lenders' Applicable Percentages; or

(e)    if any Defaulting Lender's LC Exposure is neither cash collateralized nor reallocated pursuant to this Section 2.09, then, without prejudice to any rights or remedies of the Issuing Bank or any Lender hereunder, all commitment fees that otherwise would have been payable to such Defaulting Lender (solely with respect to the portion of such Defaulting Lender's Commitment that was utilized by such LC Exposure) under Section 3.05(a) and letter of credit fees payable under Section 3.05(b) with respect to such Defaulting Lender's LC Exposure shall be payable to the Issuing Bank until such LC Exposure is cash collateralized and/or reallocated.

Notwithstanding any provision of this Agreement to the contrary, so long as any Lender is a Defaulting Lender, the Issuing Bank shall not be required to issue, amend or increase any Letter of Credit, unless it is satisfied that the related exposure will be 100% covered by the Commitments of the non-Defaulting Lenders and/or cash collateral will be provided by the Borrower in accordance with Section 2.08(j), and participating interests in any such newly issued or increased Letter of Credit shall be allocated among non-Defaulting Lenders in a manner consistent with Section 2.09(a) (and any Defaulting Lender shall not participate therein). Nothing in this Section 2.09 shall relieve any Defaulting Lender from any liability it may have to the Administrative Agent, any Loan Party, any non-Defaulting Lender or any Issuing Bank in connection with any obligation any such Defaulting Lender has under this Agreement.

## ARTICLE III
## PAYMENTS OF PRINCIPAL AND INTEREST; PREPAYMENTS; FEES

Section 3.01    Repayment of Loans.  The Borrower hereby unconditionally promises to pay to the Administrative Agent for the account of each Lender the then unpaid principal amount of each Loan on the Termination Date.

Section 3.02    Interest.

(a)    ABR Loans.  The Loans comprising each ABR Borrowing shall bear interest at the Alternate Base Rate plus the Applicable Margin, but in no event to exceed the Highest Lawful Rate.

51

(b)     Eurodollar Loans.  The Loans comprising each Eurodollar Borrowing shall bear interest at the Adjusted LIBO Rate for the Interest Period in effect for such Borrowing plus the Applicable Margin, but in no event to exceed the Highest Lawful Rate.

(c)     Post-Default Rate and Borrowing Base Deficiency Rate.  Notwithstanding the foregoing, if an Event of Default has occurred and is continuing, or if any principal of or interest on any Loan, including payments due resulting from a Borrowing Base Deficiency or any fee or other amount payable by the Borrower or any Guarantor hereunder or under any other Loan Document is not paid when due, whether at stated maturity, upon acceleration or otherwise, and including any payments in respect of a Borrowing Base Deficiency under Section 3.04(c), then, automatically in the case of an Event of Default under Section 10.01(a), (b), (h), (i) or (j) and upon the election of the Majority Lenders in the case of any other Event of Default, all Indebtedness outstanding shall bear interest, after as well as before judgment, at a rate per annum equal to (i) in the case of principal of any Loan, two percent (2%) plus the rate otherwise applicable to such Loan or (ii) in the case of other amounts, two percent (2%) plus the rate applicable to ABR Loans as provided in Section 3.02(a), but in no event to exceed the Highest Lawful Rate.

(d)     Interest Payment Dates.  Accrued interest on each Loan shall be payable in arrears on each Interest Payment Date for such Loan and on the Termination Date; *provided* that (i) interest accrued pursuant to Section 3.02(c) shall be payable on demand, (ii) in the event of any repayment or prepayment of any Loan (other than an optional prepayment of an ABR Loan prior to the Termination Date), accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment, and (iii) in the event of any conversion of any Eurodollar Loan prior to the end of the current Interest Period therefor, accrued interest on such Loan shall be payable on the effective date of such conversion.

(e)     Interest Rate Computations.  All interest hereunder shall be computed on the basis of a year of 360 days, unless such computation would exceed the Highest Lawful Rate, in which case interest shall be computed on the basis of a year of 365 days (or 366 days in a leap year), except that interest computed by reference to the Alternate Base Rate at times when the Alternate Base Rate is based on the Prime Rate shall be computed on the basis of a year of 365 days (or 366 days in a leap year), and in each case shall be payable for the actual number of days elapsed (including the first day but excluding the last day).  The applicable Alternate Base Rate, Adjusted LIBO Rate or LIBO Rate shall be determined by the Administrative Agent, and such determination shall be conclusive absent manifest error, and be binding upon the parties hereto.

Section 3.03    Alternate Rate of Interest.  If prior to the commencement of any Interest Period for a Eurodollar Borrowing:

(a)     the Administrative Agent determines (which determination shall be conclusive absent manifest error) that adequate and reasonable means do not exist for ascertaining the Adjusted LIBO Rate or the LIBO Rate for such Interest Period; or

(b)     the Administrative Agent is advised by the Majority Lenders that the Adjusted LIBO Rate or LIBO Rate, as applicable, for such Interest Period will not adequately

and fairly reflect the cost to such Lenders of making or maintaining their Loans included in such Borrowing for such Interest Period;

then the Administrative Agent shall give notice thereof to the Borrower and the Lenders by telephone or telecopy as promptly as practicable thereafter and, until the Administrative Agent notifies the Borrower and the Lenders that the circumstances giving rise to such notice no longer exist, (i) any Interest Election Request that requests the conversion of any Borrowing to, or continuation of any Borrowing as, a Eurodollar Borrowing shall be ineffective, and (ii) if any Borrowing Request requests a Eurodollar Borrowing, such Borrowing shall be made either as an ABR Borrowing or at an alternate rate of interest determined by the Majority Lenders as their cost of funds.

Section 3.04    Prepayments.

(a)    Optional Prepayments.  The Borrower shall have the right at any time and from time to time to prepay any Borrowing in whole or in part, subject to prior notice in accordance with Section 3.04(b).

(b)    Notice and Terms of Optional Prepayment.  The Borrower shall notify the Administrative Agent by telephone (confirmed by telecopy) of any prepayment hereunder (i) in the case of prepayment of a Eurodollar Borrowing, not later than 12:00 p.m., New York City time, three Business Days before the date of prepayment, or (ii) in the case of prepayment of an ABR Borrowing, not later than 12:00 p.m., New York City time, one Business Day before the date of prepayment.  Each such notice shall be irrevocable and shall specify the prepayment date and the principal amount of each Borrowing or portion thereof to be prepaid; *provided* that, if a notice of prepayment is given in connection with a conditional notice of termination of the Commitments as contemplated by Section 2.06(b), then such notice of prepayment may be revoked if such notice of termination is revoked in accordance with Section 2.06(b).  Promptly following receipt of any such notice relating to a Borrowing, the Administrative Agent shall advise the Lenders of the contents thereof.  Each partial prepayment of any Borrowing (other than pursuant to Section 3.04(c)) shall be in an amount that would be permitted in the case of an advance of a Borrowing of the same Type as provided in Section 2.02.  Each prepayment of a Borrowing shall be applied ratably to the Loans included in the prepaid Borrowing. Prepayments shall be accompanied by accrued interest to the extent required by Section 3.02.

(c)    Mandatory Prepayments.

(i)    If, after giving effect to any termination or reduction of the Aggregate Maximum Credit Amounts pursuant to Section 2.06(b), or any reduction in the Aggregate Elected Commitment Amounts pursuant to Section 2.06(c), the total Revolving Credit Exposures exceeds the total Commitments, then the Borrower shall (A) prepay the Borrowings on the date of such termination or reduction in an aggregate principal amount equal to such excess, and (B) if any excess remains after prepaying all of the Borrowings as a result of an LC Exposure, pay to the Administrative Agent on behalf of the Lenders an amount equal to such excess to be held as cash collateral as provided in Section 2.08(j).

(ii)     Upon any redetermination of the amount of the Borrowing Base in accordance with Section 2.07 (other than Section 2.07(f)) or adjustment to the amount of the Borrowing Base in accordance with Section 8.13(c), if a Borrowing Base Deficiency exists, then the Borrower shall, within 30 days following receipt of the New Borrowing Base Notice in accordance with Section 2.07(d) or the date the adjustment occurs, as applicable, provide written notice (the "Election Notice") to the Administrative Agent stating the action which the Borrower proposes to remedy such Borrowing Base Deficiency, and the Borrower shall thereafter, at its option, either (A) on the date of delivery of the Election Notice, prepay the Borrowings in an aggregate principal amount sufficient to eliminate such Borrowing Base Deficiency, (B) eliminate such Borrowing Base Deficiency by making five consecutive mandatory prepayments of principal on the Borrowings, each of which shall be in the amount of 1/5th of the amount of such Borrowing Base Deficiency, with each such payment being due on the date that is 30 days, 60 days, 90 days, 120 days and 150 days, respectively, following the Borrower's receipt of the New Borrowing Base Notice in accordance with Section 2.07(d) or the date the adjustment occurs, as applicable, (C) within 30 days following the delivery of the Election Notice, submit (and pledge as Mortgaged Properties) additional Oil and Gas Properties owned by the Loan Parties for consideration in connection with the determination of the Borrowing Base which the Administrative Agent and the Lenders deem sufficient in their sole discretion to eliminate such Borrowing Base Deficiency, or (D) within 30 days following the delivery of the Election Notice, eliminate such excess through a combination of prepayments and submission of additional Oil and Gas Properties as set forth in subclauses (A) and (C) above.  If any Borrowing Base Deficiency remains after prepaying all of the Borrowings as a result of LC Exposure, then the Borrower shall pay to the Administrative Agent on behalf of the Lenders an amount equal to such remaining Borrowing Base Deficiency to be held as cash collateral as provided in Section 2.08(j).  The Borrower shall be obligated to deposit such cash collateral amount within five Business Days following its receipt of the New Borrowing Base Notice in accordance with Section 2.07(d) or the date the adjustment occurs, as applicable; *provided* that all payments required to be made pursuant to this Section 3.04(c)(ii) must be made on or prior to the Termination Date.

(iii)     Upon any adjustments to the Borrowing Base pursuant to Section 2.07(f), if the total Revolving Credit Exposures exceeds the Borrowing Base as adjusted, then the Borrower shall (A) prepay the Borrowings in an aggregate principal amount equal to such excess, and (B) if any excess remains after prepaying all of the Borrowings as a result of an LC Exposure, pay to the Administrative Agent on behalf of the Lenders an amount equal to such excess to be held as cash collateral as provided in Section 2.08(j).  The Borrower shall be obligated to make such prepayment and/or deposit of cash collateral on the date it or any Subsidiary receives proceeds as a result of such disposition; *provided* that all payments required to be made pursuant to this Section 3.04(c)(iii) must be made on or prior to the Termination Date.

(iv)     Each prepayment of Borrowings pursuant to this Section 3.04(c) shall be applied, first, ratably to any ABR Borrowings then outstanding, and second, to any Eurodollar Borrowings then outstanding, and if more than one Eurodollar Borrowing is then outstanding, to such Eurodollar Borrowing in such order as the Borrower may direct.

(v)      Each prepayment of Borrowings pursuant to this Section 3.04(c) shall be applied ratably to the Loans included in the prepaid Borrowings.  Prepayments pursuant to this Section 3.04(c) shall be accompanied by accrued interest to the extent required by Section 3.02.

(d)      No Premium or Penalty.  Prepayments permitted or required under this Section 3.04 shall be without premium or penalty, except as required under Section 5.02.

(e)      Excess Cash Balances.  If on any Business Day the Borrower and the other Loan Parties have any Excess Cash greater than $100,000 on such date (other than the proceeds of a Borrowing that will be used within two Business Days of such Borrowing for the purposes set forth on an exhibit to the applicable Borrowing Request (as certified by the Borrower in such Borrowing Request)), then the Borrower shall prepay the Borrowings on the next Business Day in an amount equal to the amount of Excess Cash.  Each prepayment of Borrowings pursuant to this Section 3.04(e) shall be applied ratably to the Loans included in the prepaid Borrowings and shall be accompanied by accrued interest to the extent required by Section 3.02 and, if any Excess Cash remains after the Borrowings are fully prepaid, the Borrower shall transfer to the Administrative Agent on behalf of the Lenders an amount equal to the lesser of (A) such remaining Excess Cash and (B) the amount of the LC Exposure to be held as cash collateral as provided in Section 2.08(j).

Section 3.05   Fees.

(a)      Commitment Fees.  The Borrower agrees to pay to the Administrative Agent for the account of each Lender a commitment fee, which shall accrue at the applicable Commitment Fee Rate on the average daily amount of the Unused Commitment of such Lender during the period from and including the date of this Agreement to but excluding the Termination Date.  Accrued commitment fees shall be payable in arrears on the last day of March, June, September and December of each year and on the Termination Date, commencing on the first such date to occur after the date hereof.  All commitment fees shall be computed on the basis of a year of 360 days, unless such computation would exceed the Highest Lawful Rate, in which case interest shall be computed on the basis of a year of 365 days (or 366 days in a leap year), and shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

(b)      Letter of Credit Fees.  The Borrower agrees to pay (i) to the Administrative Agent for the account of each Lender, a participation fee with respect to its participations in Letters of Credit, which shall accrue at the same Applicable Margin used to determine the interest rate applicable to Eurodollar Loans on the average daily amount of such Lender's LC Exposure (excluding any portion thereof attributable to unreimbursed LC Disbursements) during the period from and including the date of this Agreement to, but excluding the later of the date on which such Lender's Commitment terminates and the date on which such Lender ceases to have any LC Exposure, (ii) to the Issuing Bank a fronting fee, which shall accrue at the rate of 0.125% per annum on the average daily amount of the LC Exposure (excluding any portion thereof attributable to unreimbursed LC Disbursements) during the period from and including the date of this Agreement to, but excluding the later of the date of termination of the Commitments and the date on which there ceases to be any LC Exposure,

55

*provided* that in no event shall such fee be less than $500 during any quarter, and (iii) to the Issuing Bank, for its own account, its standard fees with respect to the issuance, amendment, renewal or extension of any Letter of Credit or processing of drawings thereunder.  Participation fees and fronting fees accrued through and including the last day of March, June, September and December of each year shall be payable on the third Business Day following such last day, commencing on the first such date to occur after the date of this Agreement; *provided* that all such fees shall be payable on the Termination Date and any such fees accruing after the Termination Date shall be payable on demand.  Any other fees payable to the Issuing Bank pursuant to this Section 3.05(b) shall be payable within 10 Business Days after demand.  All participation fees and fronting fees shall be computed on the basis of a year of 360 days, unless such computation would cause interest hereunder to exceed the Highest Lawful Rate, in which case such fees shall be computed on the basis of a year of 365 days (or 366 days in a leap year), and shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

(c)  Administrative Agent Fees.  The Borrower agrees to pay to the Administrative Agent, for its own account, fees payable in the amounts and at the times separately agreed upon between the Borrower and the Administrative Agent in the Agency Fee Letter.

(d)  Defaulting Lender Fees.  The Borrower shall not be obligated to pay the Administrative Agent any Defaulting Lender's ratable share of the fees described in Sections 3.05(a) and (b) for the period commencing on the day such Defaulting Lender becomes a Defaulting Lender and continuing for so long as such Lender continues to be a Defaulting Lender.

(e)  Upfront Fees.  The Borrower agrees to pay to the Administrative Agent for the account of each Lender on a ratable basis a fully-earned and non-refundable upfront fee equal to 1.00% of the aggregate principal amount of the Borrowing Base on the Effective Date, which fee shall be payable on the Effective Date.

**ARTICLE IV**
**PAYMENTS; PRO RATA TREATMENT; SHARING OF SET-OFFS**

Section 4.01  Payments Generally; Pro Rata Treatment; Sharing of Set-offs.

(a)  Payments by the Borrower.  The Borrower shall make each payment required to be made by it hereunder (whether of principal, interest, fees or reimbursement of LC Disbursements, or of amounts payable under Section 5.01, Section 5.02, Section 5.03 or otherwise) prior to 12:00 p.m., New York City time, on the date when due, in immediately available funds, without defense, deduction, recoupment, set-off or counterclaim.  Fees, once paid, shall be fully earned and shall not be refundable under any circumstances.  Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon.  All such payments shall be made to the Administrative Agent at its offices specified in Section 12.01, except payments to be made directly to the Issuing Bank as expressly provided herein, and except that payments pursuant to Section 5.01, Section 5.02, Section 5.03

56

and Section 12.03 shall be made directly to the Persons entitled thereto.  The Administrative Agent shall distribute any such payments received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof.  If any payment hereunder shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension.  All payments hereunder shall be made in dollars.

(b)      Application of Insufficient Payments.  If at any time insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal, unreimbursed LC Disbursements, interest and fees then due hereunder, such funds shall be applied (i) first, towards payment of interest and fees then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest and fees then due to such parties, and (ii) second, towards payment of principal and unreimbursed LC Disbursements then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of principal and unreimbursed LC Disbursements then due to such parties.

(c)      Sharing of Payments by Lenders.  If any Lender shall, by exercising any right of set-off or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Loans or participations in LC Disbursements resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Loans and participations in LC Disbursements and accrued interest thereon than the proportion received by any other Lender, then the Lender receiving such greater proportion shall purchase (for cash at face value) participations in the Loans and participations in LC Disbursements of other Lenders to the extent necessary so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans and participations in LC Disbursements; *provided* that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and (ii) the provisions of this Section 4.01(c) shall not be construed to apply to any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement or any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans or participations in LC Disbursements to any assignee or participant, other than to the Borrower or any Subsidiary or Affiliate thereof (as to which the provisions of this Section 4.01(c) shall apply).  The Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against the Borrower rights of set-off and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Borrower in the amount of such participation.

Section 4.02   Presumption of Payment by the Borrower.  Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders or the Issuing Bank that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders or the Issuing Bank, as the case may be, the amount due. In such event, if the Borrower has not in fact made such payment, then each of the Lenders or the

57

Issuing Bank, as the case may be, severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender or Issuing Bank with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

Section 4.03   Certain Deductions by the Administrative Agent.  If any Lender shall fail to make any payment required to be made by it pursuant to Section 2.05(a), Section 2.08(d), Section 2.08(e) or Section 4.02, or otherwise hereunder, then the Administrative Agent may, in its discretion (notwithstanding any contrary provision hereof), apply any amounts thereafter received by the Administrative Agent for the account of such Lender to satisfy such Lender's obligations under such Sections until all such unsatisfied obligations are fully paid.  If at any time prior to the acceleration or maturity of the Loans, the Administrative Agent shall receive any payment in respect of principal of a Loan or a reimbursement of an LC Disbursement while one or more Defaulting Lenders shall be party to this Agreement, the Administrative Agent shall apply such payment first to the Borrowing(s) for which such Defaulting Lender(s) shall have failed to fund its pro rata share until such time as such Borrowing(s) are paid in full or each Lender (including each Defaulting Lender) is owed its Applicable Percentage of all Loans then outstanding.  After acceleration or maturity of the Loans, all principal will be paid ratably as provided in Section 10.02(c).

Section 4.04   Disposition of Proceeds.  The Security Instruments contain an assignment by the Borrower and/or the Guarantors unto and in favor of the Administrative Agent for the benefit of the Secured Parties of all of the Borrower's or each Guarantor's interest in and to production and all proceeds attributable thereto which may be produced from or allocated to the Mortgaged Property.  The Security Instruments further provide in general for the application of such proceeds to the satisfaction of the Indebtedness and other obligations described therein and secured thereby.  Notwithstanding the assignment contained in such Security Instruments, until the occurrence of an Event of Default, the Administrative Agent and the Lenders agree that they will neither notify the purchaser or purchasers of such production nor take any other action to cause such proceeds to be remitted to the Administrative Agent or the Lenders, but the Administrative Agent and the Lenders will instead permit such proceeds to be paid to the Borrower and its Subsidiaries, and the Lenders hereby authorize the Administrative Agent to take such actions as may be necessary to cause such proceeds to be paid to the Borrower and/or such Subsidiaries.

## ARTICLE V
## INCREASED COSTS; BREAK FUNDING PAYMENTS; TAXES; ILLEGALITY

Section 5.01   Increased Costs.

(a)      Eurodollar Changes in Law.  If any Change in Law shall:

(i)      impose, modify or deem applicable any reserve, special deposit compulsory loan, insurance charge or similar requirement against assets of, deposits with or for

58

the account of, or advances, loans or other credit extended or participated in by, any Lender (except any such reserve requirement reflected in the Adjusted LIBO Rate);

(ii)     subject the Administrative Agent, any Lender or the Issuing Bank to any Taxes (other than (A) Indemnified Taxes covered by Section 5.03, (B) Taxes described in clauses (c) and (d) of the definition of Excluded Taxes or (C) Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

(iii)    impose on any Lender or the London interbank market any other condition cost or expense (other than Taxes) affecting this Agreement or Eurodollar Loans made by such Lender or any Letter of Credit or participation therein;

and the result of any of the foregoing shall be to increase the cost to such Lender or the Issuing Bank of making, converting to, continuing or maintaining any Eurodollar Loan or ABR Loan determined by the Adjusted LIBO Rate (or of maintaining its obligation to make any such Eurodollar Loan or ABR Loan), or to increase the cost to such Lender or the Issuing Bank of participating in, issuing or maintaining any Letter of Credit (or of maintaining its obligation to participate in or to issue any Letter of Credit), or to reduce the amount of any sum received or receivable by such Lender or the Issuing Bank hereunder (whether of principal, interest or any other amount) with respect to its Eurodollar Loan, ABR Loan determined by the Adjusted LIBO Rate or Letters of Credit or participations therein then, upon written request of such Lender or the Issuing Bank, the Borrower shall promptly pay to any such Lender or the Issuing Bank, as the case may be, such additional amount or amounts as will compensate such Lender or the Issuing Bank, as the case may be, for such additional costs incurred or reduction suffered.

(b)     Capital Requirements.  If any Lender or the Issuing Bank determines that any Change in Law affecting such Lender or the Issuing Bank or any lending office of such Lender or such Lender's or the Issuing Bank's holding company, if any, regarding capital or liquidity requirements has or would have the effect of reducing the rate of return on such Lender's or the Issuing Bank's capital or liquidity or on the capital or liquidity of such Lender's or the Issuing Bank's holding company, if any, as a consequence of this Agreement or the Loans made by, or participations in Letters of Credit held by, such Lender, or the Letters of Credit issued by the Issuing Bank, to a level below that which such Lender or the Issuing Bank or such Lender's or the Issuing Bank's holding company could have achieved but for such Change in Law (taking into consideration such Lender's or the Issuing Bank's policies and the policies of such Lender's or the Issuing Bank's holding company with respect to capital or liquidity adequacy), then from time to time the Borrower will pay to such Lender or the Issuing Bank, as the case may be, such additional amount or amounts as will compensate such Lender or the Issuing Bank or such Lender's or the Issuing Bank's holding company for any such reduction suffered.

(c)     Certificates.  A certificate of a Lender or the Issuing Bank setting forth the amount or amounts necessary to compensate such Lender or the Issuing Bank or its holding company, as the case may be, as specified in Section 5.01(a) or (b), shall be delivered to the Borrower and shall be conclusive absent manifest error.  The Borrower shall pay such Lender or

59

the Issuing Bank, as the case may be, the amount shown as due on any such certificate within 10 Business Days after receipt thereof.

(d)     Effect of Failure or Delay in Requesting Compensation.  Failure or delay on the part of any Lender or the Issuing Bank to demand compensation pursuant to this Section 5.01 shall not constitute a waiver of such Lender's or the Issuing Bank's right to demand such compensation; *provided* that the Borrower shall not be required to compensate a Lender or the Issuing Bank pursuant to this Section 5.01 for any increased costs or reductions incurred more than 365 days prior to the date that such Lender or the Issuing Bank, as the case may be, notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's or the Issuing Bank's intention to claim compensation therefor; *provided* further that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the 365-day period referred to above shall be extended to include the period of retroactive effect thereof.

Section 5.02    Break Funding Payments.  In the event of (a) the payment of any principal of any Eurodollar Loan other than on the last day of an Interest Period applicable thereto (including as a result of an Event of Default), (b) the conversion of any Eurodollar Loan into an ABR Loan other than on the last day of the Interest Period applicable thereto, (c) the failure to borrow, convert, continue or prepay any Eurodollar Loan on the date specified in any notice delivered pursuant hereto, or (d) the assignment of any Eurodollar Loan other than on the last day of the Interest Period applicable thereto as a result of a request by the Borrower pursuant to Section 5.04(a), then, in any such event, the Borrower shall compensate each Lender for the loss, cost and expense attributable to such event (exclusive of any lost profits or opportunity costs or processing or other related fees).  In the case of a Eurodollar Loan, such loss, cost or expense to any Lender shall be deemed to include an amount determined by such Lender to be the excess, if any, of (i) the amount of interest which would have accrued on the principal amount of such Loan had such event not occurred, at the Adjusted LIBO Rate that would have been applicable to such Loan, for the period from the date of such event to the last day of the then current Interest Period therefor (or, in the case of a failure to borrow, convert or continue, for the period that would have been the Interest Period for such Loan), over (ii) the amount of interest which would accrue on such principal amount for such period at the interest rate which such Lender would bid were it to bid, at the commencement of such period, for dollar deposits of a comparable amount and period from other banks in the eurodollar market.

A certificate of any Lender setting forth any amount or amounts that such Lender is entitled to receive pursuant to this Section 5.02 shall be delivered to the Borrower and shall be conclusive absent manifest error.  The Borrower shall pay such Lender the amount shown as due on any such certificate within 10 Business Days after receipt thereof; *provided*, that the Borrower shall not have any obligation to make any payment for any loss, cost or expense incurred by a Lender as a result of an event described in this Section 5.02 if such event occurred more than 180 days prior to the date such Lender notifies the Borrower of the amount thereof.

Section 5.03    Taxes.

(a)     Payments Free of Taxes.  Any and all payments by or on account of any obligation of the Borrower or any Guarantor under any Loan Document shall be made free and

clear of and without deduction or withholding for any Taxes, except as required by applicable law. If any applicable law (as determined in the good faith discretion of an applicable Withholding Agent) requires a Withholding Agent to deduct or withhold any Taxes from any such payments, then (i) if such Taxes are Indemnified Taxes or Other Taxes, the sum payable by the applicable Loan Party shall be increased as necessary so that after making all required deductions or withholdings (including deductions or withholdings applicable to additional sums payable under this Section 5.03(a)), the Administrative Agent, Lender or Issuing Bank (as the case may be) receives an amount equal to the sum it would have received had no such deductions been made, (ii) the Withholding Agent shall be entitled to make such deduction or withholding and (iii) the Withholding Agent shall pay the full amount deducted withheld to the relevant Governmental Authority in accordance with applicable law.

(b)     Payment of Other Taxes by the Borrower.  The Borrower shall pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

(c)     Indemnification by the Borrower.  The Borrower shall indemnify the Administrative Agent, each Lender and the Issuing Bank, within 10 Business Days after written demand therefor, for the full amount of any Indemnified Taxes or Other Taxes payable or paid by the Administrative Agent, such Lender or the Issuing Bank, as the case may be, or required to be withheld or deducted from a payment to the Administrative Agent, such Lender or the Issuing Bank, as the case may be, on or with respect to any payment by or on account of any obligation of the Borrower hereunder (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section 5.03) and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate of the Administrative Agent, a Lender or the Issuing Bank as to the amount of such payment or liability under this Section 5.03 shall be delivered to the Borrower and shall be conclusive absent manifest error; provided, that the Borrower shall not have any obligation to indemnify the Administrative Agent, such Lender or the Issuing Bank under this Section 5.03 for any amounts paid or first payable by the Administrative Agent, such Lender or the Issuing Bank more than two years prior to the date the Administrative Agent, such Lender or the Issuing Bank notifies the Borrower of the amount of such payment.

(d)     Indemnification by the Lenders.  Each Lender shall severally indemnify the Administrative Agent, within 10 days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that Borrower has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Borrower to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 12.04(c) relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document

61

or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this paragraph (d).

(e) <u>Evidence of Payments</u>.  As soon as practicable after any payment of Indemnified Taxes or Other Taxes by the Borrower or a Guarantor to a Governmental Authority, the Borrower shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(f) <u>Status of Lenders</u>.

(i) Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Withholding Agent, at the time or times reasonably requested by the Withholding Agent, such properly completed and executed documentation reasonably requested by the Withholding Agent as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Lender, if reasonably requested by the Withholding Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Withholding Agent as will enable the Withholding Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.  Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in <u>Section 5.03(f)(ii)(A), Section 5.03(f)(ii)(B)</u> and <u>Section 5.03(g)</u> below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii) Without limiting the generality of the foregoing, in the event that the Borrower is a "United States person" as defined in Section 7701(a)(30) of the Code,

(A) any Lender that is a "United States person" as defined in Section 7701(a)(30) of the Code shall deliver to the Withholding Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Withholding Agent), executed originals of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(B) any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Withholding Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Withholding Agent), whichever of the following is applicable:

(1) in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States of America is a party (x) with respect to payments of interest under any Loan Document, executed originals of IRS Form W-8BEN or IRS Form W-8 BEN-E, as applicable, establishing an exemption from, or reduction of, U.S.

federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN or IRS Form W-8 BEN-E, as applicable, establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2)     executed originals of IRS Form W-8ECI;

(3)     in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit G-1 to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code (a "U.S. Tax Compliance Certificate") and (y) executed originals of IRS Form W-8BEN or IRS Form W-8 BEN-E, as applicable; or

(4)     to the extent a Foreign Lender is not the beneficial owner, executed originals of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN, IRS Form W-8 BEN-E, a U.S. Tax Compliance Certificate substantially in the form of Exhibit G-2 or Exhibit G-3, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; *provided* that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit G-4 on behalf of each such direct and indirect partner; and

(C)     any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Withholding Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Withholding Agent), executed originals of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit the Withholding Agent to determine the withholding or deduction required to be made.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Withholding Agent in writing of its legal inability to do so.

(g)     FATCA.  If a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender fails to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Withholding Agent, at the time or times prescribed by law and at such time or times reasonably requested by the Withholding Agent, such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Withholding Agent as may be necessary for the Withholding Agent to comply with its obligations under FATCA, to determine that such Lender

63

has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment.  Solely for purposes of this Section 5.03(g), "FATCA" shall include any amendments made to FATCA after the date of this Agreement. Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Withholding Agent in writing of its legal inability to do so.

(h)      Refunds. If the Administrative Agent, a Lender or the Issuing Bank determines in its sole discretion that it has received a refund of any Taxes as to which it has been indemnified or with respect to which the Borrower has paid additional amounts pursuant to this Section or any other provision of this Agreement, it shall pay the Borrower an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) incurred by the Administrative Agent, such Lender or the Issuing Bank, as applicable, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund), provided that the Borrower agree, upon request by the Administrative Agent, such Lender or the Issuing Bank, as applicable, to repay the amount paid over to the Borrower (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Administrative Agent, such Lender or the Issuing Bank, as applicable if it is required to repay such refund to the Governmental Authority. Notwithstanding anything herein to the contrary, neither the Administrative Agent, the Issuing Bank or any Lender shall be required to pay any amount to the Borrower if such payment would place the Administrative Agent, such Lender or the Issuing Bank, as applicable, in a less favorable net after-Tax position than it would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. In no event shall the Administrative Agent, such Lender or the Issuing Bank, as applicable be required to make its Tax returns (or any other information relating to its Taxes that it deems confidential in its sole discretion) available to the Borrower.

(i)      Survival. Each party's rights and obligations under (i) this Section 5.03 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of a Lender, and the repayment, satisfaction, discharge or full payment of any Loans.

Section 5.04    Mitigation Obligations; Replacement of Lenders.

(a)      Designation of Different Lending Office.   If any Lender requests compensation under Section 5.01, or if the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 5.03, then such Lender shall (at the request of the Borrower) use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the reasonable judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 5.01 or Section 5.03, as the case may be, in the future and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender.  The Borrower hereby agrees to pay all reasonable

64

costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)     Replacement of Lenders.  If any Lender requests compensation under Section 5.01, or if the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 5.03, or if any Lender shall require that its Loans be made and/or maintained as ABR Loans rather than Eurodollar Loans pursuant to Section 5.05, or if any Lender becomes a Defaulting Lender hereunder, then the Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in Section 12.04(a)), all its interests, rights (other than its existing rights to payments pursuant to Section 5.01 or Section 5.03) and obligations under this Agreement to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); *provided* that (i) the Borrower shall have received the prior written consent of the Administrative Agent, which consent shall not unreasonably be withheld, (ii) such Lender shall have received payment of an amount equal to the outstanding principal of its Loans and participations in LC Disbursements, accrued interest thereon, accrued fees (subject to Section 3.05(d)) and all other amounts payable to it hereunder, from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts), and (iii) in the case of any such assignment resulting from a claim for compensation under Section 5.01 or payments required to be made pursuant to Section 5.03, such assignment will result in a reduction in such compensation or payments.  A Lender shall not be required to make any such assignment and delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply.

Section 5.05   Illegality.  Notwithstanding any other provision of this Agreement, in the event that it becomes unlawful for any Lender or its applicable lending office to honor its obligation to make or maintain Eurodollar Loans either generally or having a particular Interest Period hereunder, then (a) such Lender shall promptly notify the Borrower and the Administrative Agent thereof, and such Lender's obligation to make such Eurodollar Loans shall be suspended (the "Affected Loans") until such time as such Lender may again make and maintain such Eurodollar Loans and (b) all Affected Loans which would otherwise be made by such Lender shall be made instead as ABR Loans (and, if such Lender so requests by notice to the Borrower and the Administrative Agent, all Affected Loans of such Lender then outstanding shall be automatically converted into ABR Loans on the date specified by such Lender in such notice) and, to the extent that Affected Loans are so made as (or converted into) ABR Loans, all payments of principal which would otherwise be applied to such Lender's Affected Loans shall be applied instead to its ABR Loans.

**ARTICLE VI**
**CONDITIONS PRECEDENT**

Section 6.01   Effective Date.  The obligations of the Lenders to make or, in accordance with Section 2.01(b), convert Loans and of the Issuing Bank to issue Letters of Credit hereunder (exclusive of the Existing Letters of Credit) shall not become effective until the date on which each of the following conditions is satisfied (or waived in accordance with Section 12.02):

(a)      (i) the Bankruptcy Court shall have entered a final order satisfactory to the Administrative Agent confirming the Plan of Reorganization (the "Confirmation Order") and all conditions to the Effective Date (as defined in the Plan of Reorganization) of the Plan of Reorganization shall have been satisfied (or will be satisfied upon the occurrence of the Effective Date) or waived in accordance with the terms of the Plan, (ii) the Confirmation Order shall approve the Loan Documents and authorize the Loan Parties' execution and delivery thereof, (iii) the Confirmation Order shall be in full force and effect and shall not be stayed and (iv) the Effective Date (as defined in the Plan of Reorganization) shall occur concurrently with the effectiveness of this Agreement, without waiver or modification that would be reasonably expected to adversely affect the interests of the Administrative Agent, the Issuing Bank or the Lenders, unless consented to by the Administrative Agent;

(b)      the Administrative Agent and the Lenders shall have received all commitment, facility and agency fees and all other fees and amounts due and payable on or prior to the Effective Date, including, to the extent invoiced, reimbursement or payment of all reasonable out-of-pocket expenses required to be reimbursed or paid by the Borrower hereunder (including, without limitation, the reasonable fees and expenses of Linklaters LLP and Vinson & Elkins LLP, each counsel to the Administrative Agent);

(c)      the Administrative Agent shall have received a certificate of the Secretary or an Assistant Secretary of the Borrower, each Guarantor and the Public Parent setting forth (i) resolutions of its Board of Directors (or comparable governing body) with respect to the authorization of the Borrower or such Guarantor to execute and deliver the Loan Documents to which it is a party and to enter into the transactions contemplated in those documents, (ii) the officers of the Borrower or such Guarantor (y) who are authorized to sign the Loan Documents to which the Borrower or such Guarantor is a party and (z) who will, until replaced by another officer or officers duly authorized for that purpose, act as its representative for the purposes of signing documents and giving notices and other communications in connection with this Agreement and the transactions contemplated hereby, (iii) specimen signatures of such authorized officers, and (iv) the Organizational Documents of the Borrower and such Guarantor, certified as being true and complete (each in form and substance reasonably acceptable to the Administrative Agent).  The Administrative Agent and the Lenders may conclusively rely on such certificate until the Administrative Agent receives notice in writing from the Borrower to the contrary;

(d)      the Administrative Agent shall have received certificates of the appropriate State agencies with respect to the existence, qualification and good standing of the Loan Parties and the Public Parent;

(e)      the Administrative Agent shall have received from each party hereto, counterparts (in such number as may be requested by the Administrative Agent) of this Agreement signed on behalf of such party;

(f)      the Administrative Agent shall have received duly executed Notes payable to each Lender in a principal amount equal to its Maximum Credit Amount dated as of the date hereof;

(g)      the Administrative Agent shall have received from each party thereto, duly executed counterparts (in such number as may be requested by the Administrative Agent) of the Security Instruments, including the Security Agreement, the Pledge Agreement, the Guaranty Agreement, the amended mortgages and the other Security Instruments described on Exhibit E-1. In connection with the execution and delivery of the Security Instruments, the Administrative Agent shall:

(i)      be reasonably satisfied that the Security Instruments will, when properly recorded (or when the applicable financing statements related thereto are properly filed) create first priority, perfected Liens (subject only to Excepted Liens identified in clauses (a) to (d), (f) and (g) of the definition thereof, but subject to the provisos at the end of such definition) on at least 95% of the total value of the Oil and Gas Properties evaluated in the Initial Reserve Report and on all other Property purported to be pledged as collateral pursuant to the Security Instruments; and

(ii)      have received certificates, together with undated, blank stock powers for each such certificate, representing all of the issued and outstanding Equity Interests required to be pledged pursuant to Section 8.14 and the Pledge Agreement;

(h)      the Administrative Agent shall have received an opinion of (i) Weil, Gotshal & Manges LLP, counsel to the Loan Parties and (ii) local counsel in each of the following states: California, Texas and Wyoming, in each case in form and substance reasonably acceptable to the Administrative Agent and its counsel;

(i)      the Administrative Agent shall have received a certificate of insurance coverage of the Loan Parties evidencing that the Loan Parties are carrying insurance in accordance with Section 7.12;

(j)      the Administrative Agent shall have received title information as the Administrative Agent may reasonably require satisfactory to the Administrative Agent setting forth the status of title to at least 95% of the total value of the Oil and Gas Properties evaluated in the Initial Reserve Report;

(k)      the Administrative Agent shall be reasonably satisfied with the environmental condition of the Oil and Gas Properties of the Loan Parties;

(l)      the Administrative Agent shall have received a certificate of a Responsible Officer of the Borrower certifying that (i) the Borrower has received all consents and approvals required by Section 7.03 and (ii) there is no litigation, governmental, administrative or judicial action or proceeding pending or, to the knowledge of any Responsible Officer of the Borrower, threatened in any court or before any Governmental Authority that could reasonably be expected to restrain or prevent the Transactions;

(m)      the Administrative Agent shall have received the financial statements referred to in Section 7.04(a) and the Initial Reserve Report accompanied by a certificate covering the matters described in Section 8.12(c) (other than Section 8.12(c)(iv) and (v));

(n)     the Administrative Agent shall have received appropriate UCC search certificates and county-level real property record search results reflecting no prior Liens encumbering the Properties of the Loan Parties for each jurisdiction requested by the Administrative Agent; other than those being assigned or released on or prior to the Effective Date or Liens permitted by Section 9.03;

(o)     the Administrative Agent shall have received a certificate of the Financial Officer of the Parent certifying that after giving effect to the transactions contemplated hereby, the Parent is Solvent;

(p)     the Administrative Agent shall have received from the Borrower a written policy regarding the Loan Parties' marketing activities for Hydrocarbons and furnish a copy thereof to the Administrative Agent and the Lenders, such policy to be in form and substance reasonably satisfactory to the Majority Lenders;

(q)     on the Effective Date, none of the Loan Parties shall have any Debt (other than Indebtedness or Debt permitted hereunder);

(r)     the Administrative Agent shall have received the Initial Reserve Report;

(s)     the Lenders shall have received at least ten Business Days prior to the Effective Date, to the extent requested 15 Business Days prior to the Effective Date, all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the Act;

(t)     the Borrower shall have paid all interest, fees, and other amounts owing (excluding amounts owed for principal or undrawn letters of credit), including expense reimbursement obligations, outstanding under the Prepetition RBL Credit Agreement;

(u)     since December 31, 2016, there shall not have occurred any Material Adverse Effect;

(v)     [reserved];

(w)     [the Administrative Agent shall have received, and satisfactorily completed its review of, information regarding litigation, tax, accounting, labor, insurance, pension liabilities (actual or contingent), real estate leases, material contracts, debt agreements, property ownership, and contingent liabilities of the Parent, the Borrower and their respective subsidiaries;][3]

(x)     the Administrative Agent and the Lenders shall have received (i) a pro forma balance sheet as to the Parent and the Consolidated Subsidiaries after giving effect to all elements of the Transactions to be effected on or before the Effective Date, and (ii) forecasts prepared by management of the Borrower, of balance sheets and income statements on a quarterly basis for the first year following the Effective Date and on an annual basis for each year thereafter during the term of this Agreement;

---

[3]     Diligence expected to be completed prior to closing, at which time the condition will be removed.

(y)      the capitalization, structure and equity ownership of each Loan Party after giving effect to the consummation of the Transactions shall be reasonably satisfactory to the Administrative Agent;

(z)      after giving effect to the initial Borrowings hereunder on the Effective Date, Availability shall be not less than $[23,700,000][4];

(aa)     the Administrative Agent shall have received copies of executed Swap Agreements that the Borrower or any other Loan Party shall have entered into on terms consistent with Section 9.18 with Lenders or Affiliates of Lenders to hedge a notional volume of not less than, in the aggregate, 50% of the reasonably anticipated projected production of Hydrocarbons from Proved Developed Producing Reserves included in the most recent Reserve Report for each calendar month during 2017 and 2018 of crude oil, natural gas and natural gas liquids, (which, in the case of natural gas liquids, may be hedged with Swap Agreements for crude oil), each calculated separately, that satisfy the following requirements:[5]

| Fiscal Year | Oil (Mbl) | | Gas (MMcf) | |
| --- | --- | --- | --- | --- |
| | Volume | Strike | Volume | Strike |
| 2017 | 804 | $51.96 | 4,730 | $3.285 |
| 2018 | 469 | $53.13 | 4,336 | $3.016 |

(bb)     [reserved]; and

(cc)     the Administrative Agent shall have received such other documents as the Administrative Agent or special counsel to the Administrative Agent may reasonably request.

Without limiting the generality of the provisions of Section 11.04, for purposes of determining compliance with the conditions specified in this Section 6.01, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required under this Section 6.01 to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received notice from such Lender prior to the Effective Date specifying its objection thereto.  All documents executed or submitted pursuant to this Section 6.01 by and on behalf of the Parent or any of its Subsidiaries shall be in form and substance reasonably satisfactory to the Administrative Agent and its counsel.  The Administrative Agent shall notify the Borrower and the Lenders of the Effective Date, and such notice shall be conclusive and binding.

Section 6.02   Each Credit Event.   The obligation of each Lender to make or, in accordance with Section 2.01(b), convert a Loan on the occasion of any Borrowing, and of the

---

[4]      Calculated as 5% of the Borrowing Base on the Effective Date after giving effect to all borrowings made or repaid on such date.

[5]      To be moved to post-closing if not satisfied prior to the Effective Date.

Issuing Bank to issue, increase, renew or extend any Letter of Credit, is subject to the satisfaction of the following conditions:

(a)     at the time of and immediately after giving effect to such Borrowing or the issuance, increase, renewal or extension of such Letter of Credit, as applicable, (and, in the case of the initial funding, after giving effect to the terms of the Plan of Reorganization) no Default or Borrowing Base Deficiency shall have occurred and be continuing;

(b)     at the time of and immediately after giving effect to such Borrowing or the issuance, increase, renewal or extension of such Letter of Credit, as applicable, no event, development or circumstance has occurred or shall then exist that has resulted in, or could reasonably be expected to have, a Material Adverse Effect;

(c)     the representations and warranties of the Loan Parties and the Public Parent set forth in this Agreement and in the other Loan Documents shall be true and correct in all material respects on and as of the date of such Borrowing or the date of issuance, increase, renewal or extension of such Letter of Credit, as applicable, except that (i) to the extent any such representations and warranties are expressly limited to an earlier date, in which case, on and as of the date of such Borrowing or the date of issuance, increase, renewal or extension of such Letter of Credit, as applicable, such representations and warranties shall continue to be true and correct in all material respects as of such specified earlier date and (ii) to the extent that any such representation and warranty is qualified by materiality, such representation and warranty shall continue to be true and correct in all respects;

(d)     the making of such Loan or the issuance, increase, renewal or extension of such Letter of Credit, as applicable, shall not be prohibited by any applicable Governmental Requirement, and no litigation shall be pending or threatened, which does or, with respect to any threatened litigation, seeks to, enjoin, prohibit or restrain, the making or repayment of any Loan, the issuance, increase, renewal, extension or repayment of any Letter of Credit or any participations therein or the consummation of the transactions contemplated by this Agreement or any other Loan Document;

(e)     the receipt by the Administrative Agent of a Borrowing Request in accordance with Section 2.03 or a request for a Letter of Credit in accordance with Section 2.08(b), as applicable; and

(f)     (i) at the time of such Borrowing before giving effect thereto, the Borrower and the Loan Parties shall not have any Excess Cash and (ii) such Borrowing (after giving effect to the use of proceeds therefrom (as certified by the Borrower in the applicable Borrowing Request) on or around such date, but in any event, not to exceed two Business Days after such date), shall not trigger a mandatory prepayment under Section 3.04(e).

Each request for a Borrowing and each request for the issuance, amendment, renewal or extension of any Letter of Credit shall be deemed to constitute a representation and warranty by the Borrower on the date thereof as to the matters, and to the extent, specified in Section 6.02(a) through (f).

**ARTICLE VII**
**REPRESENTATIONS AND WARRANTIES**

Each of the Parent and the Borrower represents and warrants to the Lenders that:

Section 7.01   Organization; Powers.  Each of the Loan Parties is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, has all requisite power and authority, and has all material governmental licenses, authorizations, consents and approvals necessary, to own its assets and to carry on its business as now conducted, and is qualified to do business in, and is in good standing in, every jurisdiction where such qualification is required, except where failure to have such power, authority, licenses, authorizations, consents, approvals and qualifications could not reasonably be expected to have a Material Adverse Effect.

Section 7.02   Authority; Enforceability.  The Transactions are within the Loan Parties' respective corporate, limited liability company or limited partnership powers and have been duly authorized by all necessary corporate, limited liability company or limited partnership and, if required, stockholder action (including, without limitation, any action required to be taken by any class of directors of the Borrower or any other Person, whether interested or disinterested, in order to ensure the due authorization of the Transactions).  Each Loan Document to which any Loan Party is a party has been duly executed and delivered by the Borrower and such Guarantor and constitutes a legal, valid and binding obligation of each Loan Party party thereto, as applicable, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

Section 7.03   Approvals; No Conflicts.  The Transactions (a) do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority or any other third Person (including shareholders, members, partners or any class of directors or managers, whether interested or disinterested, of the Borrower or any other Person), nor is any such consent, approval, registration, filing or other action necessary for the validity or enforceability of any Loan Document or the consummation of the transactions contemplated thereby, except such as have been obtained or made and are in full force and effect, other than (i) the recording and filing of the Security Instruments as required by this Agreement and (ii) those third party approvals or consents which, if not made or obtained, could not reasonably be expected to have a Material Adverse Effect or do not have an adverse effect on the enforceability of the Loan Documents, (b) will not violate any applicable law or regulation or the charter, bylaws or other Organizational Documents of any Loan Party or any order of any Governmental Authority, (c) will not violate or result in a default under any indenture or other material agreement binding upon any Loan Party or its Properties, or give rise to a right thereunder to require any payment to be made by any Loan Party and (d) will not result in the creation or imposition of any Lien on any material Property of any Loan Party (other than the Liens created by the Loan Documents).

Section 7.04    <u>Financial Condition; No Material Adverse Change</u>.

(a)    The Borrower has heretofore furnished to the Lenders the combined balance sheet and statements of income, unit holders' equity and cash flows of Memorial Production Partners LP as of and for the fiscal year ended December 31, 2016, reported on by KPMG LLP, independent public accountants.   Such financial statements present fairly, in all material respects, the financial position and results of operations and cash flows of Memorial Production Partners LP and its Consolidated Subsidiaries as of such date and for such period in accordance with GAAP, subject to year-end audit adjustments and the absence of footnotes in the case of the unaudited quarterly financial statements.

(b)    Since December 31, 2016, there has been no event, development or circumstance that has had or could reasonably be expected to have a Material Adverse Effect.

(c)    As of the Effective Date, no Loan Party nor, to the knowledge of any Loan Party, the Public Parent has any material Debt (including Disqualified Capital Stock) or any material contingent liabilities, material off-balance sheet liabilities or material partnerships, material liabilities for taxes, unusual material forward or long-term commitments or material unrealized or anticipated losses from any unfavorable commitments, except as referred to or reflected or provided for in the Financial Statements.

Section 7.05    <u>Litigation</u>.

(a)    Except as set forth on <u>Schedule 7.05</u>, there are no actions, suits, investigations or proceedings by or before any arbitrator or Governmental Authority pending against or, to the knowledge of the Borrower, threatened against or affecting any Loan Party (i) not fully covered by insurance (except for normal deductibles) which could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect, or (ii) that involve any Loan Document or the Transactions.

(b)    Since the date of this Agreement, there has been no change in the status of the matters disclosed in <u>Schedule 7.05</u> that, individually or in the aggregate, has resulted in a Material Adverse Effect.

Section 7.06    <u>Environmental Matters</u>.    Except for such matters as set forth on <u>Schedule 7.06</u> or that, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect on any Loan Party:

(a)    the Loan Parties and each of their respective Properties and operations thereon are, and within all applicable statute of limitation periods have been, in compliance with all applicable Environmental Laws;

(b)    the Loan Parties have obtained all Environmental Permits required for their respective operations and each of their Properties, with all such Environmental Permits being currently in full force and effect, and none of Borrower or the other Loan Parties has received any written notice or otherwise has knowledge that any such existing Environmental Permit will be revoked or that any application for any new Environmental Permit or renewal of any existing Environmental Permit will be protested or denied;

(c)     there are no claims, demands, suits, orders, inquiries or proceedings concerning any violation of, or any liability (including as a potentially responsible party) under, any applicable Environmental Laws that is pending or, to Borrower's knowledge, threatened against any Loan Party or any of their respective Properties or as a result of any operations at such Properties;

(d)     none of the Properties of the Loan Parties contain or have contained any: (i) underground storage tanks, (ii) asbestos-containing materials, (iii) landfills or dumps, (iv) hazardous waste management units as defined pursuant to RCRA or any comparable state law, or (v) sites on or nominated for the National Priority List promulgated pursuant to CERCLA or any state remedial priority list promulgated or published pursuant to any comparable state law;

(e)     there has been no Release or, to the Borrower's knowledge, threatened Release, of Hazardous Materials at, on, under or from the Loan Parties' Properties, there are no investigations, remediations, abatements, removals or monitorings of Hazardous Materials required under applicable Environmental Laws at such Properties and, to the knowledge of the Borrower, none of such Properties are adversely affected by any Release or threatened Release of a Hazardous Material originating or emanating from any other real property;

(f)     none of the Loan Parties has received any written notice asserting an alleged liability or obligation under any applicable Environmental Laws with respect to the investigation, remediation, abatement, removal or monitoring of any Hazardous Materials at, under, or Released or threatened to be Released from any real properties offsite the Borrower's or any other Loan Party's Properties and, to the Borrower's knowledge, there are no conditions or circumstances that could reasonably be expected to result in the receipt of such written notice;

(g)     there has been no exposure of any Person or Property to any Hazardous Materials as a result of or in connection with the operations and businesses of any of the Loan Parties' Properties that could reasonably be expected to form the basis for a claim for damages or compensation; and

(h)     the Loan Parties have provided to the Lenders complete and correct copies of all material environmental site assessment reports, investigations, studies, analyses, and correspondence on environmental matters (including matters relating to any alleged non-compliance with or liability under Environmental Laws) that are in any of the Borrower's or any other Loan Party's possession or control and relating to their respective Properties or operations thereon.

Section 7.07   Compliance with the Laws and Agreements; No Defaults or Borrowing Base Deficiency.

(a)     Each of the Loan Parties is in compliance with all Governmental Requirements applicable to it or its Property and all agreements and other instruments binding upon it or its Property, and possesses all licenses, permits, franchises, exemptions, approvals and other governmental authorizations necessary for the ownership of its Property and the conduct of its business, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

(b)     None of the Loan Parties is in default nor has any event or circumstance occurred which, but for the expiration of any applicable grace period or the giving of notice, or both, would constitute a default or would require the Borrower or any other Loan Party to Redeem or make any offer to Redeem under any indenture, note, credit agreement or instrument pursuant to which any Material Indebtedness is outstanding or by which the Borrower or any other Loan Party or any of their Properties is bound.

(c)     No Default or Borrowing Base Deficiency has occurred and is continuing.

Section 7.08    Investment Company Act.  None of the Loan Parties is an "investment company" or a company "controlled" by an "investment company," within the meaning of, or subject to regulation under, the Investment Company Act of 1940, as amended.

Section 7.09    Taxes.  Each of the Loan Parties and, to the knowledge of any Loan Party, the Public Parent has timely filed or caused to be filed all Tax returns and reports required to have been filed, and has paid or caused to be paid all Taxes required to have been paid by it, except (a) Taxes that are being contested in good faith by appropriate proceedings and for which the Borrower or such other Loan Party or the Public Parent, as applicable, has set aside on its books adequate reserves in accordance with GAAP, or (b) to the extent that the failure to do so could not reasonably be expected to result in a Material Adverse Effect.  The charges, accruals and reserves on the books of the Loan Parties and, to the knowledge of any Loan Party, the Public Parent in respect of Taxes and other governmental charges are, in the reasonable opinion of the Borrower, adequate under GAAP.  No Tax Lien, other than an Excepted Lien, has been filed and, to the knowledge of any Loan Party, no claim is being asserted with respect to any such Tax or other such governmental charge.

Section 7.10    ERISA.

(a)     The Loan Parties and each ERISA Affiliate have complied in all material respects with ERISA and, where applicable, the Code regarding each Plan.

(b)     Each Plan is, and has been, established and maintained in substantial compliance with its terms, ERISA and, where applicable, the Code.

(c)     No act, omission or transaction has occurred which could result in imposition on the Borrower, any other Loan Party or any ERISA Affiliate (whether directly or indirectly) of (i) either a civil penalty assessed pursuant to subsections (c), (i), (l) or (m) of Section 502 of ERISA or a tax imposed pursuant to Chapter 43 of Subtitle D of the Code or (ii) breach of fiduciary duty liability damages under Section 409 of ERISA.

(d)     Full payment when due has been made of all amounts which the Borrower, the other Loan Parties or any ERISA Affiliate is required under the terms of each Plan or applicable law to have paid as contributions to such Plan as of the date hereof.

(e)     None of the Loan Parties nor any ERISA Affiliate sponsors, maintains or contributes to an employee welfare benefit plan, as defined in Section 3(1) of ERISA, including, without limitation, any such plan maintained to provide benefits to former employees of such

entities, that may not be terminated by the Borrower, any other Loan Party or any ERISA Affiliate in its sole discretion at any time without any material liability.

(f)        None of the Loan Parties nor any ERISA Affiliate sponsors, maintains or contributes to, or has at any time in the six-year period preceding the date hereof sponsored, maintained or contributed to, any employee pension benefit plan, as defined in Section 3(2) of ERISA, that is subject to Title IV of ERISA, Section 302 of ERISA or Section 412 of the Code.

Section 7.11    Disclosure; No Material Misstatements.  The Borrower has disclosed to the Administrative Agent and the Lenders all agreements, instruments and corporate or other restrictions to which any Loan Party is subject, and all other matters known to it, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.  None of the reports, financial statements, certificates or other information (other than information of a general economic or industry specific nature) furnished in writing by or on behalf of the Loan Parties to the Administrative Agent or any Lender or any of their Affiliates in connection with the negotiation of this Agreement or any other Loan Document or delivered hereunder or under any other Loan Document (as modified or supplemented by other information so furnished), when taken as a whole, contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading; *provided* that, with respect to projected financial information and other forward looking statements, the Borrower represents only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time (it being understood that such projections and other forward looking statements are not to be viewed as facts and are subject to uncertainties and contingencies, and that actual results may vary and such variances may be material).  There are no statements or conclusions in any Reserve Report which are based upon or include materially misleading information or fail to take into account material information regarding the matters reported therein, it being understood that projections concerning volumes attributable to the Oil and Gas Properties of the Borrower and the other Loan Parties and production and cost estimates contained in each Reserve Report are necessarily based upon professional opinions, estimates and projections and that the Borrower and the other Loan Parties do not warrant that such opinions, estimates and projections will ultimately prove to have been accurate.

Section 7.12    Insurance.  The Loan Parties have (a) all insurance sufficient for the compliance by each of them with all material Governmental Requirements and all material agreements including, without limitation, Flood Insurance, if required, and (b) insurance coverage in at least amounts and against such risk (including, without limitation, public liability) that are usually insured against by companies similarly situated and engaged in the same or a similar business for the assets and operations of the Loan Parties.  The Administrative Agent and the Lenders have been named as additional insureds in respect of such liability insurance policies and the Administrative Agent has been named as loss payee with respect to Property loss insurance.  No Loan Party owns any material Building (as defined in the applicable Flood Insurance Regulation) or material Manufactured (Mobile) Home (as defined in the applicable Flood Insurance Regulation) located on a Mortgaged Property for which such Loan Party has not delivered to the Administrative Agent evidence reasonably satisfactory to the Administrative Agent that (a) such Loan Party maintains Flood Insurance for such Building or Manufactured (Mobile) Home, or (b) such Building or Manufactured (Mobile) Home is not located in a Special

75

Flood Hazard Area, unless such Building or Manufactured (Mobile) Home has been expressly excluded from the property that is subject to the mortgage on such Mortgaged Property.

Section 7.13   Restriction on Liens.  None of the Loan Parties is a party to any material agreement or arrangement, or subject to any order, judgment, writ or decree, which either restricts or purports to restrict its ability to grant Liens to the Administrative Agent and the Secured Parties on or in respect of their Properties to secure the Indebtedness and the Loan Documents.

Section 7.14   Subsidiaries.  Except as set forth on Schedule 7.14 or as disclosed in writing to the Administrative Agent (which shall promptly furnish a copy to the Lenders), which shall be a supplement to Schedule 7.14, the Parent has no Subsidiaries, the Parent has no Foreign Subsidiaries and each Subsidiary on such schedule is (a) a Wholly-Owned Subsidiary and (b) unless otherwise indicated, a Material Subsidiary.

Section 7.15   Location of Business and Offices.   The Borrower's jurisdiction of organization is Delaware; the name of the Borrower as listed in the public records of its jurisdiction of organization is Amplify Energy Operating LLC; and the organizational identification number of the Borrower in its jurisdiction of organization is [4992976] (or, in each case, as set forth in a notice delivered to the Administrative Agent pursuant to Section 8.01(n) in accordance with Section 12.01).  The Borrower's principal place of business and chief executive offices are located at the address specified in Section 12.01 (or as set forth in a notice delivered pursuant to Section 8.01(n) and Section 12.01(c)).  Each Guarantor's jurisdiction of organization, name as listed in the public records of its jurisdiction of organization, organizational identification number in its jurisdiction of organization and the location of its principal place of business and chief executive office is stated on Schedule 7.14 (or as set forth in a notice delivered pursuant to Section 8.01(n)).

Section 7.16   Properties; Titles, Etc.

(a)      Each of the Loan Parties has good and defensible title to the Oil and Gas Properties evaluated in the most recently delivered Reserve Report, and good title to all its material personal Properties, in each case, free and clear of all Liens except Liens permitted by Section 9.03.  After giving full effect to the Excepted Liens, the Loan Party specified as the owner owns the net interests in production attributable to the Hydrocarbon Interests as reflected in the most recently delivered Reserve Report, and the ownership of such Properties shall not in any material respect obligate such Loan Party to bear the costs and expenses relating to the maintenance, development and operations of each such Property in an amount in excess of the working interest of each Property set forth in the most recently delivered Reserve Report that is not offset by a corresponding proportionate increase in the Borrower's or such other Loan Party's net revenue interest in such Property.

(b)      All material leases and agreements necessary for the conduct of the business of the Loan Parties are valid and subsisting, in full force and effect, and there exists no default or event or circumstance which with the giving of notice or the passage of time or both would give rise to a default under any such leases or agreements, which could reasonably be expected to have a Material Adverse Effect.

(c)     The rights and Properties presently owned, leased or licensed by each Loan Party including, without limitation, all easements and rights of way, include all rights and Properties necessary to permit each Loan Party to conduct its business in all material respects in the same manner as its business has been conducted prior to the date hereof.

(d)     All of the Properties of the Loan Parties which are reasonably necessary for the operation of their businesses are in good working condition and are maintained in accordance with prudent business standards except for such failure as to condition or maintenance as could not be reasonably expected to have a Material Adverse Effect.

(e)     Each Loan Party owns, or is licensed to use, all trademarks, tradenames, copyrights, patents and other intellectual Property material to its business, and the use thereof by the Borrower and such other Loan Parties does not infringe upon the rights of any other Person, except for any such infringements that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.  The Loan Parties either own or have valid licenses or other rights to use all databases, geological data, geophysical data, engineering data, seismic data, maps, interpretations and other technical information used in their businesses as presently conducted, subject to the limitations contained in the agreements governing the use of the same, which limitations are customary for companies engaged in the business of the exploration and production of Hydrocarbons, with such exceptions as could not reasonably be expected to have a Material Adverse Effect.

Section 7.17   Maintenance of Properties.  Except for such acts or failures to act as could not be reasonably expected to have a Material Adverse Effect, the Oil and Gas Properties (and Properties unitized therewith) of the Loan Parties have been maintained, operated and developed in a good and workmanlike manner and in conformity with all Governmental Requirements and in conformity with the provisions of all leases, subleases or other contracts comprising a part of the Hydrocarbon Interests and other contracts and agreements forming a part of the Oil and Gas Properties of the Borrower and the other Loan Parties.  Specifically in connection with the foregoing, except for those as could not be reasonably expected to have a Material Adverse Effect, (i) no Oil and Gas Property of the Loan Parties is subject to having allowable production reduced below the full and regular allowable (including the maximum permissible tolerance) because of any overproduction (whether or not the same was permissible at the time), and (ii) none of the wells comprising a part of the Oil and Gas Properties (or Properties unitized therewith) of the Loan Parties is deviated from the vertical more than the maximum permitted by Governmental Requirements, and such wells are, in fact, bottomed under and are producing from, and the well bores are wholly within, the Oil and Gas Properties (or in the case of wells located on Properties unitized therewith, such unitized Properties) of the Loan Parties.  All pipelines, wells, gas processing plants, platforms and other material improvements, fixtures and equipment owned, in whole or in part, by the Loan Parties that are necessary to conduct normal operations are being maintained in a state adequate to conduct normal operations, and with respect to such of the foregoing which are operated by the Loan Parties, in a manner consistent with the Loan Parties' past practices (other than those the failure of which to maintain in accordance with this Section 7.17 could not reasonably be expected to have a Material Adverse Effect).

Section 7.18   Gas Imbalances, Prepayments.  Except as set forth on Schedule 7.18 or on the most recent certificate delivered pursuant to Section 8.12(c), on a net basis there are no gas imbalances, take or pay or other prepayments which would require the Parent or any of its Subsidiaries to deliver Hydrocarbons produced from their Oil and Gas Properties at some future time without then or thereafter receiving full payment therefor exceeding one-half bcf of gas (on an mcf equivalent basis) in the aggregate.

Section 7.19   Marketing of Production.  Except for contracts listed and in effect on the date hereof on Schedule 7.19, and thereafter either disclosed in writing to the Administrative Agent or included in the most recently delivered Reserve Report (with respect to all of which contracts the Borrower represents that it or its Subsidiaries are receiving a price for all production sold thereunder which is computed substantially in accordance with the terms of the relevant contract and are not having deliveries curtailed substantially below the subject Property's delivery capacity), no material agreements exist which are not cancelable on 60 days' notice or less without penalty or detriment for the sale of production from the Borrower's or the other Loan Parties' Hydrocarbons (including, without limitation, calls on or other rights to purchase, production, whether or not the same are currently being exercised) that (a) pertain to the sale of production at a fixed price and (b) have a maturity or expiry date of longer than six (6) months from the date hereof.

Section 7.20   Swap Agreements and Qualified ECP Guarantor.  Schedule 7.20, as of the date hereof, and after the date hereof, each report required to be delivered by the Borrower pursuant to Section 8.01(e), sets forth, a true and complete list of all Swap Agreements of the Borrower and each other Loan Party, the material terms thereof (including the type, term, effective date, termination date and notional amounts or volumes), the net mark-to-market value thereof, all credit support agreements relating thereto and the counterparty to each such agreement.   The Borrower has total assets exceeding $10,000,000 and is a Qualified ECP Guarantor.

Section 7.21   Use of Loans, Letters of Credit and Beta Freed Cash.  The proceeds of the Loans and the Letters of Credit shall be used to (a) provide additional liquidity for working capital and general corporate purposes and (b) fund distributions under the Plan of Reorganization and pay other administrative expenses of the Debtors incurred during the Bankruptcy Proceedings. The Beta Freed Cash shall be used for (i) the Noteholder Distribution to the extent permitted hereunder and (ii) general corporate purposes (which shall exclude, for the avoidance of doubt, any Restricted Payments). The Loan Parties are not engaged principally, or as one of its or their important activities, in the business of extending credit for the purpose, whether immediate, incidental or ultimate, of buying or carrying margin stock (within the meaning of Regulation T, U or X of the Board).  No part of the proceeds of any Loan or Letter of Credit will be used for any purpose which violates the provisions of Regulations T, U or X of the Board.  No Letter of Credit will be used to post margin or collateral to secure any Loan Party's obligations under any Swap Agreement with a Person other than a Lender or an Affiliate of a Lender.

Section 7.22   Solvency.  As of the Effective Date, after giving effect to the Transactions, including the incurrence of any Debt or obligations being incurred in connection herewith, the Parent is Solvent.

Section 7.23    Anti-Corruption Laws; Anti-Money Laundering; Sanctions.

(a)    None of the members of the Group or, to the knowledge of any Loan Party, any director, officer, employee, or agent acting on behalf of a member of the Group (i) (A) has used any corporate funds for any unlawful contribution, gift, entertainment or other unlawful expense relating to political activity or (B) offered, paid, given, promised to pay, authorized the payment of, or taken any action in furtherance of the payment of anything of value directly or, to the knowledge of any Loan Party, indirectly to a Government Official or any other person to improperly influence the recipient's action or otherwise to obtain or retain business or to secure an improper business advantage, in the cases of clauses (A) and (B), in violation of any applicable Anti-Corruption Laws; or (ii) violated or is in violation of any provision of any Anti-Corruption Laws.

(b)    The operations of each member of the Group are and have been conducted at all times in compliance in all material respects with all applicable Anti-Money Laundering Laws and no action, suit or proceeding by or before any Governmental Authority or any arbitrator involving a member of the Group with respect to applicable Anti-Money Laundering Laws is pending and no such actions, suits or proceedings are threatened or contemplated.

(c)    In connection with this Agreement, the Loans and all of its business with the Lenders, the Borrower has not violated any economic or financial sanctions or trade embargoes implemented, administered or enforced by the French, UK or US governments or the UN or the EU or other relevant sanctions authority (collectively, "Sanctions").

## ARTICLE VIII
## AFFIRMATIVE COVENANTS

Until the Commitments have expired or been terminated and the principal of and interest on each Loan and all fees payable hereunder and all other amounts payable under the Loan Documents then outstanding (other than contingent expense reimbursement, tax gross-up or yield protection obligations in each case for which no claim has been made) shall have been paid in full and all Letters of Credit shall have expired or terminated (other than Letters of Credit which have been cash collateralized (on terms reasonably acceptable to the Issuing Bank) or otherwise addressed in a manner satisfactory to the Issuing Bank) and all LC Disbursements shall have been reimbursed, each of the Parent and the Borrower covenants and agrees with the Lenders that:

Section 8.01    Financial Statements; Other Information. The Borrower or the Parent will furnish to the Administrative Agent and each Lender:

(a)    Annual Financial Statements. As soon as available, but in any event in accordance with then applicable law and not later than 105 days after the end of each fiscal year of the Parent (or, if the Public Parent is a Passive Holding Company, the Public Parent), its audited consolidated balance sheet and related statements of operations, stockholders' equity and cash flows as of the end of and for such year, setting forth in each case in comparative form the figures for the previous fiscal year, all reported on by KPMG LLP or other independent public accountants of recognized national standing (without a "going concern" or like qualification or

exception (other than any exception or qualification resulting from an upcoming maturity date of any Debt occurring within one year from the date of delivery of such report or any potential inability to satisfy a financial covenant on a future date or in a future period) and without any qualification or exception as to the scope of such audit) to the effect that such consolidated financial statements present fairly in all material respects the financial condition and results of operations of the Parent (or, if the Public Parent is a Passive Holding Company, the Public Parent) and its Consolidated Subsidiaries on a consolidated basis in accordance with GAAP consistently applied; *provided* that, if the Public Parent is a Passive Holding Company, the timely filing with the SEC of the Public Parent's annual report on Form 10-K will satisfy the reporting requirements of this Section 8.01(a); *provided*, however, for any period in which such financial statements were prepared for both the Parent and the Public Parent, the Parent, at the request of the Administrative Agent, shall provide to the Administrative Agent and each Lender a written reconciliation between the financial statements of the Parent and the Public Parent in form and substance reasonably satisfactory to the Administrative Agent.

(b)     Quarterly Financial Statements.  For each of the first three fiscal quarters of the Parent's fiscal year, as soon as available, but in any event in accordance with then applicable law and not later than 60 days after the end of each such fiscal quarter of the Parent (or, if the Public Parent is a Passive Holding Company, the Public Parent), its consolidated balance sheet and related statements of operations, stockholders' equity and cash flows as of the end of and for such fiscal quarter and the then elapsed portion of the fiscal year, setting forth in each case in comparative form the figures for the corresponding period or periods of (or, in the case of the balance sheet, as of the end of) the previous fiscal year, all certified by one of its Financial Officers as presenting fairly in all material respects the financial condition and results of operations of the Parent (or, if the Public Parent is a Passive Holding Company, the Public Parent) and its Consolidated Subsidiaries on a consolidated basis in accordance with GAAP consistently applied, subject to normal year-end audit adjustments and the absence of footnotes; *provided* that, if the Public Parent is a Passive Holding Company, the timely filing with the SEC of the Public Parent's quarterly reports on Form 10-Q will satisfy the reporting requirements of this Section 8.01(b); *provided*, however, for any period in which such financial statements were prepared for both the Parent and the Public Parent, the Parent, at the request of the Administrative Agent, shall provide to the Administrative Agent and each Lender a written reconciliation between the financial statements of the Parent and the Public Parent in form and substance reasonably satisfactory to the Administrative Agent.

(c)     Certificate of Financial Officer – Compliance.  Concurrently with any delivery of financial statements under Section 8.01(a) or Section 8.01(b), a certificate of a Financial Officer in substantially the form of Exhibit D hereto (i) certifying as to whether a Default has occurred and, if a Default has occurred, specifying the details thereof and any action taken or proposed to be taken with respect thereto, (ii) setting forth reasonably detailed calculations demonstrating compliance with Section 8.13(a), Section 8.14(a) and Section 9.01, (iii) stating whether any change in GAAP or in the application thereof has occurred since the date of the audited financial statements referred to in Section 7.04 and, if any such change has occurred, specifying the effect of such change on the financial statements accompanying such certificate and (iv) certifying a copy of the compliance certificate delivered for such fiscal period pursuant to any Permitted Unsecured Debt Document, if any.  Each such certificate shall include reasonably detailed information regarding any Material Disposition consummated during the

80

period covered by such certificate and give effect to such Material Disposition in the calculation of all financial covenants and other financial metrics required under this Agreement.

(d)     Certificate of Financial Officer – Consolidating Information.  If, at any time, all of the Consolidated Subsidiaries of the Parent are not Loan Parties, then concurrently with any delivery of financial statements under Section 8.01(a) or Section 8.01(b), a certificate of a Financial Officer setting forth consolidating spreadsheets that show all Consolidated Subsidiaries that are not Loan Parties and the eliminating entries, in such form as would be presentable to the auditors of the Parent.

(e)     Certificate of Financial Officer – Swap Agreements.  Concurrently with any delivery of financial statements under Section 8.01(a) and Section 8.01(b) and the delivery of each Reserve Report hereunder, a certificate of a Financial Officer, in form and substance satisfactory to the Administrative Agent, setting forth as of a recent date, a reasonably detailed summary of the Swap Agreements to which any Loan Party is a party on such date, which summary shall include information that is sufficient (as reasonably determined by the Administrative Agent) for purposes of determining the Borrowing Base hereunder including, without limitation, the type, term, effective date, termination date and notional amounts or volumes).

(f)     Certificate of Insurer – Insurance Coverage.  Concurrently with any delivery of financial statements under Section 8.01(a), a certificate of insurance coverage from each insurer with respect to the insurance required by Section 8.07, in form and substance satisfactory to the Administrative Agent, and, if requested by the Administrative Agent or any Lender, all copies of the applicable policies.

(g)     Other Accounting Reports.  Promptly upon receipt thereof, a copy of any "management letter" received by the Borrower or any of the Loan Parties by independent accountants that indicates, in the reasonable good faith judgment of the Board of Directors (or comparable governing body), as applicable, of the Borrower or any such other Loan Party, a material weakness in such Person's internal controls or procedures and the management's responses thereto.

(h)     SEC and Other Filings; Reports to Shareholders.  Promptly after the same become publicly available, copies of all periodic and other reports, proxy statements and other materials filed by the Public Parent or any Loan Party with the SEC, or with any national or foreign securities exchange, or distributed by the Public Parent to its equityholders generally, as the case may be; *provided* that the timely filing with the SEC of any such materials or the posting of such documents (or providing a link thereto) on the Public Parent's or such Loan Party's website on the Internet at the Public Parent's or such Loan Party's website address will satisfy the reporting requirements of this Section 8.01(h).

(i)     Notices Under Material Instruments.  Promptly after the furnishing thereof, copies of any financial statement, report or notice furnished to or by any Person pursuant to the terms of any preferred stock designation, indenture, loan or credit or other similar agreement, other than this Agreement and not otherwise required to be furnished to the Lenders pursuant to any other provision of this Section 8.01.

81

(j)      Lists of Purchasers.   Promptly following the written request of the Administrative Agent, a list of all Persons purchasing material quantities of Hydrocarbons from the Borrower or any other Loan Party.

(k)      Notice of Sales of Oil and Gas Properties.   In the event the Borrower or any other Loan Party intends to sell, transfer, assign or otherwise dispose of any Oil or Gas Properties or any Equity Interests in any Subsidiary in accordance with Section 9.12, prior written notice of such disposition, the price thereof and the anticipated date of closing and any other details thereof reasonably requested by the Administrative Agent or any Lender.

(l)      Notice of Casualty Events.   Prompt written notice, and in any event within five Business Days, of the occurrence of any Casualty Event or, to the knowledge of any Loan Party, the commencement of any action or proceeding that could reasonably be expected to result in a Casualty Event, in each case, in respect of Property of the Borrower or of any Loan Party having a fair market value in excess of $5,000,000.

(m)      Incurrence of Permitted Unsecured Debt.   In the event the Borrower intends to incur Permitted Unsecured Debt, 30 days' prior written notice of such intended incurrence of such Permitted Unsecured Debt, the amount thereof and the anticipated date of closing and, promptly when available, a copy of the preliminary offering memorandum (if any), the final offering memorandum (if any) and the final term sheet (if any), as applicable.

(n)      Information Regarding Borrower and Guarantors.   Prompt written notice (and in any event within 30 days prior thereto (or such later date as the Administrative Agent may agree in its sole discretion)) of any change (i) in the Borrower or any Guarantor's corporate name or in the ownership of its Properties, (ii) in the location of the Borrower's or any Guarantor's chief executive office or principal place of business, (iii) in the Borrower's or any Guarantor's identity or corporate structure, (iv) in the Borrower's or any Guarantor's jurisdiction of organization or such Person's organizational identification number in such jurisdiction of organization, and (v) in the Borrower's or any Guarantor's federal taxpayer identification number.

(o)      Production Report and Lease Operating Statements.   Concurrently with the delivery of each Reserve Report required to be delivered pursuant to Section 8.12(a), a report setting forth, for each calendar month during the then current fiscal year to date, the volume of production and sales attributable to production (and the prices at which such sales were made and the revenues derived from such sales) for each such calendar month from the Oil and Gas Properties, and setting forth the related ad valorem, severance and production taxes and lease operating expenses attributable thereto and incurred for each such calendar month.

(p)      Notices of Certain Changes.   Promptly, but in any event within five Business Days after the execution thereof, copies of any amendment, modification or supplement to any Organizational Document, any preferred stock designation or any other organic document of the Borrower or any other Loan Party.

(q)      Weekly Cash Balance.   Prior to 5:00 p.m., New York City time, on each Wednesday, a report showing the unrestricted cash balance and, at the request of the

Administrative Agent, the restricted cash balance, as of the prior Friday in each deposit account, securities account and commodity account (other than any deposit account, securities account or commodity account held with Wells Fargo or an Affiliate of Wells Fargo) held by each Loan Party and each Subsidiary of a Loan Party.

(r)    Annual Budget and Updated Forecasted Financial Statements. As soon as available, but in any event not later than 60 days after the end of each fiscal year of the Parent, an annual budget of the Loan Parties in form and detail reasonably satisfactory to the Administrative Agent and forecasts prepared by management of the Borrower of consolidated balance sheets and income statements for the Loan Parties on a quarterly basis for the first year following the year for which such financial statements are then being delivered under Section 8.01(a) and on an annual basis for each year thereafter during the term of this Agreement.

(s)    Other Requested Information. Promptly following any request therefor, such other information regarding the operations, business affairs and financial condition of the Borrower or any other Loan Party (including, without limitation, any Plan and any reports or other information required to be filed with respect thereto under the Code or under ERISA), or compliance with the terms of this Agreement or any other Loan Document, as the Administrative Agent or any Lender may reasonably request.

Section 8.02    Notices of Material Events. The Borrower or the Parent will furnish to the Administrative Agent and each Lender prompt written notice of the following:

(a)    the occurrence of any Default;

(b)    (i) the filing or commencement of, or the threat in writing of, any action, suit, proceeding, investigation or arbitration by or before any arbitrator or Governmental Authority against or affecting the Borrower or any Affiliate thereof not previously disclosed in writing to the Lenders or any material adverse development in any action, suit, proceeding, investigation or arbitration (whether or not previously disclosed to the Lenders) that, in either case, if adversely determined, could reasonably be expected to result in a Material Adverse Effect or (ii) one or more final, non-appealable judgments for the payment of money in an aggregate amount in excess of $10,000,000 shall have been rendered against a Loan Party; provided that, any failure to deliver such notice shall not constitute a Default or Event of Default if the aggregate amount of such judgments does not exceed $15,000,000;

(c)    the occurrence of any ERISA Event that, alone or together with any other ERISA Events that have occurred, could reasonably be expected to result in liability of the Borrower and the other Loan Parties in an aggregate amount exceeding $500,000; and

(d)    any other development that results in, or could reasonably be expected to result in, a Material Adverse Effect.

Each notice delivered under this Section 8.02 shall be accompanied by a statement of a Responsible Officer setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

83

Section 8.03   Existence; Conduct of Business.  Each of the Borrower and the Parent will, and will cause each other Loan Party to, do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence and the rights, licenses, permits, privileges and franchises material to the conduct of its business and maintain, if necessary, its qualification to do business in each other jurisdiction in which its Oil and Gas Properties is located or the ownership of its Properties requires such qualification, except where the failure to so qualify could not reasonably be expected to have a Material Adverse Effect; *provided* that the foregoing shall not prohibit any merger, consolidation, liquidation or dissolution permitted under Section 9.11.

Section 8.04   Payment of Obligations.  Each of the Borrower and the Parent (a) will, (b) will cause each other Loan Party to, and (c) to the extent that any Loan Party would be liable therefor, will procure that the Public Parent will, pay its obligations, including Tax liabilities, before the same shall become delinquent or in default, except where (x) the validity or amount thereof is being contested in good faith by appropriate proceedings, (y) the Borrower or such other Loan Party has set aside on its books adequate reserves with respect thereto in accordance with GAAP and (z) the failure to make payment pending such contest could not reasonably be expected to result in a Material Adverse Effect or result in the seizure or levy of any material Property of the Borrower or any other Loan Party.

Section 8.05   Performance of Obligations under Loan Documents.  The Borrower will pay the Notes according to the reading, tenor and effect thereof, and the Borrower will, and will cause each other Loan Party to, do and perform every act and discharge all of the obligations to be performed and discharged by it under the Loan Documents, including, without limitation, this Agreement, at the time or times and in the manner specified, taking into consideration any grace periods therein.

Section 8.06   Operation and Maintenance of Properties.  Each of the Borrower and the Parent at its sole expense will, and will cause each other Loan Party to:

(a)   operate its Oil and Gas Properties and other material Properties or cause such Oil and Gas Properties and other material Properties to be operated in a careful and efficient manner in accordance with the practices of the industry and in compliance with all applicable contracts and agreements and in compliance with all Governmental Requirements, including, without limitation, applicable pro ration requirements and Environmental Laws, and all applicable laws, rules and regulations of every other Governmental Authority from time to time constituted to regulate the development and operation of its Oil and Gas Properties and the production and sale of Hydrocarbons and other minerals therefrom, except, in each case, where the failure to comply could not reasonably be expected to have a Material Adverse Effect;

(b)   keep and maintain all Property material to the conduct of its business in good working order and condition (ordinary wear and tear excepted), preserve, maintain and keep in good repair, working order and efficiency (ordinary wear and tear and obsolescence excepted) all of its material Oil and Gas Properties and other material Properties, including, without limitation, all equipment, machinery and facilities;

(c)     promptly pay and discharge, or make reasonable and customary efforts to cause to be paid and discharged, all delay rentals, royalties, expenses and indebtedness accruing under the leases or other agreements affecting or pertaining to its Oil and Gas Properties and will do all other things necessary to keep materially unimpaired its rights with respect thereto and prevent any forfeiture thereof or default thereunder, except, in each case, where the failure to comply could not reasonably be expected to have a Material Adverse Effect;

(d)     promptly perform, or make reasonable and customary efforts to cause to be performed, in accordance with industry standards, the obligations required by each and all of the assignments, deeds, leases, sub-leases, contracts and agreements affecting its interests in its Oil and Gas Properties and other material Properties, except, in each case, where the failure to comply could not reasonably be expected to have a Material Adverse Effect;

(e)     operate its Oil and Gas Properties and other material Properties or cause or make reasonable and customary efforts to cause such Oil and Gas Properties and other material Properties to be operated in accordance with the practices of the industry and in material compliance with all applicable contracts and agreements and in compliance in all material respects with all Governmental Requirements; and

(f)     to the extent that a Loan Party is not the operator of any Property, the Borrower shall use reasonable efforts to cause the operator to comply with this Section 8.06.

Section 8.07   Insurance.  Each of the Borrower and Parent will, and will cause each other Loan Party to, maintain, with financially sound and reputable insurance companies, insurance (a) in such amounts and against such risks as are customarily maintained by companies engaged in the same or similar businesses operating in the same or similar locations, and (b) in accordance with all Governmental Requirements including, without limitation, Flood Insurance with respect to Mortgaged Property, if required.  Within 30 days following the Effective Date, the loss payable clauses or provisions in said insurance policy or policies insuring any of the collateral for the Loans shall be endorsed in favor of and made payable to the Administrative Agent as its interests may appear, and such policies shall name the Administrative Agent and the Lenders as "additional insureds" and provide that the insurer will endeavor to give at least 30 days prior notice of any cancellation to the Administrative Agent.

Section 8.08   Books and Records; Inspection Rights.  Each of the Borrower and the Parent will, and will cause each other Loan Party to, keep proper books of record and account in which full, true and correct entries are made of all dealings and transactions in relation to its business and activities.  Each of the Borrower and the Parent will, and will cause each other Loan Party to, permit any representatives designated by the Administrative Agent or any Lender, upon reasonable prior notice to visit and inspect its Properties, to examine and make extracts from its books and records, and to discuss its affairs, finances and condition with its officers and independent accountants, all at such reasonable times and as often as reasonably requested.

Section 8.09   Compliance with Laws.  Each of the Borrower and the Parent will, and will cause each other Loan Party to, comply with all laws, rules, regulations and orders of any Governmental Authority applicable to it or its Property, except where the failure to do so,

85

individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

Section 8.10   <u>Environmental Matters</u>.

(a)      Each of the Borrower and the Parent shall at its sole expense: (i) comply, and shall cause its Properties and operations and each other Loan Party and each other Loan Party's Properties and operations to comply, with all applicable Environmental Laws, the violation of which could be reasonably expected to have a Material Adverse Effect; (ii) not Release or threaten to Release, and shall cause each Subsidiary not to Release or threaten to Release, any Hazardous Material on, under, about or from any of the Borrower's, the Parent's or any other Loan Party's Properties or any other property offsite the Property to the extent caused by the Borrower's, the Parent's or any other Loan Party's operations except in compliance with applicable Environmental Laws, the Release or threatened Release of which could reasonably be expected to have a Material Adverse Effect; (iii) timely obtain or file, and shall cause each Subsidiary to timely obtain or file, all material Environmental Permits, if any, required under applicable Environmental Laws to be obtained or filed in connection with the operation or use of the Borrower's, the Parent's or any other Loan Party's Properties, which failure to obtain or file could reasonably be expected to have a Material Adverse Effect; (iv) promptly commence and diligently prosecute to completion, and shall cause each other Loan Party to promptly commence and diligently prosecute to completion, any assessment, evaluation, investigation, monitoring, containment, cleanup, removal, repair, restoration, remediation or other remedial obligations (collectively, the "<u>Remedial Work</u>") in the event any Remedial Work is required or reasonably necessary under applicable Environmental Laws because of or in connection with the actual or suspected past, present or future Release or threatened Release of any Hazardous Material on, under, about or from any of the Borrower's, the Parent's or any other Loan Party's Properties, which failure to commence and diligently prosecute to completion could reasonably be expected to have a Material Adverse Effect; (v) conduct, and cause each other Loan Party to conduct, its operations and businesses in a prudent manner relative to the exposure of any Property or Person to Hazardous Materials that could reasonably be expected to form the basis for a claim for damages or compensation; and (vi) establish and implement, and shall cause each other Loan Party to establish and implement, such procedures as may be necessary to continuously determine and assure that the Borrower's, the Parent's and each other Loan Party's obligations under this <u>Section 8.10(a)</u> are timely and fully satisfied, which failure to establish and implement could reasonably be expected to have a Material Adverse Effect.

(b)      Each of the Borrower and the Parent will promptly, but in no event later than ten Business Days after obtaining knowledge of the occurrence of a triggering event, notify the Administrative Agent and the Lenders in writing of any threatened action, investigation or inquiry by any Governmental Authority or any threatened demand or lawsuit by any Person against the Borrower or any other Loan Party or their Properties in connection with any Environmental Laws that could reasonably be expected to result in liability (whether individually or in the aggregate) in excess of $5,000,000, not fully covered by insurance (subject to normal deductibles).

(c)      Each of the Borrower and the Parent will, and will cause each other Loan Party to, provide environmental assessments, audits and tests in accordance with the most current

version of the American Society of Testing Materials standards upon request by the Administrative Agent and the Lenders and no more than once per year in the absence of any Event of Default (or as otherwise required to be obtained by any Governmental Authority); *provided* that notwithstanding anything to the contrary in this Section 8.10(c), no boring, subsurface sampling or phase II environmental review shall be required with respect to any environmental assessments, audits or tests conducted pursuant to this Section 8.10(c).

Section 8.11   Further Assurances.

(a)     Each of the Borrower and the Parent at its sole expense will, and will cause each other Loan Party to, promptly execute and deliver to the Administrative Agent all such other documents, agreements and instruments reasonably requested by the Administrative Agent to comply with, cure any defects or accomplish the conditions precedent, covenants and agreements of the Borrower, the Parent or any other Loan Party, as the case may be, in the Loan Documents, including the Notes, or to further evidence and more fully describe the collateral intended as security for the Indebtedness, or to correct any omissions in this Agreement or the Security Instruments, or to state more fully the obligations secured therein, or to perfect, protect or preserve any Liens created pursuant to this Agreement or any of the Security Instruments or the priority thereof, or to make any recordings, file any notices or obtain any consents, all as may be reasonably necessary or appropriate, in the reasonable discretion of the Administrative Agent, in connection therewith.

(b)     Each of the Borrower and the Parent hereby authorizes the Administrative Agent to file one or more financing or continuation statements, and amendments thereto, relative to all or any part of the Mortgaged Property without the signature of the Borrower, the Parent or any other Guarantor where permitted by law.  A carbon, photographic or other reproduction of the Security Instruments or any financing statement covering the Mortgaged Property or any part thereof shall be sufficient as a financing statement where permitted by law.  Each of the Borrower and the Parent acknowledges and agrees that any such financing statement may describe the collateral as "all assets" of the applicable Loan Party or words of similar effect as may be required by the Administrative Agent.

Section 8.12   Reserve Reports.

(a)     On or before February 28 and August 31 of each year, commencing August 31, 2017, the Borrower shall furnish to the Administrative Agent and the Lenders a Reserve Report evaluating the Oil and Gas Properties of the Borrower and the other Loan Parties as of the immediately preceding January 1 and July 1 (or December 31 and June 30).  The Reserve Report as of July 1 (or June 30) of each year shall be prepared by or under the supervision of the chief engineer of the Borrower who shall certify (i) there are no statements or conclusions in such Reserve Report which are based upon or include misleading information or fail to take into account material information regarding the matters reported therein, it being understood that projections concerning volumes attributable to the Oil and Gas Properties and production and cost estimates contained in any Reserve Report are necessarily based upon professional opinions, estimates and projections and that the Borrower and the other Loan Parties do not warrant that such opinions, estimates and projections will ultimately prove to have been accurate, and (ii) that such Reserve Report has been prepared in accordance with the procedures

used in the immediately preceding January 1 (or December 31) Reserve Report. The Reserve Report as of January 1 of each year (or December 31 of the preceding year) shall be prepared or audited by one or more Approved Petroleum Engineers.

(b)     In the event of an Interim Redetermination, the Borrower shall furnish to the Administrative Agent and the Lenders a Reserve Report prepared by or under the supervision of the chief engineer of the Borrower who shall certify such Reserve Report to be true and accurate and to have been prepared in accordance with the procedures used in the immediately preceding January 1 (or December 31) Reserve Report. For any Interim Redetermination requested by the Administrative Agent or the Borrower pursuant to Section 2.07(b), the Borrower shall provide such Reserve Report with an "as of" date as required by the Administrative Agent as soon as possible, but in no event later than 30 days following the receipt of such request.

(c)     With the delivery of each Reserve Report, the Borrower shall provide to the Administrative Agent and the Lenders a certificate from a Responsible Officer certifying that in all material respects: (i) the information contained in the Reserve Report and any other information delivered in connection therewith is true and correct, (ii) the Borrower or a Loan Party owns good and defensible title to the Oil and Gas Properties evaluated in such Reserve Report and such Properties are free of all Liens except for Liens permitted by Section 9.03, (iii) except as set forth on an exhibit to the certificate, on a net basis there are no gas imbalances, take or pay or other prepayments in excess of the volume specified in Section 7.18 with respect to its Oil and Gas Properties evaluated in such Reserve Report which would require the Borrower or any of the other Loan Parties to deliver Hydrocarbons either generally or produced from such Oil and Gas Properties at some future time without then or thereafter receiving full payment therefor, (iv) none of their Oil and Gas Properties have been sold since the date of the last Borrowing Base determination except as set forth on an exhibit to the certificate, which certificate shall list all of its Oil and Gas Properties sold and in such detail as reasonably required by the Administrative Agent, (v) attached to the certificate is a list of all marketing agreements entered into subsequent to the later of the date hereof or the most recently delivered Reserve Report which the Borrower could reasonably be expected to have been obligated to list on Schedule 7.19 had such agreement been in effect on the date hereof and (vi) attached thereto is a schedule of the Oil and Gas Properties evaluated by such Reserve Report that are Mortgaged Properties and demonstrating the percentage of the total value of the Loan Parties' Oil and Gas Properties that the value of such Mortgaged Properties represent in compliance with Section 8.14(a).

Section 8.13    Title Information.

(a)     On or before the delivery to the Administrative Agent and the Lenders of each Reserve Report required by Section 8.12, the Borrower will deliver title information in form and substance acceptable to the Administrative Agent covering enough of the Oil and Gas Properties evaluated by such Reserve Report that were not included in the immediately preceding Reserve Report, so that the Administrative Agent shall have received together with title information previously delivered to the Administrative Agent, satisfactory title information on at least 95% of the total value of the Oil and Gas Properties evaluated by such Reserve Report.

(b)      If the Borrower has provided title information for additional Properties under Section 8.13(a), the Borrower shall, within 90 days of notice from the Administrative Agent that material title defects or exceptions exist with respect to such additional Properties, either (i) cure any such material title defects or exceptions (including defects or exceptions as to priority) that do not constitute Excepted Liens pursuant to Section 9.03, raised by such information, (ii) substitute acceptable Mortgaged Properties with no material title defects or exceptions except for Excepted Liens (other than Excepted Liens described in clauses (e), (h) and (j) of such definition) having an equivalent value or (iii) deliver title information in form and substance acceptable to the Administrative Agent so that the Administrative Agent shall have received, together with title information previously delivered to the Administrative Agent, satisfactory title information on at least 95% of the value of the Oil and Gas Properties evaluated by such Reserve Report.

(c)      If the Borrower is unable to cure any material title defect requested by the Administrative Agent or the Lenders to be cured within the 90-day period or the Borrower does not comply with the requirements to provide acceptable title information covering 95% of the value of the Oil and Gas Properties evaluated in the most recent Reserve Report, such default shall not be a Default, but instead the Administrative Agent and/or the Majority Lenders shall have the right to exercise the following remedy in their sole discretion from time to time, and any failure to so exercise this remedy at any time shall not be a waiver as to future exercise of the remedy by the Administrative Agent or the Lenders.  To the extent that the Administrative Agent or the Majority Lenders are not satisfied with title to any Mortgaged Property after the 90-day period has elapsed, such unacceptable Mortgaged Property shall not count towards the 95% requirement, and the Administrative Agent may send a notice to the Borrower and the Lenders that the Borrowing Base then in effect shall be reduced by an amount as determined by the Required Lenders to cause the Borrower to be in compliance with the requirement to provide acceptable title information on 95% of the value of the Oil and Gas Properties evaluated in the most recent Reserve Report.  This new Borrowing Base shall become effective immediately after receipt of such notice.

Section 8.14    Additional Collateral; Additional Guarantors.

(a)      In connection with each redetermination of the Borrowing Base, the Borrower shall review the Reserve Report and the list of current Mortgaged Properties (as described in Section 8.12(c)(vi)) to ascertain whether the Mortgaged Properties represent at least 95% of the total value of the Oil and Gas Properties evaluated in the most recently completed Reserve Report after giving effect to exploration and production activities, acquisitions, dispositions and production.  In the event that the Mortgaged Properties do not represent at least 95% of such total value, then the Borrower shall, and shall cause the other Loan Parties to, grant, within 30 days of delivery of the certificate required under Section 8.12(a), to the Administrative Agent as security for the Indebtedness a first-priority Lien interest (provided that Excepted Liens of the type described in clauses (a) to (d), (f) and (g) of the definition thereof may exist, but subject to the provisos at the end of such definition) on additional Oil and Gas Properties of the Loan Parties not already subject to a Lien of the Security Instruments such that after giving effect thereto, the Mortgaged Properties will represent at least 95% of such total value.  All such Liens will be created and perfected by and in accordance with the provisions of deeds of trust, security agreements and financing statements or other Security Instruments, all in form and substance

reasonably satisfactory to the Administrative Agent and in sufficient executed (and acknowledged where necessary or appropriate) counterparts for recording purposes. For purposes of this Section 8.14(a), Lenders will be allowed 45 days (or such longer period as the Administrative Agent may agree in its sole discretion) from the date that such Lenders are provided information necessary for the completion of their flood due diligence to consent to the taking of additional Liens on Buildings (as defined in the applicable Flood Insurance Regulation) and Manufactured (Mobile) Homes (as defined in the applicable Flood Insurance Regulation) located on Oil and Gas Properties or otherwise and (i) any Lender who does not respond within such 45 day period (or such longer period as the Administrative Agent may agree in its sole discretion) will be deemed to have consented, and (ii) any Lender who declines consent shall not be considered secured by such Lien.

(b)     Each Loan Party shall, and shall cause each of its Material Subsidiaries to: (i) unconditionally guaranty, on a joint and several basis, the prompt payment and performance of the Indebtedness pursuant to the Guaranty Agreement, and (ii) grant to the Administrative Agent, pursuant to the Security Agreement, a perfected, first-priority security interest in all of the issued and outstanding Equity Interests in each Subsidiary of the Parent owned by such Material Subsidiary. In connection therewith, the Parent shall, or shall cause such Material Subsidiary, to promptly, but in any event within ten Business Days (or such later date as the Administrative Agent may agree in its sole discretion) after the creation or acquisition thereof (or other similar event, including an existing Subsidiary attaining the status of a Material Subsidiary), (A) execute and deliver an amendment or a supplement to the Guaranty Agreement as required by the Administrative Agent, (B) execute and deliver an amendment or supplement to the Security Agreement to pledge all of the Equity Interests in each Subsidiary of the Parent owned by such Material Subsidiary (including, without limitation, delivery of original stock or equity certificates evidencing the Equity Interests of any such Subsidiary so owned, together with an appropriate undated stock power for each certificate duly executed in blank by the registered owner thereof) and (C) execute and deliver such other additional closing documents, certificates and legal opinions as shall reasonably be requested by the Administrative Agent. Parent and Borrower shall cause any Person that guarantees the obligations with respect to any Permitted Unsecured Debt to execute and deliver to the Administrative Agent a Guaranty Agreement.

(c)     The Parent will at all times cause the other material tangible and intangible assets of the Parent and each Material Subsidiary to be subject to a Lien of the Security Instruments.

Section 8.15   ERISA Compliance. Each of the Borrower and the Parent will promptly furnish and will cause the other Loan Parties and any ERISA Affiliate to promptly furnish to the Administrative Agent (i) promptly after the filing thereof with the United States Secretary of Labor or the Internal Revenue Service, copies of each annual and other report with respect to each Plan that is subject to Title IV of ERISA, section 302 of ERISA, or Section 412 of the Code or any trust created thereunder, and (ii) immediately upon becoming aware of the occurrence of any "prohibited transaction," as described in Section 406 of ERISA or in Section 4975 of the Code, in connection with any Plan or any trust created thereunder that could reasonably be expected to result in liability of the Borrower and the other Loan Parties in an aggregate amount exceeding $500,000 (when taken together with all other such prohibited transactions that have occurred within the preceding 12 months), a written notice signed by the President or the

90

principal Financial Officer, the Subsidiary or the ERISA Affiliate, as the case may be, specifying the nature thereof, what action the Borrower, the Parent, such other Loan Party or the ERISA Affiliate is taking or proposes to take with respect thereto, and, when known, any action taken or proposed by the Internal Revenue Service or the Department of Labor with respect thereto.

Section 8.16   Commodity Price Risk Management Policy.   The Loan Parties shall maintain a commodity price risk management policy, which policy shall be reasonably acceptable to the Administrative Agent; *provided* that such policy shall be subject to the review of the Administrative Agent no more than once every three years.

Section 8.17   Commodity Exchange Act Keepwell Provisions.

(a)   The Borrower hereby guarantees the payment and performance of all Indebtedness of each Loan Party (other than the Borrower) and absolutely, unconditionally and irrevocably undertakes to provide such funds or other support as may be needed from time to time by each Benefitting Guarantor in order for such Benefitting Guarantor to honor its obligations (without giving effect to Section 8.17(b)) under the Guaranty Agreement and any other Security Instrument including obligations with respect to Swap Agreements (*provided*, *however*, that the Borrower shall only be liable under this Section 8.17(a) for the maximum amount of such liability that can be hereby incurred without rendering its obligations under this Section 8.17(a), or otherwise under this Agreement or any Loan Document, as it relates to such Benefitting Guarantor, voidable under applicable law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount). The obligations of the Borrower under this Section 8.17(a) shall remain in full force and effect until all Indebtedness is paid in full to the Lenders, the Administrative Agent and all other Secured Parties, and all of the Lenders' Commitments are terminated. The Borrower intends that this Section 8.17(a) constitute, and this Section 8.17(a) shall be deemed to constitute, a "keepwell, support, or other agreement" for the benefit of each Benefitting Guarantor for all purposes of Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

(b)   Notwithstanding any other provisions of this Agreement or any other Loan Document, Indebtedness guaranteed by any Guarantor, or secured by the grant of any Lien by such Guarantor under any Security Instrument, shall exclude all Excluded Swap Obligations with respect to such Guarantor.

Section 8.18   Hedging Requirements.   On or prior to December 31, 2017, the Borrower or any other Loan Party shall enter into Swap Agreements on terms consistent with Section 9.18 with Lenders or Affiliates of Lenders to hedge a notional volume of not less than, in the aggregate, 50% of the reasonably anticipated projected production of Hydrocarbons from Proved Developed Producing Reserves included in the most recent Reserve Report for each calendar month during 2019 of crude oil, natural gas and natural gas liquids, (which, in the case of natural gas liquids, may be hedged with Swap Agreements for crude oil), each calculated separately.

Section 8.19   Deposit Accounts.   The Loan Parties shall maintain all deposit accounts (other than De Minimis Accounts (as defined in the Security Agreement)) with a Lender.

91

**ARTICLE IX**
**NEGATIVE COVENANTS**

Until the Commitments have expired or terminated and the principal of and interest on each Loan and all fees payable hereunder and all other amounts payable under the Loan Documents then outstanding (other than contingent expense reimbursement, tax gross-up or yield protection obligations for which no claim has been made) have been paid in full and all Letters of Credit have expired or terminated (other than Letters of Credit which have been cash collateralized (on terms reasonably acceptable to the Issuing Bank) or otherwise addressed in a manner satisfactory to the Issuing Bank) and all LC Disbursements shall have been reimbursed, each of the Borrower and the Parent covenants and agrees with the Lenders that:

Section 9.01    Financial Covenants.

(a)    Interest Coverage Ratio.  Each of the Borrower and the Parent will not, as of the last day of any fiscal quarter (commencing with the first full fiscal quarter ending after the Effective Date), permit the Parent's (or, if the financial statements delivered pursuant to Section 8.01(a) or Section 8.01(b) for such fiscal quarter is in respect of the Public Parent, the Public Parent's) ratio of (i) Consolidated EBITDAX (or, in the case of the Rolling Periods ending on or before March 31, 2018, Annualized Consolidated EBITDAX) for the Rolling Period ending on such day to (ii) Consolidated Net Interest Expense (or, in the case of the Rolling Periods ending on or before March 31, 2018, Annualized Consolidated Net Interest Expense) for the Rolling Period ending on such day to be less than 2.50 to 1.00.

(b)    Current Ratio.  Each of the Borrower and the Parent will not permit, as of the last day of any fiscal quarter, the Parent's (or, if the financial statements delivered pursuant to Section 8.01(a) or Section 8.01(b) for such fiscal quarter is in respect of the Public Parent, the Public Parent's) ratio of (i) consolidated current assets (including the unused amount of the total Commitments (but only to the extent that the Borrower is permitted to borrow such amount under the terms of this Agreement including, without limitation, Section 6.02 hereof), and excluding non-cash assets under ASC 815) to (ii) consolidated current liabilities (excluding non-cash obligations under ASC 815 and current maturities under this Agreement) of the Parent to be less than 1.0 to 1.0.

(c)    Leverage Ratio.  Each of the Borrower and the Parent will not, as of the last day of any fiscal quarter (commencing with the first full fiscal quarter ending after the Effective Date), permit the Parent's (or, if the financial statements delivered pursuant to Section 8.01(a) or Section 8.01(b) for such fiscal quarter is in respect of the Public Parent, the Public Parent's) ratio of Total Debt as of such day to Consolidated EBITDAX (or, in the case of the Rolling Periods ending on or before March 31, 2018, Annualized Consolidated EBITDAX) for the Rolling Period ending on such day (the "Leverage Ratio") to be greater than 4.00 to 1.00.

Section 9.02    Debt.  Each of the Borrower and the Parent will not, and will not permit any Subsidiary to, incur, create, assume or suffer to exist any Debt, except:

92

(a)      the Notes or other Indebtedness arising under the Loan Documents or any guaranty of or suretyship arrangement for the Notes or other Indebtedness arising under the Loan Documents;

(b)      accounts payable and accrued expenses, liabilities or other obligations to pay the deferred purchase price of Property or services, from time to time incurred in the ordinary course of business which are not greater than 90 days past the date of invoice or delinquent or which are being contested in good faith by appropriate action and for which adequate reserves have been maintained in accordance with GAAP;

(c)      Debt under Capital Leases not to exceed $10,000,000 in the aggregate at any one time outstanding;

(d)      Debt associated with bonds or surety obligations required by Governmental Requirements in connection with the operation of the Oil and Gas Properties;

(e)      endorsements of negotiable instruments for collection in the ordinary course of business;

(f)      in the event after any redetermination or adjustment of the Borrowing Base, Liquidity (calculated on a pro forma basis after taking into account the repayment of any Borrowing Base Deficiency resulting from such redetermination or adjustment of the Borrowing Base) is less than $50,000,000, within 90 days after such redetermination or adjustment, Permitted Unsecured Debt and guarantees thereof by any Loan Party; *provided* that the proceeds of such Permitted Unsecured Debt are applied, first, to repay in full any Borrowing Base Deficiency caused by such redetermination or adjustment of the Borrowing Base;

(g)      other Debt not to exceed $10,000,000 in the aggregate at any one time outstanding; and

(h)      unsecured Debt of the Borrower or a Subsidiary Guarantor to the Borrower or any other Subsidiary Guarantor; *provided* that such Debt is not held, assigned, transferred or negotiated to any Person except pursuant to the Loan Documents, and *provided further* that any such Debt owed by either the Borrower or a Subsidiary Guarantor shall be subordinated to the Indebtedness on terms set forth in the Guaranty Agreement and represented by the Intercompany Note.

Section 9.03   Liens.  Each of the Borrower and the Parent will not, and will not permit any Subsidiary to, create, incur, assume or permit to exist any Lien on any of its Properties (now owned or hereafter acquired), except:

(a)      Liens securing the payment of any Indebtedness;

(b)      Excepted Liens;

(c)      Liens securing Capital Leases permitted by Section 9.02(c), but only on the Property under lease; or

(d)     Liens (other than Liens securing Debt for borrowed money) not otherwise permitted by the foregoing clauses of this Section 9.03; *provided* that the aggregate principal or face amount of all Debt secured under this Section 9.03(d) shall not exceed $2,000,000 at any time outstanding.

Notwithstanding the foregoing, none of the Liens permitted pursuant to this Section 9.03 (other than Liens securing the Indebtedness and Excepted Liens) may at any time attach to any Oil and Gas Properties evaluated in the Reserve Report used in the most recent determination of the Borrowing Base.

Section 9.04     Dividends, Distributions and Repayment of Permitted Unsecured Debt.

(a)     Restricted Payments.  Each of the Borrower and the Parent will not, and will not permit any Subsidiary to, declare or make, or agree to pay or make, directly or indirectly, any Restricted Payment, return any capital to its stockholders or make any distribution of its Property to its Equity Interest holders, except (i) the Parent may declare and pay dividends with respect to its Equity Interests payable solely in additional shares of its Equity Interests (other than Disqualified Capital Stock), (ii) Subsidiaries may declare and pay dividends ratably with respect to their Equity Interests, (iii) so long as no Default, Event of Default or Borrowing Base Deficiency shall have occurred and be continuing or would result therefrom, the Loan Parties may make Restricted Payments pursuant to and in accordance with stock option plans or other benefit plans for management or employees of the Public Parent, the Parent and the Parent's Subsidiaries if (A) such Restricted Payments are made in the ordinary course of business and (B) immediately after giving effect to such Restricted Payment, (x) the pro forma Leverage Ratio shall not exceed 3.00 to 1.00 and (y) Liquidity is no less than 15% of the Borrowing Base at such time, (iv) the Loan Parties may make Restricted Payments to the Public Parent, the Parent and the Borrower for the purpose of (A) permitting the Public Parent, the Parent and the Parent's Subsidiaries, who are required to include in income any income or gain from the operations, business or assets of the Parent and the Parent's Subsidiaries for U.S. federal income Tax purposes, to pay federal, state and local income Taxes, franchise Taxes, and similar Taxes to the extent attributable to such operations, business or assets; provided that the amount of payments pursuant to this clause (iv)(A) at any time shall not exceed the Tax liabilities that would have been imposed on the Parent, the Borrower and/or their applicable Subsidiaries had such entity(ies) filed on a stand-alone group basis at such time for the respective period and the Parent had been classified as a corporation for federal income Tax purposes and (B) permitting the Public Parent and the Parent to pay reasonable compensation and expenses of directors and officers of the Public Parent and the Parent incurred in the ordinary course of business; and (v) to the extent that the Noteholders do not receive on or before the Effective Date the $24,639,691.88 cash distribution pursuant to the Plan of Reorganization, the Parent may make the Noteholder Distribution so long as (A) the Noteholder Distribution is made with Beta Freed Cash only, (B) at the time of and immediately after giving effect to the Noteholder Distribution, no Default or Borrowing Base Deficiency shall have occurred and be continuing and (C) immediately after giving effect to the Noteholder Distribution, Liquidity is no less than (x) if the Noteholder Distribution occurs within 60 days of receipt of Beta Freed Cash, 5% of the Borrowing Base at such time and (y) thereafter, 15% of the Borrowing Base at such time.

94

(b)     Repayment of Permitted Unsecured Debt; Amendment of Terms of Permitted Unsecured Debt.  Each of the Borrower and the Parent will not, and will not permit any Subsidiary to, prior to the date that is 180 days after the Maturity Date:

(i)     call, make or offer to make any optional, voluntary or mandatory Redemption of or otherwise optionally, voluntarily or mandatorily Redeem (whether in whole or in part), or make open market purchases of or pay any fees or premiums in connection with, any Permitted Unsecured Debt;

(ii)     pay interest in cash at a rate in excess of 3% per annum on any Permitted Unsecured Debt;

(iii)     pay default interest in cash on any Permitted Unsecured Debt;

(iv)     pay interest (excluding default interest) in kind, together with interest payable in cash, on any Permitted Unsecured Debt at a rate in excess of the weighted average interest rate applicable to the Loans at the time of incurrence of such Permitted Unsecured Debt; or

(v)     amend, modify, waive or otherwise change, consent or agree to any amendment, modification, waiver or other change to, any of the terms of the Permitted Unsecured Debt Documents in any manner that would cause the Debt incurred to cease to constitute Permitted Unsecured Debt.

Section 9.05   Investments and Loans.  Each of the Borrower and the Parent will not, and will not permit any Subsidiary to, make or permit to remain outstanding any Investments in or to any Person or any intercompany loans, except that the foregoing restriction shall not apply to:

(a)     Investments as of the Effective Date which are disclosed to the Lenders in Schedule 9.05;

(b)     accounts receivable arising in the ordinary course of business and promissory notes received in settlement of any such accounts receivable; *provided* that any such accounts receivable or extensions of trade credit to Affiliates of the Borrower (other than a Subsidiary Guarantor) shall not exceed $1,000,000 (or such greater amount as the Administrative Agent may agree to in its sole discretion) at any time outstanding;

(c)     direct obligations of the United States of America or any agency thereof, or obligations guaranteed by the United States of America or any agency thereof, in each case maturing within one year from the date of creation thereof;

(d)     commercial paper maturing within one year from the date of creation thereof having a rating of at least P-2 or A-2 from either Moody's or S&P, respectively;

(e)     deposits maturing within one year from the date of creation thereof with, including certificates of deposit issued by, any Lender or any office located in the United States of America of any other bank or trust company which is organized under the laws of the United States of America or any state thereof, has capital, surplus and undivided profits aggregating at

least $100,000,000 (as of the date of such bank or trust company's most recent financial reports) and has a short term deposit rating of no lower than A2 or P2, as such rating is set forth from time to time, by S&P or Moody's, respectively;

(f)       deposits in money market funds investing not less than 90% of their assets in Investments described in Section 9.05(c), Section 9.05(d) or Section 9.05(e);

(g)       Investments (i) made by the Parent in or to the Borrower or any of the Subsidiary Guarantors, (ii) made by the Borrower or any Subsidiary in or to the Borrower or any Subsidiary Guarantor, (iii) in an aggregate amount at any one time outstanding not to exceed $500,000, made by the Parent or any other Loan Party in or to all other Subsidiaries which are not Guarantors and (iv) made by any Subsidiary which is not a Guarantor in any Subsidiary; and

(h)       other Investments not to exceed $10,000,000 in the aggregate at any time.

Section 9.06   Nature of Business; No International Operations.  Each of the Borrower and the Parent will not, and will not permit any Subsidiary to, allow any material change to be made in the character of its business as an independent oil and gas exploration and production company.  Each of the Borrower and the Parent will not, and will not permit any Subsidiary to, acquire or make any other expenditure (whether such expenditure is capital, operating or otherwise) in or related to, any Oil and Gas Properties not located within the geographical boundaries of the United States of America.

Section 9.07   Limitation on Leases.  Each of the Borrower and the Parent will not, and will not permit any Subsidiary to, create, incur, assume or suffer to exist any obligation for the payment of rent or hire of Property of any kind whatsoever (real or personal but excluding Capital Leases to the extent such Capital Leases do not go beyond the value and terms of the leased property and leases of Hydrocarbon Interests), under leases or lease agreements which would cause the aggregate amount of all payments made by the Borrower and the other Subsidiaries pursuant to all such leases or lease agreements, including, without limitation, any residual payments at the end of any lease, to exceed $15,000,000 in any period of twelve consecutive calendar months during the life of such leases.

Section 9.08   Proceeds of Notes.  Each of the Borrower and the Parent will not, and will not permit any Subsidiary to, use the proceeds of the Notes for any purpose other than those described in the first sentence of Section 7.21.  Neither the Borrower nor any Person acting on behalf of the Borrower has taken or will take any action which might cause any of the Loan Documents to violate Regulations T, U or X, or any other regulation of the Board or to violate Section 7 of the Securities Exchange Act of 1934 or any rule or regulation thereunder, in each case as now in effect or as the same may hereinafter be in effect.  If requested by the Administrative Agent, the Borrower will furnish to the Administrative Agent and each Lender a statement to the foregoing effect in conformity with the requirements of FR Form U-1 or such other form referred to in Regulation U, Regulation T or Regulation X of the Board, as the case may be.

Section 9.09   ERISA Compliance.  Each of the Borrower and the Parent will not, and will not permit any other Loan Party to, at any time:

(a)      engage in, or permit any ERISA Affiliate to engage in, any transaction in connection with which the Borrower, any other Loan Party or any ERISA Affiliate could be subjected to either a civil penalty assessed pursuant to subsections (c), (i) or (l) of Section 502 of ERISA or a tax imposed by Chapter 43 of Subtitle D of the Code;

(b)      terminate, or permit any ERISA Affiliate to terminate, any Plan in a manner, or take any other action with respect to any Plan, which could result in any liability of the Borrower, any other Loan Party or any ERISA Affiliate to the PBGC;

(c)      fail to make, or permit any ERISA Affiliate to fail to make, full payment when due of all amounts which, under the provisions of any Plan, agreement relating thereto or applicable law, the Borrower, any other Loan Party or any ERISA Affiliate is required to pay as contributions thereto;

(d)      permit to exist, or allow any ERISA Affiliate to permit to exist, any accumulated funding deficiency within the meaning of Section 302 of ERISA or Section 412 of the Code, whether or not waived, with respect to any Plan;

(e)      permit, or allow any ERISA Affiliate to permit, the actuarial present value of the benefit liabilities under any Plan maintained by the Borrower, any other Loan Party or any ERISA Affiliate which is regulated under Title IV of ERISA to materially exceed the current value of the assets (computed on a plan termination basis in accordance with Title IV of ERISA) of such Plan allocable to such benefit liabilities such that a determination would result that any Plan is, or is expected to be, in "at risk" status (as defined in Section 303(i)(4) of ERISA or Section 430(i)(4) of the Code); *provided* that the term "actuarial present value of the benefit liabilities" shall have the meaning specified in Section 4041 of ERISA;

(f)      contribute to or assume an obligation to contribute to, or permit any ERISA Affiliate to contribute to or assume an obligation to contribute to, any Multiemployer Plan;

(g)      acquire, or permit any ERISA Affiliate to acquire, an interest in any Person that causes such Person to become an ERISA Affiliate with respect to the Borrower or any other Loan Party or with respect to any ERISA Affiliate of the Borrower or any other Loan Party if such Person sponsors, maintains or contributes to, or at any time in the six-year period preceding such acquisition has sponsored, maintained, or contributed to, (i) any Multiemployer Plan, or (ii) any other Plan that is subject to Title IV of ERISA under which the actuarial present value of the benefit liabilities under such Plan materially exceeds the current value of the assets (computed on a plan termination basis in accordance with Title IV of ERISA) of such Plan allocable to such benefit liabilities such that a determination would result that any Plan is, or is expected to be, in "at risk" status (as defined in Section 303(i)(4) of ERISA or Section 430(i)(4) of the Code);

(h)      incur, or permit any ERISA Affiliate to incur, a liability to or on account of a Plan under sections 515, 4062, 4063, 4064, 4201 or 4204 of ERISA;

(i)      contribute to or assume an obligation to contribute to, or permit any ERISA Affiliate to contribute to or assume an obligation to contribute to, any employee welfare

benefit plan, as defined in Section 3(1) of ERISA, including, without limitation, any such plan maintained to provide benefits to former employees of such entities, that may not be terminated by such entities in their sole discretion at any time without any material liability; or

(j)      amend, or permit any ERISA Affiliate to amend, a Plan resulting in an increase in current liability such that the Borrower, any other Loan Party or any ERISA Affiliate is required to provide security to such Plan under Section 401(a)(29) of the Code.

Section 9.10    Sale or Discount of Receivables.  Except for receivables obtained by the Loan Parties out of the ordinary course of business or the settlement of joint interest billing accounts in the ordinary course of business or discounts granted to settle collection of accounts receivable or the sale of defaulted accounts arising in the ordinary course of business in connection with the compromise or collection thereof and not in connection with any financing transaction, each of the Borrower and the Parent will not, and will not permit any Subsidiary to, discount or sell (with or without recourse) any of its notes receivable or accounts receivable.

Section 9.11    Mergers, Etc.  Each of the Borrower and the Parent will not, and will not permit any Subsidiary to, merge into or with or consolidate with any other Person, or permit any other Person to merge into or consolidate with it, or sell, transfer, lease or otherwise dispose of (whether in one transaction or in a series of transactions) all or substantially all of its Property to any other Person (whether now owned or hereafter acquired) (any such transaction, a "consolidation") or liquidate, wind-up or dissolve (or suffer any liquidation or dissolution), terminate or discontinue its business; *provided* that so long as no Default has occurred and is continuing, or would result after giving effect thereto, (a) any Wholly-Owned Subsidiary of the Borrower may participate in a consolidation with any other Wholly-Owned Subsidiary of the Borrower, and the Borrower may participate in a consolidation with any Wholly-Owned Subsidiary of the Borrower so long as the Borrower is the surviving Person, (b) any Subsidiary of the Borrower may liquidate, wind-up, dissolve, terminate or discontinue its business so long as such event is not disadvantageous to the Administrative Agent and the Lenders in any material respect and any remaining assets are transferred to, or disposed of in favor of, a Loan Party, provided that such transfer or disposition is a tax-free transaction for U.S. federal, state, and local income tax purposes, unless the income Tax liabilities resulting therefrom could not be reasonably expected to have a Material Adverse Effect and (c) any Subsidiary of the Borrower may merge into or consolidate with any other Person to consummate a disposition permitted under Section 9.12.

Section 9.12    Sale of Properties.  Each of the Borrower and the Parent will not, and will not permit any Subsidiary to, sell, assign, farm-out, convey or otherwise transfer any Property except for:

(a)      the sale of Hydrocarbons in the ordinary course of business;

(b)      farmouts of undeveloped acreage and assignments in connection with such farmouts;

(c)      the sale or transfer of equipment that is no longer necessary for the business of a Loan Party or is replaced by equipment of at least comparable value and use;

98

(d)     Casualty Events;

(e)     sales or other dispositions (including Permitted Asset Swaps) of Oil and Gas Properties or any interest therein or Subsidiaries owning Oil and Gas Properties; *provided* that (i) the consideration received in respect of such sale or other disposition shall be equal to or greater than the fair market value of the Oil and Gas Property, interest therein or Subsidiary subject of such sale or other disposition (in each case, as reasonably determined by the Borrower and, if requested by the Administrative Agent, the Borrower shall deliver a certificate of a Responsible Officer certifying to that effect), (ii) unless such disposition is a Permitted Asset Swap, not less than 75% of the proceeds of such sale or other disposition of Oil and Gas Property shall be in cash, (iii) no Default or Event of Default has occurred and is continuing or would result from such sale or disposition, as applicable, (iv) if such sale or disposition would reasonably expected to result in an automatic redetermination of the Borrowing Base pursuant to Section 2.07(f), the Borrower delivers prior written notice thereof to the Administrative Agent at least five Business Days prior to such sale or disposition, (v) if a Borrowing Base Deficiency would result from such sale or disposition as a result of an automatic redetermination of the Borrowing Base pursuant to Section 2.07(f), the Borrower prepays Borrowings, prior to or contemporaneously with the consummation of such sale or disposition, to the extent that such prepayment would have been required under Section 3.04(c)(iii) after giving effect to such automatic redetermination of the Borrowing Base and (vi) if any such sale or other disposition is of Equity Interests in a Subsidiary owning Oil and Gas Properties, such sale or other disposition shall include all the Equity Interests of the Loan Parties in such Subsidiary; *provided* further that the fair market value of all Oil and Gas Properties sold or otherwise disposed of in connection with a Permitted Asset Swap shall not exceed $10,000,000 (or such greater amount as the Majority Lenders may agree in their sole discretion) in the aggregate between any two consecutive Scheduled Redetermination Dates.

(f)     Restricted Payments, Investments, sales or discounts of receivables, consolidations and sale and leaseback transactions permitted by Sections 9.04(a), 9.05, 9.10, 9.11 (other than Section 9.11(c)) and 9.22, respectively; and

(g)     sales and other dispositions of Properties not regulated by Section 9.12(a) to (f) having a fair market value not to exceed $7,500,000 in the aggregate during any 12-month period.

For the sake of clarity, the forfeiture of all or any portion of any lease as the result of a decision by any Loan Party not to drill any well or take any other action necessary to maintain such lease in full force and effect is not a sale or other disposition which is subject to this Section 9.12.

Section 9.13   Environmental Matters.  Each of the Borrower and the Parent will not, and will not permit any Subsidiary to, cause or permit any of its Property to be in violation of, or do anything or permit anything to be done which will subject any such Property to a Release or threatened Release of Hazardous Materials, exposure to any Hazardous Materials, or to any Remedial Work, under any Environmental Laws, assuming disclosure to the applicable Governmental Authority of all relevant facts, conditions and circumstances, if any, pertaining to

99

such Property where such violations, Release or threatened Release, exposure, or Remedial work could reasonably be expected to have a Material Adverse Effect.

Section 9.14   Transactions with Affiliates.  Each of the Borrower and the Parent will not, and will not permit any Subsidiary to, enter into any transaction, including, without limitation, any purchase, sale, lease or exchange of Property or the rendering of any service, with any Affiliate (other than the Loan Parties) unless such transactions are otherwise permitted under this Agreement and are upon fair and reasonable terms no less favorable to it than it would obtain in a comparable arm's length transaction with a Person not an Affiliate; *provided* that the foregoing restriction shall not apply to (a) reasonable and customary fees paid to members of the Board of Directors of the Borrower or the Loan Parties, (b) compensation arrangements for directors (or the members of the comparable governing body), officers and other employees of the Borrower or the Loan Parties entered into in the ordinary course of business or (c) transactions approved by the independent directors (or the independent members of the comparable governing body) or the conflicts committee of the Board of Directors of the Parent; provided that, fees and compensation paid in cash to members of the Board of Directors of the Public Parent, the Borrower and the other Loan Parties shall be reasonable and customary for similarly-situated oil and gas exploration and production companies.

Section 9.15   Subsidiaries.  Each of the Borrower and the Parent will not, and will not permit any Subsidiary to, create or acquire any additional subsidiary unless such subsidiary is a Wholly-Owned Subsidiary and the Borrower gives written notice to the Administrative Agent of such creation or acquisition and complies with Section 8.14(b) and Section 8.14(c).  The Parent shall not, and shall not permit any Subsidiary to, sell, assign or otherwise dispose of any Equity Interests in any Subsidiary except in compliance with Section 9.11.  Neither the Parent nor any Subsidiary shall have any Foreign Subsidiaries.

Section 9.16   Negative Pledge Agreements; Dividend Restrictions.   Each of the Borrower and the Parent will not, and will not permit any Subsidiary to, create, incur, assume or suffer to exist any contract, agreement or understanding (other than this Agreement, the Security Instruments, Capital Leases creating Liens permitted by Section 9.03(c)) which in any way prohibits or restricts the granting, conveying, creation or imposition of any Lien on any of its Property in favor of the Administrative Agent and the Secured Parties or, except for restrictions substantially no more restrictive than those in Section 9.04(a) hereof, restricts any Subsidiary from paying dividends or making distributions to the Borrower or any Guarantor, or which, except for dividend or distribution restrictions as aforesaid, requires the consent of or notice to other Persons in connection therewith.

Section 9.17   Gas Imbalances, Take-or-Pay or Other Prepayments.   Each of the Borrower and the Parent will not, and will not permit any Subsidiary to, allow gas imbalances, take-or-pay or other prepayments with respect to the Oil and Gas Properties of the Borrower or any other Subsidiary that would require the Borrower or such other Subsidiary to deliver Hydrocarbons at some future time without then or thereafter receiving full payment therefor to exceed three bcf of gas (on an mcf equivalent basis) in the aggregate.

Section 9.18   Swap Agreements.

100

(a)     Each of the Borrower and the Parent will not, and will not permit any Loan Party to, enter into any Swap Agreements with any Person other than:

(i)     Swap Agreements in respect of commodities (A) with an Approved Counterparty and (B) the notional volumes for which (when aggregated with other commodity Swap Agreements then in effect other than basis differential swaps on volumes already hedged pursuant to other Swap Agreements) do not exceed, as of the date such Swap Agreement is executed, 85% of the reasonably anticipated projected production from proved Oil and Gas Properties included in the most recent Reserve Report for each month during the period during which such Swap Agreement is in effect for each of crude oil, natural gas and natural gas liquids, (which, in the case of natural gas liquids, may be hedged with Swap Agreements for crude oil), each calculated separately; provided that Proved Developed Non-Producing Reserves and Proved Undeveloped Reserves, in the aggregate, do not account for greater than 50% of the total Proved Reserves;

(ii)     [reserved];

(iii)     Swap Agreements in respect of interest rates with an Approved Counterparty, as follows:  (A) Swap Agreements effectively converting interest rates from fixed to floating, the notional amounts of which (when aggregated with all other Swap Agreements of the Borrower and the other Loan Parties then in effect effectively converting interest rates from fixed to floating) do not exceed 100% of the then outstanding principal amount of the Loan Parties' Debt for borrowed money which bears interest at a fixed rate and (B) Swap Agreements effectively converting interest rates from floating to fixed, the notional amounts of which (when aggregated with all other Swap Agreements of the Borrower and the other Loan Parties then in effect effectively converting interest rates from floating to fixed) do not exceed 100% of the then outstanding principal amount of the Loan Parties' Debt for borrowed money which bears interest at a floating rate; and

(iv)     Swap Agreements entered into in the ordinary course of the Loan Parties' business in respect of Emissions Credits; *provided* that the aggregate amount that is owing but unpaid by the Loan Parties under all such Swap Agreements shall not exceed $1,000,000 in the aggregate at any time.

(b)     In no event shall any Swap Agreement contain any requirement, agreement or covenant for a Loan Party to post collateral or margin to secure their obligations under such Swap Agreement or to cover market exposures except to the extent provided pursuant to the Loan Documents.

(c)     Each of the Borrower and the Parent will not, and will not permit any Loan Party to, incur or permit to exist any speculative Swap Agreements.

(d)     Each of the Borrower and the Parent will not, and will not permit any Loan Party to, Liquidate any Swap Agreement in respect of commodities unless (x) if such Swap Liquidation would result in an automatic redetermination of the Borrowing Base pursuant to Section 2.07(f), the Borrower delivers reasonable prior written notice thereof to the Administrative Agent, and (y) if a Borrowing Base Deficiency would result from such Swap

101

Liquidation as a result of an automatic redetermination of the Borrowing Base pursuant to Section 2.07(f), the Borrower prepays Borrowings, prior to or contemporaneously with the consummation of such Swap Liquidation to the extent that such prepayment would have been required under Section 3.04(c)(iii), Section 3.04(c)(iv) and Section 3.04(c)(iv) after giving effect to such automatic redetermination of the Borrowing Base.

Section 9.19    [Reserved].

Section 9.20    Marketing Activities.

(a)    Each of the Borrower and the Parent will not, and will not permit any Subsidiary to, engage in marketing activities for any Hydrocarbons or enter into any contracts related thereto other than (i) contracts for the sale of Hydrocarbons scheduled or reasonably estimated to be produced from their proved Oil and Gas Properties during the period of such contract, (ii) contracts for the sale of Hydrocarbons scheduled or reasonably estimated to be produced from proved Oil and Gas Properties of third parties during the period of such contract associated with the Oil and Gas Properties of the Borrower and the other Loan Party that the Borrower or one of the other Loan Party has the right to market pursuant to joint operating agreements, unitization agreements or other similar contracts that are usual and customary in the oil and gas business and (iii) other contracts for the purchase and/or sale of Hydrocarbons of third parties (A) which have generally offsetting provisions (i.e., corresponding pricing mechanics, delivery dates and points and volumes) such that no "position" is taken, and (B) for which appropriate credit support has been taken to alleviate the material credit risks of the counterparty thereto.

(b)    Each of the Borrower and the Parent will not, and will not permit any Subsidiary to, amend in any material respect the written Hydrocarbon Marketing Policy delivered to the Lenders pursuant to Section 6.01(p) without the prior written consent of the Administrative Agent and the Majority Lenders.

Section 9.21    Holding Company.  The Parent will remain a holding company and not own any real property, immovable property or material assets, incur indebtedness, liens or liabilities, make Restricted Payments or engage in any operations or business (other than (a) its direct or indirect ownership of its Domestic Subsidiaries, (b) providing employees and related services to its Subsidiaries, (c) making or holding Investments permitted under Section 9.05 (other than Section 9.05(b) and (h)), (d) incurring Permitted Unsecured Debt and providing guarantees of the Indebtedness permitted under Section 9.02(a) and (f) and (e) making Restricted Payments permitted under Section 9.04(a).

Section 9.22    Sale and Leaseback.  Each of the Borrower and the Parent will not, and will not permit any Subsidiary to, enter into any arrangement, directly or indirectly, with any Person whereby it shall sell or transfer any Property, whether now owned or hereafter acquired, and thereafter rent or lease such Property which it intends to use for substantially the same purpose or purposes as the Property being sold or transferred.

Section 9.23   Amendments to Organizational Documents; Changes in Fiscal Year End.

(a)   Each of the Borrower and the Parent will not, and will not permit any Subsidiary to, amend, supplement or otherwise modify (or permit to be amended, supplemented or modified) its Organizational Documents in any manner that would be adverse to the Lenders in any material respect.

(b)   Each of the Borrower and the Parent will not, and will not permit any Subsidiary to, change the last day of its fiscal year from December 31 of each year, or the last days of the first three fiscal quarters in each of its fiscal years from March 31, June 30 and September 30 of each year, respectively

Section 9.24   [Reserved].

Section 9.25   Anti-Corruption Laws; Anti-Money Laundering Laws; Sanctions.

(a)   None of the members of the Group nor, to the knowledge of Borrower, any director, officer, employee, or agent acting on behalf of any of the foregoing shall (i)(A) use any corporate funds for any unlawful contribution, gift, entertainment or other unlawful expense relating to political activity or (B) offer, pay, give, promise to pay, authorize the payment of, or take any action in furtherance of the payment of anything of value directly or, to the knowledge of any Loan  Party, indirectly to a Government Official or any other person to improperly influence the recipient's action or otherwise to obtain or retain business or to secure an improper business advantage, in the case of clauses (A) and (B), in violation of any applicable Anti-Corruption Laws or (ii) by act or omission, violate any Anti-Corruption Laws.

(b)   Each Loan Party (i) shall and shall cause each other member of the Group to, conduct its operations at all times in compliance in all material respects with all applicable Anti-Money Laundering Laws and (ii) shall not, directly or, to the knowledge of any Loan Party, indirectly, use the proceeds of the Loans or lend, contribute or otherwise make available such proceeds to any Subsidiary, Affiliate, joint venture partner or other Person for the purpose of financing or facilitating any activity that would violate any applicable Anti-Money Laundering Laws.

(c)   The Borrower will not involve or include, directly or indirectly, any person that is a subject of Sanctions in any of its dealings with the Administrative Agent, the Issuing Bank or the Lenders or related to this Agreement.

**ARTICLE X**
**EVENTS OF DEFAULT; REMEDIES**

Section 10.01   Events of Default.  The occurrence of one or more of the following events shall constitute an "Event of Default":

(a)   the Borrower shall fail to pay any principal of any Loan or any reimbursement obligation in respect of any LC Disbursement when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof, by acceleration or otherwise;

103

(b)      the Borrower shall fail to pay any interest on any Loan or any fee or any other amount (other than an amount referred to in Section 10.01(a)) payable under any Loan Document, when and as the same shall become due and payable, and such failure shall continue unremedied for a period of five days;

(c)      any representation or warranty made or deemed made by or on behalf of the Borrower, any other Loan Party or the Public Parent in or in connection with any Loan Document or any amendment or modification of any Loan Document or waiver under such Loan Document, or in any report, certificate, financial statement or other document furnished pursuant to or in connection with any Loan Document or any amendment or modification thereof or waiver thereunder, shall prove to have been incorrect in any material respect (or, to the extent that any such representation or warranty is qualified by materiality, such representation or warranty shall prove to have been incorrect in any respect) when made or deemed made;

(d)      any Loan Party shall fail to observe or perform any covenant, condition or agreement contained in Section 8.02, Section 8.03 (with respect to the existence of the Parent and the Borrower), Section 8.14, Section 8.18 or in Article IX of this Agreement;

(e)      any Loan Party or the Public Parent shall fail to observe or perform any covenant, condition or agreement contained in this Agreement (other than those specified in Section 10.01(a), Section 10.01(b), Section 10.01(c) or Section 10.01(d)) or any other Loan Document, and such failure shall continue unremedied for a period of 30 days after the earlier to occur of (A) notice thereof from the Administrative Agent to the Borrower (which notice will be given at the request of any Lender), or (B) a Responsible Officer of the Borrower, the Public Parent or such other Loan Party otherwise becoming aware of such default;

(f)      any Loan Party shall fail to make any payment (whether of principal or interest and regardless of amount) in respect of any Material Indebtedness, when and as the same shall become due and payable (after giving effect to all applicable cure periods);

(g)      (i) any event or condition occurs that results in any Material Indebtedness becoming due prior to its scheduled maturity or (ii) any event or condition (other than a "termination event" as set forth in Sections 5(b)(1), 5(b)(2), 5(b)(3) and 5(b)(4) of the 1992 ISDA Master Agreement form of the International Swaps and Derivatives Association or in Sections 5(b)(1), 5(b)(2), 5(b)(3), 5(b)(4) and 5(b)(5) of the 2002 ISDA Master Agreement form of the International Swaps and Derivatives Association) that enables or permits (after giving effect to all applicable notice and cure periods) the holder or holders of any Material Indebtedness or any trustee or agent on its or their behalf to cause any Material Indebtedness to become due, or to require the Redemption thereof or any offer to Redeem to be made in respect thereof, prior to its scheduled maturity or require the Borrower or any other Loan Party to make an offer in respect thereof;

(h)      an involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking (i) liquidation, reorganization or other relief in respect of the Borrower, any other Loan Party or the Public Parent or its debts, or of a substantial part of its assets, under any federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect, or (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator or

104

similar official for the Borrower, any other Loan Party or the Public Parent or for a substantial part of its assets, and, in any such case, such proceeding or petition shall continue undismissed for 60 days or an order or decree approving or ordering any of the foregoing shall be entered;

(i)    any Loan Party or the Public Parent shall (i) voluntarily commence any proceeding or file any petition seeking liquidation, reorganization or other relief under any federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect, (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition described in Section 10.01(h), (iii) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for the Borrower, any other Loan Party or the Public Parent or for a substantial part of its assets, (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding, (v) make a general assignment for the benefit of creditors or (vi) take any action for the purpose of effecting any of the foregoing; or any stockholder of the Borrower shall make any request or take any action for the purpose of calling a meeting of the equityholders of the Borrower to consider a resolution to dissolve and wind-up the Borrower's affairs;

(j)    any Loan Party or the Public Parent shall become unable, admit in writing its inability or fail generally to pay its debts as they become due;

(k)    (i) one or more final, non-appealable judgments for the payment of money in an aggregate amount in excess of $15,000,000 (to the extent not covered by independent third party insurance provided by insurers of the highest claims paying rating or financial strength as to which the insurer does not dispute coverage and is not subject to an insolvency proceeding) or (ii) any one or more final, non-appealable non-monetary judgments that have, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, shall be rendered against any Loan Party or any combination thereof and the same shall remain undischarged for a period of 60 consecutive days during which execution shall not be effectively stayed, or any action shall be legally taken by a judgment creditor to attach or levy upon any assets of any Loan Party to enforce any such judgment;

(l)    the Loan Documents (including, without limitation, each Subordination Agreement) after delivery thereof shall for any reason, except to the extent permitted by the terms thereof, cease to be in full force and effect and valid, binding and enforceable in accordance with their terms against any Loan Party party thereto or the Public Parent (or, in the case of any Subordination Agreement, against any other party thereto) or shall be repudiated by any of them, or cease to create a valid and perfected Lien of the priority required thereby on any material part of the collateral purported to be covered thereby, except to the extent permitted by the terms of this Agreement, or the Borrower or any other Loan Party or any of their Affiliates shall so state in writing;

(m)    a Change in Control shall occur; or

(n)    an ERISA Event shall have occurred that, in the opinion of the Majority Lenders, when taken together with all other ERISA Events that have occurred, could reasonably be expected to result in liability of the Parent and its Subsidiaries in an aggregate amount exceeding $10,000,000 for all periods.

105

Section 10.02   Remedies.

(a)     In the case of an Event of Default other than one described in Section 10.01(h), Section 10.01(i) or Section 10.01(j), at any time thereafter during the continuance of such Event of Default, the Administrative Agent may, and at the request of the Majority Lenders, shall, by notice to the Borrower, take either or both of the following actions, at the same or different times:  (i) terminate the Commitments, and thereupon the Commitments shall terminate immediately, and (ii) declare the Notes and the Loans then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), and thereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and all fees and other obligations of the Borrower and the Guarantors accrued hereunder and under the Notes and the other Loan Documents (including, without limitation, the payment of cash collateral to secure the LC Exposure as provided in Section 2.08(j)), shall become due and payable immediately, without presentment, demand, protest, notice of intent to accelerate, notice of acceleration or other notice of any kind, all of which are hereby waived by the Borrower and each Guarantor; and in case of an Event of Default described in Section 10.01(h), Section 10.01(i) or Section 10.01(j), the Commitments shall automatically terminate and the Notes and the principal of the Loans then outstanding, together with accrued interest thereon and all fees and the other obligations of the Borrower and the Guarantors accrued hereunder and under the Notes and the other Loan Documents (including, without limitation, the payment of cash collateral to secure the LC Exposure as provided in Section 2.08(j)), shall automatically become due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower and each Guarantor.

(b)     In the case of the occurrence of an Event of Default, the Administrative Agent and the Lenders will have all other rights and remedies available at law and equity.

(c)     All proceeds realized from the liquidation or other disposition of collateral or otherwise received after maturity of the Notes, whether by acceleration or otherwise, shall be applied:

(i)     *first*, to payment or reimbursement of that portion of the Indebtedness constituting fees, expenses and indemnities payable to the Administrative Agent in its capacity as such;

(ii)    *second*, pro rata to payment or reimbursement of that portion of the Indebtedness constituting fees, expenses and indemnities payable to the Lenders;

(iii)   *third*, pro rata to payment of accrued interest on the Loans;

(iv)    *fourth*, pro rata to payment of (A) principal outstanding on the Loans, (B) Indebtedness referred to in clause (b) of the definition of Indebtedness owing to a Secured Swap Provider and (C) Indebtedness referred to in clause (c) of the definition of Indebtedness owing to a Bank Products Provider;

(v)     *fifth*, pro rata to any other Indebtedness;

106

(vi)    *sixth*, to serve as cash collateral to be held by the Administrative Agent to secure the LC Exposure; and

(vii)    *seventh*, any excess, after all of the Indebtedness shall have been indefeasibly paid in full in cash, shall be paid to the Borrower or as otherwise required by any Governmental Requirement.

Notwithstanding the foregoing, amounts received from the Borrower or any Guarantor that is not an Eligible Contract Participant shall not be applied to any Excluded Swap Obligations owing to a Secured Swap Provider (it being understood, that in the event that any amount is applied to Indebtedness other than Excluded Swap Obligations as a result of this clause, the Administrative Agent shall make such adjustments as it determines are appropriate to distributions pursuant to clause *fourth* above from amounts received from Eligible Contract Participants to ensure, as nearly as possible, that the proportional aggregate recoveries with respect to Indebtedness described in clause *fourth* above by Secured Swap Providers that are the holders of any Excluded Swap Obligations are the same as the proportional aggregate recoveries with respect to other Indebtedness pursuant to clause *fourth* above).

## ARTICLE XI
## THE ADMINISTRATIVE AGENT

Section 11.01    Appointment; Powers.

(a)    Each of the Lenders and the Issuing Bank hereby irrevocably appoints the Administrative Agent as its agent and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof and the other Loan Documents, together with such actions and powers as are reasonably incidental thereto. The provisions of this Article are solely for the benefit of the Administrative Agent, the Lenders and the Issuing Bank, and neither the Borrower nor any Subsidiary thereof shall have rights as a third-party beneficiary of any of such provisions (other than Sections 11.06, 11.10 and 11.12).  It is understood and agreed that the use of the term "agent" herein or in any other Loan Documents (or any other similar term) with reference to the Administrative Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any Applicable Law. Instead such term is used as a matter of market custom, and is intended to create or reflect only an administrative relationship between contracting parties.

(b)    The Administrative Agent shall also act as the "collateral agent" under the Loan Documents, and each of the Lenders (including in its capacity as a potential Secured Swap Provider or Bank Products Provider) and the Issuing Bank hereby irrevocably appoints and authorizes the Administrative Agent to act as the agent of such Lender and the Issuing Bank for purposes of acquiring, holding and enforcing any and all Liens on collateral granted by any of the Loan Parties to secure any Indebtedness, together with such powers and discretion as are reasonably incidental thereto (including, without limitation, to enter into additional Loan Documents or supplements to existing Loan Documents on behalf of the Secured Parties).  In this connection, the Administrative Agent, as "collateral agent" and any co-agents, subagents and attorneys-in-fact appointed by the Administrative Agent pursuant to this Article XI for purposes

107

of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Security Instruments, or for exercising any rights and remedies thereunder at the direction of the Administrative Agent), shall be entitled to the benefits of all provisions of Article XI and Article XII (including Section 12.03, as though such co-agents, subagents and attorneys-in-fact were the "collateral agent" under the Loan Documents) as if set forth in full herein with respect thereto.

Section 11.02 <u>Duties and Obligations of Administrative Agent</u>.  The Administrative Agent shall not have any duties or obligations except those expressly set forth herein and in the Loan Documents, and its duties hereunder and thereunder shall be administrative in nature. Without limiting the generality of the foregoing, except as may be necessary for the Administrative Agent to be an "agent," "collateral agent" or "representative" of the Secured Parties within the meaning of such terms under Section 9-102(a)(72), 9-502 and 9-503 of the Uniform Commercial Code, (a) the Administrative Agent shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing, (b) the Administrative Agent shall have no duty to take any discretionary action or exercise any discretionary powers, except as provided in <u>Section 11.03</u> and (c) except as expressly set forth herein and in the other Loan Documents, the Administrative Agent shall not have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any of the other Loan Parties that is communicated to or obtained by the bank serving as Administrative Agent or any of its Affiliates in any capacity.  The Administrative Agent shall be deemed not to have knowledge of any Default unless and until written notice thereof is given to the Administrative Agent by the Borrower or a Lender, and shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered (or deemed delivered) hereunder or under any other Loan Document or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or in any other Loan Document or the occurrence of any Default or Event of Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document, (v) the satisfaction of any condition set forth in <u>Article VI</u> or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent or as to those conditions precedent expressly required to be to the Administrative Agent's satisfaction, (vi) the existence, value, perfection or priority of any collateral security or the financial or other condition of the Borrower and the other Loan Parties or any other obligor or guarantor, (vii) any failure by the Borrower or any other Person (other than itself) to perform any of its obligations hereunder or under any other Loan Document or the performance or observance of any covenants, agreements or other terms or conditions set forth herein or therein or (viii) the utilization of the Issuing Bank's LC Commitment (it being understood and agreed that the Issuing Bank shall monitor compliance with the LC Commitment without any further action by the Administrative Agent).  For purposes of determining compliance with the conditions specified in <u>Article VI</u>, each Lender shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received written notice from such Lender prior to the proposed closing date specifying its objection thereto.

Section 11.03  Action by Administrative Agent.  The Administrative Agent shall have no duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Administrative Agent is required to exercise in writing as directed by the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 12.02) and in all cases the Administrative Agent shall be fully justified in failing or refusing to take any discretionary action or exercise any discretionary power hereunder or under any other Loan Documents unless it shall (a) receive written instructions from the Required Lenders or the Lenders, as applicable, (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 12.02) specifying the action to be taken, and (b) be indemnified to its satisfaction by the Lenders against any and all liability and expenses which may be incurred by it by reason of taking or continuing to take any such action.  The instructions as aforesaid and any action taken or failure to act pursuant thereto by the Administrative Agent shall be binding on all of the Lenders.  If a Default has occurred and is continuing, then the Administrative Agent shall take such action with respect to such Default as shall be directed by the requisite Lenders in the written instructions (with indemnities) described in this Section 11.03; *provided* that, unless and until the Administrative Agent shall have received such directions, the Administrative Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default as it shall deem advisable in the best interests of the Lenders.  In no event, however, shall the Administrative Agent be required to take any action which exposes the Administrative Agent to personal liability or which is contrary to this Agreement, the Loan Documents or applicable law (including for the avoidance of doubt any action that may be in violation of the automatic stay under any bankruptcy law or that may effect a forfeiture, modification or termination of property of a Defaulting Lender in violation of any bankruptcy law).  The Administrative Agent shall not be liable to any Lender or any Issuing Bank for any action taken or not taken by it with the consent or at the request of the Required Lenders or the Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith shall be necessary, under the circumstances as provided in Section 12.02), and otherwise the Administrative Agent shall not be liable for any action taken or not taken by it hereunder or under any other Loan Document or under any other document or instrument referred to or provided for herein or therein or in connection herewith or therewith INCLUDING ITS OWN ORDINARY NEGLIGENCE, except for its own gross negligence or willful misconduct.

Section 11.04  Reliance by Administrative Agent.  The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing reasonably believed by it to be genuine and to have been signed or sent by the proper Person.  The Administrative Agent also may rely upon any statement made to it orally or by telephone and reasonably believed by it to be made by the proper Person, and shall not incur any liability for relying thereon and each of the Borrower, the Lenders and the Issuing Bank hereby waives the right to dispute the Administrative Agent's record of such statement, except in the case of gross negligence or willful misconduct by the Administrative Agent.  The Administrative Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.  The Administrative Agent may deem

and treat the payee of any Note as the holder thereof for all purposes hereof unless and until a written notice of the assignment or transfer thereof permitted hereunder shall have been filed with the Administrative Agent. In determining compliance with any condition hereunder to the making of a Loan, or the issuance, extension, renewal or increase of a Letter of Credit, that by its terms must be fulfilled to the satisfaction of a Lender or the Issuing Bank, the Administrative Agent may presume that such condition is satisfactory to such Lender or the Issuing Bank unless the Administrative Agent shall have received notice to the contrary from such Lender or the Issuing Bank prior to the making of such Loan or the issuance of such Letter of Credit.

Section 11.05  Subagents.  The Administrative Agent may perform any and all its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more subagents appointed by the Administrative Agent.  The Administrative Agent and any such subagent may perform any and all its duties and exercise its rights and powers through their respective Related Parties.  The exculpatory provisions of the preceding Sections of this Article XI shall apply to any such subagent and to the Related Parties of the Administrative Agent and any such subagent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent. The Administrative Agent shall not be responsible for the negligence or misconduct of any subagents except to the extent that a court of competent jurisdiction determines in a final and nonappealable judgment that the Administrative Agent acted with gross negligence or willful misconduct in the selection of such sub agents.

Section 11.06  Resignation of Administrative Agent.

(a)      The Administrative Agent may at any time give notice of its resignation to the Lenders, the Issuing Bank and the Borrower.  Upon receipt of any such notice of resignation, the Majority Lenders shall have the right, in consultation with the Borrower, to appoint a successor, which shall be a bank with an office in the United States, or an Affiliate of any such bank with an office in the United States.  If no such successor shall have been so appointed by the Majority Lenders and shall have accepted such appointment within 30 days after the retiring Administrative Agent gives notice of its resignation (or such earlier day as shall be agreed by the Majority Lenders) (the "Resignation Effective Date"), then the retiring Administrative Agent may (but shall not be obligated to), on behalf of the Lenders and the Issuing Bank, appoint a successor Administrative Agent meeting the qualifications set forth above. Whether or not a successor has been appointed, such resignation shall become effective in accordance with such notice on the Resignation Effective Date.

(b)      With effect from the Resignation Effective Date, (i) the retiring or removed Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any collateral security held by the Administrative Agent on behalf of the Lenders or the Issuing Bank under any of the Loan Documents, the retiring or removed Administrative Agent shall continue to hold such collateral security until such time as a successor Administrative Agent is appointed) and (ii) except for any indemnity payments owed to the retiring or removed Administrative Agent, all payments, communications and determinations provided to be made by, to or through the Administrative Agent shall instead be made by or to each Lender and the Issuing Bank directly, until such time, if any, as the Majority Lenders appoint a successor Administrative Agent as provided for above.

110

Upon the acceptance of a successor's appointment as Administrative Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring or removed Administrative Agent (other than any rights to indemnity payments owed to the retiring or removed Administrative Agent), and the retiring or removed Administrative Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents. The fees payable by the Borrower to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor.  After the retiring or removed Administrative Agent's resignation or removal hereunder and under the other Loan Documents, the provisions of this Article and Section 12.03 shall continue in effect for the benefit of such retiring or removed Administrative Agent, its subagents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring or removed Administrative Agent was acting as Administrative Agent.

Section 11.07 <u>Administrative Agent as Lender</u>.  The bank serving as Administrative Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Administrative Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the bank serving as the Administrative Agent hereunder in its individual capacity. Such bank and its Affiliates may accept deposits from, lend money to, own securities of, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with the Borrower or any other Loan Party or other Affiliate thereof as if it were not the Administrative Agent hereunder and without any duty to account therefor to the Lenders.

Section 11.08 <u>No Reliance</u>.  Each Lender acknowledges that it has, independently and without reliance upon the Administrative Agent or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement and each other Loan Document to which it is a party.  Each Lender also acknowledges that it will, independently and without reliance upon the Administrative Agent or any other Lender and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document, any related agreement or any document furnished hereunder or thereunder.  The Administrative Agent shall not be required to keep itself informed as to the performance or observance by the Borrower or any of the other Loan Parties of this Agreement, the Loan Documents or any other document referred to or provided for herein or to inspect the Properties or books of the Borrower or the other Loan Parties.  Except for notices, reports and other documents and information expressly required to be furnished to the Lenders by the Administrative Agent hereunder, the Administrative Agent shall have no duty or responsibility to provide any Lender with any credit or other information concerning the affairs, financial condition or business of the Borrower (or any of its Affiliates) which may come into the possession of the Administrative Agent or any of its Affiliates.  In this regard, each Lender acknowledges that Linklaters LLP is acting in this transaction as special counsel to the Administrative Agent only, except to the extent otherwise expressly stated in any legal opinion or any Loan Document.  Each other party hereto will consult with its own legal counsel to the extent that it deems necessary in connection with the Loan Documents and the matters contemplated therein.

Section 11.09  <u>Administrative Agent May File Proofs of Claim</u>.  In case of the pendency of any receivership, insolvency, liquidation, bankruptcy, reorganization, arrangement, adjustment, composition or other judicial proceeding relative to the Borrower or any of the other Loan Parties, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(a)       to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Indebtedness that are owing and unpaid, and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders and the Administrative Agent under <u>Section 12.03</u>) allowed in such judicial proceeding; and

(b)       to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due the Administrative Agent under <u>Section 12.03</u>.

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Indebtedness or the rights of any Lender or to authorize the Administrative Agent to vote in respect of the claim of any Lender in any such proceeding.

Section 11.10  <u>Authority of Administrative Agent to Release Collateral and Liens</u>.

(a)       Each of the Lenders (including in its or any of its Affiliate's capacities as a potential Secured Swap Provider or Bank Products Provider) and the Issuing Bank irrevocably authorize the Administrative Agent, and the Administrative Agent hereby agrees:

(i)       to release any Lien on any collateral granted to or held by the Administrative Agent, for the ratable benefit of the Secured Parties, under any Loan Document (A) upon the termination of the Commitments and payment in full of all Indebtedness (other than (1) contingent indemnification obligations and (2) obligations and liabilities under Swap Agreements as to which arrangements satisfactory to the applicable Secured Swap Provider shall have been made) and the expiration or termination of all Letters of Credit (other than Letters of Credit which have been cash collateralized (on terms reasonably acceptable to the Issuing Bank) or otherwise addressed in a manner satisfactory to the Issuing Bank), (B) that is sold or otherwise

112

disposed of or to be sold or otherwise disposed of as part of or in connection with any sale or other disposition permitted under the Loan Documents, (C) that is owned by any Subsidiary Guarantor who has been released from its obligations under the Loan Documents pursuant to Section 10.10(a)(iii) or (D) if approved, authorized or ratified in writing in accordance with Section 12.02;

(ii)     to subordinate any Lien on any collateral granted to or held by the Administrative Agent under any Loan Document to the holder of any Excepted Lien or Lien permitted pursuant to Section 9.03(c); and

(iii)     to release any Subsidiary Guarantor from its obligations under any Loan Documents if such Person ceases to be a Guarantor as a result of a transaction permitted under the Loan Documents.

(b)     Upon request by the Administrative Agent at any time, the Majority Lenders will confirm in writing the Administrative Agent's authority to release or subordinate its interest in particular types or items of property, or to release any Subsidiary Guarantor from its obligations under the Guaranty Agreement pursuant to this Section 11.10. In each case as specified in this Section 11.10, the Administrative Agent will, at the Borrower's expense, execute and deliver to the applicable Loan Party such documents as such Loan Party may reasonably request to evidence the release of such item of collateral from the assignment and security interest granted under the Security Instruments or to subordinate its interest in such item, or to release such Subsidiary Guarantor from its obligations under the Guaranty Agreement, in each case in accordance with the terms of the Loan Documents and this Section 11.10.  In the case of any such sale, transfer or disposal of any property constituting collateral in a transaction permitted pursuant to Section 9.12, the Liens created by any of the Security Instruments on such property shall be automatically released without need for further action by any person.

(c)     The Administrative Agent shall not be responsible for or have a duty to ascertain or inquire into any representation or warranty regarding the existence, value or collectability of the collateral, the existence, priority or perfection of the Administrative Agent's Lien thereon, or any certificate prepared by any Loan Party in connection therewith, nor shall the Administrative Agent be responsible or liable to the Lenders for any failure to monitor or maintain any portion of the collateral.

Section 11.11   Swap Agreements. No Secured Swap Provider that obtains the benefits of Section 10.02(c) or any collateral by virtue of the provisions hereof or of any Security Instrument shall have any right to notice of any action or to consent to, direct or object to any action hereunder or under any other Loan Document or otherwise in respect of the collateral (including the release or impairment of any collateral) other than in its capacity as a Lender and, in such case, only to the extent expressly provided in the Loan Documents.  Notwithstanding any other provision of this Article XI to the contrary, the Administrative Agent shall not be required to verify the payment of, or that other satisfactory arrangements have been made with respect to, Swap Agreements unless the Administrative Agent has received written notice of such Swap Agreements, together with such supporting documentation as the Administrative Agent may request, from the applicable Secured Swap Provider.

Section 11.12   Intercreditor and Subordination Agreements.

(a)     Each of the Lenders, the Issuing Bank and the other Secured Parties hereby irrevocably authorizes and directs the Administrative Agent to execute and deliver, in each case on behalf of such Secured Party and without any further consent, authorization or other action by such Secured Party, (i) from time to time upon the request of the Borrower, in connection with the establishment, incurrence, amendment, modification, refinancing or replacement of any Permitted Unsecured Debt, any Subordination Agreement (which, for the avoidance of doubt, shall include the provisions set forth in Annex III hereto or such other terms as may be agreed by the Borrower, the Administrative Agent and the Majority Lenders) and (ii) any documents relating to any of the foregoing.

(b)     Each of the Lenders, the Issuing Bank and the other Secured Parties hereby irrevocably further authorizes and directs the Administrative Agent to execute and deliver, in each case on behalf of such Secured Party and without any further consent, authorization or other action by such Secured Party, any amendments, supplements or other modifications of any Subordination Agreement that the Borrower may from time to time request (A) to give effect to any establishment, incurrence, amendment, modification, refinancing or replacement of any Permitted Unsecured Debt in accordance with the terms hereof, or (B) to effect any other amendment, supplement or modification so long as the resulting agreement would constitute a Subordination Agreement if executed at such time as a new agreement.

(c)     Each of the Lenders, the Issuing Bank and the other Secured Parties hereby irrevocably further authorizes and directs the Administrative Agent to execute and deliver, in each case on behalf of such Secured Party and without any further consent, authorization or other action by such Secured Party, any amendments, supplements or other modifications of any Security Instrument to add or remove any legend that may be required pursuant to any such Subordination Agreement.

(d)     The Administrative Agent shall have the benefit of the provisions of Article XI with respect to all actions taken by it pursuant to this Section 11.12 or in accordance with the terms of any such Subordination Agreement to the full extent thereof.

**ARTICLE XII**
**MISCELLANEOUS**

Section 12.01   Notices.

(a)     Except in the case of notices and other communications expressly permitted to be given by telephone (and subject to Section 12.01(b)), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by electronic mail or telecopy, as follows:

(i)     if to the Borrower or the Parent, to it at Amplify Energy Operating LLC, [500 Dallas Street, Suite 1600], Houston, Texas 77002, Attn: Robert L. Stillwell, Jr., Chief Financial Officer (Telecopy No.: (713) 490-8901; email: bobby.stillwell@memorialpp.com);

114

(ii)     if to the Administrative Agent, to it at Wells Fargo Bank, National Association, 1000 Louisiana Street, 9th Floor, Houston, Texas 77002, Attn: Bryan McDavid (Telecopy No.: (713) 652-5874; email: Bryan.M.McDavid@wellsfargo.com);

(iii)     if to the Issuing Bank, to it at Wells Fargo Bank, National Association, 1525 W WT Harris Blvd., 1st Floor, MAC D1109-019, Charlotte, NC 28262, Attn: Agency Services (Telecopy No.: (704) 590-2782), with a copy to Wells Fargo Bank, National Association, 1000 Louisiana Street, 9th Floor, Houston, Texas 77002, Attn: Bryan McDavid (Telecopy No.: (713) 652-5874; email: Bryan.M.McDavid@wellsfargo.com); and

(iv)     if to any other Lender, to it at its address (or electronic mail address or telecopy number) set forth in its Administrative Questionnaire.

Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices sent by telecopy or electronic mail shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next business day for the recipient).  Notices delivered through electronic communications to the extent provided in paragraph (b) below, shall be effective as provided in said paragraph (b).

(b)     Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communications (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Administrative Agent; *provided* that the foregoing shall not apply to notices pursuant to Article II, Article III, Article IV and Article V unless otherwise agreed by the Administrative Agent and the applicable Lender.   The Administrative Agent or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; *provided* that approval of such procedures may be limited to particular notices or communications. Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor; provided that, for both clauses (i) and (ii) above, if such notice, email or other communication is not sent during the normal business hours of the recipient, such notice, email or other communication shall be deemed to have been sent at the opening of business on the next business day for the recipient.

(c)     Any party hereto may change its address or telecopy number for notices and other communications hereunder by notice to the other parties hereto.  All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt.

115

Section 12.02  Waivers; Amendments.

(a)     No failure on the part of the Administrative Agent, the Issuing Bank or any Lender to exercise and no delay in exercising, and no course of dealing with respect to, any right, power or privilege, or any abandonment or discontinuance of steps to enforce such right, power or privilege, under any of the Loan Documents shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege under any of the Loan Documents preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  The rights and remedies of the Administrative Agent, the Issuing Bank and the Lenders hereunder and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have.  No waiver of any provision of this Agreement or any other Loan Document or consent to any departure by the Borrower therefrom shall in any event be effective unless the same shall be permitted by Section 12.02(b), and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  Without limiting the generality of the foregoing, the making of a Loan or issuance of a Letter of Credit shall not be construed as a waiver of any Default, regardless of whether the Administrative Agent, any Lender or the Issuing Bank may have had notice or knowledge of such Default at the time.

(b)     Neither this Agreement nor any provision hereof nor any Security Instrument nor any provision thereof may be waived, amended or modified, except pursuant to an agreement or agreements in writing entered into by the Borrower and the Majority Lenders or by the Borrower and the Administrative Agent with the consent of the Majority Lenders; *provided* that no such agreement shall (i) increase the Commitment, Elected Commitment or the Maximum Credit Amount of any Lender without the written consent of such Lender, (ii) increase the Borrowing Base without the written consent of each Lender, decrease or maintain the Borrowing Base without the consent of the Required Lenders, or modify in any manner Section 2.07 without the consent of each Lender (other than any Defaulting Lender); *provided* that a Scheduled Redetermination may be postponed by Required Lenders, (iii) reduce the principal amount of any Loan or LC Disbursement or reduce the rate of interest thereon (other than the waiver of interest at the default rate pursuant to Section 3.02(c)), or reduce any fees payable hereunder, or reduce any other Indebtedness hereunder or under any other Loan Document, without the written consent of each Lender directly and adversely affected thereby, (iv) postpone the scheduled date of payment or prepayment of the principal amount of any Loan or LC Disbursement, or any interest thereon, or any fees payable hereunder, or any other Indebtedness hereunder or under any other Loan Document, or reduce the amount of, waive or excuse any such payment, or postpone or extend the Termination Date without the written consent of each Lender directly and adversely affected thereby, (v) change Section 4.01(b), Section 4.01(c) or Section 10.02(c) in a manner that would alter the pro rata sharing of payments required thereby, without the written consent of each Lender adversely affected thereby, (vi) waive or amend Section 3.04(c), Section 6.01 or Section 8.14 without the written consent of each Lender (other than any Defaulting Lender), (vii) waive or amend Section 12.14 without the written consent of each Lender (other than any Defaulting Lender) and each Secured Swap Provider affected thereby, (viii) waive or amend Section 12.15 without the written consent of each Secured Swap Provider affected thereby, (ix) release any Guarantor (except pursuant to a transaction permitted hereunder, as set forth in Section 11.10 or in the Guaranty Agreement) or release all or substantially all of the Property subject to a lien and security interest in favor of the

116

Administrative Agent pursuant to any Security Instrument (other than as provided in Section 11.10) without the written consent of each Lender (other than any Defaulting Lender), (x) reduce the percentage set forth in Section 8.14(a) to less than (A) 95% without the written consent of the Required Lenders or (B) 80% without the written consent of each Lender, (xi) change any of the provisions of this Section 12.02(b) or the definitions of "Required Lenders" or "Majority Lenders" or any other provision hereof specifying the number or percentage of Lenders required to waive, amend or modify any rights hereunder or under any other Loan Documents or make any determination or grant any consent hereunder or under any other Loan Documents, without the written consent of each Lender (other than any Defaulting Lender) or (xii) or change the definition of the terms "Domestic Subsidiary," "Foreign Subsidiary," "Material Subsidiary" or "Subsidiary," without the written consent of the Required Lenders; *provided further* that no such agreement shall amend, modify or otherwise affect the rights or duties of the Administrative Agent or the Issuing Bank hereunder or under any other Loan Document without the prior written consent of the Administrative Agent or the Issuing Bank, as the case may be.  Notwithstanding the foregoing, any supplement to Schedule 7.14 (Loan Parties and Subsidiaries) shall be effective simply by delivering to the Administrative Agent a supplemental schedule clearly marked as such and, upon receipt, the Administrative Agent will promptly deliver a copy thereof to the Lenders.

Section 12.03  Expenses, Indemnity; Damage Waiver.

(a)  The Borrower shall pay (i) all reasonable and documented out-of-pocket expenses incurred by the Administrative Agent and its Affiliates, including, without limitation, the reasonable and documented fees, charges and disbursements of outside counsel and other outside consultants for the Administrative Agent, the reasonable and documented out-of-pocket travel, photocopy, mailing, courier, telephone and other similar expenses, including all *Syndtrak* (or similar service) expenses, and the reasonable and documented out-of-pocket cost of environmental assessments and audits and surveys and appraisals, in connection with the syndication of the credit facilities provided for herein, the preparation, negotiation, execution, delivery and administration (both before and after the execution hereof and including advice of counsel to the Administrative Agent as to the rights and duties of the Administrative Agent and the Lenders with respect thereto) of this Agreement and the other Loan Documents and any amendments, modifications or waivers of or consents related to the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), (ii) all reasonable and documented out-of-pocket costs, expenses, Taxes, assessments and other charges incurred by the Administrative Agent in connection with any filing, registration, recording or perfection of any security interest contemplated by this Agreement or any Security Instrument or any other document referred to therein, (iii) all reasonable and documented out-of-pocket expenses incurred by the Issuing Bank in connection with the issuance, amendment, renewal or extension of any Letter of Credit or any demand for payment thereunder and (iv) if a Default has occurred, all documented out-of-pocket expenses incurred by the Administrative Agent, the Issuing Bank or any Lender, including the documented fees, charges and disbursements of any counsel for the Administrative Agent, the Issuing Bank or any Lender, in connection with the enforcement or protection of its rights in connection with this Agreement or any other Loan Document, including its rights under this Section 12.03, or in connection with the Loans made or Letters of Credit issued hereunder, including, without limitation, all such out-of-pocket expenses

117

incurred during any workout, restructuring or negotiations in respect of such Loans or Letters of Credit.

(b)     THE BORROWER SHALL INDEMNIFY THE ADMINISTRATIVE AGENT, THE ISSUING BANK AND EACH LENDER, AND EACH RELATED PARTY OF ANY OF THE FOREGOING PERSONS (EACH SUCH PERSON BEING CALLED AN "INDEMNITEE") AGAINST, AND DEFEND AND HOLD EACH INDEMNITEE HARMLESS FROM, ANY AND ALL LOSSES, CLAIMS, DAMAGES, PENALTIES, LIABILITIES AND RELATED EXPENSES, INCLUDING THE REASONABLE FEES, CHARGES AND DISBURSEMENTS OF ANY OUTSIDE COUNSEL FOR ANY INDEMNITEE, INCURRED BY OR ASSERTED AGAINST ANY INDEMNITEE ARISING OUT OF, IN CONNECTION WITH, OR AS A RESULT OF (i) THE EXECUTION OR DELIVERY OF THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR ANY AGREEMENT OR INSTRUMENT CONTEMPLATED HEREBY OR THEREBY, THE PERFORMANCE BY THE PARTIES HERETO OR THE PARTIES TO ANY OTHER LOAN DOCUMENT OF THEIR RESPECTIVE OBLIGATIONS HEREUNDER OR THEREUNDER OR THE CONSUMMATION OF THE TRANSACTIONS CONTEMPLATED HEREBY OR BY ANY OTHER LOAN DOCUMENT (PROVIDED THAT THE INDEMNIFICATION IN THIS CLAUSE (i) SHALL NOT EXTEND TO DISPUTES SOLELY BETWEEN OR AMONG THE ADMINISTRATIVE AGENT, THE LENDERS, THEIR RESPECTIVE AFFILIATES OR ANY OF THEIR RESPECTIVE SUCCESSORS OR ASSIGNS), (ii) THE FAILURE OF THE BORROWER OR ANY OTHER LOAN PARTY TO COMPLY WITH THE TERMS OF ANY LOAN DOCUMENT, INCLUDING THIS AGREEMENT, OR WITH ANY GOVERNMENTAL REQUIREMENT, (iii) ANY INACCURACY OF ANY REPRESENTATION OR ANY BREACH OF ANY WARRANTY OR COVENANT OF THE BORROWER OR ANY GUARANTOR SET FORTH IN ANY OF THE LOAN DOCUMENTS OR ANY INSTRUMENTS, DOCUMENTS OR CERTIFICATIONS DELIVERED IN CONNECTION THEREWITH, (iv) ANY LOAN OR LETTER OF CREDIT OR THE USE OF THE PROCEEDS THEREFROM, INCLUDING, WITHOUT LIMITATION, (A) ANY REFUSAL BY THE ISSUING BANK TO HONOR A DEMAND FOR PAYMENT UNDER A LETTER OF CREDIT IF THE DOCUMENTS PRESENTED IN CONNECTION WITH SUCH DEMAND DO NOT STRICTLY COMPLY WITH THE TERMS OF SUCH LETTER OF CREDIT, OR (B) THE PAYMENT OF A DRAWING UNDER ANY LETTER OF CREDIT NOTWITHSTANDING THE NON-COMPLIANCE, NON-DELIVERY OR OTHER IMPROPER PRESENTATION OF THE DOCUMENTS PRESENTED IN CONNECTION THEREWITH, (v) ANY OTHER ASPECT OF THE LOAN DOCUMENTS, (vi) THE OPERATIONS OF THE BUSINESS OF THE BORROWER AND THE OTHER LOAN PARTIES BY THE BORROWER AND THE OTHER LOAN PARTIES, (vii) ANY ASSERTION THAT THE LENDERS WERE NOT ENTITLED TO RECEIVE THE PROCEEDS RECEIVED PURSUANT TO THE SECURITY INSTRUMENTS, (viii) ANY ENVIRONMENTAL LAW APPLICABLE TO THE BORROWER OR ANY OTHER LOAN PARTY REGARDING ANY OF THEIR PROPERTIES OR OPERATIONS, INCLUDING, THE PRESENCE, GENERATION, STORAGE, RELEASE, THREATENED RELEASE, USE, TRANSPORT, DISPOSAL, ARRANGEMENT OF DISPOSAL OR TREATMENT OF HAZARDOUS MATERIALS ON OR AT ANY OF THEIR PROPERTIES, (ix) THE BREACH OR NON-COMPLIANCE BY THE BORROWER OR ANY OTHER LOAN PARTY WITH ANY ENVIRONMENTAL LAW APPLICABLE TO THE BORROWER OR ANY OTHER

118

LOAN PARTY, (x) THE PAST OWNERSHIP BY THE BORROWER OR ANY OTHER LOAN PARTY OF ANY OF THEIR PROPERTIES OR PAST ACTIVITY ON ANY OF THEIR PROPERTIES WHICH, THOUGH LAWFUL AND FULLY PERMISSIBLE AT THE TIME, COULD RESULT IN PRESENT LIABILITY, (xi) THE PRESENCE, USE, RELEASE, STORAGE, TREATMENT, DISPOSAL, GENERATION, THREATENED RELEASE, TRANSPORT, ARRANGEMENT FOR TRANSPORT OR ARRANGEMENT FOR DISPOSAL OF HAZARDOUS MATERIALS ON OR AT ANY OF THE PROPERTIES OWNED OR OPERATED BY THE BORROWER OR ANY OTHER LOAN PARTY OR ANY ACTUAL OR ALLEGED PRESENCE OR RELEASE OF HAZARDOUS MATERIALS ON OR FROM ANY PROPERTY OWNED OR OPERATED BY THE BORROWER OR ANY OF THE OTHER LOAN PARTIES, (xii) ANY ENVIRONMENTAL LIABILITY RELATED IN ANY WAY TO THE BORROWER OR ANY OF THE OTHER LOAN PARTIES, OR (xiii) ANY OTHER ENVIRONMENTAL, HEALTH OR SAFETY CONDITION IN CONNECTION WITH THE LOAN DOCUMENTS OR (xiv) ANY ACTUAL OR PROSPECTIVE CLAIM, LITIGATION, INVESTIGATION OR PROCEEDING RELATING TO ANY OF THE FOREGOING, WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY AND REGARDLESS OF WHETHER ANY INDEMNITEE IS A PARTY THERETO, AND SUCH INDEMNITY SHALL EXTEND TO EACH INDEMNITEE NOTWITHSTANDING THE SOLE OR CONCURRENT NEGLIGENCE OF EVERY KIND OR CHARACTER WHATSOEVER, WHETHER ACTIVE OR PASSIVE, WHETHER AN AFFIRMATIVE ACT OR AN OMISSION, INCLUDING WITHOUT LIMITATION, ALL TYPES OF NEGLIGENT CONDUCT IDENTIFIED IN THE RESTATEMENT (SECOND) OF TORTS OF ONE OR MORE OF THE INDEMNITEES OR BY REASON OF STRICT LIABILITY IMPOSED WITHOUT FAULT ON ANY ONE OR MORE OF THE INDEMNITEES; *provided* THAT SUCH INDEMNITY SHALL NOT, AS TO ANY INDEMNITEE, BE AVAILABLE TO THE EXTENT THAT SUCH LOSSES, CLAIMS, DAMAGES, PENALTIES, LIABILITIES OR RELATED EXPENSES (A) ARE DETERMINED BY A COURT OF COMPETENT JURISDICTION BY FINAL AND NONAPPEALABLE JUDGMENT TO HAVE RESULTED FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF SUCH INDEMNITEE, OR (B) ARE IN RESPECT OF ANY PROPERTY FOR ANY OCCURRENCE ARISING FROM THE ACTS OR OMISSIONS OF THE ADMINISTRATIVE AGENT OR ANY LENDER DURING THE PERIOD AFTER WHICH SUCH PERSON, ITS SUCCESSORS OR ASSIGNS HAVE OBTAINED TITLE AND POSSESSION OF SUCH PROPERTY BY FORECLOSURE OR DEED IN LIEU OF FORECLOSURE).

(c)      To the extent that the Borrower fails to pay any amount required to be paid by it to the Administrative Agent or the Issuing Bank under Section 12.03(a) or (b), each Lender severally agrees to pay to the Administrative Agent or the Issuing Bank, as the case may be, such Lender's Applicable Percentage (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount; *provided* that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent or the Issuing Bank in its capacity as such.

(d)      The Borrower hereby assumes, and agrees to pay, all expense reimbursement and indemnification obligations of the Prepetition RBL Borrower under the

119

Prepetition RBL Credit Agreement to the Administrative Agent (as defined in the Prepetition RBL Credit Agreement), the Prepetition RBL Lenders and the other Indemnitees (as defined in the Prepetition RBL Credit Agreement) including, without limitation, pursuant to Section 5.03, Section 12.03(a) and Section 12.03(b) of the Prepetition RBL Credit Agreement.

(e)    To the extent permitted by applicable law, no party hereto shall assert, and each hereby waives, any claim against any other such Person, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the Transactions, any Loan or Letter of Credit or the use of the proceeds thereof; *provided* that, this waiver and agreement shall not limit the Loan Parties' indemnification obligations to the extent set forth in this Agreement or the other Loan Documents to the extent such special, indirect, consequential or punitive damages are included in any third party claim in connection with which such Indemnitee is otherwise entitled to indemnification hereunder or thereunder.

(f)    All amounts due under this Section 12.03 shall be payable not later than ten Business Days after written demand therefor accompanied by appropriate documentation thereof.

Section 12.04   Successors and Assigns.

(a)    The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby (including any Affiliate of the Issuing Bank that issues any Letter of Credit), except that (i) the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender (and any attempted assignment or transfer by the Borrower without such consent shall be null and void), and (ii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section 12.04.  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby (including any Affiliate of the Issuing Bank that issues any Letter of Credit), Participants (to the extent provided in Section 12.04(c)) and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent, the Issuing Bank and the Lenders and their respective successors and assigns permitted hereby) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    (i)    Subject to the conditions set forth in Section 12.04(b)(ii), any Lender may assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it) with the prior written consent (such consent not to be unreasonably withheld) of:

(A)    the Borrower; *provided* that no consent of the Borrower shall be required if such assignment is to an assignee that is a Lender immediately prior to giving effect to such assignment, an Affiliate of such a Lender, an Approved Fund or, if an Event of Default has occurred and is continuing, is to any other assignee; and

120

(B)     the Administrative Agent; *provided* that no consent of the Administrative Agent shall be required for an assignment to an assignee that is a Lender immediately prior to giving effect to such assignment.

(ii)     Assignments shall be subject to the following additional conditions:

(A)     except in the case of an assignment to an assignee that is a Lender immediately prior to giving effect to such assignment or an Affiliate of a Lender or an assignment of the entire remaining amount of the assigning Lender's Commitment or Loans, the amount of the Commitment or Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent) shall not be less than $5,000,000 unless each of the Borrower and the Administrative Agent otherwise consent; *provided* that no such consent of the Borrower shall be required if an Event of Default has occurred and is continuing;

(B)     each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement;

(C)     the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500;

(D)     the assignee, if it shall not already be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire;

(E)     in no event may any Lender assign all or a portion of its rights and obligations under this Agreement to the Parent, any Affiliate of the Parent or a natural person; and

(F)     the Applicable Percentage of Maximum Credit Amount and Elected Commitment assigned are equal.

(iii)     Subject to Section 12.04(b)(iv) and the acceptance and recording thereof, from and after the effective date specified in each Assignment and Assumption the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Section 5.01, Section 5.02, Section 5.03 and Section 12.03). Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section 12.04 shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 12.04(c).

(iv)     The Administrative Agent, acting solely for this purpose as a non-fiduciary agent of the Borrower, shall maintain at one of its offices a copy of each Assignment

121

and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Maximum Credit Amount and Elected Commitment of, and principal amount of the Loans and LC Disbursements owing to, each Lender pursuant to the terms hereof from time to time (the "Register").  The entries in the Register shall be conclusive absent manifest error, and the Borrower, the Administrative Agent, the Issuing Bank and the Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Borrower, the Issuing Bank and any Lender, at any reasonable time and from time to time upon reasonable prior notice.  In connection with any changes to the Register, if necessary, the Administrative Agent will reflect the revisions on Annex I and forward a copy of such revised Annex I to the Borrower, the Issuing Bank and each Lender.

(v)     Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Lender and an assignee, the assignee's completed Administrative Questionnaire and applicable Tax forms (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in Section 12.04(b) and any written consent to such assignment required by Section 12.04(b), the Administrative Agent shall accept such Assignment and Assumption and record the information contained therein in the Register. No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this Section 12.04(b).

(c)     (i)     Any Lender may, without the consent of the Borrower, the Administrative Agent or the Issuing Bank, sell participations to one or more banks or other Person (other than the Parent, any Affiliate of the Parent or a natural person) (a "Participant") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans owing to it); *provided* that (A) such Lender's obligations under this Agreement shall remain unchanged, (B) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (C) the Borrower, the Administrative Agent, the Issuing Bank and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; *provided* that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in the proviso to Section 12.02 that affects such Participant.  In addition such agreement must provide that the Participant be bound by the provisions of Section 12.03.  Subject to Section 12.04(c)(ii), the Borrower agrees that each Participant shall be entitled to the benefits of Section 5.01, Section 5.02 and Section 5.03 (in each case, without duplication of any benefits afforded the Lender granting such participation) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to Section 12.04(b).  Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Loan Documents (the "Participant Register"); *provided* that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or

122

any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations.  The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.  For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(ii)      A Participant shall not be entitled to receive any greater payment under  Section 5.01 or Section 5.03 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation.

(d)      Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including, without limitation, any pledge or assignment to secure obligations to a Federal Reserve Bank or other central bank, and this Section 12.04 shall not apply to any such pledge or assignment of a security interest; *provided* that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

Section 12.05  Survival; Revival; Reinstatement.

(a)      All covenants, agreements, representations and warranties made by the Borrower or the Parent herein and in the certificates or other instruments delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of this Agreement and the making of any Loans and issuance of any Letters of Credit, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Administrative Agent, the Issuing Bank or any Lender may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any fee or any other amount payable under this Agreement is outstanding and unpaid or any Letter of Credit is outstanding and so long as the Commitments have not expired or terminated.  The provisions of Section 5.01 (subject to Section 5.01(d)), Section 5.02 (subject to the proviso in the last sentence thereof), Section 5.03 (subject to the proviso in the last sentence of Section 5.03(c)) and Section 12.03 (for a period of two years after the Maturity Date) and Article XI shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loans, the expiration or termination of the Letters of Credit and each Lender's Commitment or the termination of this Agreement, any other Loan Document or any provision hereof or thereof; *provided*, that any time limitation on the survival of any provision hereunder shall be tolled for any claims filed prior to the expiration of such time limitation until two months after final, non-appealable adjudication of any such claim.

123

(b)      To the extent that any payments on the Indebtedness or proceeds of any collateral are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, debtor in possession, receiver or other Person under any bankruptcy law, common law or equitable cause, then to the extent of a recovery in respect thereof, the Indebtedness so satisfied, shall be revived and continue as if such payment or proceeds had not been received and the Administrative Agent's and the Lenders' Liens, security interests, rights, powers and remedies under this Agreement and each Loan Document shall continue in full force and effect.  In such event, each Loan Document shall be automatically reinstated and the Borrower and the Parent shall take such action as may be reasonably requested by the Administrative Agent and the Lenders to effect such reinstatement.

Section 12.06  Counterparts; Integration; Effectiveness.

(a)      This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement and the other Loan Documents, and any separate letter agreements with respect to fees payable to the Administrative Agent, constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  Except as provided in Section 6.01, this Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto.  Delivery of an executed counterpart of a signature page of this Agreement by facsimile or in electronic (i.e., "pdf" or "tif") format shall be effective as delivery of a manually executed counterpart of this Agreement.

(b)      The words "execution," "signed," "signature," and words of like import in any Assignment and Assumption shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

Section 12.07  Severability.   Any provision of this Agreement or any other Loan Document held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof or thereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

Section 12.08  Right of Setoff.   If an Event of Default shall have occurred and be continuing, each Lender and each of its Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by applicable law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other obligations (of whatsoever kind, including, without limitations obligations under Swap Agreements) at any

124

time owing by such Lender or Affiliate to or for the credit or the account of the Borrower or any other Loan Party against any of and all the obligations of the Borrower or any other Loan Party owed to such Lender now or hereafter existing under this Agreement or any other Loan Document, irrespective of whether or not such Lender shall have made any demand under this Agreement or any other Loan Document and although such obligations may be unmatured.  The rights of each Lender under this Section 12.08 are in addition to other rights and remedies (including other rights of setoff) which such Lender or its Affiliates may have.  Each Lender agrees to notify the Borrower and the Administrative Agent promptly after any such setoff and application, provided that the failure to give such notice shall not affect the validity of such setoff and application.

Without limiting the generality of the foregoing, "set off" as used herein shall include the set off and application of any amounts owed by any Lender or its Affiliates to any Loan Party under any Swap Agreement against all obligations and indebtedness owed by such Loan Party to such Lender under this Agreement or the other Loan Documents, whether direct or indirect, contingent or liquidated, matured or unmatured, including, without limitation, any amounts owed under any participation in amounts owed by the Borrower to such Lender purchased by such Lender (or its Affiliates) under Section 4.01(c) or any other similar provisions for the pro rata sharing of payments received from or on behalf of the Loan Parties among the Lenders.

Section 12.09  GOVERNING LAW; JURISDICTION; CONSENT TO SERVICE OF PROCESS; WAIVER OF JURY TRIAL.

(a)    Governing Law.  This Agreement, the Notes and the other Loan Documents and any claim, controversy, dispute or cause of action (whether in contract or tort or otherwise) based upon, arising out of or relating to this Agreement or any other Loan Document (except, as to any other Loan Document, as expressly set forth therein) and the transactions contemplated hereby and thereby shall be governed by, and construed in accordance with, the law of the State of New York.

(b)    Submission to Jurisdiction.  The Borrower and each Guarantor irrevocably and unconditionally agrees that it will not commence any action, litigation or proceeding of any kind or description, whether in law or equity, whether in contract or in tort or otherwise, against the Administrative Agent, any Lender or any Related Party of the foregoing relating to this Agreement or any other Loan Document, in any forum other than the courts of the State of New York sitting in New York County, and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, and each of the parties hereto irrevocably and unconditionally submits to the jurisdiction of such courts and agrees that all claims in respect of any such action, litigation or proceeding may be heard and determined in such New York State court or, to the fullest extent permitted by applicable law, in such federal court.  Each of the parties hereto agrees that a final judgment in any such action, litigation or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in this Agreement or in any other Loan Document shall affect any right that the Administrative Agent or any Lender, may otherwise have to bring any action or proceeding relating to this Agreement or any other Loan Document against the Borrower or any Guarantor or its properties in the courts of any jurisdiction.

125

(c)     Waiver of Venue.  The Borrower and each Guarantor irrevocably and unconditionally waives, to the fullest extent permitted by applicable law, any objection that it may now or hereafter have to the laying of venue of any action or proceeding arising out of or relating to this Agreement or any other Loan Document in any court referred to in paragraph (b) of this Section.  Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by applicable law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)     Service of Process.  Each party hereto irrevocably consents to service of process in the manner provided for notices in Section 12.01.  Nothing in this Agreement will affect the right of any party hereto to serve process in any other manner permitted by applicable law.

(e)     Waiver of Jury Trial.  EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND CONSENT AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

Section 12.10 Titles and Captions.  Titles and captions of Articles, Sections and subsections in, and the table of contents of, this Agreement are for convenience only, and neither limit nor amplify the provisions of this Agreement.

Section 12.11 Confidentiality.  Each of the Administrative Agent, the Issuing Bank and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its and its Affiliates' directors, officers, employees and agents, including accountants, legal counsel and other advisors (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority or self-regulatory authority, (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process; provided that, subject to the Borrower's obligation to reimburse expenses under Section 12.03, it shall use commercially reasonable efforts to seek to obtain confidential treatment of such Information; provided further, that it shall not be liable for failure to obtain such confidential treatment, (d) to any other party to this Agreement or any other Loan Document, (e) in connection with the exercise of any remedies hereunder or under any other Loan Document or any suit, action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of this

126

Section 12.11, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement, or (ii) any actual or prospective counterparty (or its advisors) to any Swap Agreement relating to the Borrower and its obligations, (g) with the consent of the Borrower or (h) to the extent such Information (i) becomes publicly available other than as a result of a breach of this Section 12.11, or (ii) becomes available to the Administrative Agent, the Issuing Bank or any Lender on a nonconfidential basis from a source other than the Borrower.  For the purposes of this Section 12.11, "Information" means all information received from the Parent or any of its Subsidiaries relating to the Public Parent, the Parent or any of its Subsidiaries and their businesses, other than any such information that is available to the Administrative Agent, the Issuing Bank or any Lender on a nonconfidential basis prior to disclosure by the Borrower or any other Loan Party; *provided* that, in the case of information received from the Borrower or any other Loan Party after the date hereof, such information is clearly identified at the time of delivery as confidential.  Any Person required to maintain the confidentiality of Information as provided in this Section 12.11 shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.  Notwithstanding anything herein to the contrary, "Information" shall not include, and the Parent and its Subsidiaries, the Administrative Agent, each Lender and the respective Affiliates of each of the foregoing (and the respective partners, directors, officers, employees, agents, advisors and other representatives of the aforementioned Persons), and any other party, may disclose to any and all Persons, without limitation of any kind, (a) any information with respect to the United States of America federal and state income tax treatment of the transactions contemplated hereby and any facts that may be relevant to understanding the United States of America federal or state income tax treatment of such transactions ("tax structure"), which facts shall not include for this purpose the names of the parties or any other person named herein, or information that would permit identification of the parties or such other persons, or any pricing terms or other nonpublic business or financial information that is unrelated to such tax treatment or tax structure, and (b) all materials of any kind (including opinions or other tax analyses) that are provided to the Borrower, the Administrative Agent or such Lender relating to such tax treatment or tax structure.

Section 12.12  Interest Rate Limitation.  It is the intention of the parties hereto that each Lender shall conform strictly to usury laws applicable to it.  Accordingly, if the transactions contemplated hereby would be usurious as to any Lender under laws applicable to it (including the laws of the United States of America, the State of Texas or any other jurisdiction whose laws may be mandatorily applicable to such Lender notwithstanding the other provisions of this Agreement), then, in that event, notwithstanding anything to the contrary in any of the Loan Documents or any agreement entered into in connection with or as security for the Notes, it is agreed as follows:  (a) the aggregate of all consideration which constitutes interest under law applicable to any Lender that is contracted for, taken, reserved, charged or received by such Lender under any of the Loan Documents or agreements or otherwise in connection with the Notes shall under no circumstances exceed the maximum amount allowed by such applicable law, and any excess shall be canceled automatically and if theretofore paid shall be credited by such Lender on the principal amount of the Indebtedness (or, to the extent that the principal amount of the Indebtedness shall have been or would thereby be paid in full, refunded by such Lender to the Borrower); and (b) in the event that the maturity of the Notes is accelerated by

127

reason of an election of the holder thereof resulting from any Event of Default under this Agreement or otherwise, or in the event of any required or permitted prepayment, then such consideration that constitutes interest under law applicable to any Lender may never include more than the maximum amount allowed by such applicable law, and excess interest, if any, provided for in this Agreement or otherwise shall be canceled automatically by such Lender as of the date of such acceleration or prepayment and, if theretofore paid, shall be credited by such Lender on the principal amount of the Indebtedness (or, to the extent that the principal amount of the Indebtedness shall have been or would thereby be paid in full, refunded by such Lender to the Borrower). All sums paid or agreed to be paid to any Lender for the use, forbearance or detention of sums due hereunder shall, to the extent permitted by law applicable to such Lender, be amortized, prorated, allocated and spread throughout the stated term of the Loans evidenced by the Notes until payment in full so that the rate or amount of interest on account of any Loans hereunder does not exceed the maximum amount allowed by such applicable law. If at any time and from time to time (i) the amount of interest payable to any Lender on any date shall be computed at the Highest Lawful Rate applicable to such Lender pursuant to this Section 12.12, and (ii) in respect of any subsequent interest computation period the amount of interest otherwise payable to such Lender would be less than the amount of interest payable to such Lender computed at the Highest Lawful Rate applicable to such Lender, then the amount of interest payable to such Lender in respect of such subsequent interest computation period shall continue to be computed at the Highest Lawful Rate applicable to such Lender until the total amount of interest payable to such Lender shall equal the total amount of interest which would have been payable to such Lender if the total amount of interest had been computed without giving effect to this Section 12.12. To the extent that Chapter 303 of the Texas Finance Code is relevant for the purpose of determining the Highest Lawful Rate applicable to a Lender, such Lender elects to determine the applicable rate ceiling under such Chapter by the weekly ceiling from time to time in effect. Chapter 346 of the Texas Finance Code does not apply to the Borrower's obligations hereunder.

Section 12.13 <u>EXCULPATION PROVISIONS</u>. EACH OF THE PARTIES HERETO SPECIFICALLY AGREES THAT IT HAS A DUTY TO READ THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS AND AGREES THAT IT IS CHARGED WITH NOTICE AND KNOWLEDGE OF THE TERMS OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS; THAT IT HAS IN FACT READ THIS AGREEMENT AND IS FULLY INFORMED AND HAS FULL NOTICE AND KNOWLEDGE OF THE TERMS, CONDITIONS AND EFFECTS OF THIS AGREEMENT; THAT IT HAS BEEN REPRESENTED BY INDEPENDENT LEGAL COUNSEL OF ITS CHOICE THROUGHOUT THE NEGOTIATIONS PRECEDING ITS EXECUTION OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS; AND HAS RECEIVED THE ADVICE OF ITS ATTORNEY IN ENTERING INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS; AND THAT IT RECOGNIZES THAT CERTAIN OF THE TERMS OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS RESULT IN ONE PARTY ASSUMING THE LIABILITY INHERENT IN SOME ASPECTS OF THE TRANSACTION AND RELIEVING THE OTHER PARTY OF ITS RESPONSIBILITY FOR SUCH LIABILITY. EACH PARTY HERETO AGREES AND COVENANTS THAT IT WILL NOT CONTEST THE VALIDITY OR ENFORCEABILITY OF ANY EXCULPATORY PROVISION OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS ON THE BASIS THAT THE PARTY HAD NO

NOTICE OR KNOWLEDGE OF SUCH PROVISION OR THAT THE PROVISION IS NOT "CONSPICUOUS."

Section 12.14 <u>Collateral Matters; Swap Agreements</u>.   The benefit of the Security Instruments and of the provisions of this Agreement relating to any Property of the Loan Parties securing the Indebtedness shall also extend to and be available to the Secured Swap Providers with respect to any Swap Agreement including any Swap Agreement in existence prior to the date hereof, but excluding any additional transactions or confirmations entered into (a) after such Secured Swap Provider ceases to be a Secured Swap Provider, or (b) after assignment by a Secured Swap Provider to a Person who is not, at the time of such assignment, a Secured Swap Provider.  No Secured Swap Provider shall have any voting rights under any Loan Document as a result of the existence of obligations owed to it under any such Swap Agreements.  Each of the Lenders in its or any of its Affiliates' capacities as a Secured Swap Provider agrees to promptly provide the Administrative Agent with the mark-to-market value of any such Swap Agreement as determined by such Secured Swap Provider in good faith if an Event of Default has occurred and is continuing and the Loan Parties hereby waive any confidentiality obligations applicable to such Secured Swap Provider under such Swap Agreement in connection with its obligations under this sentence.

Section 12.15 <u>No Third Party Beneficiaries</u>.   This Agreement, the other Loan Documents, and the agreement of the Lenders to make Loans and the Issuing Bank to issue, amend, renew or extend Letters of Credit hereunder are solely for the benefit of the Borrower, and no other Person (including, without limitation, any other Loan Party, any obligor, contractor, subcontractor, supplier or materialsman) shall have any rights, claims, remedies or privileges hereunder or under any other Loan Document against the Administrative Agent, the Issuing Bank or any Lender for any reason whatsoever.  Except as specified in <u>Section 12.14</u> and <u>Section 12.03</u>, there are no third party beneficiaries, except that any Secured Swap Provider that is not a Lender or an Affiliate of a Lender, shall be a beneficiary of <u>Section 12.14</u> and the Security Instruments pursuant to the terms thereof.

Section 12.16 <u>USA Patriot Act Notice</u>.   The Administrative Agent and each Lender hereby notifies the Borrower that pursuant to the requirements of the PATRIOT Act, each of them is required to obtain, verify and record information that identifies the Borrower and each Guarantor, which information includes the name and address of the Borrower and each Guarantor and other information that will allow such Lender to identify the Borrower and each Guarantor in accordance with the PATRIOT Act.

Section 12.17 <u>Acknowledgement and Consent to Bail-In of EEA Financial Institutions</u>. Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)    the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

(b)      the effects of any Bail-In Action on any such liability, including, if applicable:

(i)      a reduction in full or in part or cancellation of any such liability;

(ii)      a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)      the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of any EEA Resolution Authority.

Section 12.18  Amendment and Restatement.  It is the intention of the parties hereto that this Agreement amends and restates, supersedes and replaces the Prepetition RBL Credit Agreement in its entirety; *provided* that (a) to the extent expressly set forth in the Plan of Reorganization and the Confirmation Order such amendment and restatement shall operate to renew, amend, modify, extend and assign all of the rights, duties, liabilities and obligations of the Prepetition RBL Borrower under the Prepetition RBL Credit Agreement and under the Existing Loan Documents, which rights, duties, liabilities and obligations are hereby renewed, amended, modified and extended, and shall not act as a novation thereof, and (b) the Liens securing the Indebtedness under and as defined in the Prepetition RBL Credit Agreement and the rights, duties, liabilities and obligations of the Prepetition Borrower and the Guarantors under the Prepetition RBL Credit Agreement and the Existing Loan Documents to which they are a party shall not be extinguished, in each case, except as contemplated by the Plan of Reorganization and the Confirmation Order, but shall be carried forward and shall secure such obligations and liabilities as amended, renewed, extended and/or restated hereby and constitute Indebtedness hereunder.

Section 12.19  Independent Effect of Covenants.  The Borrower expressly acknowledges and agrees that each covenant contained in Article VIII or Article IX hereof shall be given independent effect.  Accordingly, the Borrower shall not engage in any transaction or other act otherwise permitted under any covenant contained in Article VIII or Article IX, before or after giving effect to such transaction or act, the Borrower shall or would be in breach of any other covenant contained in Article VIII or Article IX.

Section 12.20  Performance of Duties.  Each of the Loan Party's obligations under this Agreement and each of the other Loan Documents shall be performed by such Loan Party at its sole cost and expense.

Section 12.21  Inconsistencies with Other Documents.  In the event there is a conflict or inconsistency between this Agreement and any other Loan Document, the terms of this Agreement shall control; provided that any provision of the Security Instruments which imposes additional burdens on the Parent or any of its Subsidiaries or further restricts the rights of the Parent or any of its Subsidiaries or gives the Administrative Agent or Lenders additional rights

shall not be deemed to be in conflict or inconsistent with this Agreement and shall be given full force and effect.

[SIGNATURES BEGIN NEXT PAGE]

131

**Exhibit C**

**New Common Shares Allocation Schedule**

WEIL:\96067153\5\62739.0004

# Illustrative Plan Share Analysis – 25M New Shares

| ILLUSTRATIVE PLAN SHARE ANALYSIS | | |
|---|---|---|
| Proposed Number of New Common Shares (Before MIP and Warrants) | 25,000,000 | |
| | | |
| **Exchange Analysis:** | | |
| New Common Equity Percentage Allocated to Noteholders | 98.0% | |
| Number of New Common Shares Allocated to Noteholders | 24,500,000 | |
| | | |
| New Common Equity Percentage Allocated to Existing Equity | 2.0% | |
| Number of New Common Shares Allocated to Existing Equity | 500,000 | |
| Existing Common Units | 83,800,000 | |
| Implied Exchange Ratio of New Common Shares for One Existing Unit | 0.00597 | |
| | | |
| Minimum Number of New Shares | 0.50000 | |
| Minimum Number of Old Units to Receive One New Common Share | 83.80000 | |

| Dilution Analysis: | Total (Shares) | % of Total |
|---|---|---|
| Proposed Number of New Common Shares | 25,000,000 | |
| Percentage of New Common Shares to MIP | 10.0% | |
| Percentage of New Common Shares to Warrants | 8.0% | |
| | | |
| New Common Shares Issuable to Noteholders | 24,500,000 | 81.8% |
| New Common Shares Issuable to Existing Equity | 500,000 | 1.7% |
| New Common Shares Issuable to MIP | 2,777,778 | 9.3% |
| New Common Shares Issuable to Warrants | 2,173,913 | 7.3% |
| Total Number of New Common Shares with MIP and Warrants | 29,951,691 | 100.0% |

| Warrant Strike Price Analysis: | | |
|---|---|---|
| Unsecured Notes: Principal and Accrued Unpaid Interest Through 12/31/16 | $1,157,737,361.82 | |
| Total New Common Shares (Excluding MIP Shares) | 27,173,913 | |
| Strike Price | $42.60 | |

1

## Exhibit D

## Memorial Limited Partner Warrant Agreement

Draft 3/24/2017

WARRANT AGREEMENT

between

AMPLIFY ENERGY CORP.,

AS ISSUER

and

AMERICAN STOCK TRANSFER & TRUST COMPANY, LLC,

AS WARRANT AGENT

[●], 2017

Draft 3/24/2017

SECTION 1.    CERTAIN DEFINED TERMS.................................................................... 1

SECTION 2.    APPOINTMENT OF WARRANT AGENT ........................................... 3

SECTION 3.    ISSUANCE OF WARRANTS; FORM, EXECUTION AND
              DELIVERY.................................................................................... 4

SECTION 4.    TRANSFER OR EXCHANGE................................................................ 6

SECTION 5.    DURATION AND EXERCISE OF WARRANTS ............................... 8

SECTION 6.    ADJUSTMENT OF EXERCISE PRICE AND NUMBER OF SHARES
              PURCHASABLE OR NUMBER OF WARRANTS ...................... 12

SECTION 7.    CANCELLATION OF WARRANTS .................................................. 16

SECTION 8.    MUTILATED OR MISSING GLOBAL WARRANT CERTIFICATES........ 16

SECTION 9.    MERGER, CONSOLIDATION, AND SALE OF ASSETS;
              AUTOMATIC EXERCISE. .................................................... 16

SECTION 10.   RESERVATION OF SHARES; CERTAIN ACTIONS.................................. 17

SECTION 11.   NOTIFICATION OF CERTAIN EVENTS; CORPORATE ACTION............ 17

SECTION 12.   WARRANT AGENT ....................................................................... 18

SECTION 13.   SEVERABILITY ........................................................................... 23

SECTION 14.   HOLDER NOT DEEMED A STOCKHOLDER ............................................. 23

SECTION 15.   NOTICES TO COMPANY AND WARRANT AGENT................................ 23

SECTION 16.   SUPPLEMENTS AND AMENDMENTS......................................................... 24

SECTION 17.   TERMINATION ........................................................................... 24

SECTION 18.   GOVERNING LAW AND CONSENT TO FORUM .................................... 24

SECTION 19.   WAIVER OF JURY TRIAL........................................................................ 25

SECTION 20.   BENEFITS OF THIS AGREEMENT ............................................................. 25

SECTION 21.   COUNTERPARTS ....................................................................... 25

SECTION 22.   HEADINGS ............................................................................... 25

EXHIBIT A   FORM OF WARRANT CERTIFICATE
EXHIBIT B   FORM OF ASSIGNMENT
EXHIBIT C   WARRANT SUMMARY

Draft 3/24/2017

This WARRANT AGREEMENT (this "Agreement") is dated as of [●], 2017, between AMPLIFY ENERGY CORP., a Delaware corporation, as issuer (the "Company"), and AMPLIFY ENERGY CORP., as warrant agent (the "Warrant Agent").

W I T N E S S E T H

WHEREAS, in connection with the financial restructuring of the Company and certain of its subsidiaries (collectively, the "Debtors") pursuant to the Debtors' Joint Plan of Reorganization (the "Plan") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§101 *et. seq.*, the Company has agreed to issue warrants (the "Warrants") which, in the aggregate, are exercisable to purchase up to [●] shares ("Shares") of the Company's common stock, par value $0.0001 per share, subject to adjustment as provided herein (the "Common Stock");

WHEREAS, the Company desires the Warrant Agent to act on behalf of the Company, and the Warrant Agent is willing to so act, in connection with the issuance, registration, transfer, exchange, replacement, exercise and cancellation of the Warrants;

WHEREAS, the Warrant Agent, at the request of the Company, has agreed to act as the agent of the Company in connection with the issuance, registration, transfer, exchange, replacement, exercise and cancellation of the Warrants as provided herein;

WHEREAS, the Company desires to enter into this Agreement to set forth the terms and conditions of the Warrants and the rights of the Holders (as defined below) thereof.

NOW, THEREFORE, in consideration of the premises and mutual agreements herein set forth, the parties hereto agree as follows:

SECTION 1.    Certain Defined Terms.  Whenever used in this Agreement, the following words and phrases, unless the context otherwise requires, shall have the meanings specified in this Section.

"Agreement" has the meaning specified in the preamble hereof.

"Appropriate Officers" has the meaning specified in Section 3(c) hereof.

"Business Day" means any date other than a Saturday or a Sunday or a day on which commercial banking institutions in New York City, New York are authorized or required by law to be closed; provided that, in determining the period within which Global Warrant Certificates or Warrants are to be issued and delivered at a time when shares of Common Stock (or Other Securities) are listed or admitted to trading on any national securities exchange or in the over-the-counter market and in determining Market Price of any securities listed or admitted to trading on any national securities exchange or in the over-the-counter market, "Business Day" shall mean any day when the principal exchange on which such securities are then listed or admitted to trading is open for trading or, if such securities are traded in the over-the counter market in the United States, such market is open for trading.

"Cashless Exercise" has the meaning specified in Section 5(c)(ii) hereof.

"Common Stock" has the meaning specified in the recitals hereof.

"Direct Registration Warrant" has the meaning specified in Section 3(a) hereof.

"Deemed Liquidation Date" means the date on which a Deemed Liquidation Event occurs.

"Deemed Liquidation Event" means: (i) the effective time of (A) any sale, lease or other transfer in one transaction or a series of transactions of all or substantially all of the consolidated assets of the Company and its subsidiaries, taken as a whole, to any Person other than one of the Company's wholly owned subsidiaries, or (B) any share exchange, consolidation or merger of the Company with or into any other person or entity in which the stockholders of the Company immediately prior to such event do not retain a majority of the voting power in the surviving company, or (ii) the stockholders of the Company approve any plan or proposal for the liquidation or dissolution of the Company; provided, however, that none of (x) a merger of the Company solely for the purpose of changing the Company's jurisdiction of incorporation, that results in a reclassification, conversion or exchange of outstanding shares of Common Stock solely into shares of common stock of the surviving entity; or (y) the transactions contemplated by the Plan shall be a Deemed Liquidation Event.

"Depository" has the meaning specified in Section 3(b) hereof.

"Effective Date" has the meaning specified in the Plan.

"Exercise Price" means the initial Exercise Price for the Warrants as set forth in Section 5(b) hereof, as it may be adjusted from time to time as provided herein.

"Expiration Date" has the meaning specified in Section 5(a) hereof.

"Ex-Date" means, when used with respect to any issuance of or distribution in respect of the Common Stock or any Other Securities, the first date on which the Common Stock or such Other Securities trade without the right to receive such issuance or distribution.

"Global Warrant Certificate" has the meaning specified in Section 3(b) hereof.

"Holder" means the beneficial holder or beneficial holders of Global Warrant Certificates.

"Market Price" means with respect to Common Stock or any Other Security the arithmetic average of the VWAP of a share or single unit of such securities for the last ten trading days on which such security traded (or such lesser number of trading days as such security has been listed, quoted or traded) immediately preceding the date of measurement, or, if the security is not listed or quoted on the New York Stock Exchange, NASDAQ Stock Market or a U.S. national or regional securities exchange, the average of the reported closing bid and asked prices of such security on such dates in the over-the-counter market or a comparable system as shown by a system of automated dissemination of quotations of securities prices then in common use comparable to the National Association of Securities Dealers, Inc. Automated Quotations System; provided, however, that if there is otherwise no established trading market for such

security, then "Market Price" means the value of such Common Stock or Other Security as determined in good faith by the Board of Directors of the Company.

"Other Securities" or "Other Security" means any stock (other than Common Stock) and other securities of the Company or any other Person that the Holder at any time shall be entitled to receive or shall have received, upon the exercise of the Warrants, in lieu of or in addition to Common Stock, or that at any time shall be issuable or shall have been issued in exchange for or in replacement of Common Stock or Other Securities.

"Person" means any individual, corporation, limited liability company, partnership, firm, joint venture, association, joint-stock company, trust or other entity.

"Plan" has the meaning specified in the recitals hereof.

"Settlement Date" means the date that is three Business Days after a Warrant Exercise Notice is delivered.

"Shares" has the meaning specified in the recitals hereof, as may be adjusted in accordance with Section 6 hereof.

"VWAP" means for any trading day, the price for securities (including Common Stock) determined by the daily volume weighted average price per unit of securities for such trading day on the New York Stock Exchange or NASDAQ Stock Market, as the case may be, in each case, for the regular trading session (including any extensions thereof, without regard to pre-open or after hours trading outside of such regular trading session), or if such securities are not listed or quoted on the New York Stock Exchange or NASDAQ Stock Market, as reported by the principal U.S. national or regional securities exchange on which such securities are then listed or quoted, whichever is applicable, as published by Bloomberg at 4:15 P.M., New York City time (or 15 minutes following the end of any extension of the regular trading session), on such trading day.

"Warrant Agent" has the meaning specified in the preamble hereof and shall include any successor Warrant Agent hereunder.

"Warrant Agent Office" has the meaning specified in Section 4(g)(iv) hereof.

"Warrant Exercise Notice" has the meaning specified Section 5(c)(i) hereof.

"Warrant Register" has the meaning specified in Section 3(d) hereof.

"Warrants" has the meaning specified in the recitals hereof.

"Warrant Shares" has the meaning specified in Section 3(a) hereof.

"Warrant Statement" has the meaning specified in Section 3(b) hereof.

SECTION 2.   Appointment of Warrant Agent.  The Company hereby appoints the Warrant Agent to act as agent for the Company in accordance with the instructions set forth

in this Agreement, and the Warrant Agent hereby accepts such appointment, upon the terms and conditions hereinafter set forth.

SECTION 3.    Issuance of Warrants; Form, Execution and Delivery.

(a)    Issuance of Warrants.  On the Effective Date or a date that is as soon as reasonably practicable after the Effective Date, the Warrants will be issued by the Company in the amounts and to the recipients specified in the Plan.  Such Warrants shall be, upon issuance, duly authorized and validly issued. In accordance with Section 4 hereof and the Plan, the Company will cause to be issued to the Depository, one or more Global Warrant Certificates evidencing the Warrants not evidenced by book-entry registration on the books and records of the Warrant Agent ("Direct Registration Warrants").  In accordance with Section 4 hereof and the Plan, the Company will cause to be issued to the applicable registered Holders, one or more Direct Registration Warrants.  The Direct Registration Warrants and each Warrant evidenced by a Global Warrant Certificate entitles the Holder, upon proper exercise and payment of the Exercise Price, to receive from the Company, as adjusted as provided herein, one share of Common Stock at the Exercise Price per share specified therein.  The shares of Common Stock (as provided pursuant to Section 6 hereof) and/or Other Securities deliverable upon proper exercise of the Warrants are referred to herein as the "Warrant Shares".  The maximum number of Warrant Shares issuable pursuant to all Warrants issued pursuant to this Agreement shall be [●] shares, as such amount may be adjusted from time to time pursuant to the terms of this Agreement. The Company shall promptly notify the Warrant Agent in writing upon the occurrence of the Effective Date and, if such notification is given orally, the Company shall confirm the same in writing on or prior to the Business Day next following.  Until such notice is received by the Warrant Agent, the Warrant Agent may presume conclusively for all purposes that the Effective Date has not occurred.

(b)    Form of Warrant.  Subject to Section 4 of this Agreement, the Warrants shall be issued in the form of one or more global certificates (the "Global Warrant Certificates") in substantially the form of Exhibit A-1 attached hereto with the form of assignment to be printed on the reverse thereof, in substantially the form set forth in Exhibit B attached hereto, and/or (ii) in the form of Direct Registration Warrants reflected on statements issued by the Warrant Agent from time to time to the holders thereof reflecting such book-entry position (the "Warrant Statements"); *provided that* any Direct Registration Warrants that are not subject to any vesting requirements may be exchanged at any time for a corresponding number of Global Warrant Certificates, in accordance with Section 4(d) and the applicable procedures of the Depository and the Warrant Agent. Such Warrant Statements shall include as an attachment thereto the "Warrant Summary" as set forth in Exhibit C hereto. The Global Warrant Certificates and Warrant Statements may bear such appropriate insertions, omissions, substitutions and other variations as are required or permitted by this Agreement, and may have such letters, numbers or other marks of identification and such legends or endorsements placed thereon as may be required to comply with the rules and regulations of The Depository Trust Company or any successor thereof (the "Depository") in the case of the Global Warrant Certificates, with any law or with any rules made pursuant thereto or with any rules of any securities exchange or as may be determined, consistently herewith and reasonably acceptable to the Warrant Agent, by (i) in the case of Global Warrant Certificates, the Appropriate Officers executing such Global Warrant Certificates, as evidenced by their execution of the Global Warrant Certificates and (ii) in the

Draft 3/24/2017

case of Warrant Statements, any Appropriate Officer.  The Global Warrant Certificates shall be deposited on or after the date hereof with or on behalf of the Depository and registered in the name of Cede & Co. or any successor thereof, as the Depository's nominee.  Each Global Warrant Certificate shall represent such number of the outstanding Warrants as specified therein, and each shall provide that it shall represent the aggregate amount of outstanding Warrants from time to time endorsed thereon and that the aggregate amount of outstanding Warrants represented thereby may from time to time be reduced or increased, as appropriate, in accordance with the terms of this Agreement.

(c)     Execution of Warrants.  Global Warrant Certificates shall be signed on behalf of the Company by its Chairman of the Board, its Chief Executive Officer, its President, its Chief Financial Officer, its Treasurer or any Vice President (or higher or equivalent officer) of the Company (each, an "Appropriate Officer"), and by the Secretary or any Assistant Secretary of the Company.  Each such signature upon the Global Warrant Certificates may be in the form of a facsimile or electronic signature of any such Appropriate Officer, Secretary or Assistant Secretary and may be imprinted or otherwise reproduced on the Global Warrant Certificates and for that purpose the Company may adopt and use the facsimile or electronic signature of any Appropriate Officer, the Secretary or any Assistant Secretary who shall have been serving as an Appropriate Officer, the Secretary, or an Assistant Secretary at the time of entering into this Agreement or issuing such Global Warrant Certificate.  If any Appropriate Officer, the Secretary or any Assistant Secretary who shall have signed any of the Global Warrant Certificates shall cease to be such Appropriate Officer, the Secretary or an Assistant Secretary before the Global Warrant Certificates so signed shall have been countersigned by the Warrant Agent or disposed of by the Company, such Global Warrant Certificates nevertheless may be countersigned and delivered or disposed of as though such Appropriate Officer, Secretary or Assistant Secretary had not ceased to be such Appropriate Officer, Secretary or Assistant Secretary, and any Global Warrant Certificate may be signed on behalf of the Company by any person who, at the actual date of the execution of such Global Warrant Certificate, shall be a proper Appropriate Officer, Secretary or Assistant Secretary, although at the date of the execution of this Agreement any such person was not such Appropriate Officer, Secretary or Assistant Secretary.  Global Warrant Certificates shall be dated as of the date of countersignature by the Warrant Agent and shall represent one or more whole Warrants.

(d)     Countersignature.  Upon receipt of a written order of the Company and Global Warrant Certificates duly executed on behalf of the Company, the Warrant Agent, on behalf of the Company, shall countersign one or more Global Warrant Certificates evidencing the Warrants and shall deliver such Global Warrant Certificates to or upon the written order of the Company.  Such written order of the Company shall specifically state the number of Warrants that are to be represented by such Global Warrant Certificate.  Each Warrant shall be, and shall remain, subject to the provisions of this Agreement until such time as all of the Warrants evidenced thereby shall have been duly exercised or shall have expired or been canceled in accordance with the terms hereof.  Each Holder shall be bound by all of the terms and provisions of this Agreement (a copy of which is available on request to the Secretary of the Company) and any amendments thereto as fully and effectively as if such Holder had signed the same.  No Global Warrant Certificate shall be valid for any purpose, and no Warrant evidenced thereby shall be exercisable, until such Global Warrant Certificate has been countersigned by the manual, facsimile or electronic signature of the Warrant Agent.  Such signature by the Warrant

Draft 3/24/2017

Agent upon any Global Warrant Certificate executed by the Company shall be conclusive evidence that such Global Warrant Certificate so countersigned has been duly issued hereunder. The Warrant Agent shall keep, at an office designated for such purpose, books (the "Warrant Register") in which, subject to such reasonable regulations as it may prescribe, it shall register any Global Warrant Certificates or Direct Registration Warrants and exchanges and transfers of outstanding Warrants in accordance with the procedures set forth in Section 4 of this Agreement, all in form satisfactory to the Company and the Warrant Agent.  The Company may require payment of a sum sufficient to cover any stamp or other tax or other governmental charge that may be imposed on the Holder in connection with any such exchange or registration of transfer. The Warrant Agent shall have no obligation to effect an exchange or register a transfer unless and until any payments required by the immediately preceding sentence have been made. Prior to due presentment for registration of transfer or exchange of any Warrant in accordance with the procedures set forth in this Agreement, the Warrant Agent and the Company may deem and treat the person in whose name any Warrant is registered as the absolute owner of such Warrant (notwithstanding any notation of ownership or other writing made in a Global Warrant Certificate by anyone), for the purpose of any exercise thereof, any distribution to the Holder thereof and for all other purposes, and neither the Warrant Agent nor the Company shall be affected by notice to the contrary. Notwithstanding anything in this Agreement to the contrary, the Company shall not instruct the Warrant Agent to register any Direct Registration Warrants unless and until the Warrant Agent shall notify the Company in writing that it has the capabilities to accommodate Direct Registration Warrants.

SECTION 4.     Transfer or Exchange.

(a)     Transfer and Exchange of Global Warrant Certificates or Beneficial Interests Therein.  The transfer and exchange of Global Warrant Certificates or beneficial interests therein shall be effected through the Depository, in accordance with the terms of this Agreement and the procedures of the Depository.

(b)     Exchange of a Beneficial Interest in a Global Warrant Certificate for a Direct Registration Warrant.  Any Holder of a beneficial interest in any whole number of Warrants represented by a Global Warrant Certificate may, upon request, exchange such beneficial interest for a Direct Registration Warrant. Upon receipt by the Warrant Agent from the Depository or its nominee of written instructions or such other form of instructions as is customary for the Depository on behalf of any Person having a beneficial interest in a Global Warrant Certificate, and all other necessary information, the Warrant Agent shall cause, in accordance with the standing instructions and procedures existing between the Depository and the Warrant Agent, the number of Warrants represented by the Global Warrant Certificate to be reduced by the number of Warrants to be represented by a Direct Registration Warrant, as the case may be, to be issued in exchange for the beneficial interest of such Person in the Global Warrant Certificate and, following such reduction, the Warrant Agent shall register such Direct Registration Warrants in accordance with such written instructions and deliver to such holder a Warrant Statement.

(c)     Transfer and Exchange of Direct Registration Warrants.  When the registered Holder of a Direct Registration Warrant has presented to the Warrant Agent a written request:

(i)       to register the transfer of any Direct Registration Warrant; or

(ii)      to exchange any Direct Registration Warrant for a Direct Registration Warrant(s), representing an equal number of Warrants of other authorized denominations, the Warrant Agent shall register the transfer or make the exchange as requested if (x) its customary requirements for such transactions are met and (y) such transfer or exchange otherwise satisfies the provisions of this Agreement; provided, however, that the Warrant Agent has received a written instruction of transfer or exchange, as applicable, in form satisfactory to the Warrant Agent, properly completed and duly executed by the Holder thereof or by his attorney, duly authorized in writing. A party requesting transfer of Warrants must provide any evidence of authority that may be required by the Warrant Agent, including but not limited to, a signature guarantee from an eligible guarantor institution participating in a signature guarantee program approved by the Securities Transfer Association.

(d)      <u>Restrictions on Transfer and Exchange of Direct Registration Warrants for a Beneficial Interest in a Global Warrant Certificate</u>.  A Direct Registration Warrant may not be exchanged for a beneficial interest in a Global Warrant Certificate except upon satisfaction of the requirements set forth below. Upon receipt by the Warrant Agent of appropriate instruments of transfer with respect to a Direct Registration Warrant, in form satisfactory to the Warrant Agent, together with written instructions directing the Warrant Agent to make, or to direct the Depository to make, an endorsement on the Global Warrant Certificate to reflect an increase in the number of Warrants represented by the Global Warrant Certificate equal to the number of Warrants represented by such Direct Registration Warrant, and all other necessary information, then the Warrant Agent shall cancel such Direct Registration Warrant on the Warrant Register and cause, or direct the Depository to cause, in accordance with the standing instructions and procedures existing between the Depository and the Warrant Agent, the number of Warrants represented by the Global Warrant Certificate to be increased accordingly. If no Global Warrant Certificates are then outstanding, the Company shall issue and the Warrant Agent shall either manually or by facsimile countersign a new Global Warrant Certificate representing the appropriate number of Warrants.

(e)      <u>Restrictions on Transfer and Exchange of Global Warrant Certificates</u>. Notwithstanding any other provisions of this Agreement (other than the provision set forth in Section 4(f)), a Global Warrant Certificate may not be transferred as a whole except by the Depository to a nominee of the Depository or by a nominee of the Depository to the Depository or another nominee of the Depository or by the Depository or any such nominee to a successor Depository or a nominee of such successor Depository.

(f)      <u>Cancellation of Global Warrant Certificate</u>.  At such time as all beneficial interests in Global Warrant Certificates and Direct Registration Warrants have been exchanged for Common Stock in accordance herewith, redeemed, repurchased or cancelled, all Global Warrant Certificates shall be returned to, or cancelled and retained pursuant to applicable law by, the Warrant Agent, upon written instructions from the Company reasonably satisfactory to the Warrant Agent.

(g)      <u>Obligations with Respect to Transfers and Exchanges of Warrants</u>.

(i)      To permit registrations of transfers and exchanges, the Company shall execute and the Warrant Agent is hereby authorized to countersign, in accordance with the provisions of this Section 4, Global Warrant Certificates, as required pursuant to the provisions of this Section 4.

(ii)      All Global Warrant Certificates or Direct Registration Warrants issued upon any registration of transfer or exchange shall be the valid obligations of the Company, entitled to the same benefits under this Agreement as the Global Warrant Certificates or Direct Registration Warrants surrendered upon such registration of transfer or exchange.

(iii)      So long as the Depository, or its nominee, is the registered owner of a Global Warrant Certificate, the Depository or such nominee, as the case may be, will be considered the sole owner or Holder represented by such Global Warrant Certificate for all purposes under this Agreement, including, without limitation, for the purposes of (a) giving notices with respect to such Warrants and (b) registering transfers with respect to such Warrants. Neither the Company nor the Warrant Agent, in its capacity as registrar for such Warrants, will have any responsibility or liability for any aspect of the records relating to beneficial interests in a Global Warrant Certificate or for maintaining, supervising or reviewing any records relating to such beneficial interests.

(iv)      The Warrant Agent shall, upon receipt of all information required to be delivered hereunder, register the transfer of any outstanding Warrants in the Warrant Register, upon surrender of Global Warrant Certificates, representing such Warrants or, in the case of Direct Registration Warrants, upon the delivery by the Registered Holder thereof, at the Warrant Agent Office referred to in Section 15 hereof (the "Warrant Agent Office"), duly endorsed, and accompanied by a completed form of assignment substantially in the form attached as Exhibit B hereto duly signed by the Holder thereof or by the duly appointed legal representative thereof or by his attorney, duly authorized in writing, such signature to be guaranteed by a participant in a Medallion Signature Guarantee Program at a guarantee level acceptable to the Warrant Agent. Upon any such registration of transfer, a new Global Warrant Certificate or Warrant Statement, as the case may be, shall be issued to the transferee.

(v)      The Warrant Agent shall not undertake the duties and obligations of a stock transfer agent under this Agreement, or otherwise, including, without limitation, the duty to receive, issue or transfer shares of the Common Stock.

(h)      Each Holder, by its acceptance of any Warrant under this Agreement, acknowledges and agrees that the Warrants were issued, and the Warrant Shares issuable upon exercise thereof shall be issued, pursuant to the exemption from the registration requirement of Section 5 of the Securities Act of 1933, as amended (the "Securities Act") provided by Section 1145 of the Bankruptcy Code, and to the extent that a Warrant holder (or holder of Warrant Shares) is an "underwriter" as defined in Section 1145(b)(1) of the Bankruptcy Code, such holder may not sell or transfer any Warrants or Warrant Shares in the absence of an effective registration statement under the Securities Act or an exemption from registration thereunder.

SECTION 5.      Duration and Exercise of Warrants.

Draft 3/24/2017

(a)     Expiration Date.  The Warrants shall expire on [●], at 5:00 p.m., New York City time, which is the fifth (5th) anniversary of the Effective Date (the "Expiration Date"). After 5:00 p.m. New York City time on the Expiration Date, the Warrants will become void and of no value, and all rights thereunder and all rights in respect thereof under this Agreement shall cease as of such time.

(b)     Exercise Price.  On the Effective Date, the Exercise Price for the Warrants shall be $[●] per Share (subject to adjustment pursuant to Section 6 hereof).

(c)     Manner of Exercise.

(i)     *Cash Payment*. Subject to the provisions of this Agreement, including the adjustments contained in Section 6, each Warrant evidenced by a Global Warrant Certificate shall entitle the Holder thereof to purchase from the Company (and the Company shall issue and sell to such Holder) one fully paid and nonassessable share of Common Stock at a price equal to the Exercise Price.  All or any of the Warrants represented by a Global Warrant Certificate or in the form of Direct Registration Warrants may be exercised by the registered Holder thereof during normal business hours on any Business Day, by delivering (A) written notice of such election ("Warrant Exercise Notice") to exercise the Warrants to the Company and the Warrant Agent at the addresses set forth in Section 15 hereof no later than 5:00 p.m., New York City time, on the Expiration Date, which Warrant Exercise Notice shall be (i) substantially in the form set forth in Exhibit A-1 in the case of Warrants represented by a Global Warrant Certificate and (ii) substantially in the form set forth in Exhibit A-2 hereto in the case of Direct Registration Warrants; and (B) by no later than 5:00 p.m., New York City time, on the Business Day immediately prior to the Settlement Date, such Warrants to the Warrant Agent (by book-entry transfer through the facilities of the Depository, if such Warrants are represented by a Global Warrant Certificate). Such Global Warrant Certificate and the documents referred to in clause (A) and (B) of the immediately preceding sentence shall be accompanied by payment in full in respect to each Warrant that is exercised, which shall be made by certified or official bank or bank cashier's check payable to the order of the Company, or by wire transfer to the Warrant Agent in immediately available funds.  Such payment shall be in an amount equal to the product of the number of shares of Common Stock designated in such Warrant Exercise Notice multiplied by the Exercise Price for the Warrants being exercised, in each case as adjusted herein.  Upon such surrender and payment, such Holder shall thereupon be entitled to receive the number of duly authorized, validly issued, fully paid and nonassessable Warrant Shares as set forth in clause (d) below and in accordance with clause (h) below.

(ii)     *Cashless Exercise*.  Provided the Common Stock is then listed or admitted for trading on a national securities exchange or an over-the-counter market or comparable system, and subject to the provisions of this Agreement, the Holder shall have the right, in lieu of paying the Exercise Price in cash, to instruct the Company to reduce the number of shares of Common Stock issuable pursuant to the exercise of the Warrants (the "Cashless Exercise"), so that the total number of Warrant Shares issuable upon the exercise of the Warrants that shall be delivered shall be in accordance with the following formula:

$$X = \frac{(M - B) \times C}{M}$$

where:

X = the number of Warrant Shares issuable upon exercise of the Warrants

M = the Market Price of a share of Common Stock determined as of the Business Day immediately preceding the day the Warrant Exercise Notice is delivered to the Warrant Agent;

B = the Exercise Price; and

C = the aggregate number of shares of Warrant Shares for which the Warrants are being exercised.

If the Exercise Price exceeds the Market Price at the time of exercise, then no Warrant Shares will be issuable via the Cashless Exercise.

(d)     The number of Warrant Shares to be issued on such exercise will be determined by the Company (with written notice thereof to the Warrant Agent) in accordance with Section 5(c).  For the avoidance of doubt, the number of Warrant Shares determined pursuant to the foregoing formula to be issuable shall, if not a whole number, be rounded down to the nearest whole number. The Warrant Agent shall have no duty or obligation to investigate or confirm whether the Company's determination of the number of Warrant Shares of Common Stock to be issued on such exercise is accurate or correct, nor shall the Warrant Agent have any duty or obligation to take any action with regard to such warrant exercise prior to being notified by the Company of the relevant number of Warrant Shares to be issued.

(e)     Any exercise of a Warrant pursuant to the terms of this Agreement shall be irrevocable and shall constitute a binding agreement between the Holder and the Company, enforceable in accordance with its terms.

(f)     The Warrant Agent shall:

(i)     examine all Warrant Exercise Notices and all other documents delivered to it by or on behalf of Holders as contemplated hereunder to ascertain whether, on their face, such Warrant Exercise Notices and any such other documents have been executed and completed in accordance with their terms;

(ii)     inform the Company of and cooperate with and assist the Company in resolving any reconciliation problems between the Warrant Exercise Notices received and delivery of Warrants to the Warrant Agent's account;

(iii)     advise the Company, no later than five Business Days after receipt of a Warrant Exercise Notice, of (a) the receipt of such Warrant Exercise Notice and the number of Warrants exercised in accordance with the terms of this Agreement, (b) the number of Shares issued upon exercise of a Warrant, (c) the notation to the records of the Depository reflecting the

Draft 3/24/2017

balance, if any, of the shares of Common Stock issuable after such exercise of the Warrant, (d) the instructions with respect to delivery of the shares of Common Stock deliverable upon such exercise, subject to the timely receipt from the Depository of the necessary information, and (e) such other information as the Company shall reasonably require;

      (iv)     liaise with the Depository and effect such delivery to the relevant accounts at the Depository in accordance with its requirements, if requested by the Company and delivered with the Common Stock and all other necessary information by or on behalf of the Company for delivery to the Depository; and

      (g)     All questions as to the validity, form and sufficiency (including time of receipt) of a Warrant exercise shall be determined by the Company in its sole discretion in good faith, which determination shall be final and binding.  The Warrant Agent shall incur no liability for or in respect of and, except to the extent such liability arises from the Warrant Agent's bad faith, gross negligence or willful misconduct (each as determined by a final, non-appealable order, judgment of a court decree or ruling of competent jurisdiction), shall be indemnified and held harmless by the Company for acting or refraining from acting upon, or as a result of such determination by, the Company.  The Company reserves the right to reject any and all Warrant Exercise Notices not in proper form or for which any corresponding agreement by the Company to exchange would, in the opinion of the Company, be unlawful as determined in good faith. Such determination by the Company shall be final and binding on the Holders absent manifest error.  Moreover, the Company reserves the absolute right to waive any of the conditions to the exercise of Warrants or defects in Warrant Exercise Notices with regard to any particular exercise of Warrants.  Neither the Company nor the Warrant Agent shall be under any duty to give notice to the Holders of any irregularities in any exercise of Warrants, nor shall they incur any liability for the failure to give such notice.

      (h)     As soon as reasonably practicable after the exercise of any Warrant, the Company shall issue, or otherwise deliver, in authorized denominations to or upon the order of the Holder, either: (A) if such Holder holds the Warrants being exercised through the Depository's book-entry transfer facilities, by same-day or next-day credit to the Depository for the account of such Holder or for the account of a participant in the Depository the number of Warrant Shares to which such Holder is entitled, in each case registered in such name and delivered to such account as directed in the Warrant Exercise Notice by such Holder or by the direct participant in the Depository through which such Holder is acting; or (B) if such Holder holds the Warrants being exercised in the form of Direct Registration Warrants, a book-entry interest in the number of Warrant Shares to which such Holder is entitled on the books and records of the Company's transfer agent. Such Warrant Shares shall be deemed to have been issued and any person so designated to be named therein shall be deemed to have become a Holder of record of such Warrant Shares as of the close of business on the date of the delivery thereof.

      If fewer than all of the Warrants evidenced by a Global Warrant Certificate surrendered upon the exercise of Warrants are exercised at any time prior to the Expiration Date, the Warrant Agent shall cause a notation to be made to the records maintained by the Depository.

Draft 3/24/2017

(i)      Notwithstanding any adjustment pursuant to Section 6 in the number of Warrant Shares purchasable upon the exercise of a Warrant, the Company shall not be required to issue Warrants to purchase fractions of Warrant Shares, or to issue fractions of Warrant Shares upon exercise of the Warrants, or to distribute certificates which evidence fractional Warrant Shares.  In the event of an adjustment that results in a Warrant becoming exercisable for fractional Warrant Shares, the number of Warrant Shares subject to such Warrant shall be adjusted upward or downward to the nearest whole number of Warrant Shares or Other Securities (with one half rounded up). All Warrants held by a holder shall be aggregated for purposes of determining any such adjustment.

(j)      If all of the Warrants evidenced by a Global Warrant Certificate have been exercised, such Global Warrant Certificate shall be cancelled by the Warrant Agent.  Such cancelled Global Warrant Certificate shall then be disposed of by or at the direction of the Company in accordance with applicable law.  The Warrant Agent shall confirm such information to the Company in writing as promptly as practicable.

(k)      The Company shall pay all expenses in connection with, and all taxes and other governmental charges that may be imposed with respect to, the issuance or delivery of Warrant Shares upon exercise of Warrants; provided, that the Company shall not be required to pay any tax or governmental charge that may be imposed with respect to any applicable withholding or the issuance or delivery of the Warrant Shares to any Person other than the Holder of the Warrants underlying such Warrant Shares, and no such issuance or delivery shall be made unless and until the Person requesting such issuance has paid to the Company the amount of any such tax, or has established to the satisfaction of the Company that such tax has been paid.

(l)      The Warrant Agent shall keep copies of this Agreement and any notices given or received hereunder for a period beginning on the date of this Agreement and ending no earlier than the first anniversary of the Expiration Date.

SECTION 6.      Adjustment of Exercise Price and Number of Shares Purchasable or Number of Warrants.

(a)      Stock Dividends, Subdivisions and Combinations of Shares.  If after the date hereof the number of outstanding shares of Common Stock is increased by a dividend or share distribution to all holders of Common Stock, in each case payable in shares of Common Stock, or by a subdivision, combination or other reclassification of shares of Common Stock, then, in the case of such events, the amount of Common Stock issuable for each Warrant and the Exercise Price will be adjusted as follows:  on the day following the date fixed for the determination of holders of shares of Common Stock entitled to receive such dividend or share distribution, and in the cases of subdivisions, combinations and other reclassifications, on the day following the effective date thereof:  (a) the Exercise Price in effect immediately prior to such action shall be adjusted to a new Exercise Price that bears the same relationship to the Exercise Price in effect immediately prior to such event as the total number of shares of Common Stock outstanding immediately prior to such action bears to the total number of shares of Common Stock outstanding immediately after such event, and (b) the number of Shares of Common Stock purchasable upon the exercise of any Warrant after such event shall be the number of Shares of

Draft 3/24/2017

Common Stock obtained by multiplying the number of Shares of Common Stock purchasable immediately prior to such adjustment upon the exercise of such Warrant by the Exercise Price in effect immediately prior to such adjustment and dividing the product so obtained by the Exercise Price in effect after such adjustment.

(b)     Certain Distributions.  A distribution to all holders of the Common Stock of rights expiring less than thirty (30) calendar days after the issuance thereof entitling holders to purchase shares of Common Stock at a price per share less than the Market Price as of the record date for such issuance (or, if there is no record date, on the date of such issuance)  shall be deemed a dividend of a number of shares of Common Stock equal to the product of (i) the number of shares of Common Stock actually issued in such distribution (or actually issued under any issued rights that are convertible into or exercisable for the Common Stock) multiplied by (ii) one (1) minus the quotient of (x) the price per share of Common Stock paid to exercise such rights divided by (y) the Market Price, and the amount of Common Stock issuable for each Warrant, and the Exercise Price will be adjusted in accordance with the foregoing sentence.  For purposes of this Section 6(b), if the rights constitute securities convertible into or exercisable for Common Stock, in determining the price payable for Common Stock, there shall be taken into account any consideration received for such rights, as well as any additional amount payable upon exercise or conversion.

(c)     Distributions.  If after the date hereof the Company shall distribute to all holders of its shares of Common Stock evidences of its indebtedness or assets (excluding cash distributions made as a dividend payable out of earnings or out of surplus legally available for dividends under the laws of the jurisdiction of incorporation of the Company) or rights to subscribe for shares of Common Stock expiring at least thirty (30) calendar days after the issuance thereof, then in each such case (i) the Exercise Price in effect on the trading day immediately following the close of business on the record date for such distribution shall be decreased to an amount determined by multiplying such Exercise Price by a fraction, the numerator of which is the Market Price of a share of the Common Stock on the trading day immediately prior to the Ex-Date less the Market Price of the assets or evidences of indebtedness so distributed or of such subscription rights per share of Common Stock outstanding on the trading day immediately prior to the Ex-Date (determined for such purpose on the basis of the aggregate assets, evidences of indebtedness and/or rights distributed with respect to one share of Common Stock as if, for purposes of the definition of "Market Price", such assets, evidences of indebtedness and/or rights were an "Other Security" as defined herein) (as determined by the Board of Directors of the Company, whose determination shall be conclusive, and described in a statement filed with the Warrant Agent) and the denominator of which is the Market Price of a share of Common Stock on the trading day immediately prior to the Ex-Date and (ii) the number of Shares of Common Stock purchasable upon the exercise of any Warrant after such event shall be the number of Shares of Common Stock obtained by multiplying the number of Shares of Common Stock purchasable immediately prior to such adjustment upon the exercise of such Warrant by the Exercise Price in effect immediately prior to such adjustment and dividing the product so obtained by the Exercise Price in effect after such adjustment.  Such adjustments shall be made whenever any such distribution is made, and shall become effective retroactively on the date immediately after the record date for the determination of stockholders entitled to receive such distribution.

Draft 3/24/2017

(d)      Adjustments for Mergers and Consolidations.  In case the Company, after the date hereof, shall merge, consolidate or otherwise engage in a recapitalization, reclassification, reorganization or business combination with another Person, then, in the case of any such transaction, proper provision shall be made so that, upon the basis and terms and in the manner provided in this Agreement, the Holders, upon the exercise of the Warrants at any time after the consummation of such transaction (subject to the Expiration Date), shall be entitled to receive (at the aggregate Exercise Price in effect at the time of the transaction for all Common Stock or Other Securities issuable upon such exercise immediately prior to such consummation), in lieu of the Common Stock or Other Securities Warrant Shares issuable upon such exercise prior to such consummation, the greatest amount of securities, cash or other property to which such Holder would have been entitled as a holder of Common Stock (or Other Securities) upon such consummation if such Holder had exercised the rights represented by the Warrants held by such Holder immediately prior thereto, subject to adjustments (subsequent to such consummation) as nearly equivalent as possible to the adjustments provided for in Sections 6(a) and 6(b) above; provided, however, that each Holder, at the election of the Company, may be required at the consummation of any such transaction to receive solely cash in an amount determined reasonably and in good faith by the Board of Directors of the Company to equal the excess of (i) the product of (A) the value of the per share consideration to be received by the holders of the Common Stock (or Other Securities) in such transaction multiplied by (B) the number of Warrant Shares subject to the Warrants held by such Holder, over (ii) the aggregate Exercise Price payable by such Holder upon exercise in full of such Warrants, and upon consummation of such transaction the Holders shall surrender all Global Warrant Certificates to the Warrant Agent for cancellation.

(e)      Restrictions on Adjustments. Notwithstanding anything to the contrary in this Section 6, the Exercise Price and the Warrant Shares issuable shall not be adjusted:

(i)      in the case of a Deemed Liquidation Event;

(ii)      upon the issuance of any shares of Common Stock pursuant to the exercise of the Warrants;

(iii)      upon the issuance of any shares of Common Stock or other securities of the Company issued in connection with a business combination, consolidation, merger, acquisition or joint venture transaction involving the Corporation or any of its subsidiaries;

(iv)      upon the issuance of any shares of Common Stock pursuant to any present or future plan providing for the reinvestment of dividends or interest payable on the Company's securities and the investment of additional optional amounts in shares of Common Stock under any plan;

(v)      upon the issuance of any shares of Common Stock or other securities (including options or rights) pursuant to the Management Incentive Plan (as defined in the Plan) or any other present or future employee, director or consultant benefit plan or program of, or assumed by, the Company or any of the Company's subsidiaries, and securities issued upon exercise or conversion of such options or other rights;

(vi)      upon the issuance of any shares of Common Stock pursuant to any security of the Company not described otherwise in this subsection and outstanding as of the date the Warrants were first issued, or otherwise contemplated under the Plan; or

(vii)     for a change in the par value of the Common Stock.

(f)      Additional Restrictions on Adjustment.

(i)      In no event will the Company adjust the Exercise Price or make a corresponding adjustment to the number of Warrant Shares to the extent that the adjustment would reduce the Exercise Price below the par value per share of Common Stock.

(ii)     No adjustment shall be made to the Exercise Price or the number of Warrant Shares for any of the transactions described in Sections 6(a) – (d) if the Company makes provisions for the Holders to participate in any such transaction without exercising their Warrants on the same basis as holders of Common Stock and with notice that the Board of Directors determines in good faith to be fair and appropriate.

(iii)    No adjustment shall be made to the Exercise Price, nor will any corresponding adjustment be made to the number of Warrant Shares, unless the adjustment would result in a change of at least 1% of the Exercise Price; *provided* that any adjustments that are less than 1% of the Exercise Price shall be carried forward and such carried forward adjustments, regardless of whether the aggregate adjustment is less than 1% of the Exercise Price, shall be made (x) immediately prior to the time of any exercise and (y) five (5) Business Days prior to the Expiration Date, unless, in each case, such adjustment has already been made.

(g)      Notice of Adjustment in Exercise Price.  Whenever the Exercise Price and Warrant Shares issuable shall be adjusted as provided in this Section 6, the Company shall forthwith file with the Warrant Agent a statement, signed by an Appropriate Officer, briefly stating the facts requiring such adjustment, the Exercise Price that will be effective after such adjustment and the impact of such adjustment on the number and kind of securities issuable upon exercise of the Warrants.  The Warrant Agent shall have no duty with respect to any statement filed with it except to keep the same on file and available for inspection by registered Holders during reasonable business hours.  The Warrant Agent shall not at any time be under any duty or responsibility to any Holder to determine whether any facts exist which may require any adjustment to the Exercise Price or securities issuable, or with respect to the nature or extent of any adjustment of the Exercise Price or securities issuable when made or with respect to the method employed in making such adjustment.

(h)      No Change in Warrant Terms on Adjustment.  Irrespective of any adjustments in the Exercise Price or the number of Warrant Shares (including any inclusion of Other Securities) issuable upon exercise, Warrants theretofore or thereafter issued may continue to express the same prices and number of Warrant Shares as are stated in the similar Warrants issuable initially, or at some subsequent time, pursuant to this Agreement, and the Exercise Price

Draft 3/24/2017

and such number of Warrant Shares issuable upon exercise specified thereon shall be deemed to have been so adjusted.

(i)     Treasury Shares.  Shares of Common Stock at any time owned by the Company shall not be deemed to be outstanding for the purposes of any computation under this Section 6.

SECTION 7.     Cancellation of Warrants.  The Warrant Agent shall cancel all Global Warrant Certificates surrendered for exchange, substitution or transfer in whole or in part. Such cancelled Global Warrant Certificates shall thereafter be disposed of by the Warrant Agent upon written instructions from the Company reasonably satisfactory to the Warrant Agent and such Direct Registration Warrants shall be canceled by appropriate notation on the Warrant Register.

SECTION 8.     Mutilated or Missing Global Warrant Certificates.  Upon receipt by the Company and the Warrant Agent from any Holder of evidence reasonably satisfactory to them of the ownership of and the loss, theft, destruction or mutilation of such Holder's Global Warrant Certificate and a surety bond or indemnity reasonably satisfactory to them, and in case of mutilation upon surrender and cancellation thereof, the Company will execute and the Warrant Agent will countersign and deliver in lieu thereof a new Global Warrant Certificate of like tenor and representing an equal number of Warrants to such Holder; provided in the case of mutilation, no bond or indemnity shall be required if such Global Warrant Certificate in identifiable form is surrendered to the Company or the Warrant Agent for cancellation.  Upon the issuance of any new Global Warrant Certificate under this Section 8, the Company may require the payment of a sum sufficient to cover any stamp tax or other governmental charge that may be imposed in relation thereto and any other expenses (including the reasonable fees and expenses of the Warrant Agent) in connection therewith.  Every new Global Warrant Certificate executed and delivered pursuant to this Section 8 in lieu of any lost, stolen, destroyed or mutilated Global Warrant Certificate shall be entitled to the same benefits of this Agreement equally and proportionately with any and all other Global Warrant Certificates, whether or not the allegedly lost, stolen or destroyed Global Warrant Certificate shall be at any time enforceable by anyone. The provisions of this Section 8 are exclusive and shall preclude (to the extent lawful) all other rights or remedies with respect to the replacement of lost, stolen, destroyed or mutilated Global Warrant Certificates.

SECTION 9.     Merger, Consolidation, and Sale of Assets; Automatic Exercise.

(a)     Notwithstanding anything contained herein to the contrary, but subject to the provisions of Section 9(b) of this Agreement, the Company will not effect a merger or consolidation unless, prior to the consummation of such transaction, each Person (other than the Company) (a "Successor Entity") that may be required to deliver any Warrant Shares, cash or property upon the exercise of any Warrant as provided herein shall assume, by written instrument delivered to the Warrant Agent, the obligations of the Company under this Agreement and under each of the Warrants, including, without limitation, the obligation to deliver such Warrant Shares, cash or property as may be required pursuant to Section 6 hereof, and shall provide for adjustments equivalent to the adjustments provided for in Section 6 hereof.

Draft 3/24/2017

(b)      In case of any consolidation, merger, business combination, sale, lease or other transfer is a Deemed Liquidation Event, the Successor Entity may, at its sole option, (A) deem all Warrants outstanding as of the close of business on the trading day immediately preceding the Deemed Liquidation Date (the "Automatic Exercise Time") exercised (even if not surrendered) as of the Automatic Exercise Time and settled as set forth in Section 5(c)(ii), or (B) assume all of the Company's obligations under this Agreement and the Warrants and upon any such assumption shall succeed to and be substituted for the Company with the same effect as if it had been named herein as the Company. For the avoidance of doubt, for the option described in Section 9(b)(A) above, no Warrant shall remain outstanding or exercisable after the Automatic Exercise Time and each Person in whose name any shares of Common Stock are issued as a result shall for all for all purposes be deemed to have become the holder of record of such shares as of the Automatic Exercise Time. The Company shall promptly notify the Holders and the Warrant Agent of any automatic exercise pursuant to this Section 9 and the number of shares of Common Stock, if any, issuable to each Holder as a result of such automatic exercise.

SECTION 10.    Reservation of Shares; Certain Actions.

(a)      Reservation of Shares.  The Company shall at all times reserve and keep available, free from preemptive rights, out of its authorized but unissued Common Stock (or out of authorized Other Securities), solely for issuance and delivery upon exercise of Warrants, the full number of Warrant Shares from time to time issuable upon the exercise of all Warrants and any other outstanding warrants, options or similar rights, from time to time outstanding.  All Warrant Shares shall be duly authorized and, when issued upon such exercise of the Warrants, shall be duly and validly issued, and (if applicable) fully paid and nonassessable, free from all taxes, liens, charges, security interests, encumbrances and other restrictions created by or through the Company and issued without violation (i) of any preemptive or similar rights of any stockholder of the Company and (ii) by the Company of any applicable law or governmental regulation or any requirements of any domestic securities exchange upon which the Warrant Shares may be listed at the time of such exercise.

(b)      Certain Actions.  Before taking any action that would cause an adjustment pursuant to Section 6 reducing any Exercise Price below the then par value (if any and if applicable) of the Warrant Shares issuable upon exercise of the Warrants, the Company will take any reasonable corporate action that may, in the opinion of its counsel, be necessary in order that the Company may validly and legally issue fully paid and nonassessable Warrant Shares at such Exercise Price as so adjusted.

SECTION 11.    Notification of Certain Events; Corporate Action.  In the event of:

(a)      any taking by the Company of a record of the holders of any class of securities for the purpose of determining the holders thereof who are entitled to receive any dividend (excluding cash distributions made as a dividend payable out of earnings or out of surplus legally available for dividends under the laws of the jurisdiction of incorporation of the Company) or other distribution of any kind, or any right to subscribe for, purchase or otherwise acquire any shares of stock of any class or any other securities or property, or to receive any other right or interest of any kind; or

(b)      (A) any capital reorganization of the Company, (B) any reclassification of the capital stock of the Company (other than a change in par value or from par value to no par value or from no par value to par value or as a result of a subdivision or combination), (C) the consolidation or merger of the Company with or into any other Person (other than a consolidation or merger in which the Company is the continuing corporation and which does not result in any change in the shares of Common Stock), (D) the sale or transfer of the properties and assets of the Company as, or substantially as, an entirety to another Person, or (E) an exchange offer for Common Stock (or Other Securities); or

(c)      the voluntary or involuntary dissolution, liquidation, or winding up of the Company, the Company shall cause to be filed with the Warrant Agent and mailed to each Holder a notice specifying (x) the date or expected date on which any such record is to be taken for the purpose of such dividend, distribution or right, and the amount and character of any such dividend, distribution or right, or if a record is not to be taken, the date as of which the holders of Common Stock of record to be entitled to such dividend, distribution, or right are to be determined, and the amount and character of such dividend, distribution or right, or (y) the date or expected date on which any such reorganization, reclassification, consolidation, merger, sale, transfer, exchange offer, dissolution, liquidation or winding up is expected to become effective, and the time, if any such time is to be fixed, as of which holders of record of Common Stock (or Other Securities) shall be entitled to exchange their shares of Common Stock (or Other Securities) for the securities or other property deliverable upon such reorganization, reclassification, consolidation, merger, sale, transfer, exchange offer, dissolution, liquidation or winding up. Such notice shall be delivered not less than ten (10) calendar days prior to such date therein specified, in the case of any such date referred to in clause (x) of the preceding sentence, and not less than twenty (20) calendar days prior to such date therein specified, in the case of any such date referred to in clause (y) of the preceding sentence.  Failure to give such notice within the time provided or any defect therein shall not affect the legality or validity of any such action.

SECTION 12.   Warrant Agent.  The Warrant Agent undertakes the duties and obligations imposed by this Agreement upon the terms and conditions set forth in this Section 12.

(a)      Limitation on Liability.  The Warrant Agent shall not by countersigning Global Warrant Certificates or by any other act hereunder be accountable with respect to or be deemed to make any representations as to the validity or authorization of the Warrants or the Global Warrant Certificates (except as to its countersignature thereon), as to the validity, authorization or value (or kind or amount) of any Warrant Shares or other property delivered or deliverable upon exercise of any Warrant, or as to the purchase price of such Warrant Shares or other property.  The Warrant Agent shall not (i) be liable for any recital or statement of fact contained herein or in the Global Warrant Certificates or for any action taken, suffered or omitted by the Warrant Agent in good faith in the belief that any Global Warrant Certificate or any other document or any signature is genuine or properly authorized, (ii) be responsible for determining whether any facts exist that may require any adjustment of the Exercise Price and the number of Warrant Shares, or with respect to the nature or extent of any such adjustments when made, or with respect to the method of adjustment employed, (iii) be responsible for any failure on the part of the Company to issue, transfer or deliver any Warrant Shares or property upon the surrender of any Warrant for the purpose of exercise or to comply with any other of the

Company's covenants and obligations contained in this Agreement or in the Global Warrant Certificates or (iv) be liable for any action taken, suffered or omitted to be taken in connection with this Agreement, except for its own bad faith, gross negligence or willful misconduct. The Warrant Agent shall be liable hereunder only for its own bad faith, gross negligence or willful misconduct (which bad faith, gross negligence or willful misconduct must be determined by a final, non-appealable order, judgment, decree or ruling of a court of competent jurisdiction). Except for the foregoing, notwithstanding anything in this Agreement to the contrary, in no event shall the Warrant Agent be liable for special, indirect, punitive, incidental or consequential loss or damage of any kind whatsoever (including but not limited to lost profits), even if the Warrant Agent has been advised of the likelihood of the loss or damage and regardless of the form of the action.

(b)     Instructions. The Warrant Agent is hereby authorized to accept advice or instructions with respect to the performance of its duties hereunder from an Appropriate Officer and to apply to any such officer for advice or instructions. The Warrant Agent shall be fully protected and authorized in relying upon the most recent advice or instructions received from any such officer. The Warrant Agent shall not be liable for any action taken, suffered or omitted by it in accordance with the advice or instructions of any such officer, except to the extent that such action or omission resulted directly from the Warrant Agent's bad faith, gross negligence, or willful misconduct.

(c)     Agents. The Warrant Agent may execute and exercise any of the rights and powers hereby vested in it or perform any duty hereunder either itself or by or through its attorneys, agents or employees, provided reasonable care has been exercised in the selection and in the continued employment of such attorney, agent or employee. The Warrant Agent shall not be under any obligation or duty to institute, appear in, or defend any action, suit or legal proceeding in respect hereof, but this provision shall not affect the power of the Warrant Agent to take such action as the Warrant Agent may consider necessary. The Warrant Agent shall promptly notify the Company in writing of any claim made or action, suit or proceeding instituted against the Warrant Agent arising out of or in connection with this Agreement.

(d)     Cooperation. The Company will perform, execute, acknowledge and deliver or cause to be performed, executed, acknowledged and delivered all such further acts, instruments and assurances as may reasonably be required by the Warrant Agent in order to enable the Warrant Agent to carry out or perform its duties under this Agreement.

(e)     Agent Only. The Warrant Agent shall act solely as agent for the Company in accordance with the terms and conditions hereof and does not assume any obligation or relationship of agency or trust with any Holders. The Warrant Agent shall not be liable except for the performance of such duties as are specifically set forth herein, and no implied covenants or obligations shall be read into this Agreement against the Warrant Agent, whose duties and obligations shall be determined solely by the express provisions hereof.

(f)     Right to Counsel. The Warrant Agent may at any time consult with legal counsel reasonably satisfactory to it (who may be legal counsel for the Company), and the Warrant Agent shall incur no liability or responsibility to the Company or to any Warrant Holder

for any action taken, suffered or omitted by the Warrant Agent in good faith in accordance with the opinion or advice of such counsel.

(g)     Compensation.  The Company agrees to pay the Warrant Agent reasonable compensation for all services rendered by it hereunder and to reimburse the Warrant Agent for its reasonable expenses hereunder (including reasonable and documented fees and out-of-pocket expenses of one legal counsel and one local counsel), and further agrees to indemnify and hold the Warrant Agent and its employees, officers, directors and agents harmless against any and all loss, claims, damages, expenses and liabilities, including, but not limited to, any judgments, costs and such reasonable counsel fees, for any action taken, suffered or omitted by the Warrant Agent and its employees, officers, directors and agents in connection with the acceptance, administration, exercise and performance of its duties under this Agreement and the Warrants, except for any such liabilities that arise as a result of the Warrant Agent's bad faith, gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable judgment).

(h)     Accounting and Payment.  The Warrant Agent shall account promptly to the Company with respect to Warrants exercised and concurrently pay to the Company all moneys received by the Warrant Agent on behalf of the Company on the purchase of Warrant Shares through the exercise of Warrants.  The Warrant Agent shall advise the Company by telephone at the end of each day on which a payment for the exercise of Warrants is received of the amount so deposited to such account.  The Warrant Agent shall as soon as practicable confirm such telephone advice to the Company in writing.

(i)     No Conflict.  Subject to applicable law, the Warrant Agent and any stockholder, affiliate, director, officer or employee of the Warrant Agent may buy, sell or deal in any of the Warrants or other securities of the Company or become pecuniarily interested in any transaction in which the Company may be interested, or contract with or lend money to the Company or otherwise act as fully and freely as though it were not Warrant Agent under this Agreement.  Subject to applicable law, nothing herein shall preclude the Warrant Agent from acting in any other capacity for the Company or for any other Person including, without limitation, acting as trustee under an indenture.

(j)     Resignation; Termination.  The Warrant Agent may resign its duties and be discharged from all further duties and liabilities hereunder (except liabilities arising as a result of the Warrant Agent's bad faith, gross negligence or willful misconduct) after giving thirty (30) calendar days' prior written notice to the Company.  The Company may remove the Warrant Agent upon thirty (30) calendar days' written notice, and the Warrant Agent shall thereupon in like manner be discharged from all further duties and liabilities hereunder, except as have been caused by the Warrant Agent's bad faith, gross negligence or willful misconduct.  The Company shall cause to be mailed promptly (by first class mail, postage prepaid) to each registered Holder at such Holder's last address as shown on the register of the Company, at the Company's expense, a copy of such notice of resignation or notice of removal, as the case may be.  Upon such resignation or removal the Company shall promptly appoint in writing a new warrant agent. If the Company shall fail to make such appointment within a period of sixty (60) calendar days after it has been notified in writing of such resignation by the resigning Warrant Agent or after such removal, then the Holder of any Warrant may apply to any court of competent jurisdiction

for the appointment of a new warrant agent.  A resignation or removal of the Warrant Agent and appointment of a successor Warrant Agent will become effective only upon the successor Warrant Agent's acceptance of appointment.  Pending appointment of a successor to the Warrant Agent, either by the Company or by such a court, the duties of the Warrant Agent shall be carried out by the Company.  Any successor warrant agent, whether appointed by the Company or by such a court, shall be a Person, organized under the laws of the United States or of any state thereof and authorized under such laws to conduct a shareholder services business, be subject to supervision and examination by a Federal or state authority, and have a combined capital and surplus of not less than $100,000,000 as set forth in its most recent published annual report of condition; or in the case of such capital and surplus requirement, a controlled affiliate of such a Person meeting such capital and surplus requirement.  After acceptance in writing of such appointment by the new Warrant Agent, such successor Warrant Agent shall be vested with the same powers, rights, duties and responsibilities under this Agreement as if it had been originally named herein as the Warrant Agent, without any further assurance, conveyance, act or deed; but if for any reason it shall be necessary or expedient to execute and deliver any further assurance, conveyance, act or deed, the same shall be done at the expense of the Company and shall be legally and validly executed and delivered by the resigning or removed Warrant Agent.  Not later than the effective date of any such appointment, the Company shall send notice thereof to the resigning or removed Warrant Agent and shall forthwith cause a copy of such notice to be mailed (by first class, postage prepaid) to each registered Holder at such Holder's last address as shown on the register of the Company.  Failure to give any notice provided for in this Section 12(j), or any defect in any such notice, shall not affect the legality or validity of the resignation of the Warrant Agent or the appointment of a successor Warrant Agent, as the case may be.

(k)     Merger, Consolidation or Change of Name of Warrant Agent.  Any corporation into which the Warrant Agent may be merged or converted or with which it may be consolidated, or any corporation resulting from any merger, conversion or consolidation to which the Warrant Agent shall be a party, or any corporation succeeding to all or substantially all of the agency business of the Warrant Agent shall be the successor to the Warrant Agent hereunder without the execution or filing of any document or any further act on the part of any of the parties hereto, provided that such corporation would be eligible for appointment as a successor Warrant Agent under the provisions of Section 12(j).  If at the time such successor to the Warrant Agent shall succeed under this Agreement, any of the Global Warrant Certificates shall have been countersigned but not delivered, any such successor to the Warrant Agent may adopt the countersignature of the original Warrant Agent; and if at that time any of the Global Warrant Certificates shall not have been countersigned, any successor to the Warrant Agent may countersign such Global Warrant Certificates either in the name of the predecessor Warrant Agent or in the name of the successor Warrant Agent; and in all such cases such Warrant Certificates shall have the full force and effect provided in the Global Warrant Certificates and in this Agreement.  If at any time the name of the Global Warrant Agent shall be changed and at such time any of the Warrants shall have been countersigned but not delivered, the Warrant Agent whose name has changed may adopt the countersignature under its prior name; and if at that time any of the Warrants shall not have been countersigned, the Warrant Agent may countersign such Warrants either in its prior name or in its changed name; and in all such cases such Warrants shall have the full force and effect provided in the Warrants and in this Agreement.

Draft 3/24/2017

(l)   Exclusions.  Unless a court of competent jurisdiction determines by a final, non-appealable order, judgment, decree or ruling that the Warrant Agent's action or inaction constitutes bad faith, gross negligence or willful misconduct on the part of the Warrant Agent, the Warrant Agent shall have no responsibility with respect to the validity of this Agreement or with respect to the validity or execution of any Warrant (except its countersignature thereof); nor shall it be responsible for any breach by the Company of any covenant or condition contained in this Agreement or in any Warrant; nor shall it be responsible or have any duty to make any calculation or adjustment (unless reasonably requested to do so by the Company in writing in a manner consistent with the terms of this Agreement), or to determine when any calculation or adjustment required under the provisions hereof should be made, how it should be made or what it should be, or have any responsibility or liability for the manner, method or amount of any such calculation or adjustment or the ascertaining of the existence of facts that would require any such calculation or adjustment; nor shall it by any act hereunder be deemed to make any representation or warranty as to the authorization or reservation of any Warrant to be issued pursuant to this Agreement or as to whether any Warrant Shares will, when issued, be valid and fully paid and nonassessable.

(m)   No Liability for Interest.  The Warrant Agent shall not be under any liability for interest on any monies at any time received by it pursuant to any of the provisions of this Agreement.

(n)   No Liability for Invalidity.  The Warrant Agent shall not be under any responsibility with respect to the validity or sufficiency of this Agreement or the execution and delivery hereof (except the due execution and delivery hereof by the Warrant Agent) or with respect to the validity or execution of the Global Warrant Certificates (except its countersignature thereon).

(o)   No Responsibilities for Recitals.  The recitals contained herein and in the Global Warrant Certificates (except as to the Warrant Agent's countersignature thereon) shall be taken as the statements of the Company, and the Warrant Agent assumes no responsibility hereby for the correctness of the same.

(p)   No Implied Obligations.  The Warrant Agent shall be obligated to perform such duties as are explicitly set forth herein and no implied duties or obligations shall be read into this Agreement against the Warrant Agent.  The Warrant Agent shall not be under any obligation to take any action hereunder that may involve it in any expense or liability, the payment of which within a reasonable time is not, in its reasonable opinion, assured to it.  The Warrant Agent shall not be accountable or under any duty or responsibility for the use by the Company of any Global Warrant Certificate authenticated by the Warrant Agent and delivered by it to the Company pursuant to this Agreement or for the application by the Company of the proceeds of the issuance and sale, or exercise, of the Warrants or Warrant Shares.  The Warrant Agent shall have no duty or responsibility in case of any default by the Company in the performance of its covenants or agreements contained herein or in any Global Warrant Certificate or in the case of the receipt of any written demand from a Holder with respect to such default, including, without limiting the generality of the foregoing, any duty or responsibility to initiate or attempt to initiate any proceedings at law or otherwise or, to make any demand upon the Company.

(q)     Force Majeure.  In no event shall the Warrant Agent be responsible or liable for any failure or delay in the performance of its obligations under this Agreement arising out of or caused by, directly or indirectly, forces beyond its reasonable control, including, without limitation, strikes, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, and interruptions, loss or malfunctions of utilities, communications or computer (software or hardware) services.

SECTION 13.    Severability.  In the event that any one or more of the provisions contained herein or in the Warrants, or the application thereof in any circumstances, is held invalid, illegal or unenforceable, the validity, legality and enforceability of any such provisions in every other respect and of the remaining provisions contained herein and therein shall not be affected or impaired thereby; provided, that if any such excluded term, provision, covenant or restriction shall materially adversely affect the rights, immunities, duties or obligations of the Warrant Agent, the Warrant Agent shall be entitled to resign immediately.  Furthermore, subject to the preceding sentence, in lieu of any such invalid, illegal or unenforceable provision, the parties hereto intend that there shall be added as a part of this Agreement a provision as similar in terms and commercial effect to such invalid, illegal or unenforceable provision as may be possible and be valid and enforceable.

SECTION 14.    Holder Not Deemed a Stockholder.  Prior to the exercise of any Warrants, no Holder of a Global Warrant Certificate, as such, shall be entitled to any rights of a stockholder of the Company, including, but not limited to, the right to vote, to receive dividends or other distributions, to exercise any preemptive right or, except as otherwise provided herein, to receive notice as stockholders in respect of the meetings of stockholders or for the election of directors of the Company or any other matter.

SECTION 15.    Notices to Company and Warrant Agent.  All notices, requests or demands authorized by this Agreement to be given or made by the Warrant Agent or by any registered Holder of any Warrant to or on the Company or the Warrant Agent to be effective shall be in writing (including by telecopy), and shall be deemed to have been duly given or made when delivered by hand, or two Business Days after being delivered to a recognized courier (whose stated terms of delivery are two business days or less to the destination such notice), or five Business Days after being deposited in the mail, or, in the case of facsimile or email notice, when received, addressed (until another address is filed in writing by the Company with the Warrant Agent) as follows:

AMPLIFY ENERGY CORP.
500 Dallas Street, Suite 1600
Houston, TX  77002
Attention:    General Counsel
E-mail:        [legal_notices@memorialpp.com]

If the Company shall fail to maintain such office or agency or shall fail to give such notice of any change in the location thereof, presentation may be made and notices and demands may be served at the principal office of the Warrant Agent.

Any notice pursuant to this Agreement to be given by the Company or by any registered Holder of any Warrant to the Warrant Agent shall be sufficiently given if sent by first-class mail, postage prepaid, or by facsimile or email notice, addressed (until another address is filed in writing by the Warrant Agent with the Company), as follows:

> American Stock Transfer & Trust Company, LLC
> 48 Wall Street, 22nd Floor
> New York, NY  10005
> Attention: Legal Department
> Email: legalteamAST@amstock.com

The Warrant Agent maintains the Warrant Agent's Principal Office at the above address.

SECTION 16.   Supplements and Amendments.  The Company and the Warrant Agent may from time to time supplement or amend this Agreement (a) without the approval of any Holders in order to cure any ambiguity, manifest error or other mistake in this Agreement, or to correct or supplement any provision contained herein that may be defective or inconsistent with any other provision herein, or to make any other provisions in regard to matters or questions arising hereunder that the Company and the Warrant Agent may deem necessary or desirable and that shall not adversely affect, alter or change the interests of the Holders in any material respect or (b) with the prior written consent of Holders exercisable for a majority of the Warrant Shares then issuable upon exercise of all of the Warrants then outstanding; provided that each amendment or supplement that decreases the Warrant Agent's rights or increases its duties and responsibilities hereunder shall also require the prior written consent of the Warrant Agent. Notwithstanding the foregoing, the consent of each Holder affected shall be required for any amendment pursuant to which the Exercise Price would be increased or the number of Warrant Shares purchasable would be decreased (other than pursuant to adjustments provided herein) or the Expiration Date would be shortened.  Upon execution and delivery of any supplement or amendment pursuant to this Section 16, such amendment shall be considered a part of this Agreement for all purposes and every Holder of a Global Warrant Certificate theretofore or thereafter countersigned and delivered hereunder shall be bound thereby.

SECTION 17.   Termination.  This Agreement shall terminate on the Expiration Date or, if later, upon settlement of all Warrants (i) validly exercised prior to the Expiration Date and, (ii) if exercised pursuant to section 5(c)(i) hereof, for which the Exercise Price was timely paid.  Notwithstanding the foregoing, this Agreement will terminate on any earlier date when all Warrants have been exercised, or cancelled, provided, however, that the provisions of Section 12 shall survive such termination.

SECTION 18.   Governing Law and Consent to Forum.  This Agreement shall be governed by and construed in accordance with the laws of the State of New York applicable to contracts made and to be performed within the State of New York. Each of the Company and the Warrant Agent hereby irrevocably submits to the jurisdiction of any New York State court sitting in the City of New York or any Federal Court sitting in the City of New York with respect to any suit, action or proceeding arising out of or relating to this Agreement, and each irrevocably accepts for itself and in respect of its property, generally and unconditionally, the jurisdiction of the aforesaid courts. Nothing herein shall affect the right of any Person to serve process in any

Draft 3/24/2017

manner permitted by law or to commence legal proceedings or otherwise proceed against the Company or the Warrant Agent in any other jurisdiction.

SECTION 19.   Waiver of Jury Trial.  The parties hereto waive all right to trial by jury in any action or proceeding to enforce or defend any rights hereunder.

SECTION 20.   Benefits of this Agreement.  Nothing in this Agreement shall be construed to give to any Person other than the Company, the Warrant Agent and the registered Holders (who are express third party beneficiaries of this Agreement) any legal or equitable right, remedy or claim under this Agreement, and this Agreement shall be for the sole and exclusive benefit of the Company, the Warrant Agent and the registered Holders.

SECTION 21.   Counterparts.  This Agreement may be executed in any number of counterparts and each of such counterparts shall for all purposes be deemed to be an original, and such counterparts shall together constitute but one and the same instrument.

SECTION 22.   Headings.  The headings of sections of this Agreement have been inserted for convenience of reference only, are not to be considered a part hereof and in no way modify or restrict any of the terms or provisions hereof.

*[signature page follows]*

Draft 3/24/2017

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed and delivered as of the day and year first above written.

AMPLIFY ENERGY CORP.

By_____
   Name:
   Title:

Draft 3/24/2017

AMERICAN STOCK TRANSFER & TRUST
COMPANY, LLC

By_____
   Name:
   Title:

Draft 3/24/2017

**EXHIBIT A-1**

**FORM OF FACE OF GLOBAL WARRANT CERTIFICATE**

This Global Warrant Certificate is deposited with or on behalf of The Depository Trust Company (the "Depository") or its nominee in custody for the benefit of the beneficial owners hereof, and is not transferable to any person under any circumstances except that (i) this Global Warrant Certificate may be delivered to the Warrant Agent for cancellation pursuant to Section 4(f) of the Warrant Agreement and (ii) this Global Warrant Certificate may be transferred pursuant to Section 4(e) of the Warrant Agreement and as set forth below.

**UNLESS THIS GLOBAL WARRANT CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TO THE COMPANY OR THE WARRANT AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY (AND ANY PAYMENT HEREON IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL BECAUSE THE REGISTERED OWNER HEREOF, CEDE & CO. OR SUCH OTHER ENTITY, HAS AN INTEREST HEREIN.**

**TRANSFERS OF THIS GLOBAL WARRANT CERTIFICATE SHALL BE LIMITED TO TRANSFERS IN WHOLE, BUT NOT IN PART, TO NOMINEES OF THE DEPOSITORY OR TO A SUCCESSOR THEREOF OR SUCH SUCCESSOR'S NOMINEE OR AS OTHERWISE PERMITTED IN SECTION 4(E) OF THE WARRANT AGREEMENT, AND TRANSFERS OF BENEFICIAL INTERESTS IN THIS GLOBAL WARRANT CERTIFICATE SHALL BE LIMITED TO TRANSFERS MADE IN ACCORDANCE WITH THE RESTRICTIONS SET FORTH IN SECTION 4 OF THE WARRANT AGREEMENT.**

No registration or transfer of the securities issuable pursuant to the exercise of the Warrant will be recorded on the books of the Company until such provisions have been complied with.

To the extent that any provision hereof conflicts with any provision of the Warrant Agreement, the provision in the Warrant Agreement shall control.

Draft 3/24/2017

CUSIP No. _____

ISIN No. _____

WARRANTS TO PURCHASE

SHARES OF COMMON STOCK

AMPLIFY ENERGY CORP.

GLOBAL WARRANT TO PURCHASE COMMON STOCK

VOID AFTER 5:00 P.M., New York City Time, [●]

This Global Warrant Certificate ("Warrant Certificate") certifies that Cede & Co., or its registered assigns is the registered holder of Warrants (the "Warrants") of AMPLIFY ENERGY CORP., a Delaware corporation (the "Company"), to purchase the number of shares (the "Shares") of common stock, par value $0. 0001 per share (the "Common Stock"), of the Company set forth above.  The Warrants expire at 5:00 p.m., New York City time, on the date that is the fifth year anniversary of the Effective Date (such date, the "Expiration Date"), and each Warrant entitles the holder to purchase from the Company one fully paid and non-assessable Share at the exercise price (the "Exercise Price"), payable to the Company either by certified or official bank or bank cashier's check payable to the order of the Company, or by wire transfer in immediately available funds of the aggregate Exercise Price to an account of the Warrant Agent specified in writing by the Warrant Agent for such purpose, no later than 5:00 p.m., New York City time, on the business day immediately prior to the settlement date, which settlement date is three Business Days after a Warrant Exercise Notice is delivered (the "Settlement Date").  The initial Exercise Price shall be $[●].

In lieu of paying the Exercise Price as set forth in the preceding paragraph, subject to the provisions of the Warrant Agreement (as defined on the reverse hereof), the Warrants shall entitle the holder thereof, at the election of such holder, to exercise the Warrants by authorizing the Company to withhold from issuance a number of Shares issuable upon exercise of the Warrants which when multiplied by the Market Price of the Common Stock is equal to the aggregate price for the number of Shares for which the Warrants are being exercised at the Exercise Price (assuming the Exercise Price for all such Shares was being paid in cash), and such withheld shares shall no longer be issuable under the Warrants.

The Exercise Price and the number of Shares purchasable upon exercise of the Warrants are subject to adjustment upon the occurrence of certain events as set forth in the Warrant Agreement.

To the extent that any provision hereof conflicts with any provision of the Warrant Agreement, the provision in the Warrant Agreement shall control.

No Warrant may be exercised prior to the date of the Warrant Agreement or after the Expiration Date.

After 5:00 p.m., New York City time, on the Expiration Date, the Warrants will become wholly void and of no value.

REFERENCE IS HEREBY MADE TO THE FURTHER PROVISIONS OF THIS WARRANT CERTIFICATE SET FORTH ON THE REVERSE HEREOF.  SUCH FURTHER PROVISIONS SHALL FOR ALL PURPOSES HAVE THE SAME EFFECT AS THOUGH FULLY SET FORTH AT THIS PLACE.

Draft 3/24/2017

This Warrant Certificate shall not be valid unless countersigned by the Warrant Agent.

IN WITNESS WHEREOF, the Company has caused this Warrant Certificate to be executed by its duly authorized officer.

Dated: _____


AMPLIFY ENERGY CORP.

By:_____
Name:
Title:



By:_____
Name:
Title:



AMERICAN STOCK TRANSFER & TRUST COMPANY, LLC

as Warrant Agent

By:_____
Name:
Title:

Draft 3/24/2017

FORM OF REVERSE OF GLOBAL WARRANT CERTIFICATE
AMPLIFY ENERGY CORP.

The Warrants evidenced by this Warrant Certificate are a part of a duly authorized issue of Warrants to purchase shares of Common Stock issued pursuant to that certain Warrant Agreement, dated as of [●], 2017 (the "Warrant Agreement"), duly executed and delivered by the Company and American Stock Transfer & Trust Company, LLC, as Warrant Agent (the "Warrant Agent").  The Warrant Agreement hereby is incorporated by reference in and made a part of this instrument and is hereby referred to for a description of the rights, limitation of rights, obligations, duties and immunities thereunder of the Warrant Agent, the Company and the holders (the words "holders" or "holder" meaning the registered holders or registered holder) of the Warrants.  A copy of the Warrant Agreement may be inspected at the Warrant Agent's office and is available upon written request addressed to the Company.  All capitalized terms used on the face of this Warrant Certificate but not defined herein and are defined in the Warrant Agreement shall have the meanings assigned to them therein.

Warrants may be exercised to purchase Warrant Shares from the Company from the date of the Warrant Agreement through 5:00 p.m., New York City time, on the Expiration Date, at the Exercise Price set forth on the face hereof, subject to adjustment as described in the Warrant Agreement.  Subject to the terms and conditions set forth herein and in the Warrant Agreement, the holder of the Warrants evidenced by this Warrant Certificate may exercise such Warrants by:

(i) providing written notice of such election ("Warrant Exercise Notice") to exercise the Warrants to the Company and the Warrant Agent at the addresses set forth in the Warrant Agreement, by hand or by facsimile, no later than 5:00 p.m., New York City time, on the Expiration Date, which Warrant Exercise Notice shall substantially be in the form of an election to purchase shares of Common Stock set forth herein, properly completed and executed by the holder; (ii) delivering no later than 5:00 p.m., New York City time, on the Business Day immediately prior to the Settlement Date, the Warrants to the Warrant Agent (by book-entry transfer through the facilities of the Depository); and (iii) paying the Exercise Price, together with any applicable taxes and governmental charges.

In lieu of paying the Exercise Price as set forth in the preceding paragraph, subject to the provisions of the Warrant Agreement, the Warrants shall entitle the holder thereof, at the election of such holder, to exercise the Warrants by authorizing the Company to withhold from issuance a number of shares of Common Stock issuable upon exercise of the Warrants which when multiplied by the Market Price of the Common Stock is equal to the aggregate price for the number of Shares for which the Warrants are being exercised at the Exercise Price (assuming the Exercise Price for all such Shares was being paid in cash), and such withheld shares shall no longer be issuable under the Warrants.

In the event that upon any exercise of the Warrants evidenced hereby the number of shares of Common Stock actually purchased shall be less than the total number of shares of Common Stock purchasable upon exercise of the Warrants evidenced hereby, there shall be issued to the holder hereof, or such holder's assignee, a new Warrant Certificate evidencing Warrants to purchase the shares of Common Stock not so purchased or appropriate adjustment shall be made in the "Schedule of Increases or Decreases in Global Warrant Certificate" annexed hereto.  No adjustment shall be made for any cash dividends on any shares of Common Stock issuable upon exercise of Warrants.  After 5:00 p.m., New York City time on the Expiration Date, unexercised Warrants shall become wholly void and of no value.

The Company shall not be required to issue fractional shares of Common Stock or any certificates that evidence fractional Shares.

Draft 3/24/2017

Warrant Certificates, when surrendered by book-entry delivery through the facilities of the Depository, may be exchanged, in the manner and subject to the limitations provided in the Warrant Agreement, but without payment of any service charge, for another Warrant Certificate or Warrant Certificates of like tenor evidencing Warrants to purchase in the aggregate a like number of shares of Common Stock.

No Warrants may be sold, exchanged or otherwise transferred in violation of the Securities Act or state securities laws.

The Company and Warrant Agent may deem and treat the registered holder hereof as the absolute owner of this Warrant Certificate (notwithstanding any notation of ownership or other writing hereon made by anyone) for the purpose of any exercise hereof and for all other purposes, and neither the Company nor the Warrant Agent shall be affected by any notice to the contrary.

[Balance of page intentionally remains blank]

Draft 3/24/2017

[TO BE ATTACHED TO GLOBAL WARRANT CERTIFICATE]

SCHEDULE OF INCREASES OR DECREASES IN GLOBAL WARRANT CERTIFICATE

The following increases or decreases in this Global Warrant have been made:

| Date | Amount of decrease in the number of shares issuable upon exercise of the Warrants represented by this Global Warrant | Amount of increase in number of shares issuable upon exercise of the Warrants represented by this Global Warrant | Number of shares issuable upon exercise of the Warrants represented by this Global Security following such decrease or increase | Signature of authorized officer of the Warrant Agent |
|---|---|---|---|---|
| | | | | |

Draft 3/24/2017

FORM OF ELECTION TO EXERCISE WARRANT FOR
WARRANT HOLDERS HOLDING WARRANTS
THROUGH THE DEPOSITORY TRUST COMPANY

TO BE COMPLETED BY DIRECT PARTICIPANT
IN THE DEPOSITORY TRUST COMPANY

AMPLIFY ENERGY CORP.

Warrants to Purchase _____ Shares of Common Stock

(TO BE EXECUTED UPON EXERCISE OF THE WARRANT)

The undersigned hereby irrevocably elects to exercise the right, represented by Warrants to purchase shares of Common Stock of AMPLIFY ENERGY CORP. (the "Company") held for its benefit through the book-entry facilities of The Depository Trust Company (the "Depository"), to purchase _____ newly issued shares of Common Stock of the Company at the Exercise Price of $_____ per share.

The undersigned represents, warrants and promises that it has the full power and authority to exercise and deliver the Warrants exercised hereby.  The undersigned represents, warrants and promises that it has delivered or will deliver in payment for such shares $_____ by certified or official bank or bank cashier's check payable to the order of the Company, or by wire transfer in immediately available funds of the aggregate Exercise Price to an account of the Warrant Agent specified in writing by the Warrant Agent for such purpose or through a cashless exercise (as described below), no later than 5:00 p.m., New York City time, on the Business Day immediately prior to the Settlement Date.

☐Please check if the undersigned, in lieu of paying the Exercise Price as set forth in the preceding paragraph, elects to exercise Warrants by authorizing the Company to withhold from issuance a number of shares of Common Stock issuable upon exercise of the Warrants which when multiplied by the Market Price of the Common Stock is equal to the aggregate price for the number of Shares for which the Warrants are being exercised at the Exercise Price (assuming the Exercise Price for all such Shares was being paid in cash), and such withheld shares shall no longer be issuable under the Warrants.

The undersigned requests that the shares of Common Stock purchased hereby be in registered form in the authorized denominations, registered in such names and delivered, all as specified in accordance with the instructions set forth below, provided that if the shares of Common Stock are evidenced by global securities, the shares of Common Stock shall be registered in the name of the Depository or its nominee.

Dated: _____

NOTE: THIS EXERCISE NOTICE MUST BE DELIVERED TO THE WARRANT AGENT, PRIOR TO 5:00 P.M., NEW YORK CITY TIME, ON THE EXPIRATION DATE.  THE WARRANT AGENT SHALL NOTIFY YOU (THROUGH THE CLEARING SYSTEM) OF (1) THE WARRANT AGENT'S ACCOUNT AT THE DEPOSITORY TO WHICH YOU MUST DELIVER YOUR WARRANTS ON THE EXERCISE DATE AND (2) THE ADDRESS, PHONE NUMBER AND FACSIMILE NUMBER WHERE YOU CAN CONTACT THE WARRANT AGENT AND TO WHICH WARRANT EXERCISE NOTICES ARE TO BE SUBMITTED.

Draft 3/24/2017

NAME OF DIRECT PARTICIPANT IN THE DEPOSITORY: _____

(PLEASE PRINT)

ADDRESS: _____

CONTACT NAME: _____

ADDRESS: _____

_____

TELEPHONE (INCLUDING INTERNATIONAL CODE): _____

FAX (INCLUDING INTERNATIONAL CODE): _____

SOCIAL SECURITY OR OTHER TAXPAYER IDENTIFICATION NUMBER (IF APPLICABLE):

_____

ACCOUNT FROM WHICH WARRANTS ARE BEING DELIVERED: _____

DEPOSITORY ACCOUNT NO.: _____

WARRANT EXERCISE NOTICES WILL ONLY BE VALID IF DELIVERED IN ACCORDANCE WITH THE INSTRUCTIONS SET FORTH IN THIS NOTIFICATION (OR AS OTHERWISE DIRECTED), MARKED TO THE ATTENTION OF "WARRANT EXERCISE". WARRANT HOLDER DELIVERING WARRANTS, IF OTHER THAN THE DIRECT DTC PARTICIPANT DELIVERING THIS WARRANT EXERCISE NOTICE:

NAME: _____

(PLEASE PRINT)

CONTACT NAME: _____

TELEPHONE (INCLUDING INTERNATIONAL CODE): _____

FAX (INCLUDING INTERNATIONAL CODE): _____

SOCIAL SECURITY OR OTHER TAXPAYER IDENTIFICATION NUMBER (IF APPLICABLE):

_____

ACCOUNT TO WHICH THE SHARES OF COMMON STOCK ARE TO BE CREDITED:

_____

DEPOSITORY ACCOUNT NO.: _____

Draft 3/24/2017

FILL IN FOR DELIVERY OF THE COMMON STOCK, IF OTHER THAN TO THE PERSON DELIVERING THIS WARRANT EXERCISE NOTICE:

NAME: _____
     (PLEASE PRINT)

ADDRESS:  _____

_____

CONTACT

NAME: _____

TELEPHONE (INCLUDING INTERNATIONAL CODE):  _____

FAX (INCLUDING INTERNATIONAL CODE):  _____

SOCIAL SECURITY OR OTHER TAXPAYER IDENTIFICATION NUMBER (IF APPLICABLE):

_____

NUMBER OF SHARES OF COMMON STOCK FOR WHICH WARRANT IS BEING EXERCISED (ONLY ONE EXERCISE PER WARRANT EXERCISE NOTICE): _____

Signature: _____

Name: _____

Capacity in which Signing:_____

Signature Guaranteed

BY: _____

Signatures must be guaranteed by a participant in a Medallion Signature Guarantee Program at a guarantee level acceptable to the Company's transfer agent.

Draft 3/24/2017

**EXHIBIT A-2**

FORM OF ELECTION TO EXERCISE WARRANT FOR
WARRANT HOLDERS HOLDING
DIRECT REGISTRATION WARRANTS

TO BE COMPLETED BY REGISTERED HOLDER

AMPLIFY ENERGY CORP.

Warrants to Purchase _____ Shares of Common Stock

(TO BE EXECUTED UPON EXERCISE OF THE WARRANT)

The undersigned hereby irrevocably elects to exercise the right, represented by Warrants to purchase shares of Common Stock of AMPLIFY ENERGY CORP. (the "Company"), to purchase _____ newly issued shares of Common Stock of the Company at the Exercise Price of $_____ per share.

The undersigned represents, warrants and promises that it has the full power and authority to exercise and deliver the Warrants exercised hereby.  The undersigned represents, warrants and promises that it has delivered or will deliver in payment for such shares $_____ by certified or official bank or bank cashier's check payable to the order of the Company, or by wire transfer in immediately available funds of the aggregate Exercise Price to an account of the Warrant Agent specified in writing by the Warrant Agent for such purpose or through a cashless exercise (as described below), no later than 5:00 p.m., New York City time, on the Business Day immediately prior to the Settlement Date.

☐ Please check if the undersigned, in lieu of paying the Exercise Price as set forth in the preceding paragraph, elects to exercise Warrants by authorizing the Company to withhold from issuance a number of shares of Common Stock issuable upon exercise of the Warrants which when multiplied by the Market Price of the Common Stock is equal to the aggregate price for the number of Shares for which the Warrants are being exercised at the Exercise Price (assuming the Exercise Price for all such Shares was being paid in cash), and such withheld shares shall no longer be issuable under the Warrants.

The undersigned requests that the shares of Common Stock purchased hereby be in registered form in the authorized denominations, registered in such names and delivered, all as specified in accordance with the instructions set forth below, provided that if the shares of Common Stock are evidenced by global securities, the shares of Common Stock shall be registered in the name of the Depository or its nominee.

Dated: _____

NOTE: THIS EXERCISE NOTICE MUST BE DELIVERED TO THE WARRANT AGENT, PRIOR TO 5:00 P.M., NEW YORK CITY TIME, ON THE EXPIRATION DATE.  THE WARRANT AGENT SHALL NOTIFY YOU (THROUGH THE CLEARING SYSTEM) OF (1) THE WARRANT AGENT'S ACCOUNT AT THE DEPOSITORY TO WHICH YOU MUST DELIVER YOUR WARRANTS ON THE EXERCISE DATE AND (2) THE ADDRESS, PHONE NUMBER AND FACSIMILE NUMBER WHERE YOU CAN CONTACT THE WARRANT AGENT AND TO WHICH WARRANT EXERCISE NOTICES ARE TO BE SUBMITTED.

Draft 3/24/2017

NAME OF DIRECT PARTICIPANT IN THE DEPOSITORY: _____
(PLEASE PRINT)

ADDRESS: _____

CONTACT NAME: _____

ADDRESS: _____

_____

TELEPHONE (INCLUDING INTERNATIONAL CODE): _____

FAX (INCLUDING INTERNATIONAL CODE): _____

SOCIAL SECURITY OR OTHER TAXPAYER IDENTIFICATION NUMBER (IF APPLICABLE):

_____

ACCOUNT FROM WHICH WARRANTS ARE BEING DELIVERED: _____

DEPOSITORY ACCOUNT NO.: _____

WARRANT EXERCISE NOTICES WILL ONLY BE VALID IF DELIVERED IN ACCORDANCE WITH THE INSTRUCTIONS SET FORTH IN THIS NOTIFICATION (OR AS OTHERWISE DIRECTED), MARKED TO THE ATTENTION OF "WARRANT EXERCISE". WARRANT HOLDER DELIVERING WARRANTS, IF OTHER THAN THE DIRECT DTC PARTICIPANT DELIVERING THIS WARRANT EXERCISE NOTICE:

NAME: _____
(PLEASE PRINT)

CONTACT NAME: _____

TELEPHONE (INCLUDING INTERNATIONAL CODE): _____

FAX (INCLUDING INTERNATIONAL CODE): _____

SOCIAL SECURITY OR OTHER TAXPAYER IDENTIFICATION NUMBER (IF APPLICABLE):

_____

ACCOUNT TO WHICH THE SHARES OF COMMON STOCK ARE TO BE CREDITED:

_____

DEPOSITORY ACCOUNT NO.: _____

Draft 3/24/2017

FILL IN FOR DELIVERY OF THE COMMON STOCK, IF OTHER THAN TO THE PERSON DELIVERING THIS WARRANT EXERCISE NOTICE:

NAME: _____
         (PLEASE PRINT)

ADDRESS:  _____

         _____

CONTACT

NAME: _____

TELEPHONE (INCLUDING INTERNATIONAL CODE):  _____

FAX (INCLUDING INTERNATIONAL CODE):  _____

SOCIAL SECURITY OR OTHER TAXPAYER IDENTIFICATION NUMBER (IF APPLICABLE):

         _____

NUMBER OF SHARES OF COMMON STOCK FOR WHICH WARRANT IS BEING EXERCISED
(ONLY ONE EXERCISE PER WARRANT EXERCISE NOTICE): _____

Signature: _____

Name: _____

Capacity in which Signing:_____

Signature Guaranteed

BY: _____

Signatures must be guaranteed by a participant in a Medallion Signature Guarantee Program at a guarantee level acceptable to the Company's transfer agent.

Draft 3/24/2017

EXHIBIT B

FORM OF ASSIGNMENT

(TO BE EXECUTED BY THE REGISTERED HOLDER
IF SUCH HOLDER DESIRES TO TRANSFER A WARRANT)

FOR VALUE RECEIVED, the undersigned registered holder hereby sells, assigns and transfers unto

_____
 Name of Assignee

_____
 Address of Assignee

Warrants to purchase _____ shares of Common Stock held by the undersigned, together with all right, title and interest therein, and does irrevocably constitute and appoint attorney, to transfer such Warrants on the books of the Warrant Agent, with full power of substitution.

_____
 Signature

_____
 Date

_____
 Social Security or Other Taxpayer Identification Number of Assignee

 SIGNATURE GUARANTEED BY:

_____

Signatures must be guaranteed by a participant in a Medallion Signature Guarantee Program at a guarantee level acceptable to the Company's transfer agent.

EXHIBIT C

WARRANT SUMMARY

NUMBER OF WARRANTS: Initially, [●] Warrants, subject to adjustment as described in the Warrant Agreement dated as of [●] between AMPLIFY ENERGY CORP. (the "**Company**") and AMERICAN STOCK TRANSFER & TRUST COMPANY, LLC, as Warrant Agent (as supplemented or amended, the "**Warrant Agreement**"), each of which is exercisable for one share of the Company's common stock, par value $0.0001 per share.  This summary is not complete and reference is made to the Warrant Agreement for the terms of the Warrants.  In the event of any conflict, the terms of the Warrant Agreement shall control.

EXERCISE PRICE: Initially, $[●] per Warrant, subject to adjustment as described in the Warrant Agreement.

FORM OF SETTLEMENT:

Full Settlement: If Full Physical Settlement is elected, the Company shall deliver, against payment of the Exercise Price, a number of Common Shares equal to the number of Warrants exercised.

Cashless Exercise: If Cashless Exercise is elected, the Company will withhold from issuance a number of shares of Common Stock issuable upon the exercise of the Warrants which, when multiplied by the Market Price of the Common Stock, is equal to the aggregate price for the number of Shares for which the Warrants are being exercised at the Exercise Price (assuming the Exercise price for all such Shares was being paid in cash), and such withheld shares shall no longer be issuable under the Warrants.

DATES OF EXERCISE: At any time, and from time to time, prior to the Close of Business on the Expiration Date.

EXPIRATION DATE: The Close of Business on [●], 2022.

C-1-2

**Exhibit E**

**New Stockholders Agreement**

WEIL:\96067153\5\62739.0004

<u>Draft</u>: 03/24/2017

**STOCKHOLDERS AGREEMENT**

**by and among**

**AMPLIFY ENERGY CORP.**

**and**

**[CONTRIBUTION LLCs]**

**and**

**THE HOLDERS PARTY TO THIS AGREEMENT**

**Dated as of [●], 2017**

WEIL:\96056114\5\62739.0003

## STOCKHOLDERS AGREEMENT

THIS STOCKHOLDERS AGREEMENT (this "**Agreement**"), dated as of [●], 2017, is entered into by and among (i) Amplify Energy Corp., a Delaware corporation (the "**Company**"), (ii) [●], (iii) [●], (iv) [●], (v) [●], (vi) [●][1] (the parties in (ii) – (vi), collectively, the "**Contribution LLCs**" and each a "**Contribution LLC**"), (vii) each of the persons listed on <u>Annex A</u> hereto (the "**Unsecured Noteholders**")[2], and (viii) any other Person who shall at any time be a party to or bound by this Agreement (each such Person, together with the Contribution LLCs and Unsecured Noteholders, the "**Holders**") as a result of the execution and delivery to the Company of a Joinder substantially in the form attached as <u>Annex B</u> (a "**Joinder**"), in accordance with the terms hereof.

### RECITALS:

WHEREAS, pursuant to the Plan of Reorganization (the "**Plan**") of Memorial Production Partners LP and certain of its subsidiaries under Chapter 11 of Title 11 of the United States Code approved by the United States Bankruptcy Court for the Southern District of Texas, Houston Division on [●], 2017, the Company and Holders desire to enter into this Agreement with respect to the rights, priorities and obligations set forth herein; and

WHEREAS, each of (i) the Company, (ii) the Contribution LLCs and (iii) the Unsecured Noteholders desires to enter into this Agreement with respect to the rights, priorities and obligations set forth herein.

NOW, THEREFORE, in consideration of the premises and the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the Company and each of the other parties hereto hereby agree as follows:

ARTICLE 1
DEFINITIONS; INTERPRETATION

Section 1.1    *Definitions.* As used in this Agreement, the following terms have the following meanings:

"**75% Holders**" means Holders then beneficially owning, in the aggregate, at least 75% of all outstanding shares of Common Stock held by all the Holders.

---

[1] **Note to draft**: Details to be updated based on the final number of Contribution LLCs to be used.

[2] **Note to draft**: Parties listed on <u>Annex A</u> to exclude Contributing Noteholders.

"**Affiliate**" of any particular Person means any other Person directly or indirectly controlling, controlled by or under common control with such Person.

"**beneficially owned**," "**beneficial ownership**" and similar phrases have the same meanings as such terms have under Rule 13d-3 and 13d-5 (or any successor rule then in effect) promulgated under the Securities Exchange Act of 1934, as amended, except that in calculating the beneficial ownership of any Person, such Person shall be deemed to have beneficial ownership of all securities that such Person has the right to acquire, whether such right is currently exercisable or is exercisable only upon the occurrence of a subsequent condition. The calculation of beneficial ownership for a Person shall also include any Related Fund of such Person.

"**Board**" means the board of directors of the Company.

"**Common Stock**" means the common stock, par value $[0.0001] per share, of the Company.

"**Competitor**" means a competitor of the Company as determined by the Board acting in good faith.

"**control**" (including the terms "controlling," "controlled by" and "under common control with") means, unless otherwise noted, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting shares, by contract, or otherwise.

"**Effective Date**" shall have the meaning given to such term in the Plan.

"**Person**" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, a governmental entity or any department, agency or political subdivision thereof or any other entity.

"**Related Fund**" means any fund, account or investment vehicle controlled, managed, advised or sub-advised by a Person, an Affiliate of such Person or the same investment manager, advisor or subadvisor of such Person or an Affiliate of such investment manager, advisor or subadvisor.

"**Requisite Holders**" means any of the Contribution LLCs, the Unsecured Noteholders, or any other holder of Common Stock party to this Agreement, who, in the aggregate, beneficially own at least 10% of the outstanding shares of Common Stock.

"**Transfer**" means, any direct or indirect, voluntary or involuntary, sale, transfer, assignment, encumbrance or other disposition by operation of law or otherwise.

Section 1.2    *Other Definitional and Interpretative Provisions*.    The words "hereof", "herein" and "hereunder" and words of like import used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. The captions herein are included for convenience of reference only and shall be ignored

2

in the construction or interpretation hereof.  References to Articles, Sections, Annexes and Schedules are to Articles, Sections and Annexes of this Agreement unless otherwise specified.  All Annexes annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any capitalized terms used in any Annex but not otherwise defined therein, shall have the meaning as defined in this Agreement. Any singular term in this Agreement shall be deemed to include the plural, and any plural term the singular.  Whenever the words "include", "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation", whether or not they are in fact followed by those words or words of like import.  "Writing", "written" and comparable terms refer to printing, typing and other means of reproducing words (including electronic media) in a visible form. References to any agreement or contract are to that agreement or contract as amended, modified or supplemented from time to time in accordance with the terms hereof and thereof. References to any law include all rules and regulations promulgated thereunder. References to any Person include the successors and permitted assigns of that Person. References from or through any date mean, unless otherwise specified, from and including or through and including, respectively.

ARTICLE 2
SALE SUPPORT ARRANGEMENTS

Section 2.1    *Request for Cooperation.* At any time and from time to time on or following the Effective Date, the Requisite Holders may, by notice in writing ("**Transfer Notice**"), inform the Company regarding a proposed Transfer of shares of Common Stock. Each Transfer Notice shall specify (i) the number of shares of Common Stock proposed to be sold, and (ii) the identity of the proposed transferees (if known) (the "**Proposed Transferee**").

Section 2.2    *Cooperation by the Company.*[3] Upon receipt of a Transfer Notice, the Company shall, and shall cause its subsidiaries to, use commercially reasonable efforts to cooperate with the Requisite Holders and the Proposed Transferee in connection with the proposed Transfer, including [(i)] providing, and causing each subsidiary to provide, the Requisite Holders and the Proposed Transferee, their counsel, financial advisors, auditors and other authorized representatives reasonable access during normal business hours to the books and records, financial and operating data and such other information of the Company and its subsidiaries as may reasonably be requested in connection with such sale in order to allow the Proposed Transferee and their representatives to conduct a reasonable and customary due diligence review and (ii) instructing the employees, counsel and financial advisors of the Company or any subsidiary to cooperate with the Proposed Transferee in its investigation of the Company or any subsidiary (including by participating in a reasonable number of due diligence sessions upon prior notice); *provided*, that (A) any cooperation shall not unreasonably interfere with the conduct of the business of the Company or any subsidiary, (B) any information of a confidential or proprietary nature shall only be made available to the

---

[3] **Note to DPW:** Discuss.

3

Proposed Transferee upon the execution of customary confidentiality agreements in favor of, and satisfactory to, the Company, (C) the Company shall not be required to incur any out-of-pocket expenses in excess of $25,000 in connection with any Transfer Notice unless such additional expenses are reimbursed by the Requisite Holders or the Prospective Transferee, (D) the Company shall not be required to extend such cooperation with respect to more than two Transfer Notices in any twelve-month period, and three Transfer Notices in the aggregate, and (E) this Agreement shall not require the Company to extend any such cooperation to any Proposed Transferee that is a Competitor.

For the avoidance of doubt, any such commercially reasonable efforts of the Company shall not include any requirement (i) of the management team of the Company and its subsidiaries (or any other employee or representative of the Company) to participate in road shows, (ii) to provide any opinions or comfort letters with respect to any information made available to the Prospective Transferee, or (iii) to take any other action customary for a registered offering.  For the avoidance of doubt, nothing in this Agreement shall be deemed to impose any restriction upon the ability of any stockholder of the Company to transfer its shares of Common Stock.

## ARTICLE 3
### MISCELLANEOUS

Section 3.1     *Termination.*  All rights and obligations of the Company and the Holders set forth in this Agreement shall terminate automatically upon the earlier of (a) the date the Common Stock is listed on a national securities exchange (which, for the avoidance of doubt, does not include an "over-the-counter" system or network) in the United States and (b) the consummation of the first public offering and sale of Common Stock by the Company (other than on Forms S-4 or S-8 or their equivalent), pursuant to an effective registration statement under the Securities Act of 1933, as amended.  A Holder shall cease to have any rights or obligations under this Agreement for so long as it does not own any shares of Common Stock.

Section 3.2     *Notices.*  All notices, demands or other communications to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be deemed to have been given when (i) delivered personally to the recipient, (ii) e-mailed or sent by facsimile to the recipient, or (iii) one business day after being sent to the recipient by reputable overnight courier service (charges prepaid). Such notices, demands and other communications shall be sent to the Company at the address set forth below and to any Holder at the address set forth on the signature page hereto (with copies sent at the address set forth below), or at such address or to the attention of such other Person as the recipient party has specified by prior written notice to the sending party.

The Company's address is:

500 Dallas Street, Suite 1600
Houston, Texas 77002
Attention: [●]

4

WEIL:\96056114\5\62739.0003

Facsimile: [●]
Email: [●]

with copies to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attention:    Gary T. Holtzer
              Joseph H. Smolinsky
Facsimile:    212-310-8007
Email:        gary.holtzer@weil.com
              joseph.smolinsky@weil.com

Copies of notices to the Holders shall be sent to:

Davis Polk & Wardwell LLP
1600 El Camino Real
Menlo Park, California 94025
Attention:    Brian M. Resnick
              Kirtee Kapoor
Facsimile:    650-752-2114
Email:        brian.resnick@davispolk.com
              kirtee.kapoor@davispolk.com

If any time period for giving notice or taking action hereunder expires on a day which is a Saturday, Sunday or legal holiday in the State of New York or the jurisdiction in which the Company's principal office is located, the time period shall automatically be extended to the business day immediately following such Saturday, Sunday or legal holiday.

Section 3.3    *Governing Law.*   This Agreement and the exhibits, attachments and annexes hereto shall be governed by, and construed in accordance with, the laws of the State of New York, without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of New York or any other jurisdiction) to the extent such rules or provisions would cause the application of the laws of any jurisdiction other than the State of New York.

Section 3.4    *Submission to Jurisdiction.*   Any action, suit or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby must be brought in the United States District Court for the Southern District of New York or any New York state court, in each case, located in the Borough of Manhattan, and each party consents to the exclusive jurisdiction and venue of such courts (and of the appropriate appellate courts therefrom) in any such action, suit or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of

5

the venue of any such, action, suit or proceeding in any such court or that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum.

Section 3.5    *Waiver of Jury Trial.*  Each of the parties to this Agreement hereby agrees to waive its respective rights to a jury trial of any claim or cause of action based upon or arising out of this Agreement.

Section 3.6    *Successors and Assigns.*  All covenants and agreements in this Agreement by or on behalf of any of the parties hereto shall bind and inure to the benefit of the respective successors and permitted assigns of the parties hereto (including any trustee in bankruptcy) whether so expressed or not. In addition, whether or not any express assignment has been made, the provisions of this Agreement which are for the benefit of purchasers or holders of shares of Common Stock are also for the benefit of, and enforceable by, any subsequent holder of Common Stock. No assignment or delegation of this Agreement by the Company, or any of the Company's rights, interests or obligations hereunder, shall be effective without the prior written consent of 75% Holders. For the avoidance of any doubt, each Contribution LLC may assign any and all of its rights under this Agreement to its members at any time, subject, in the case of each such member, to such member's agreement to be bound by the terms of this Agreement by its execution and delivery of a Joinder.

Section 3.7    *Counterparts.*  This Agreement may be executed in one or more counterparts, and may be delivered by means of facsimile or electronic transmission in portable document format ("pdf"), each of which shall be deemed to be an original and shall be binding upon the party who executed the same, but all of such counterparts shall constitute the same agreement.

Section 3.8    *Severability.*  In the event any one or more of the provisions contained in this Agreement should be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby (it being understood that the invalidity of a particular provision in a particular jurisdiction shall not in and of itself affect the validity of such provision in any other jurisdiction). The parties shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

Section 3.9    *Specific Performance.*  The parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement are not performed in accordance with their specific terms or are otherwise breached. It is accordingly agreed that, in addition to any other applicable remedies at law or equity, the parties shall be entitled to an injunction or injunctions, without proof of damages, to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement. Each party hereto agrees that it will not oppose the granting of an injunction, specific performance or other equitable relief on the basis that (i) the other party has an adequate remedy at law or (ii) an award of specific performance is not an appropriate remedy for any reason at law or in equity. Each of the parties hereto hereby waives (i) any defenses

WEIL:\96056114\5\62739.0003

in any action for specific performance, including the defense that a remedy at law would be adequate and (ii) any requirement under any law to post a bond or other security as a prerequisite to obtaining equitable relief.

Section 3.10   *No Waivers; Amendments.*   (a) No failure or delay on the part of any party in exercising any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, power or remedy preclude any other or further exercise thereof or the exercise of any other right, power or remedy. The remedies provided for herein are cumulative and are not exclusive of any remedies that may be available to any party at law or in equity or otherwise.

(b)      Any provision of this Agreement may be amended or waived if, but only if, (i) such amendment or waiver makes specific reference to this Agreement and (ii) (A) in the case of an amendment, such amendment is signed by the Company and 75% Holders and (B) in the case of a waiver, such waiver is signed by the Person against whom it is to be enforced; *provided* that a waiver on behalf of all Holders may only be given by 75% Holders. Any amendment or waiver effected in accordance with this paragraph shall be binding upon each party to this Agreement, regardless of whether such party has signed such amendment or waiver, and each then current and future holder of shares of Common Stock.

Section 3.11   *Further Assurances.* Each of the parties hereto shall execute all such further instruments and documents and take all such further action as any other party hereto may reasonably require in order to effectuate the terms and purposes of this Agreement.

Section 3.12   *Entire Agreement.* This Agreement and any certificates, documents, instruments and writings that are delivered pursuant hereto, represent the complete agreement among the parties hereto as to all matters covered hereby, and supersedes any prior agreements or understandings among the parties.

[*Signature Pages Follow*]

WEIL:\96056114\5\62739.0003

## SIGNATURES TO STOCKHOLDERS AGREEMENT

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed, all as of the date first written above.

AMPLIFY ENERGY CORP.

By: _____

       Name: [●]
       Title:  [●]

[*Signature Page to Stockholders Agreement*]

WEIL:\96056114\5\62739.0003

[CONTRIBUTION LLC][4]:

By: _____
      Name:
      Title:

ADDRESS:

[ADDRESS]
Attention: [●]
Facsimile No.: [●]
Email: [●]

---

[4] **Note to Draft**: Additional signature pages will be added once the number of LLCs is finalized.

*[Signature Page to Stockholders Agreement]*

[UNSECURED NOTEHOLDER][5]:


By: _____
      Name:
      Title:

ADDRESS:

[ADDRESS]
Attention: [●]
Facsimile No.: [●]
Email: [●]

---

[5] **Note to Draft**: Additional signature pages will be added for each Unsecured Noteholder.

*[Signature Page to Stockholders Agreement]*

WEIL:\96056114\5\62739.0003

**Annex-A**
**Unsecured Noteholders**

WEIL:\96056114\5\62739.0003

**Annex-B**
**Form of Joinder**

THIS JOINDER AGREEMENT is made and entered into by the undersigned with reference to the following facts:

Reference is made to the Stockholders Agreement, dated as of [•], 2017, as amended (the "**Stockholders Agreement**"), by and among Amplify Energy Corp. (the "**Company**") and the other parties thereto. Capitalized terms used but not defined in this Joinder Agreement shall have the meanings ascribed thereto in the Stockholders Agreement.

As a condition to the acquisition of rights under the Stockholders Agreement in accordance with the terms thereof, the undersigned agrees as follows:

1.      The undersigned hereby agrees to be bound by the provisions of the Stockholders Agreement and undertakes to perform each obligation as if it were an original signatory thereto in such capacity.

2.      This Joinder Agreement shall bind, and inure to the benefit of, the undersigned hereto and its respective devisees, heirs, personal and legal representatives, executors, administrators, successors and assigns.

3.      This Joinder Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of New York or any other jurisdiction) to the extent such rules or provisions would cause the application of the laws of any jurisdiction other than the State of New York.

*[Signature Page Follows]*

WEIL:\96056114\5\62739.0003

[NAME OF JOINING PARTY]:

By: _____
     Name:
     Title:

ADDRESS:

[ADDRESS]
Attention: [●]
Facsimile No.: [●]
Email: [●]

**Exhibit F**

**Registration Rights Agreement**

WEIL:\96067153\5\62739.0004

*Weil Draft*: March 24, 2017

**REGISTRATION RIGHTS AGREEMENT**

**by and among**

**Amplify Energy Corp.**

**and**

**THE HOLDERS PARTY HERETO**

**Dated as of [•], 2017**

**TABLE OF CONTENTS**

PAGE

1.   Definitions....................................................................................................................1

2.   Shelf Registration..........................................................................................................6

3.   Piggyback Registration. ................................................................................................8

4.   Postponement; Suspensions; Withdrawals. .................................................................9

5.   Company Undertakings. ..............................................................................................11

6.   Holder Undertakings. ..................................................................................................17

7.   Registration Expenses. ................................................................................................18

8.   Lock-Up Agreements...................................................................................................19

9.   Indemnification; Contribution. ...................................................................................20

10.   Transfer of Registration Rights...................................................................................24

11.   Amendment, Modification and Waivers; Further Assurances.....................................24

12.   Miscellaneous. .............................................................................................................25

Annex A      Form of Joinder Agreement

i

**REGISTRATION RIGHTS AGREEMENT**

THIS REGISTRATION RIGHTS AGREEMENT (this "**Agreement**") is made as of [●], 2017 by and among (i) Amplify Energy Corp., a Delaware corporation (the "**Company**"), (ii) [●], (iii) [●], (iv) [●], (v) [●], (vi) [●][1] (the parties in (ii) – (vi), collectively, the "**Contribution LLCs**" and each a "**Contribution LLC**"), and (vii) any other Person who shall at any time be a party to or bound by this Agreement as a result of the execution and delivery to the Company of a Joinder substantially in the form attached as <u>Annex A</u> (a "**Joinder**"), in accordance with the terms hereof.

**RECITALS:**

WHEREAS, pursuant to the Plan of Reorganization (the "**Plan**") of Memorial Production Partners LP and certain of its subsidiaries under Chapter 11 of Title 11 of the United States Code approved by the United States Bankruptcy Court for the Southern District of Texas, Houston Division on [●], 2017, the Company proposes to issue shares of Common Stock (as defined below) pursuant to, and upon the terms set forth in, the Plan to each Contribution LLC party hereto;

WHEREAS, each of (i) the Company and (ii) the Contribution LLCs desires to enter into this Agreement with respect to the rights, priorities and obligations set forth herein; and

NOW, THEREFORE, in consideration of the premises and the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the Company and each of the parties hereby agree as follows:

1.    **Definitions.**

(a)    As used herein, the following terms have the following meanings:

"**Affiliate**" of any particular Person means any other Person directly or indirectly controlling, controlled by or under common control with such Person.

"**Alternative Securities Exchange**" means, excluding any National Securities Exchange, any other securities exchange or over-the-counter quotation system, including, without limitation, the NYSE MKT, the NASDAQ Capital Market, any quotation or other listing service provided by the OTC Markets Group or the Financial Industry Regulatory Authority, Inc., any "pink sheet" or other alternative listing service or any successor or substantially equivalent service to any of the foregoing.

"**Automatic Shelf Registration Statement**" means an "automatic shelf registration statement" as defined in Rule 405 (or any successor rule then in effect) promulgated under the Securities Act.

---

[1] **Note to draft**: Details to be updated based on the final number of Contribution LLCs to be used

"**beneficially owned**," "**beneficial ownership**" and similar phrases have the same meanings as such terms have under Rule 13d-3 and 13d-5 (or any successor rule then in effect) promulgated under the Exchange Act, except that in calculating the beneficial ownership of any Holder, such Holder shall be deemed to have beneficial ownership of all securities that such Holder has the right to acquire, whether such right is currently exercisable or is exercisable only upon the occurrence of a subsequent condition. The calculation of beneficial ownership for a Holder shall also include any Related Fund of such Holder.

"**Block Sale**" means the sale of shares of Common Stock to one or more purchasers that are financial institutions in an offering registered under the Securities Act (a) without a prior public marketing process by means of (i) a bought deal or (ii) a block trade or (b) pursuant to an "overnight" underwritten offering.

"**Business Day**" means any day other than a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by applicable law or executive order to close.

"**Capital Stock**" means with respect to a corporation, any and all shares, interests or equivalents in capital stock of such corporation (whether voting or nonvoting and whether common or preferred) and any and all warrants, rights (including conversion and exchange rights) and options to purchase any such shares, interests or equivalents (including convertible debt).

"**Commission**" means the United States Securities and Exchange Commission or any successor governmental agency.

"**Common Stock**" means the shares of common stock, par value $0.0001 per share, of the Company issued on or after the Effective Date.

"**control**" (including the terms "controlling," "controlled by" and "under common control with") means, unless otherwise noted, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting shares, by contract, or otherwise.

"**Counsel to the Holders**" means the one law firm or other legal counsel to the Holders, which counsel shall be Davis Polk & Wardwell LLP, or such other counsel selected (i) in the case of a Holder Shelf Takedown, by the Holders beneficially owning a majority of the Registrable Securities initially requesting such Holder Shelf Takedown; (ii) in the case of a Piggyback Registration, the Holders beneficially owning a majority of the Registrable Securities requested to be included in such Piggyback Registration; and (iii) in the case of a Shelf Registration, the Holders beneficially owning a majority of the Registrable Securities to be included in such Shelf Registration.

"**EDGAR**" means the Electronic Data Gathering, Analysis and Retrieval System of the Commission.

WEIL:\96059134\9\62739.0003

"**Effective Date**" has the meaning assigned to such term in the Plan, and is the date hereof.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended from time to time.

"**Excluded Registration**" means a registration of the Company's securities (i) pursuant to a Registration Statement on Form S-8 (or other registration solely relating to an offering or sale to employees or directors of the Company or any of its subsidiaries pursuant to any employee stock plan or other employee benefit arrangement), (ii) pursuant to a Registration Statement on Form S-4 (or similar form), or (iii) involving shares issued in an acquisition or debt securities or in respect of an employee benefit or dividend reinvestment plan.

"**FINRA**" means the Financial Industry Regulatory Authority or any successor regulatory authority.

"**Free Writing Prospectus**" means any "free writing prospectus" as defined in Rule 405 promulgated under the Securities Act.

"**Holder**" means any Initial Holder that, on or after the Effective Date, (i) together with its Affiliates beneficially owns at least 10% of the Common Stock outstanding, or (ii) beneficially owns Common Stock and furnishes an opinion of legal counsel to the effect that such party could reasonably be considered an "affiliate" of the Company for purposes of Rule 144, and in each case, becomes a party to this Agreement by its execution of a Joinder in accordance with the terms hereof.

"**Initial Holder**" means (i) the Contribution LLCs, and (ii) all members of each Contribution LLC as of the Effective Date and their Affiliates.

"**Issuer Free Writing Prospectus**" means an issuer free writing prospectus as defined in Rule 433 under the Securities Act.

"**Material Adverse Effect**" means any material adverse effect on the business, properties, assets, operations, results of operations, condition (financial or otherwise) or prospects of the Company and its subsidiaries, taken as a whole.

"**National Securities Exchange**" means The NASDAQ Global Market, The NASDAQ Global Select Market or The New York Stock Exchange.

"**Person**" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, a governmental entity or any department, agency or political subdivision thereof or any other entity.

"**Public Offering**" means any sale or distribution to the public of Common Stock of the Company pursuant to an offering registered under the Securities Act, whether by the

3

Company, by Holders and/or by any other holders of the Company's Common Stock, including a Block Sale or a Holder Block Sale.

"**Prospectus**" means the prospectus or prospectuses included in any Registration Statement (including, without limitation, a prospectus that includes any information previously omitted from a prospectus filed as part of an effective Registration Statement in reliance on Rule 430A under the Securities Act or any successor rule thereto), as amended or supplemented by any prospectus supplement with respect to the terms of the offering of any portion of the Registrable Securities covered by such Registration Statement and by all other amendments and supplements to the prospectus, including post-effective amendments and all material incorporated by reference in such prospectus or prospectuses.

"**Registrable Securities**" means at any time Common Stock of the Company held or beneficially owned by any Holder, including (i) any Common Stock issued pursuant to the Plan or upon the conversion, exercise or exchange, as applicable, of any other securities and/or interests issued pursuant to the Plan; (ii) any shares of Common Stock purchased or acquired by the Holder after the Effective Date; and (iii) any shares of Common Stock issued by way of dividend, distribution, split or combination of securities or any recapitalization, merger, consolidation or other reorganization; *provided*, *however*, that as to any Registrable Securities, such securities shall irrevocably cease to constitute Registrable Securities upon the earliest to occur of: (A) the date on which such securities have been disposed of pursuant to an effective Registration Statement under the Securities Act; (B) the date on which such securities have been disposed of pursuant to Rule 144; (C) the date on which such securities cease to be outstanding and (D) the date on which the sale or other disposition of such securities may be effected under Rule 144 without registration under the Securities Act and without regard to the volume and manner of sale requirements under Rule 144.

"**Registration Statement**" means any registration statement of the Company, including the Prospectus, amendments and supplements to such registration statement, including post-effective amendments, all exhibits and all material incorporated by reference in such registration statement.

"**Related Fund**" means any fund, account or investment vehicle controlled, managed, advised or sub-advised by a Holder, an Affiliate of such Holder or the same investment manager, advisor or subadvisor of such Holder or an Affiliate of such investment manager, advisor or subadvisor.

"**Rule 144**" means Rule 144 promulgated under the Securities Act (or any successor rule then in effect).

"**Rule 144A**" means Rule 144A promulgated under the Securities Act (or any successor rule then in effect).

"**Securities Act**" means the Securities Act of 1933, as amended from time to time.

"**Selling Expenses**" means all underwriting discounts, selling commissions, and stock transfer taxes applicable to the sale of Registrable Securities and fees and

4

disbursements of counsel for any Holder, except for the fees and disbursements of the Counsel to the Holders borne and paid by the Company as provided in Section 7(b).

"**Shelf Registration**" means a registration of securities pursuant to a Registration Statement filed with the Commission in accordance with and pursuant to Rule 415 promulgated under the Securities Act (or any successor rule then in effect).

"**Shelf Takedown**" means a Holder Shelf Takedown or another Public Offering pursuant to a Shelf Registration.

"**Well-Known Seasoned Issuer**" means a "well-known seasoned issuer" as defined in Rule 405 promulgated under the Securities Act (or any successor rule then in effect) and which (i) is a "well-known seasoned issuer" under paragraph (1)(i)(A) of such definition or (ii) is a "well-known seasoned issuer" under paragraph (1)(i)(B) of such definition and is also eligible to register a primary offering of its securities relying on General Instruction I.B.1 of Form S-3 or Form F-3 under the Securities Act.

(b)        Each of the following terms is defined in the Section set forth opposite such term:

| Term | Section |
| --- | --- |
| Agreement | Preamble |
| Block Sale Notice | 2(d) |
| Company | Preamble |
| Company Block Sale Notice | 2(d) |
| Company Shelf Registration Notice | 2(a) |
| Company Shelf Takedown Notice | 2(a) |
| Contribution LLC | Preamble |
| Due Diligence Information | 5(a)(x) |
| Effectiveness Period | 2(a) |
| Equity Securities | 8(a) |
| End of Suspension Notice | 4(b) |
| Form S-1 Shelf | 2(a) |
| Form S-3 Shelf | 2(a) |
| Holder Block Sale | 2(d) |
| Holder Shelf Takedown | 2(a) |
| Joinder | Preamble |
| Lock-Up Agreement | 8(a)(ii) |
| Losses | 9(a) |
| MNPI | 4(a) |
| Opt-Out Election | 6(e) |
| Permitted Free Writing Prospectus | 6(a) |
| Piggyback Registration | 3(a) |
| Piggyback Registration Notice | 3(a) |
| Plan | Recitals |
| Registration Expenses | 7(a) |
| Required Effective Period | 5(a)(iii) |

5

WEIL:\96059134\9\62739.0003

| Term | Section |
|------|---------|
| Restricted Period | 8(a) |
| road show | 9(a) |
| Sale Transaction | 8(a) |
| Shelf Registration Statement | 2(a) |
| Suspension Event | 4(b) |
| Suspension Notice | 4(b) |
| Withdrawal Request | 4(c) |

**2.      Shelf Registration.**

(a)      Shelf Registration. At any time on or after the Effective Date, any Holder may request that the Company file a Registration Statement for a Shelf Registration covering the resale of all of the Registrable Securities on a delayed or continuous basis on Form S-3 (the "**Form S-3 Shelf**") or, if Form S-3 is not available, on Form S-1 (a "**Form S-1 Shelf**" and, together with the Form S-3 Shelf and any Automatic Shelf Registration Statement, a "**Shelf Registration Statement**"), and the Company shall file such Shelf Registration Statement with the Commission within 90 days after the receipt of such request. The Company shall give written notice (a "**Company Shelf Registration Notice**") of the anticipated filing of any Shelf Registration Statement at least ten (10) Business Days prior to such filing to all Holders of Registrable Securities and shall include in such Shelf Registration Statement all Registrable Securities held by Holders on the date of the Company Shelf Registration Notice with respect to which the Company has received written requests for inclusion therein within five (5) Business Days of the date of the Company Shelf Registration Notice.  The Company shall use commercially reasonable efforts to cause such Shelf Registration Statement to be declared effective as promptly as practicable and to remain effective until the earlier of (i) the date on which all Registrable Securities included in such registration have been sold; (ii) the date on which all such securities are no longer Registrable Securities; and (iii) the maximum length permitted by the Commission (the "**Effectiveness Period**"), including, to the extent a Form S-1 Shelf was converted to a Form S-3 Shelf and the Company thereafter became ineligible to use Form S-3, by filing a Form S-1 Shelf not later than 45 days after the date of such ineligibility and using its commercially reasonable efforts to have such Registration Statement declared effective as promptly as practicable. The Company shall use its commercially reasonable efforts to maintain the effectiveness of the Shelf Registration Statement (subject to postponement or suspension as provided for in Section 4(a) and (b) hereof) during the Effectiveness Period.

(b)      Conversion to Form S-3. The Company shall use commercially reasonable efforts to convert any Form S-1 Shelf to a Form S-3 Shelf as soon as reasonably practicable after the Company is eligible to use Form S-3, and the Holders shall reasonably cooperate with the Company in any such conversion.

(c)      Requests for Shelf Takedowns. At any time and from time to time after a Shelf Registration Statement has been declared effective by or, in the case of an Automatic Shelf Registration Statement, filed with, the Commission, any Holder may

6

request to sell all or any portion of their Registrable Securities in a Public Offering that is registered pursuant to the Shelf Registration Statement (each, a "**Holder Shelf Takedown**") *provided that* the Company will not be required to take any action pursuant to this Section 2(c) if within the 75 calendar day period preceding the date of a request for a Holder Shelf Takedown, the Company priced a Holder Shelf Takedown (other than a Block Sale) and such Holders received notice of such Holder Shelf Takedown; *provided however* that if a Holder is unable to register and actually sell pursuant to such registration all of the Registrable Securities requested to be included in such registration due to the application of Section 2(e) below, then the foregoing reference to 75 calendar days shall be deemed to be 45 calendar days instead. All requests for Holder Shelf Takedowns shall be made by giving written notice to the Company (a "**Demand Shelf Takedown Notice**"). Each Demand Shelf Takedown Notice shall specify the approximate number of Registrable Securities proposed to be sold in the Holder Shelf Takedown (which shall not be less than [●] shares), as well as whether the Registrable Securities are proposed to be sold in a Public Offering (in which case, the applicable Holder(s) issuing the Demand Shelf Takedown Notice shall also include a notice confirming that such Holder (and any other Holder whose Registrable Securities are included in such Holder Shelf Takedown) shall agree to bear all fees and expenses of any underwriter in connection with such Holder Shelf Takedown). Within five (5) Business Days after receipt of any Demand Shelf Takedown Notice, the Company shall give written notice of such requested Holder Shelf Takedown to all other Holders (a "**Company Shelf Takedown Notice**")(which Company Shelf Takedown Notice each Holder shall hold in confidence until the earlier of (x) such time as such marketing has commenced and (y) six (6) months after receipt of such notice, unless required to be disclosed by any applicable law, rule, regulation, order, decree or subpoena or otherwise agreed by the Company) and, subject to the provisions of Section 2(e) below, shall include in such Holder Shelf Takedown all Registrable Securities with respect to which the Company has received written requests for inclusion therein within five (5) Business Days after sending the Company Shelf Takedown Notice.

        (d)     <u>Block Sales</u>. Notwithstanding anything in Section (c)2(c), any of the Holders shall be permitted to demand or participate in a Block Sale, subject to the provisions of this Section 2(d). All requests for a Block Sale (a "**Holder Block Sale**") shall be made by giving written notice to the Company (a "**Block Sale Notice**"). Each Block Sale Notice shall specify the approximate number of Registrable Securities proposed to be sold in the Holder Block Sale and the proposed date of such proposed Holder Block Sale, provided that such date must be at least five (5) Business Days after receipt of the Block Sale Notice. Within two (2) Business Days after receipt of any Block Sale Notice and no later than 48 hours before the date of such proposed Holder Block Sale, the Company shall give written notice of such requested Holder Block Sale to all other Holders (a "**Company Block Sale Notice**")(which Block Sale Notice each Holder shall hold in confidence until the earlier of (x) such time as such Holder Block Sale has been publicly disclosed and (y) six (6) months after receipt of such notice, unless required to be disclosed by any applicable law, rule, regulation, order, decree or subpoena or otherwise agreed by the Company) and, subject to the provisions of Section 2(e) below, shall include in such Holder Block Sale all Registrable Securities with respect to which the Company has received written requests for inclusion therein within 24 hours of sending the Company Block Sale Notice.

7

(e)     <u>Priority on Holder Shelf Takedowns and Holder Block Sales</u>. If the managing underwriters, if any, for such Holder Shelf Takedown or underwritten Holder Block Sale advise the Company and the Holders of Registrable Securities included in the Holder Shelf Takedown or Holder Block Sale in writing that in their opinion the number of Registrable Securities and, if permitted hereunder, other securities requested to be included in such Holder Shelf Takedown or Holder Block Sale exceeds the number of Registrable Securities and other securities, if any, which can be sold without adversely affecting the marketability, proposed offering price range acceptable to the Holders beneficially owning a majority of the Registrable Securities initially requested to be included in such Holder Shelf Takedown or Holder Block Sale, timing or method of distribution of the offering, the Company shall include in such Holder Shelf Takedown or Holder Block Sale the number of Registrable Securities which can be so sold in the following order of priority: (i) *first*, the Registrable Securities beneficially owned by the Holders requested to be included in such Holder Shelf Takedown or Holder Block Sale (as applicable), allocated *pro rata* among the respective Holders beneficially owning such Registrable Securities on the basis of the number of Registrable Securities beneficially owned by each such party; (ii) *second*, any securities to be sold by the Company for its own account requested to be included in such Holder Shelf Takedown or Holder Block Sale by the Company; and (iii) *third*, other securities requested to be included in such Holder Shelf Takedown or Holder Block Sale (as applicable) to the extent permitted hereunder; *provided* that the Company shall not include in any Holder Shelf Takedown or Holder Block Sale any such securities pursuant to the foregoing clause (iii) which are not Registrable Securities without the prior written consent of the Holders beneficially owning a majority of the Registrable Securities initially requested to be included in such Holder Shelf Takedown or Holder Block Sale.

(f)     <u>Selection of Underwriters</u>. The Holders beneficially owning a majority of the Registrable Securities initially requesting an Underwritten Shelf Takedown or Holder Block Sale shall have the right to select the managing underwriters (which shall consist of one or more reputable nationally recognized investment banks) to administer the Public Offering after consultation with the Company, and shall bear all fees and expenses of any underwriter in connection with any Holder Shelf Takedown or underwritten Holder Block Sale (including expenses associated with a Withdrawal Request, if applicable).

**3.     Piggyback Registration.**

(a)     <u>Right to Piggyback</u>. Whenever the Company proposes to file a Registration Statement under the Securities Act or conduct a Shelf Takedown with respect to a Public Offering of any class of the Company's Capital Stock (other than a Holder Shelf Takedown, Holder Block Sale or Excluded Registration, a "**Piggyback Registration**"), the Company shall give prompt written notice to all Holders of Registrable Securities of its intention to effect such Piggyback Registration (the "**Piggyback Registration Notice**") and (i) in the case of a Piggyback Registration that is a Shelf Takedown or is automatically effective upon filing, such Piggyback Registration Notice shall be given not less than five (5) Business Days (two (2) Business Days in the case of a Block Sale) prior to the expected date of commencement of marketing efforts for such Shelf Takedown (and each Holder shall hold each such Piggyback Registration Notice in confidence until the earlier of (x) such time as marketing has commenced and (y) six (6)

8

months after receipt of such notice, unless required to be disclosed by any applicable law, rule, regulation, order, decree or subpoena or otherwise agreed by the Company) and (ii) in the case of any other Piggyback Registration, such Piggyback Registration Notice shall be given not less than five (5) Business Days after the public filing of such Registration Statement. The Company shall, subject to the provisions of Section 3(b) below, include in such Piggyback Registration, as applicable, all Registrable Securities beneficially owned by Holders on the date of the Piggyback Registration Notice with respect to which the Company has received written requests for inclusion therein within five (5) Business Days (2 Business Days in the case of a Block Sale) after the date of the Piggyback Registration Notice.

(b)     Priority on Piggyback Registrations. For any Piggyback Registration that includes an underwritten Public Offering and the managing underwriters advise the Company in writing that in their reasonable opinion the number of securities requested to be included in such Piggyback Registration exceeds the number of Registrable Securities and other securities, if any, which can be sold without adversely affecting the marketability, proposed offering price range acceptable to the Company, timing or method of distribution of the offering, the Company shall include in such Piggyback Registration the number of Registrable Securities which can be sold without such adverse effect in the following order of priority: (i) *first*, if the Piggyback Registration includes a primary offering of Company securities for the Company's own account, the securities offered by the Company thereby; (ii) *second*, the Registrable Securities requested to be included in such Piggyback Registration by the remaining Holders allocated *pro rata* among the remaining Holders on the basis of the number of Registrable Securities beneficially owned by each Holder; and (iii) *third*, other securities requested to be included in such Piggyback Registration, if any.

(c)     Selection of Underwriters. For any Piggyback Registration that includes an underwritten Public Offering, the Company shall have the sole right to select the managing underwriters to administer the Public Offering (which shall consist of one or more reputable nationally recognized investment banks).

## 4.     Postponement; Suspensions; Withdrawals.

(a)     Postponement. The Company may postpone, for up to 90 calendar days from the date of the Demand Shelf Takedown Notice, Block Sale Notice or request for a Shelf Registration Statement, or from the date that the Shelf Registration Statement is required to be filed, the filing or the effectiveness of a Registration Statement for a Shelf Registration Statement or suspend the use of a Prospectus that is part of a Shelf Registration for up to 90 calendar days from the date of the Suspension Notice and therefore suspend sales of Registrable Securities included therein by providing written notice to the Holders included in such registration if the Company shall have furnished to the Holders a notice (which notice each Holder shall hold in confidence until the earlier of (x) such time as such postponement or suspension has ceased and (y) six (6) months after receipt of such notice, unless required to be disclosed by any applicable law, rule, regulation, order, decree or subpoena or otherwise agreed by the Company) stating that the Company's Board of Directors has resolved that the offer or sale of Registrable Securities should be suspended; *provided* that the Company may not invoke a delay pursuant to this

9

Section 4(a) more than three times or for more than 90 calendar days in the aggregate, in each case, in any 12-month period. The Company may invoke this Section 4(a) only if the Company's Board of Directors determines in good faith, after consultation with its advisors or legal counsel, that the offer or sale of Registrable Securities would reasonably be expected to: (i) have a Material Adverse Effect on any proposal or plan by the Company or any of its subsidiaries to engage in any material acquisition of assets or stock (other than in the ordinary course of business) or any material merger, consolidation, tender offer, recapitalization, reorganization, financing, offering or other transaction involving the Company or any of its subsidiaries; or (ii) require premature disclosure of material non-public information ("**MNPI**") that the Company has a *bona fide* business purpose for preserving as confidential. Furthermore, the Company shall not be required to effect any registration pursuant to this Agreement while awaiting the Commission to declare the effectiveness of a Registration Statement of the Company.

(b)     Suspension. In the case of an event that causes the Company to suspend the use of a Registration Statement as set forth in Section 4(a) or Section 5(a)(vi)(A), (a "**Suspension Event**"), the Company shall give a notice to the Holders of Registrable Securities included in such Registration Statement (a "**Suspension Notice**") to suspend sales of the Registrable Securities and such notice shall state that such suspension shall continue only for so long as the Suspension Event or its effect is continuing. The Company shall not include any MNPI in the Suspension Notice. A Holder shall not sell any Registrable Securities pursuant to such Registration Statement (or such filings) at any time after it has received a Suspension Notice from the Company and prior to receipt of an End of Suspension Notice. Holders may recommence sales of Registrable Securities pursuant to the Registration Statement (or such filings) following further written notice to such effect (an "**End of Suspension Notice**") from the Company, and such End of Suspension Notice shall be given by the Company to the Holders promptly following the conclusion of any Suspension Event.

(c)     Withdrawal Requests. Any Holder may withdraw its request for inclusion of Registrable Securities in a Registration Statement by giving written notice to the Company of its intention to remove its Registrable Securities from such Registration Statement within two (2) Business Days before the earlier of (i) the expected date of the commencement of marketing efforts for the Public Offering in connection with such Registration Statement or (ii) the effectiveness of the Registration Statement (a "**Withdrawal Request**").  The Company shall pay all Registration Expenses in connection with any Registration Statement subject to a Withdrawal Request; *provided, however*, that if the aggregate number of Holder Shelf Takedowns and Holder Block Sales that are the subject of a Withdrawal Request and are not completed (each an "Abandoned Holder Shelf Takedown" and an "Abandoned Holder Block Sale", respectively) exceeds two, then the Holders who requested that their Registrable Securities be included in any such excess Abandoned Holder Shelf Takedown or Abandoned Holder Block Sale shall reimburse the company for all Registration Expenses incurred by the Company in connection therewith.

10

**5.      Company Undertakings.**

(a)      Whenever Registrable Securities are registered pursuant to this Agreement, the Company shall use commercially reasonable efforts to effect the registration and the sale of such Registrable Securities as soon as reasonably practicable in accordance with the intended method of disposition thereof, and pursuant thereto the Company shall as promptly as reasonably practicable:

(i)      prepare and file with the Commission a Registration Statement with regard to such Registrable Securities as soon as reasonably practicable but not later than the time required hereby (unless the Registration Statement would be required pursuant to the rules and regulations of the Securities Act to include any audited or unaudited consolidated or pro forma financial statements that are not then currently available, in which case, promptly after such financial statements are available) and use commercially reasonable efforts to cause such Registration Statement to become effective as soon thereafter as is reasonably practicable;

(ii)      before filing a Registration Statement or Prospectus or any amendments or supplements thereto, furnish to the Holders whose Registrable Securities are requested to be included in the Registration Statement copies of all such documents, other than exhibits, documents that are incorporated by reference and such documents that are otherwise publicly available on EDGAR, proposed to be filed and provide Counsel to the Holders with a reasonable opportunity to review and comment on such documents of no less than three (3) Business Days;

(iii)      notify each Holder of the effectiveness of each Registration Statement, prepare and file with the Commission such amendments and supplements to such Registration Statement as may be necessary to keep such Registration Statement effective until the date on which all Registrable Securities have been sold pursuant to the Shelf Registration or have otherwise ceased to be Registrable Securities, (or, in each case, if sooner, until all Registrable Securities have been sold under such Registration Statement or the maximum length permitted by the Commission), and comply with the provisions of the Securities Act (including by preparing and filing with the Commission any Prospectus or supplement to be used in connection therewith) with respect to the disposition of all securities covered by such Registration Statement during such period in accordance with the intended methods of disposition by the Holders as set forth in such Registration Statement (each such period as applicable, the "**Required Effective Period**");

(iv)      furnish to each seller of Registrable Securities, and the managing underwriters, without charge, such number of copies of the applicable Registration Statement, each amendment and supplement thereto, the Prospectus included in such Registration Statement (including each preliminary Prospectus, final Prospectus, and any other Prospectus (including any Prospectus filed under Rule 424, Rule 430A or Rule 430B promulgated under the Securities Act and any Issuer Free Writing Prospectus)), and all exhibits and other documents filed therewith as such seller or such managing underwriters shall reasonably request in order to facilitate the disposition of the Registrable Securities owned by such seller, and upon request, a copy of any and all transmittal letters

11

or other correspondence to or received from, the Commission or any other governmental authority relating to such offer;

           (v)    use commercially reasonable efforts to (A) register or qualify such Registrable Securities under such other securities or blue sky laws of such jurisdictions as any seller reasonably requests in writing, (B) keep such registration or qualification in effect for so long as such Registration Statement remains in effect, and (C) do any and all other acts and things which may be reasonably necessary or advisable to enable such seller to consummate the disposition in such jurisdictions of the Registrable Securities owned by such seller (*provided* that the Company shall not be required to (x) qualify generally to do business in any jurisdiction where it would not otherwise be required to qualify but for this subsection, (y) subject itself to taxation in any such jurisdiction or (z) consent to general service of process in any such jurisdiction);

           (vi)    notify each seller of such Registrable Securities, the managing underwriters and Counsel to the Holders (A) at any time when a Prospectus relating to the applicable Registration Statement is required to be delivered under the Securities Act, (1) upon discovery that, or upon the happening of any event as a result of which, such Registration Statement, or the Prospectus or Issuer Free Writing Prospectus relating to such Registration Statement, or any document incorporated or deemed to be incorporated therein by reference contains an untrue statement of a material fact or omits any material fact necessary to make the statements in the Registration Statement or the Prospectus or Issuer Free Writing Prospectus relating thereto not misleading or otherwise requires the making of any changes in such Registration Statement, Prospectus, Issuer Free Writing Prospectus or document, and, at the request of any such seller and subject to Section 4(a) hereof, the Company shall promptly prepare a supplement or amendment to such Prospectus or Issuer Free Writing Prospectus, furnish such reasonable number of copies of such supplement or amendment to each seller of such Registrable Securities, Counsel to the Holders and the managing underwriters as the same shall reasonably request and file such supplement or amendment with the Commission so that, as thereafter delivered to the purchasers of such Registrable Securities, such Prospectus or Issuer Free Writing Prospectus as so amended or supplemented shall not contain an untrue statement of a material fact or omit to state any fact necessary to make the statements therein not misleading, (2) as soon as the Company becomes aware of any comments or inquiries by the Commission or any requests by the Commission or any federal or state governmental authority for amendments or supplements to a Registration Statement or related Prospectus or Issuer Free Writing Prospectus covering Registrable Securities or for additional information relating thereto, (3) as soon as the Company becomes aware of the issuance, or receives a written threat of issuance, by the Commission of any stop order suspending, or a written statement threatening to suspend, the effectiveness of a Registration Statement covering the Registrable Securities or (4) of the receipt by the Company of any notification with respect to the suspension of the qualification or exemption from qualification of any Registrable Security for sale in any jurisdiction, or the initiation or written threat of any proceeding for such purpose; and (B) when each Registration Statement or any amendment thereto has been filed with the Commission and when each Registration Statement or the related Prospectus or Issuer Free Writing Prospectus or any Prospectus supplement or any post-effective amendment thereto has become effective;

12

(vii)   use commercially reasonable efforts to cause all such Registrable Securities (A) if the Common Stock is then listed on a National Securities Exchange or an Alternative Securities Exchange or included for quotation in a recognized trading market, to continue to be so listed or included, and (B) to be registered with or approved by such other governmental agencies or authorities as may be necessary to enable the sellers thereof to consummate the disposition of the Registrable Securities;

(viii)   provide and cause to be maintained a transfer agent and registrar for all such Registrable Securities from and after the effective date of the applicable Registration Statement;

(ix)   in connection with any underwritten Public Offering (including a Holder Shelf Takedown):

(A)   enter into and perform under such customary agreements (including underwriting agreements in customary form, including customary representations and warranties and provisions with respect to indemnification and contribution) and take all such other actions as the Holders beneficially owning a majority of the Registrable Securities initially requested to be sold or the underwriters, if any, reasonably request in order to expedite or facilitate the disposition of such Registrable Securities and provide commercially reasonable cooperation, including upon reasonable notice causing appropriate officers to attend and participate in "road shows" and analyst or investor presentations and such other customary selling or other informational meetings organized by the underwriters, if any (taking into account the needs of the Company's businesses and the responsibilities of such officers with respect thereto and the requirement of the marketing process); and

(B)   use commercially reasonable efforts to obtain and cause to be furnished to the managing underwriters a signed counterpart of (i) one or more comfort letters from the Company's independent public accountant(s) in customary form and covering such matters of the type customarily covered by comfort letters and (ii) a legal opinion (and negative assurance letter) of counsel to the Company addressed to the relevant underwriters in customary form and covering such matters of the type customarily covered by such letters as the managing underwriters reasonably request;

(x)   upon reasonable notice and at reasonable times during normal business hours, make available for inspection by a representative appointed by the Holders of a majority of Registrable Securities proposed to be included in any disposition pursuant to a Registration Statement, Counsel to the Holders, any underwriter participating in any disposition pursuant to such registration, as applicable, and any other attorney or accountant retained by such Holder or underwriter, all financial and other records and

13

WEIL:\96059134\9\62739.0003

pertinent corporate documents of the Company, and cause the Company's officers, directors, employees and independent accountants to supply all information reasonably requested by any such Holder, underwriter, attorney or accountant in connection with such Registration Statement or Shelf Takedown, as applicable, and make themselves available at mutually convenient times to discuss the business of the Company and other matters reasonably requested by any such Holders, sellers, underwriter or agent thereof in connection with such Registration Statement as shall be necessary (subject to the Company's compliance with Regulation FD) to enable them to exercise their due diligence responsibility, as applicable (any information provided under this Section 5(a)(x), "**Due Diligence Information**"); *provided* that the Company shall not provide any Due Diligence Information to a Holder unless such Holder explicitly requests such Due Diligence Information in writing and such Holder has entered into a customary confidentiality agreement with the Company with respect to MNPI;

(xi)     permit Counsel to the Holders, any underwriter participating in any disposition pursuant to a Registration Statement, and any other attorney, accountant or other agent retained by any Holder or underwriter, to participate (including, but not limited to, reviewing, commenting on and attending all meetings) in the preparation of such Registration Statement and any Prospectus supplements relating to a Shelf Takedown, if applicable;

(xii)    in the event of the issuance or (to the Company's actual knowledge) threatened issuance of any stop order suspending the effectiveness of a Registration Statement, or of any order suspending or preventing the use of any related Prospectus or suspending the qualification of any Common Stock included in such Registration Statement for sale in any jurisdiction, the Company shall use commercially reasonable efforts to (A) prevent the issuance of any such stop order, and in the event of such issuance, to obtain the withdrawal of such order and (B) obtain the withdrawal of any order suspending or preventing the use of any related Prospectus or Issuer Free Writing Prospectus or suspending qualification of any Registrable Securities included in such Registration Statement for sale in any jurisdiction at the earliest practicable date;

(xiii)   provide a CUSIP number for the Registrable Securities prior to the effective date of the first Registration Statement including Registrable Securities;

(xiv)    promptly notify in writing the participating Holders, the sales or placement agent, if any, therefor and the managing underwriters of the securities being sold: (A) when such Registration Statement or related Prospectus or Free Writing Prospectus or any Prospectus amendment or supplement or post-effective amendment has been filed, and, with respect to any such Registration Statement or any post-effective amendment, when the same has become effective; and (B) of any written comments by the Commission and by the blue sky or securities commissioner or regulator of any state with respect thereto;

(xv)     (A) prepare and file with the Commission such amendments and supplements to each Registration Statement as may be necessary to comply with the provisions of the Securities Act, including post effective amendments to each Registration

14

WEIL:\96059134\9\62739.0003

Statement as may be necessary to keep such Registration Statement continuously effective for the applicable time period required hereunder and, if applicable, file any Registration Statements pursuant to Rule 462(b) promulgated under the Securities Act; (B) cause the related Prospectus to be supplemented by any required Prospectus supplement, and as so supplemented to be filed pursuant to Rule 424 (or any similar provisions then in force) promulgated under the Securities Act; (C) comply in all material respects with the provisions of the Securities Act and the Exchange Act and any applicable securities exchange or other recognized trading market with respect to the disposition of all securities covered by such Registration Statement during such period in accordance with the intended methods of disposition by the sellers thereof set forth in such Registration Statement as so amended or in such Prospectus as so supplemented; and (D) provide additional information related to each Registration Statement as requested by, and obtain any required approval necessary from, the Commission or any federal or state governmental authority;

(xvi)    cooperate with each Holder and each underwriter, if any, participating in the disposition of such Registrable Securities and their respective counsel in connection with any filings required to be made with FINRA;

(xvii)   within the deadlines specified by the Securities Act, make all required filing fee payments in respect of any Registration Statement or Prospectus used under this Agreement (and any Public Offering covered thereby);

(xviii)  if requested by any participating Holder or the managing underwriters, promptly include in a Prospectus supplement or Registration Statement amendment such information regarding the Company or the offering as the Holder or managing underwriters may reasonably request, including in order to permit the intended method of distribution of such securities, and make all required filings of such Prospectus supplement or such Registration Statement amendment as soon as reasonably practicable after the Company has received such request;

(xix)    in the case of certificated Registrable Securities, cooperate with the participating Holders of Registrable Securities and the managing underwriters to facilitate the timely preparation and delivery of certificates (not bearing any legends) representing Registrable Securities to be sold after receiving written representations from each participating Holder that the Registrable Securities represented by the certificates so delivered by such Holder will be transferred in accordance with the Registration Statement, and enable such Registrable Securities to be in such denominations and registered in such names as the Holders or managing underwriters may reasonably request at least two (2) Business Days prior to any sale of Registrable Securities provided that nothing in this Agreement shall require the Company to issue securities in certificated form unless such securities are already in certificated form; and

(xx)    use commercially reasonable efforts to take all other actions deemed necessary or advisable in the reasonable judgment of the Company to effect the registration and sale of the Registrable Securities contemplated hereby.

15

(b)     The Company shall use its commercially reasonable efforts to cause the Common Stock to be quoted on any of the OTCQX, OTCQB, OTCBB or OTC Pink markets as promptly as practicable after the Effective Date and shall thereafter use its commercially reasonable efforts to maintain such quotation.

(c)     The Company shall hold in confidence and not make any disclosure of information concerning a Holder provided to the Company pursuant to this Agreement unless (i) disclosure of such information is necessary to comply with federal or state securities laws or the rules of any applicable securities exchange or other recognized trading market, (ii) the disclosure of such information is necessary to avoid or correct a misstatement or omission in, or is otherwise required to be included in, any Registration Statement or Prospectus pursuant to the Securities Act or any rule or regulation thereunder, (iii) the release of such information is ordered pursuant to a subpoena or other final, non-appealable order from a court or governmental body of competent jurisdiction, or (iv) such information has been made generally available to the public other than by disclosure in violation of this Agreement or any other agreement. The Company agrees that to the extent permitted by law, it shall, upon learning that disclosure of such information concerning a Holder is sought in or by a court or governmental body of competent jurisdiction or through other means, use its commercially reasonable efforts to give prompt written notice to such Holder (or such Holder's counsel) and allow such Holder, at the Holder's expense, to undertake appropriate action to prevent disclosure of, or to obtain a protective order for, such information.

(d)     As of the date hereof and except as provided pursuant to the Plan, the Company represents and warrants that it is not a party to, or otherwise subject to, any other agreement granting registration rights to any other Person with respect to any securities of the Company, including securities convertible, exercisable or exchangeable into or for shares of any Capital Stock of the Company.

(e)     With a view to making available certain rules and regulations of the Commission that may permit the sale of the Registrable Securities to the public without registration, on and after the Effective Date and until such date as no Holder owns any Registrable Securities, the Company agrees to:

(i)     use commercially reasonable efforts to continue to file in a timely manner all reports and other documents required, if any, to be filed by it under the Securities Act and the Exchange Act and the rules and regulations adopted thereunder;

(ii)     make available information necessary to comply with Section 4(a)(7) under the Securities Act and Rule 144 and Rule 144A promulgated under the Securities Act, if available, with respect to resales of the Registrable Securities under the Securities Act, at all times, all to the extent required from time to time to enable such Holder to sell Registrable Securities without registration under the Securities Act within the limitation of the exemptions provided by Section 4(a)(7), Rule 144 and Rule 144A promulgated under the Securities Act, or any successor rules or regulations hereafter adopted by the Commission; and

16

(iii)    upon the reasonable written request of any Holder, the Company will deliver to such Holder a written statement as to whether the Company has complied with such information requirements, and if not, the specific reasons for non-compliance.

(f)    The Company agrees that nothing in this Agreement shall prohibit the Holders, at any time and from time to time, from selling or otherwise transferring Registrable Securities pursuant to a private placement or other transaction which is not registered pursuant to the Securities Act.

## 6.    Holder Undertakings.

(a)    Free Writing Prospectuses. Each Holder represents that it has not prepared or had prepared on its behalf or used or referred to, and agrees that it will not prepare or have prepared on its behalf or used or refer to, any Free Writing Prospectus, and has not distributed and will not distribute any written materials in connection with the offer or sale of Common Stock without the prior written consent of the Company and, in connection with any underwritten Public Offering, the underwriters. Any such Free Writing Prospectus consented to by the Company and the underwriters, as the case may be, is hereinafter referred to as a "**Permitted Free Writing Prospectus**." The Company represents and agrees that it has treated and will treat, as the case may be, each Permitted Free Writing Prospectus as an Issuer Free Writing Prospectus, including in respect of timely filing with the Commission, legending and record keeping.

(b)    Information for Inclusion. Each selling Holder that has requested or will request inclusion of its Registrable Securities in any Registration Statement shall furnish to the Company such information regarding such Holder and its plan and method of distribution of such Registrable Securities as the Company may, from time to time, reasonably request. The Company may refuse to proceed with the registration of such Holder's Registrable Securities if such Holder unreasonably fails to furnish such information within a reasonable time after receiving such request.

(c)    Underwritten Public Offering Participation. No Person may participate in any underwritten Public Offering hereunder unless such Person (i) agrees to sell such Person's securities on the basis provided in any underwriting arrangements in customary form entered into pursuant to this Agreement and (ii) completes and executes all questionnaires, powers of attorney, indemnities, underwriting agreements and other documents reasonably required under the terms of such underwriting arrangements; *provided* that no Holder included in any underwritten Public Offering shall be required to make any representations or warranties to the Company or the underwriters (other than (A) representations and warranties regarding (1) such Holder's ownership of its Registrable Securities to be sold or transferred, (2) such Holder's power and authority to effect such transfer, and (3) such matters pertaining to compliance with securities laws as may be reasonably requested by the Company or the underwriters, and (B) such other representations, warranties and other provisions relating to such Holder's participation in such Public Offering as may be reasonably requested by the underwriters) or to undertake any indemnification obligations to the Company with respect thereto, except as otherwise

17

provided in Section 9(b), or to the underwriters with respect thereto, except to the extent of the indemnification being given to the underwriters and their controlling Persons in Section 9(b).

(d)        Price and Underwriting Discounts. In the case of an underwritten Holder Shelf Takedown requested by Holders pursuant to this Agreement, the price, underwriting discount and other financial terms of the related underwriting agreement for the Registrable Securities shall be determined by the Holders beneficially owning a majority of the Registrable Securities initially requested to be included in such underwritten Public Offering.

(e)        Notice and Opt-Out. Notwithstanding anything to the contrary in this Agreement, any Holder may make a written election (an "**Opt-Out Election**") to no longer receive from the Company any Company Shelf Registration Notice, Demand Shelf Takedown Notice, Company Shelf Takedown Notice, Company Block Sale Notice, Piggyback Registration Notice or Suspension Notice (other than a Suspension Notice with respect to a Registration Statement as to which such Holder's Registrable Securities are, or have been requested to be, included in)(each as **"Covered Notice"**), and, following receipt of such Opt-Out Election, the Company shall not be required to, and shall not, deliver any such Covered Notice to such Holder from the date of such Opt-Out Election and such Holder shall have no right to participate in any registration statement or offering as to which such Covered Notices pertain. An Opt-Out Election shall remain in effect until it has been revoked in writing and received by the Company. A Holder who previously has given the Company an Opt-Out Election may revoke such election at any time, and there shall be no limit on the ability of a Holder to issue and revoke subsequent Opt-Out Elections.

**7.        Registration Expenses.**

(a)        Expenses. Except as set forth in Sections 2(c) and 4(c) above, all fees and expenses incurred by the Company in connection with this Agreement ("**Registration Expenses**") will be borne by the Company. These fees and expenses will include without limitation (i) stock exchange, Commission, FINRA and other registration and filing fees, (ii) all fees and expenses incurred in connection with complying with any securities or blue sky laws (including reasonable fees, charges and disbursements of counsel in connection with blue sky qualifications of the Registrable Securities), (iii) all printing, messenger and delivery expenses, (iv) the fees, charges and disbursements of counsel to the Company and of its independent public accountants and any other accounting and legal fees, charges and expenses incurred by the Company (including any expenses arising from any special audits or "comfort letters" required in connection with or incident to any registration) and other Persons retained by the Company and (v) the fees and expenses incurred in connection with the listing of the Registrable Securities on a National Securities Exchange or Alternative Securities Exchange. For the avoidance of doubt, Registration Expenses shall not include Selling Expenses.

(b)        Reimbursement of Counsel. The Company will also reimburse or pay, as the case may be, the Holders of Registrable Securities included in such registration for the reasonable fees and out-of-pocket expenses of one Counsel to the Holders relating

18

to or in connection with any registration or offering of Registrable Securities pursuant to this Agreement within 30 calendar days of presentation of an invoice approved by such Holders and disbursements of each additional counsel retained by any Holder for the purpose of rendering a legal opinion on behalf of such Holder in connection with any underwritten Public Offering if the managing underwriters of such Public Offering or the Company reasonably request such legal opinion and Counsel to the Holders cannot reasonably provide such legal opinion due to legal jurisdiction or otherwise.

**8.     Lock-Up Agreements.**

(a)     <u>Lock-Up Agreements and Market Stand-Off</u>.

(i)     In the event of any underwritten Public Offering or an Excluded Registration, if reasonably requested by the Company and the managing underwriters of such underwritten Public Offering or required by the Holders of a majority of the Registrable Securities participating in such Public Offering, each Holder agrees that in connection with such underwritten Public Offering it shall not (A) offer, sell, contract to sell, pledge or otherwise dispose of (including sales pursuant to Rule 144 or Section 1145 of the Bankruptcy Code), directly or indirectly, any Capital Stock of the Company (including Capital Stock of the Company that may be deemed to be owned beneficially by such Holder in accordance with the rules and regulations of the Commission) (collectively, "**Equity Securities**"), (B) enter into a transaction which would have the same effect as described in clause (A) above, (C) enter into any swap, hedge or other arrangement that transfers, in whole or in part, any of the economic consequences or ownership of any Equity Securities, whether such transaction is to be settled by delivery of such Equity Securities, in cash or otherwise (each of (A), (B) and (C) above, a "**Sale Transaction**"), or (D) publicly disclose the intention to enter into any Sale Transaction, from the earlier of (1) the date of the pricing of such Public Offering or (2) the filing of a preliminary Prospectus or Prospectus supplement immediately prior to the commencement of marketing efforts by the managing underwriters until (and including) the date that is 90 calendar days following the date of the final Prospectus or Prospectus supplement, as applicable, for such Public Offering (the "**Restricted Period**"), unless the underwriters managing the Public Offering otherwise agree in writing in a Lock-Up Agreement pursuant to Section 8(a)(ii); *provided further* that the foregoing restrictions shall only be applicable to any Holder if all executive officers and directors of the Company are bound by Lock-Up Agreements or substantially similar transfer restrictions; *provided further* that if any Holder's Lock-Up Agreement is any less restrictive than the foregoing provisions, then such less restrictive provisions shall apply.

(ii)     Any Lock-Up Agreement (a "**Lock-Up Agreement**") required pursuant to Section 8(a)(i) shall be addressed to the managing underwriters of such underwritten Public Offering and be in customary form and substance with customary exceptions as reasonably requested by such managing underwriters. Each Holder agrees to execute a Lock-Up Agreement setting forth such Holder's agreement not to engage in any Sale Transactions during the Restricted Period if reasonably requested by the managing underwriters of such underwritten Public Offering. The foregoing requirements to enter into a Lock-Up Agreement are only applicable to a Holder if all executive officers and

19

directors of the Company are bound by and have entered into substantially similar or more restrictive Lock-Up Agreements.

(iii)    The Company may impose stop-transfer instructions with respect to the shares of Common Stock (or other securities) subject to the restrictions set forth in this Section 8(a) until the end of the applicable Restricted Period of the Lock-Up Agreement.

(b)    Company Lock-Up. If reasonably requested by the managing underwriters for any underwritten Public Offering, the Company shall: (i) agree to a customary lock up provision applicable to the Company in an underwriting agreement as reasonably requested by the managing underwriters for such Public Offering, including customary exceptions to be agreed in good faith between the Company and the managing underwriters for such underwritten Public Offering and (ii) use commercially reasonable efforts to cause each of its executive officers and directors, in each case, to enter into Lock-Up Agreements with the managing underwriters of such Public Offering meeting the requirements of Section 8(a)(ii).

9.    **Indemnification; Contribution.**

(a)    Indemnification by the Company. The Company agrees to indemnify and hold harmless each Holder registered pursuant to this Agreement, such Holder's Affiliates, directors, officers, employees, members, managers, agents and any Person who controls any such Holder (within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act), and any underwriter that facilitates the sale of the Registrable Securities and any Person who controls such underwriter (within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act) to the fullest extent permitted by applicable law, from and against any and all losses, claims, damages, liabilities and expenses ("**Losses**") to which they or any of them may become subject insofar as such Losses arise out of or are based upon any untrue or alleged untrue statement of a material fact contained in any Registration Statement pursuant to which Registrable Securities were registered, Prospectus, preliminary prospectus, any road show, as defined in Rule 433(h)(4) under the Securities Act a ("**road show**"), or Issuer Free Writing Prospectus included in any such Registration Statement, or in any amendment thereof or supplement thereto, or arise out of or are based upon the omission or alleged omission to state therein a material fact required to be stated therein or necessary in the case of any Prospectus, preliminary prospectus, road show or Issuer Free Writing Prospectus, in light of the circumstances under which they were made, to make the statements therein not misleading and the Company agrees to reimburse each such indemnified party for any reasonable legal or other reasonable out-of-pocket expenses incurred by them in connection with investigating or defending any such Losses (whether or not the indemnified party is a party to any proceeding); *provided, however*, that the Company will not be liable in any case to the extent that any such Loss arises out of or is based upon any such untrue or alleged untrue statement or omission or alleged omission made therein in reliance upon and in conformity with written information furnished to the Company by or on behalf of any such Holder specifically for inclusion therein, including, without

20

limitation, any notice and questionnaire. This indemnity agreement will be in addition to any liability which the Company may otherwise have.

(b)      Indemnification by the Holders. Each Holder severally (and not jointly) agrees to indemnify and hold harmless the Company and each of its Affiliates, directors, officers,  employees, members, managers, agents and each Person who controls the Company (within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act), and any underwriter that facilitates the sale of Registrable Securities and any Person who controls such underwriter (within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act) to the fullest extent permitted by applicable law, from and against any and all Losses to which they or any of them may become subject insofar as such Losses arise out of or are based upon any untrue or alleged untrue statement of a material fact contained in any Registration Statement pursuant to which Registrable Securities were registered, Prospectus, preliminary Prospectus, road show, Issuer Free Writing Prospectus included in any such Registration Statement, or in any amendment thereof or supplement thereto, or arise out of or are based upon the omission or alleged omission to state therein a material fact required to be stated therein or necessary in the case of any Prospectus, preliminary prospectus, road show, Issuer Free Writing Prospectus, in light of the circumstances under which they were made, to make the statements therein not misleading, to the extent, but only to the extent, that any such untrue statement or alleged untrue statement or omission or alleged omission is contained in any written information furnished to the Company by or on behalf of such Holder specifically for inclusion therein; *provided*, *however*, that the maximum amount to be indemnified by such Holder pursuant to this Section 9(b) shall be limited to the net proceeds (after deducting underwriters' discounts and commissions) received by such Holder in the Public Offering to which such Registration Statement, Prospectus, preliminary prospectus, road show or Issuer Free Writing Prospectus relates; *provided*, *further*, that a Holder shall not be liable in any case to the extent that prior to the filing of any such Registration Statement, Prospectus, preliminary prospectus, road show or Issuer Free Writing Prospectus or any amendment thereof or supplement thereto, each Holder has furnished in writing to the Company, information expressly for use in, and within a reasonable period of time prior to the effectiveness of such Registration Statement or the use of the Prospectus, preliminary prospectus, road show or Issuer Free Writing Prospectus, or any amendment thereof or supplement thereto which corrected or made not misleading information previously provided to the Company. This indemnity agreement will be in addition to any liability which any such Holder may otherwise have.

(c)      Conduct of Indemnification Proceedings. Promptly after receipt by an indemnified party under this Section 9 of notice of the commencement of any action, such indemnified party will, if a claim in respect thereof is to be made against the indemnifying party under this Section 9(c), notify the indemnifying party in writing of the commencement thereof; but the failure so to notify the indemnifying party (i) will not relieve it from liability under Section 9(a) or Section 9(b) above unless and to the extent such action and such failure results in material prejudice to the indemnifying party and forfeiture by the indemnifying party of substantial rights and defenses; and (ii) will not, in any event, relieve the indemnifying party from any obligations to any indemnified party other than the indemnification obligation provided in Section 9(a) or Section 9(b) above.

21

The indemnifying party shall be entitled to participate therein and, to the extent that it shall wish, jointly with any other indemnifying party similarly notified, to assume the defense thereof, with counsel reasonably satisfactory to such indemnified party (who shall not, except with the consent of the indemnified party, be counsel to the indemnifying party), and, except as provided in the next sentence, after notice from the indemnifying party to such indemnified party of its election to so assume the defense thereof, the indemnifying party shall not be liable to such indemnified party for any legal expenses of other counsel or any other expenses subsequently incurred by such indemnified party in connection with the defense thereof other than reasonable costs of investigation. Notwithstanding the indemnifying party's rights in the prior sentence, the indemnified party shall have the right to employ its own counsel (and one local counsel), and the indemnifying party shall bear the reasonable fees, costs and expenses of such separate counsel if:

(i)  the use of counsel chosen by the indemnifying party to represent the indemnified party would present such counsel with an actual or potential conflict of interest;

(ii)  the actual or potential defendants in, or targets of, any such action include both the indemnified party and the indemnifying party and the indemnified party shall have reasonably concluded that there may be legal defenses available to it and/or other indemnified parties which are different from or additional to those available to the indemnifying party;

(iii)  the indemnifying party shall not have employed counsel reasonably satisfactory to the indemnified party to represent the indemnified party within a reasonable time after notice of the institution of such action; or

(iv)  the indemnifying party shall authorize the indemnified party to employ separate counsel at the expense of the indemnifying party.

No indemnifying party shall, in connection with any one action or separate but substantially similar or related actions in the same jurisdiction arising out of the same general circumstances or allegations, be liable for the fees and expenses of more than one separate firm of attorneys (in addition to any local counsel) for all indemnified parties. An indemnifying party shall not be liable under this Section 9(c) to any indemnified party regarding any settlement or compromise or consent to the entry of any judgment with respect to any pending or threatened claim, action, suit or proceeding in respect of which indemnification or contribution may be sought hereunder (whether or not the indemnified parties are actual or potential parties to such claim or action) unless such settlement, compromise or consent is consented to by such indemnifying party, which consent shall not be unreasonably withheld. No indemnifying party, in the defense of any such claim or litigation, shall, except with the consent of each indemnified party (which consent shall not be unreasonably withheld), consent to entry of any judgment or enter into any settlement or compromise unless such settlement or compromise (x) includes as an unconditional term thereof the giving by the claimant or plaintiff therein, to such indemnified party, of a full and final release from all liability in respect to such claim or litigation and (y) does not

22

include a statement as to, or an admission of, fault, culpability or a failure to act by or on behalf of such indemnified party.

(d)   Contribution.

(i)   In the event that the indemnity provided in Section 9(a) or Section 9(b) above is unavailable to or insufficient to hold harmless an indemnified party for any reason, then each applicable indemnifying party agrees to contribute to the aggregate Losses (including reasonable legal or other reasonable out-of-pocket expenses incurred in connection with investigating or defending same) to which such indemnifying party may be subject in such proportion as is appropriate to reflect the relative benefits received by the indemnifying party on the one hand and by the indemnified party on the other from the Public Offering of the Common Stock; *provided*, *however*, that the maximum amount of liability in respect of such contribution shall be limited in the case of any Holder to the net proceeds (after deducting underwriters' discounts and commissions) received by such Holder in connection with such registration. If, however, the allocation provided by the immediately preceding sentence is not permitted by applicable law, then each indemnifying party shall contribute to such amount paid or payable by such indemnified party in such proportion as is appropriate to reflect not only such relative benefits but also the relative fault of the indemnifying party on the one hand and the indemnified party on the other in connection with the statements or omissions which resulted in such Losses, as well as any other relevant equitable considerations. The relative fault shall be determined by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission or alleged omission to state a material fact relates to information supplied by the indemnifying party on the one hand or the indemnified party on the other and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission.

(ii)   The parties agree that it would not be just and equitable if contribution pursuant to this Section 9(d) were determined by *pro rata* allocation (even if the Holders of Registrable Securities or any agents or underwriters or all of them were treated as one entity for such purpose) or by any other method of allocation which does not take account of the equitable considerations referred to above in this Section 9(d). The amount paid or payable by an indemnified party as a result of the Losses referred to above in this Section 9(d) shall be deemed to include any reasonable legal or other reasonable out-of-pocket expenses incurred by such indemnified party in connection with investigating or defending any such action or claim.

(iii)   Notwithstanding the provisions of this Section 9(d), no Person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation.

(iv)   For purposes of this Section 9, each Person who controls any Holder, agent or underwriter (within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act) and each director, officer, employee and agent of any such Holder, agent or underwriter shall have the same rights to contribution as such Holder,

23

agent or underwriter, and each Person who controls the Company (within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act) and each officer and director of the Company shall have the same rights to contribution as the Company, subject in each case to the applicable terms and conditions of this Section 9(d).

(e)    The provisions of this Section 9 will remain in full force and effect, regardless of any investigation made by or on behalf of any Holder or the Company or any of the officers, directors or controlling Persons referred to in this Section 9, and will survive the transfer of Registrable Securities.

## 10.    Transfer of Registration Rights.

The rights of a Holder hereunder may be transferred, assigned, or otherwise conveyed on a *pro rata* basis in connection with any transfer, distribution, assignment, or other conveyance of Registrable Securities to any transferee or assignee; *provided* that all of the following additional conditions are satisfied with respect to any transfer, assignment or conveyance of rights hereunder: (a) such transfer, assignment or conveyance (other than any transfer, assignment or conveyance of rights of a Holder to an Affiliate or Related Fund of such Holder) is for not less than the lesser of (i) 10% of the outstanding Common Stock and (ii) all of the Common Stock initially held by such Holder upon the Effective Date of the Plan; (b) such transfer, assignment or conveyance is effected in accordance with applicable securities laws and in compliance with the charter documents of the Company; (c) such transferee or assignee agrees in writing to become subject to the terms of this Agreement by executing and delivering to the Company a Joinder; and (d) the Company is given written notice by such Holder within 15 Business Days of such transfer or assignment, stating the name and address of the transferee or assignee, identifying the Registrable Securities with respect to which such rights are being transferred or assigned and the total number of Registrable Securities and other Capital Stock of the Company beneficially owned by such transferee or assignee. Notwithstanding anything to the contrary contained in this Agreement or in the foregoing sentence, the parties agree that the Contribution LLCs shall be entitled to transfer, assign and convey each of their rights under this Agreement to those of its members that qualify as Holders, subject, in the case of each such Holder, to such Holder's agreement to become subject to the terms of this Agreement by executing and delivering to the Company a Joinder.

## 11.    Amendment, Modification and Waivers; Further Assurances.

(a)    <u>Amendment</u>. This Agreement may be amended, modified, superseded, cancelled, renewed or extended, and the terms and conditions of this Agreement may be waived, only by a written instrument, (a) signed by (i) the Company, and (ii) the Holders of at least a majority of the Registrable Securities; *provided*, that no provision of this Agreement shall be modified or amended in a manner that is disproportionately and materially adverse to any Holder, without the prior written consent of such Holder, as applicable, or (b) in the case of a waiver, by the party hereto waiving compliance.

24

(b)      Changes in Common Stock. If, and as often as, there are any changes in the Common Stock by way of stock split, stock dividend, combination or reclassification, or through merger, consolidation, reorganization or recapitalization, or by any other means, appropriate adjustment shall be made in the provisions hereof as may be required so that the rights and privileges granted hereby shall continue with respect to the Registrable Securities as so changed and the Company shall make appropriate provision in connection with any merger, consolidation, reorganization or recapitalization that any successor to the Company (or resulting parent thereof) shall agree, as a condition to the consummation of any such transaction, to expressly assume the Company's obligations hereunder.

(c)      Effect of Waiver. No waiver of any terms or conditions of this Agreement shall operate as a waiver of any other breach of such terms and conditions or any other term or condition, nor shall any failure to enforce any provision hereof operate as a waiver of such provision or of any other provision hereof. No written waiver hereunder, unless it by its own terms explicitly provides to the contrary, shall be construed to effect a continuing waiver of the provisions being waived and no such waiver in any instance shall constitute a waiver in any other instance or for any other purpose or impair the right of the party against whom such waiver is claimed in all other instances or for all other purposes to require full compliance with such provision. The failure of any party to enforce any provision of this Agreement shall not be construed as a waiver of such provision and shall not affect the right of such party thereafter to enforce each provision of this Agreement in accordance with its terms.

(d)      Further Assurances. Each of the parties hereto shall execute all such further instruments and documents and take all such further action as any other party hereto may reasonably require in order to effectuate the terms and purposes of this Agreement.

**12.      Miscellaneous.**

(a)      Successors and Assigns. All covenants and agreements in this Agreement by or on behalf of any of the parties hereto shall bind and inure to the benefit of the respective successors and assigns of the parties hereto whether so expressed or not. In addition, whether or not any express assignment has been made, the provisions of this Agreement which are for the benefit of purchasers or Holders of Registrable Securities are also for the benefit of, and enforceable by, any subsequent Holder. No assignment of this Agreement by the Company, or any of the Company's rights, interests or obligations hereunder, shall be effective against any Holder without the prior written consent of such Holder (such consent not to be unreasonably withheld).

(b)      Remedies; Specific Performance. Any Person having rights under any provision of this Agreement shall be entitled to enforce such rights specifically, to recover damages caused by reason of any breach of any provision of this Agreement and to exercise all other rights existing in their favor; *provided* that the liability of the Holders shall be several and not joint. The parties hereto agree and acknowledge that money damages would not be an adequate remedy for any breach of the provisions of this

25

WEIL:\96059134\9\62739.0003

Agreement and that any party may in its sole discretion apply to any court of law or equity of competent jurisdiction for specific performance and/or injunctive relief (without posting any bond or other security) in order to enforce or prevent violation of the provisions of this Agreement and shall not be required to prove irreparable injury to such party or that such party does not have an adequate remedy at law with respect to any breach of this Agreement (each of which elements the parties admit). The parties hereto further agree and acknowledge that each and every obligation applicable to it contained in this Agreement shall be specifically enforceable against it and hereby waives and agrees not to assert any defenses against an action for specific performance of their respective obligations hereunder. All rights and remedies existing under this Agreement are cumulative to, and not exclusive of, any rights or remedies available under this Agreement or otherwise. No Holder shall have any right to obtain or seek an injunction restraining or otherwise delaying any registration pursuant to this Agreement as the result of any controversy that might arise with respect to the interpretation or implementation of this Agreement.

(c)      Notices. All notices, demands or other communications to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be deemed to have been given when (i) delivered personally to the recipient, (ii) e-mailed or sent by facsimile to the recipient, or (iii) one Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid). Such notices, demands and other communications shall be sent to the Company at the address set forth below and to any Holder at the address set forth on the signature page hereto (with copies sent at the address set forth below), or at such address or to the attention of such other Person as the recipient party has specified by prior written notice to the sending party.

The Company's address is:

> 500 Dallas St., Suite 1600
> Houston, TX  77002
> Attention:    General Counsel
> Email:        [●]

> with copies to:

> [●]

Copies of notices to the Holders shall be sent to:

> Davis Polk & Wardwell LLP
> 1600 El Camino Real
> Menlo Park, California 94025
> Attention:    Brian M. Resnick
>               Kirtee Kapoor
>               Derek Dostal
> Facsimile:    650-752-2114
> Email:        brian.resnick@davispolk.com
>               kirtee.kapoor@davispolk.com

26

WEIL:\96059134\9\62739.0003

derek.dostal@davispolk.com

If any time period for giving notice or taking action hereunder expires on a day which is a Saturday, Sunday or legal holiday in the State of New York or the jurisdiction in which the Company's principal office is located, the time period shall automatically be extended to the Business Day immediately following such Saturday, Sunday or legal holiday.

(d)      No Inconsistent Agreements. The Company shall not hereafter enter into any agreement with respect to its securities which is inconsistent with or violates the rights granted to the Holders of Registrable Securities in this Agreement.

(e)      Counterparts. This Agreement may be executed in one or more counterparts, and may be delivered by means of facsimile or electronic transmission in portable document format ("pdf"), each of which shall be deemed to be an original and shall be binding upon the party who executed the same, but all of such counterparts shall constitute the same agreement.

(f)      Descriptive Headings; Interpretation; No Strict Construction. The descriptive headings of this Agreement are inserted for convenience only and do not constitute a substantive part of this Agreement. Whenever required by the context, any pronoun used in this Agreement shall include the corresponding masculine, feminine or neuter forms, and the singular forms of nouns, pronouns, and verbs shall include the plural and vice versa. Reference to any agreement, document, or instrument means such agreement, document, or instrument as amended or otherwise modified from time to time in accordance with the terms thereof, and, if applicable, hereof. The words "include," "includes" or "including" in this Agreement shall be deemed to be followed by "without limitation." The use of the words "or," "either" or "any" shall not be exclusive. The parties hereto have participated jointly in the negotiation and drafting of this Agreement. If an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement. All references to laws, rules, regulations and forms in this Agreement shall be deemed to be references to such laws, rules, regulations and forms, as amended from time to time or, to the extent replaced, the comparable successor thereto in effect at the time. All references to agencies, self-regulatory organizations or governmental entities in this Agreement shall be deemed to be references to the comparable successors thereto from time to time.

(g)      Delivery by Facsimile and Electronic Means. This Agreement, the agreements referred to herein, and each other agreement or instrument entered into in connection herewith or therewith or contemplated hereby or thereby, and any amendments hereto or thereto, to the extent signed and delivered by means of a facsimile machine or other electronic means, shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person. At the request of any party hereto or to any such agreement or instrument, each other party hereto or thereto shall re-execute

27

original forms thereof and deliver them to all other parties. No party hereto or to any such agreement or instrument shall raise the use of a facsimile machine or other electronic means to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of a facsimile machine or other electronic means as a defense to the formation or enforceability of a contract and each such party forever waives any such defense.

(h)     Arm's Length Agreement. Each of the parties to this Agreement agrees and acknowledges that this Agreement has been negotiated in good faith, at arm's length, and not by any means prohibited by law.

(i)     Sophisticated Parties; Advice of Counsel. Each of the parties to this Agreement specifically acknowledges that (i) it is a knowledgeable, informed, sophisticated Person capable of understanding and evaluating the provisions set forth in this Agreement and (ii) it has been fully advised and represented by legal counsel of its own independent selection and has relied wholly upon its independent judgment and the advice of such counsel in negotiating and entering into this Agreement.

(j)     Governing Law. This Agreement and the exhibits, attachments and annexes hereto shall be governed by, and construed in accordance with, the laws of the State of New York, without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of New York or any other jurisdiction) to the extent such rules or provisions would cause the application of the laws of any jurisdiction other than the State of New York.

(k)     Submission to Jurisdiction. Any action, suit or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby must be brought in the United States District Court for the Southern District of New York or any New York state court, in each case, located in the Borough of Manhattan, and each party consents to the exclusive jurisdiction and venue of such courts (and of the appropriate appellate courts therefrom) in any such action, suit or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such, action, suit or proceeding in any such court or that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum.

(l)     Waiver of Jury Trial. Each of the parties to this Agreement hereby agrees to waive its respective rights to a jury trial of any claim or cause of action based upon or arising out of this Agreement. The scope of this waiver is intended to be all-encompassing of any and all disputes that may be filed in any court and that relate to the subject matter of this Agreement, including contract claims, tort claims and all other common law and statutory claims. Each party hereto acknowledges that this waiver is a material inducement to enter into this Agreement, that each has already relied on this waiver in entering into this Agreement and that each will continue to rely on this waiver in their related future dealings. Each party hereto further warrants and represents that it has reviewed this waiver with its legal counsel and that it knowingly and voluntarily waives its jury trial rights following consultation with legal counsel. THIS WAIVER IS

28

IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING (OTHER THAN BY A MUTUAL WRITTEN WAIVER SPECIFICALLY REFERRING TO THIS SECTION 12(l) AND EXECUTED BY EACH OF THE PARTIES HERETO), AND THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT. In the event of litigation, this Agreement may be filed as a written consent to a trial by the court.

(m)     Complete Agreement. This Agreement and any certificates, documents, instruments and writings that are delivered pursuant hereto, represent the complete agreement among the parties hereto as to all matters covered hereby, and supersedes any prior agreements or understandings among the parties.

(n)     Severability. In the event any one or more of the provisions contained in this Agreement should be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby (it being understood that the invalidity of a particular provision in a particular jurisdiction shall not in and of itself affect the validity of such provision in any other jurisdiction). The parties shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

(o)     Termination. This Agreement shall terminate and be of no further force or effect when there shall no longer be any Registrable Securities outstanding; *provided* that (i) any Holder may elect to terminate its obligations under this Agreement by giving the Company written notice thereof and (ii) this Agreement shall automatically terminate with respect to a Holder that no longer holds any Registrable Securities; *provided further* that the provisions of Sections 5(c), 6(e), 7, 8, 9 and 12 shall survive any termination pursuant to this Section 12(o).

(p)     Independent Agreement by the Holders. The obligations of each Holder hereunder are several and not joint with the obligations of any other Holder, and no provision of this Agreement is intended to confer any obligations on any Holder vis-à-vis any other Holder. Nothing contained herein, and no action taken by any Holder pursuant hereto, shall be deemed to constitute the Holders as a partnership, an association, a joint venture or any other kind of entity, or create a presumption that the Holders are in any way acting in concert or as a group with respect to such obligations or the transactions contemplated herein.

[*Signature Pages Follow*]

29

WEIL:\96059134\9\62739.0003

IN WITNESS WHEREOF, the parties hereto have executed this Registration Rights Agreement as of the date first written above.

**AMPLIFY ENERGY CORP.**

By: _____

      Name: [•]

      Title:  [•]

*[Signature Page to Registration Rights Agreement]*

IN WITNESS WHEREOF, the parties hereto have executed this Registration Rights Agreement as of the date first written above.

**[HOLDER]**


By: _____
     Name:
     Title:


Address:

_____
_____
_____

Telephone: _____

Fax No.: _____

E-mail: _____




**[HOLDER]**


By: _____
     Name:
     Title:




[*Signature Page to Registration Rights Agreement*]

**ANNEX A**

**Form of Joinder Agreement**

THIS JOINDER AGREEMENT is made and entered into by the undersigned with reference to the following facts:

Reference is made to the Registration Rights Agreement, dated as of [•], 2017, as amended (the "**Registration Rights Agreement**"), by and among Amplify Energy Corp. (the "**Company**") and the other parties (the "**Holders**") thereto. Capitalized terms used but not defined in this Joinder Agreement shall have the meanings ascribed thereto in the Registration Rights Agreement.

As a condition to the acquisition of rights under the Registration Rights Agreement in accordance with the terms thereof, the undersigned agrees as follows:

1.      The undersigned hereby agrees to be bound by the provisions of the Registration Rights Agreement and undertakes to perform each obligation as if a Holder thereunder and an original signatory thereto in such capacity.

2.      This Joinder Agreement shall bind, and inure to the benefit of, the undersigned hereto and its respective devisees, heirs, personal and legal representatives, executors, administrators, successors and assigns.

3.      This Joinder Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of New York or any other jurisdiction) to the extent such rules or provisions would cause the application of the laws of any jurisdiction other than the State of New York.

[*Signature Page Follows*]

B-1

WEIL:\96059134\9\62739.0003

IN WITNESS WHEREOF, the undersigned has executed this Joinder Agreement.

[**HOLDER**]

By: _____
         Name:
         Title:

Date: _____

Address: _____

        _____

        _____

        _____

Phone Number: _____

Facsimile Number: _____

E-mail for Notice: _____

I.R.S. I.D. Number: _____

Amount of Registrable
Securities Acquired: _____

[**HOLDER**]

By: _____
         Name:
         Title:

[*Signature Page to Joinder Agreement*]

## Exhibit G

## Schedule of Rejected Contracts and Leases

WEIL:\96067153\5\62739.0004

**Schedule of Rejected Contracts and Leases**

The Debtors do not currently intend to reject any executory contracts or unexpired leases.

WEIL:\96067153\5\62739.0004

**Exhibit H**

**Schedule of Cure Amounts**

WEIL:\96067153\5\62739.0004

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|                              |   |                        |
|------------------------------|---|------------------------|
|                              | § |                        |
| In re:                       | § | **Chapter 11**         |
|                              | § |                        |
| **MEMORIAL PRODUCTION**      | § | **Case No. 17-30262**  |
| **PARTNERS LP,** *et al.*,   | § |                        |
|                              | § |                        |
| **Debtors.**[1]              | § | **(Jointly Administered)** |
|                              | § |                        |

### NOTICE OF CURE AMOUNTS WITH RESPECT TO
### EXECUTORY CONTRACTS AND UNEXPIRED LEASES OF THE DEBTORS

     **PLEASE TAKE NOTICE** that, on January 17, 2017, Memorial Production Partners LP ("**MEMP**") and certain of its affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), filed the *Joint Plan of Reorganization of Memorial Production Partners LP, et al. Under Chapter 11 of the Bankruptcy Code* (ECF No. 18) and, on February 24, 2017, filed the *Amended Joint Plan of Reorganization of Memorial Production Partners LP, et al. Under Chapter 11 of the Bankruptcy Code* (ECF No. 228) (the "**Plan**").[2]

     **PLEASE TAKE FURTHER NOTICE THAT**, in accordance with Section 8.1 of the Plan and sections 365 and 1123 of the Bankruptcy Code, the Debtors currently intend to assume all of their executory contracts and unexpired leases except as otherwise set forth herein.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Memorial Production Partners LP (6667); Memorial Production Partners GP LLC; MEMP Services LLC (1887); Memorial Production Operating LLC; Memorial Production Finance Corporation (3356); WHT Energy Partners LLC; WHT Carthage LLC; Memorial Midstream LLC; Beta Operating Company, LLC; Columbus Energy, LLC; Rise Energy Operating, LLC; Rise Energy Minerals, LLC; Rise Energy Beta, LLC; San Pedro Bay Pipeline Company (1234); and Memorial Energy Services LLC.  The Debtors' mailing address is 500 Dallas Street, Suite 1600, Houston, Texas 77002.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan.

**PLEASE TAKE FURTHER NOTICE** that the Debtors have determined that, except as set forth on the Schedule of Proposed Cure Amounts for Assumed Contracts and Unexpired Leases attached hereto, the Cure Amount (i.e., the amount necessary to cure a monetary default by the Debtors) applicable to each of the Debtors' executory contracts and unexpired leases is zero dollars ($0.00).  In addition, the Plan provides that all General Unsecured Claims shall be Unimpaired.

**PLEASE TAKE FURTHER NOTICE** that the Debtors intend to assume that certain Purchase and Sale Agreement, dated as of April 27, 2016, by and between Memorial Resource Development Corp. and MEMP, as amended by that certain Amendment to Purchase and Sale Agreement, dated as of March 7, 2017, by and between Range Resources-Louisiana, Inc., as successor-in-interest to Memorial Resource Development Corp., and MEMP, together with that certain Sublease Agreement by and between such parties and dated of even date therewith and the documents ancillary thereto.

**PLEASE TAKE FURTHER NOTICE that**, **to the extent that a non-Debtor party objects to (a) the assumption of such party's contract or lease (including adequate assurance of future performance thereunder) or (b) the applicable Cure Amount, such party must file and serve an objection (each, an "Objection") and such Objection must: (i) be in writing, filed with the Clerk of the United States Bankruptcy Court for the Southern District of Texas together with proof of service thereof, so as to be actually received by the Debtors or Reorganized Debtors, as applicable, on or before the date that is thirty (30) days after the Effective Date of the Plan; (ii) set forth the name of the objecting party, the nature of such party's dispute to such assumption or over the applicable Cure Amount, and the amount such party believes to be the correct Cure Amount; and (iii) state**

2

the legal and factual basis for such dispute.

PLEASE TAKE FURTHER NOTICE that, if no Objection is timely received, (a) the non-Debtor party to an executory contract or unexpired lease shall be deemed to have consented to the assumption of such contract or lease and shall be forever barred from asserting any objection to, or otherwise challenging, such assumption; and (b) the Cure Amount with respect to such contract or lease shall be zero dollars ($0.00), and the non-Debtor party shall be deemed to have consented to the Cure Amount.

PLEASE TAKE FURTHER NOTICE that, if a timely Objection is filed in accordance with this notice and cannot be otherwise resolved by the parties, the Bankruptcy Court may hear such Objection at a date set by the Bankruptcy Court.

**UNLESS AN OBJECTION IS TIMELY SERVED AND FILED IN ACCORDANCE WITH THIS NOTICE, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

Dated: March 24, 2017
      Houston, Texas

> /s/ Alfredo R. Pérez
> WEIL, GOTSHAL & MANGES LLP
> Alfredo R. Pérez (15776275)
> 700 Louisiana Street, Suite 1700
> Houston, Texas  77002
> Telephone: (713) 546-5000
> Facsimile:  (713) 224-9511
>
> - and –
>
> WEIL, GOTSHAL & MANGES LLP
> Gary T. Holtzer (admitted *pro hac vice*)
> Joseph H. Smolinsky (admitted *pro hac vice*)
> 767 Fifth Avenue
> New York, New York  10153
> Telephone:  (212) 310-8000
> Facsimile:  (212) 310-8007
>
> *Attorneys for the Debtors*
> *and Debtors in Possession*

WEIL:\96074079\2\62739.0004

**Schedule of Proposed Cure Amounts for Assumed Contracts & Unexpired Leases**

| Debtor | Counterparty Name | Contract Description | Contract Date | Proposed Cure Amount |
|---|---|---|---|---|
| Memorial Production Partners LP | 8X8, Inc. | Service Agreement | 1/12/2016 | $ 235.56 |
| Memorial Production Partners LP | Advisian Inc | Master Service Agreement | 11/9/2015 | $ 387,099.50 |
| Memorial Production Partners LP | Ascende Wealth Advisers, Inc | Retirement Plan Services Agreement | 7/1/2016 | $ 111.12 |
| Beta Operating Company, LLC | AssetPoint LLC (Aptean) | T&C's/Order Form | 12/29/2016 | $ 103.54 |
| Memorial Production Partners LP | AT&T | Telecommunications Agreement (Account No. 8310005811996) | - | $ 8,308.61 |
| Memorial Production Partners LP | AT&T | Used by Columbus Energy, Telecommunications Agreement (Account No. 9567225238 772 7) | - | $ 1,457.88 |
| Memorial Production Partners LP | AT&T | Telecommunications Agreement (Account No. 0304843015001) | - | $ 54.25 |
| Memorial Production Partners LP | AT&T | Used by Columbus Energy, Telecommunications Agreement (Account No. 9567225238 772 7) | - | $ 45.43 |
| Memorial Production Partners LP | AT&T Long Distance | Used by Tanos Midstream LLC, Wireless Agreement (Account No. 858121280) | - | $ 28.78 |
| Memorial Production Partners LP | AT&T Mobility | Telecommunications Agreement (Account No. 287245222152) | - | $ 536.73 |
| Memorial Production Partners LP | Cellco Partnership On Behalf Of Itself And Its Controlled And/Or Managed Affiliates D/B/A Verizon Wireless | Verizon Wireless Entity Agreement | 5/4/2016 | $ 4,649.12 |
| Memorial Production Partners LP | Centurylink Communications, Llc F/K/A Qwest Communications Company, LLC | CenturyLink Total Advantage Agreement - Option Z | 10/14/2016 | $ 1,575.85 |
| Memorial Production Partners LP | Centurylink Communications, Llc F/K/A Qwest Communications Company, Llc | CenturyLink Total Advantage Agreement - Option Z | 10/14/2016 | $ 640.00 |
| Memorial Production Partners LP | Compass Group Usa, Inc. D/B/A Canteen Refreshment Services | Office Coffee Service Agreement | 9/20/2016 | $ 2,022.40 |
| Memorial Production Partners LP | Compliance Services Inc | Master Service Agreement | 8/25/2016 | $ 12,151.52 |
| San Pedro Bay Pipeline Company | Compliance Services Inc | Master Services Agreement | 6/15/2010 | $ 1,290.32 |
| Memorial Production Partners LP | Directv | DirecTV Customer Account and Equipment Transfer Form | 6/1/2016 | $ 176.99 |
| Beta Operating Company, LLC | Ecology Control Industries Inc | Master Services Agreement | 2/11/2016 | $ 4,607.50 |
| Memorial Production Partners LP | Electricity Sales Agreement | Reliant Energy Retail Services, LLC | 5/9/2014 | $ 1,520.58 |
| Beta Operating Company, LLC | Interact Pmti Inc | Master Services Agreement | 1/28/2011 | $ 2,270.25 |
| Beta Operating Company, LLC | John Hancock Life Insurance Co | Office Lease- 4/1/2016 - 12/31/2021 | 4/1/2016 | $ 12,298.29 |
| Beta Operating Company, LLC | Laz Parking California Llc | Office Lease- 4/1/2016 - 12/31/2021 | 4/1/2016 | $ 487.74 |
| Memorial Production Partners LP | Lee D. Vendig Ii Oil & Gas Consultant Inc. | Crude Oil Marketing Agreement | 6/1/2016 | $ 4,000.00 |
| Memorial Production Partners LP | Lexisnexis | Subscription Agreement with Fixed Price Commitment Automatic Renewal | 6/17/2016 and 6/20/2016 | $ 717.45 |
| Memorial Production Partners LP | Mag Datacenters, LLC | Master Services Agreement | 2/26/2015 | $ 7,859.25 |

**Schedule of Proposed Cure Amounts for Assumed Contracts & Unexpired Leases**

| Debtor | Counterparty Name | Contract Description | Contract Date | Proposed Cure Amount |
|---|---|---|---|---|
| Memorial Production Partners LP | Nasdaq Corporate Solutions LLC | Master Services Agreement | 5/12/2016 | $ 3,271.62 |
| Memorial Production Partners LP | One Allen Center Co LLC | Office Lease | 5/15/2014 | $ 10,197.41 |
| Memorial Production Partners LP | One Allen Center Co LLC | Central Parking System (Part of Office Lease)- the parking arrangement is generally through the MRD-MEMP PSA and the MRD (now Range) – Brookfield office lease | 5/15/2014 | $ 3,090.00 |
| Memorial Production Partners LP | P2Es Holdings, LLC | Master Agreement | 5/31/2016 | $ 1,299.02 |
| San Pedro Bay Pipeline Company | Paragon Partners Ltd | Master Consulting Agreement | 3/16/2016 | $ 13,072.26 |
| Beta Operating Company, LLC | Patriot Environmental Services | Master Services Agreement | 5/31/2011 | $ 570.62 |
| Beta Operating Company, LLC | Preferred Telecom Llc | Master Services Agreement | 6/13/2011 | $ 563.98 |
| Memorial Production Partners LP | Reliable It LLC, (D/B/A Broadleaf Group) | Master Agreement | 8/18/2016 | $ 63,699.33 |
| Memorial Production Partners LP | Reliant Energy Retail Services, LLC | Electricity Sales Agreement | 5/9/2014 | $ 19,093.33 |
| Memorial Production Partners LP | Ryan, LLC | Severance Tax Agreement | 3/3/2013 | $ 52,613.85 |
| Memorial Production Partners LP | Sabine Rig Communications D/B/A Sabine Mud-Logging, Inc. | Master Service Agreement | 10/27/2014 | $ 1,845.66 |
| San Pedro Bay Pipeline Company | Saybolt Lp | Master Services Agreement | 6/21/2010 | $ 6,968.20 |
| Memorial Production Partners LP | Schneider Electric Software, LLC | General Terms & Conditions of Sale of Goods and Services and License of Software | 5/17/2016 | $ 55,189.12 |
| Memorial Production Partners LP | Shareholder.com (A/K/A  Nasdaq Corporate Solutions LLC) | Master Services Agreement | 5/12/2016 | $ 1,170.00 |
| Memorial Production Partners LP | Shred-It Usa Llc | Customer Service Agreement Regular Service | 5/18/2016 | $ 711.18 |
| Memorial Production Partners LP | Standard Register, Inc. D/B/A Taylor Communications | Master Agreement | 6/30/2016 | $ 559.88 |
| Memorial Production Partners LP | Startex Software LLC | Master License Agreement; Master Professional Services Agreement | 11/10/2015 | $ 11,023.71 |
| Memorial Production Partners LP | Stericycle Communications | Telecommunications Agreement | - | $ 597.03 |
| Memorial Production Partners LP | The Econsortium Group | Master Service Agreement | 8/18/2016 | $ 5,380.00 |
| Memorial Production Partners LP | The Welland Company, Inc. | Export Software License Agreement | 5/17/2016 | $ 3,069.07 |
| Beta Operating Company, LLC | Thomas & Beers | Master Services Agreement | 6/24/2011 | $ 11,476.94 |
| Memorial Production Partners LP | Town Of Bairoil | Lease Agreement | 9/1/2016 | $ 3,636.22 |
| Memorial Production Partners LP | Transzap, Inc. | Master Service Agreement | 6/1/2016 | $ 1,728.13 |
| Memorial Production Partners LP | Venio Llc Doing Business As Keane | Master Services Agreement | 6/26/2016 | $ 425.81 |

**Schedule of Proposed Cure Amounts for Assumed Contracts & Unexpired Leases**

| Debtor | Counterparty Name | Contract Description | Contract Date | Proposed Cure Amount |
|---|---|---|---|---|
| Memorial Production Partners LP | Wells Fargo Shareowner Services | Transfer Agent Services Agreement | 9/10/2016 | $ 2,393.30 |
| San Pedro Bay Pipeline Company | Wex Bank | Master Services Agreement | 9/19/2016 | $ 60.80 |
| Memorial Production Partners LP | Windstream | Wireless Agreement for Joaquin Region | - | $ 247.48 |
| Memorial Production Partners LP | Wolf Pack Rentals, Llc, A Texas Limited Liability Company By And On Behalf Of Its Divisions; Ark La Tex Services, And Just In Time Sanitation Services | Master Service Agreement | 6/21/2016 | $ 638.68 |

**<u>Exhibit I</u>**

**Management Incentive Plan**

[TO BE FILED]

WEIL:\96067153\5\62739.0004

**Exhibit J**

**Directors and Officers of Reorganized Debtors**

### Directors and Officers of Reorganized Debtors[1]

***Directors and Officers of Memorial Parent NewCo.*** Upon the Effective Date, the New Board shall be a five (5) or seven (7) member board composed of the Chief Executive Officer and four (4) or six (6) directors, as applicable, designated by the Requisite Noteholders; provided that the Requisite Noteholders will consider at least two (2) directors proposed by the Chief Executive Officer. The members of the New Board shall be identified no later than the Confirmation Hearing or otherwise in accordance with section 1129(a)(5) of the Bankruptcy Code. On the Effective Date, the terms of the current members of the board of directors of Memorial General Partner shall expire. The officers of Memorial Parent immediately before the Effective Date shall serve as the initial officers of Memorial Parent NewCo upon the Effective Date.

***Directors and Officers of the Reorganized Debtor Affiliates.*** Except as otherwise provided in the Plan or the Plan Supplement, the members of the board of directors for each of the Debtor Affiliates immediately before the Effective Date shall serve as the members of the board of directors of each of the corresponding Reorganized Debtor Affiliates on or after the Effective Date and, thereafter, the selection of directors shall be in accordance with their respective organizational documents. Except as otherwise provided in the Plan or the Plan Supplement, the officers of the respective Debtors immediately before the Effective Date shall serve as the initial officers of each of the corresponding Reorganized Debtor Affiliates upon the Effective Date and in accordance with any employment agreement in effect immediately before the Effective Date and, thereafter, the selection of officers shall be in accordance with their respective organizational documents.

---

[1] Capitalized terms used but not otherwise herein defined shall have the meanings ascribed to such terms in the Amended Plan.