**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| | § | |
| In re: | § | Chapter 11 |
| | § | |
| **MEMORIAL PRODUCTION** | § | Case No. 17-30262 |
| **PARTNERS LP**, *et al.*, | § | |
| | § | **(Jointly Administered)** |
| Reorganized Debtors.[1] | § | |
| | § | |

**REORGANIZED DEBTORS' PRELIMINARY RESPONSE TO
CURE OBJECTIONS FILED BY RELIANT AND BOAZ**

Pursuant to the Agreed Scheduling Order submitted by the parties on August 21, 2017

(ECF No. 426), Amplify Energy Corp. and its affiliates, certain of which are reorganized debtors

in the above-captioned chapter 11 cases (collectively, the "**Reorganized Debtors**," and prior to

reorganization, the "**Debtors**") hereby file this joint preliminary response to: (1) the June 1, 2017

filing styled as an *Objection of Reliant Energy Retail Services, LLC to Debtors' Proposed Cure

Amounts for Assumed Contracts & Unexpired Leases* (ECF No. 385) (the "**Reliant Cure

Objection**") and (2) the June 1, 2017 filing styled as *Boaz Energy II, LLC's Objection to Cure

Amount* (ECF No. 386) (the "**Boaz Cure Objection**") (together, the "**Cure Objections**"), and in

support states the matters set forth below:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of their respective federal tax
identification numbers, as applicable, were: Memorial Production Partners LP (6667); Memorial
Production Partners GP LLC; MEMP Services LLC (1887); Memorial Production Operating LLC;
Memorial Production Finance Corporation (3356); WHT Energy Partners LLC; WHT Carthage LLC;
Memorial Midstream LLC; Beta Operating Company, LLC; Columbus Energy, LLC; Rise Energy
Operating, LLC; Rise Energy Minerals, LLC; Rise Energy Beta, LLC; San Pedro Bay Pipeline Company
(1234); and Memorial Energy Services LLC. In accordance with the Plan and Confirmation Order (each
as defined below), certain of the Debtors were dissolved or changed their names. The Reorganized
Debtors' mailing address is 500 Dallas Street, Suite 1600, Houston, Texas 77002.

## I. **Summary**

1.      Both the Reliant Cure Objection and Boaz Cure Objection are legally without merit and should be denied in full or, solely in the alternative, reduced and/or limited for a failure to properly substantiate the amounts claimed, a failure to mitigate damages, and setoff.

2.      First, as to Reliant Energy Retail Services, LLC ("**Reliant**"), the $1,352,745.21 "termination fee" it seeks to impose for certain properties sold to Boaz Energy II, LLC ("**Boaz**") in May 2016 is invalid because Reliant unilaterally terminated electrical service to those locations without proper authorization.  The only other party to the electricity contract is Memorial Production Operating LLC (n/k/a Amplify Energy Operating LLC) ("**MPO**").  MPO never gave Reliant authorization to stop electrical service and was continuing to pay all charges for electricity months after the sale occurred while obtaining reimbursement from Boaz (which Boaz was obligated to pay pursuant to a May 2016 purchase and sale agreement between Boaz and MPO).  Reliant's unilateral declaration of a partial termination and assessment of a $1,352,745.21 fee as to the sold locations was a complete repudiation that acted to discharge MPO from any responsibility as to the severed locations.  If Reliant seeks to recover a partial termination fee, it should pursue that claim against Boaz and/or any other parties upon whom Reliant allegedly relied for authorization to terminate the electrical service.  Alternatively, if Reliant properly declared a partial termination as to MPO, the amount that Reliant seeks to recover was not substantiated nor ever properly asserted under law.

3.      Second, as to Boaz's claim for indemnification from MPO as to the $76,341.74 in legal costs it allegedly incurred in defending against a litigation pending in Coke County, Texas, that amount is not recoverable because the May 2016 purchase and sale agreement between MPO and Boaz does not provide indemnification as to the specific allegation made against Boaz

WEIL:\96246632\3\62739.0005

in that suit.  In particular, Boaz was named as a defendant in the Coke County litigation based solely on the speculation that Boaz had, by contract, assumed all pre-existing liabilities related to the property sold in the May 2016 purchase and sale agreement.  That allegation is incorrect. More importantly, however, it is not an allegation that is indemnified because it is not based on any pre-closing conduct of MPO.  The allegation is based on Boaz's own conduct of allegedly entering into a contract whereby it assumed pre-existing liabilities.  Boaz itself is responsible for answering and disproving that contention.  Alternatively, even if the allegations against Boaz in the Coke County litigation could be characterized as indemnifiable in some way, the $76,341.74 in legal costs that Boaz seeks to recover should be denied as not properly substantiated, due to a failure to mitigate, and by way of setoff.  No proof of the legal costs or their necessity was provided by Boaz and most were apparently incurred during a stay of the Coke County litigation. Further, Boaz should have already gotten itself dismissed from the Coke County litigation since the incorrect allegation is easily disproven.  Boaz's failure to even attempt to limit its legal costs in such circumstances is a failure to mitigate.  Likewise, a failure by Boaz to seek coverage from its insurance providers for its defense costs would be a failure to mitigate as well.  Finally, any amount due to Boaz for indemnification of its defense costs is subject to setoff by the indemnification Boaz owes, under the same May 2016 purchase and sale agreement, to MPO for all costs incurred by MPO related to dealing with the Reliant Cure Objection.

## II.  Procedural Background

4.      On January 16, 2017, each of the Debtors commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").  The chapter 11 cases are being jointly administered for procedural purposes pursuant to Rule 1015(b)

of the Federal Rules of Bankruptcy Procedure and Rule 1015-1 of the Bankruptcy Local Rules

for the Southern District of Texas.

5.       On March 24, 2017, the Debtors filed the *Supplement to Amended Joint Plan of Reorganization of Memorial Production Partners LP, et al. Under Chapter 11 of the Bankruptcy Code* (ECF No. 283), which incorporates the *Schedule of Proposed Cure Amounts for Assumed Contracts and Unexpired Leases* at Exhibit H providing proposed cure amounts of $1,520.58 and $19,093.33 in regard to Reliant and $0.00 for Boaz (together, the "**Proposed Cure Amounts**").

6.       On April 14, 2017, the Debtors filed the *Second Amended Joint Chapter 11 Plan of Reorganization of Memorial Production Partners LP, et al. Under Chapter 11 of the Bankruptcy Code* (ECF No. 341) (the "**Plan**") and the Court entered the *Findings of Fact, Conclusions of Law, and Order Confirming Second Amended Joint Plan of Reorganization of Memorial Production Partners LP, et al., Under Chapter 11 of the Bankruptcy Code and Granting Related Relief* (ECF No. 344) (the "**Confirmation Order**").   The Plan became effective on May 4, 2017.[2]

7.       On June 1, 2017, both of the Cure Objections were filed.   The Reliant Cure Objection seeks $1,352,745.21 in the form of a "partial termination fee" (*see* Reliant Cure Objection [ECF No. 385] at ¶ 3) and the Boaz Cure Objection seeks $76,341.74 in "costs of defending" a separate lawsuit in Coke County, Texas.   (*See* Boaz Cure Objection [ECF No. 386] at ¶¶ 2-3.)

### III.  Factual Background

8.       By a purchase and sale agreement dated July 15, 2013, MPO acquired all the equity interest in Boaz Energy LLC (a different entity from the current Boaz "II" that is a party

---

[2] Capitalized terms used but not defined herein have the meanings ascribed to such terms in the Plan.

WEIL:\96246632\3\62739.0005

here) from Boaz Energy Partners LLC.  The various properties and assets acquired in that transaction included, among others, the Bronte No. 5W Salt Water Disposal Well located in Coke County, Texas (the "**SWD5 Well**").

9.  On May 9, 2014, MPO entered into an Electricity Sales Agreement with Reliant (Exhibit A attached hereto, the "**Electricity Contract**") in which Reliant agreed to supply electricity to various properties owned by MPO until approximately December 31, 2019.  (Ex. A at p. 1 ("Delivery Term").)  Other than the service locations and price, the Electricity Contract consisted primarily of standard "General Terms" drafted by Reliant.  (*See generally* Ex. A.) Those terms provide the contract is governed by Texas law (*id.* at ¶ 9) and that a partial termination could occur only by the customer, i.e., MPO, "delet[ing] one or more, but not all, Customer Locations … from the Agreement" (*id.* at ¶ 12), which MPO could do only by giving Reliant thirty days' prior written notice.  (*Id.* at ¶ 12; *see also id.* at p. 8 (providing means of deleting customer locations with an "Email Request").)  The Electricity Contract specifically defined a "Switch" of electrical service as occurring only when "authorized" by MPO (*see id.* at p. 4) and made no reference to a switch or partial termination occurring upon the instruction or authorization of the Electric Reliability Council of Texas ("**ERCOT**")[3] or anyone else.  By its plain terms, therefore, MPO was the only party to the Electricity Contract that could cause a partial termination and make it responsible for a termination fee.  Reliant was not allowed to

---

[3] According to its website (excerpts attached hereto as Exhibit B), ERCOT "manages the flow of electric power to 24 million Texas customers -- representing about 90 percent of the state's electric load. As the independent system operator for the region, ERCOT schedules power on an electric grid that connects more than 46,500 miles of transmission lines and 570+ generation units. It also performs financial settlement for the competitive wholesale bulk-power market and administers retail switching for 7 million premises in competitive choice areas. ERCOT is a membership-based 501(c)(4) nonprofit corporation, governed by a board of directors and subject to oversight by the Public Utility Commission of Texas and the Texas Legislature. Its members include consumers, cooperatives, generators, power marketers, retail electric providers, investor-owned electric utilities, transmission and distribution providers and municipally owned electric utilities." (*See* Ex. B at 1.)  Reliant is identified on the ERCOT website as a current "Corporate Member" of the organization.  (*See id.* at 2.)

terminate service as to any locations without authorization from MPO and was instead required to continue supplying electricity to each location listed during the applicable term so long as MPO continued paying for the electricity.

10.     Commencing on or about September 6, 2014 (as discovered on or about September 24, 2014), the SWD5 Well in Coke County experienced a sudden and unintended release of saltwater and related fluids that contaminated soil and groundwater in the immediate vicinity of the well (the "**Known Bronte Environmental Condition**" or "**KBEC**").   After discovery, MPO: (i) reported the event to the relevant authorities, (ii) gave notice to MPO's insurance provider, and (iii) hired a vendor to remediate the contamination.

11.     Several months later, while the remediation of the KBEC was in process, MPO entered into negotiations with Boaz Energy Partners LLC to sell certain properties and assets— specifically including the SWD5 Well—to a newly-formed Boaz entity (i.e., Boaz Energy "II" LLC, the party here).  The environmental issue with the SWD5 Well was fully disclosed.

12.     On May 5, 2016, MPO and Boaz entered into a definitive purchase and sale agreement (Exhibit C attached hereto,[4] the "**May 2016 PSA**") to transfer ownership of the various properties and assets sold to Boaz while further providing for continued remediation and indemnification by MPO on specific matters related to the KBEC.  However, the responsibility to provide indemnification related to the KBEC was expressly limited to the "Lowest Cost Response" that would be necessary to remediate the KBEC to the satisfaction of governmental authorities.  (*See* Ex. C at §§ 4.3(d), 10.6, and 11.2(d).)  All liability for third-party property damage that arose from events prior to the closing due to MPO's ownership or operation of the

---

[4] The May 2016 PSA is subject to certain confidentiality restrictions.  (*See* Ex. C at § 13.4.)  The copy attached hereto as Exhibit C is thus filed under seal (and redacted to protect financial terms not relevant to this proceeding) and will be provided to Reliant in the same redacted form provided the parties can reach an agreement as to the confidentiality and use of the May 2016 PSA.

WEIL:\96246632\3\62739.0005

property was specifically retained and excluded from the May 2016 PSA.  (*See id.* at §§ 2.4, 11.2(c), and p. 11 (definition of "Retained Liabilities").)

13.      A number of the properties sold to Boaz in the May 2016 PSA were receiving electricity under the terms of the Electricity Contract with Reliant.   By way of various representations, warranties, and covenants, Boaz agreed it would assume the Electricity Contract as to those properties and pay all charges related to the properties.  (*See* Ex. C at §§ 2.1(d), 2.4, and 5.4.)  As such, in or around August 2016, MPO and Reliant prepared draft assignments to transfer to Boaz the Electricity Contract as it pertained to the relevant properties.  (*See* Exhibit D attached hereto.)  However, Boaz declined to execute assignment of the Electricity Contract for the sold locations and chose instead to continue reimbursing MPO for all electricity charges assessed by Reliant as to the relevant locations on a monthly basis.

14.      On September 23, 2016, a number of plaintiffs owning interests in land and other property around the SWD5 Well sued various defendants—including, among others, MPO and Boaz—for damages caused by the KBEC in a litigation styled as *Carroll L. Lee, et al. v. Memorial Production Operating LLC, et al.*, Cause No. CV1604622, which is currently pending in the 51st Judicial District Court of Coke County, Texas (the "**Coke County Litigation**").  By all indications Boaz was named as a defendant in that litigation due solely to an allegation made "on information and belief" (an incorrect one) that Boaz had assumed all pre-existing liability related to the SWD5 Well blowout that occurred in September 2014.  (*See* Coke County Litigation Original Petition, attached hereto as Exhibit E, at ¶ 57.)

15.      In October-November 2016 Boaz sought to obtain indemnification from MPO for its defense costs related to the Coke County Litigation on the basis that the indemnification related to the KBEC in Section 11.2(d) of the May 2016 PSA was not limited to the "Lowest

WEIL:\96246632\3\62739.0005

Cost Response" for anything other than pure remediation of the KBEC and, instead, that MPO was required to indemnify all costs Boaz may otherwise incur in any way related to the KBEC, allegedly including the Coke County Litigation.  (*See generally* Letter from C. Brown, attached hereto as <u>Exhibit F</u>.[5])  MPO did not agree indemnification was required.

16.     On January 16, 2017, the Debtors commenced their voluntary case under chapter 11.  As a result, the Coke County Litigation was effectively stayed by operation of law.

17.     Upon belief it appears that, in or around February 2017, Boaz sought to obtain electricity for the properties it bought from MPO in the May 2016 PSA—which remained subject to the Electricity Contract—from a provider other than Reliant.  Reliant in turn appears to have accepted an instruction from Boaz or ERCOT (or someone other than MPO at least) to stop providing electricity to the affected locations and viewed that as a partial termination of the Electricity Contract as to the relevant locations.  According to the Reliant Cure Objection, the purported $1,352,745.21 "termination fee" that Reliant seeks to recover now was first assessed by way of the proof of claim Reliant filed with this Court on April 21, 2017.  (*See* Reliant Cure Objection [ECF No. 385] at ¶ 3.)  The remaining locations in the Electricity Contract not sold to Boaz continued to receive electricity service from Reliant and are being paid for by MPO in the ordinary course of business, as duly acknowledged in the Reliant Cure Objection.  (*See id.* at ¶ 3 (noting "… Debtors have remained current on their post-petition invoices").)

18.     On March 7, 2017, Boaz filed a proof of claim in this matter for $29,088.00 in defense costs related to the Coke County Litigation (Case No. 17-30259, Claim No. 33-1) and then, on June 1, 2017, raised that amount to the $76,341.74 now sought by the Boaz Cure

---

[5] Mr. Brown's indemnification letter, unlike the May 2016 PSA itself, contains of facts and legal argument relevant to this proceeding and, thus, is not necessary to file under seal.  MPO does not intend to waive any confidentiality rights with respect to the May 2016 PSA by not filing that letter under seal.

WEIL:\96246632\3\62739.0005

Objection.  That represents an increase of $47,253.74 in defense costs allegedly incurred by Boaz for the Coke County Litigation while it was stayed as a result of Debtors' bankruptcy.

19.     Reliant and Boaz now ask this Court to approve their requests for the assessment of, respectively, $1,352,745.21 and $76,341.74 as cure amounts.   MPO denies liability and asserts that the Proposed Cure Amounts it set forth as to each respective party—i.e., $1,520.58 and $19,093.33 in regard to Reliant and $0.00 in regard to Boaz—are proper based on the legal arguments below or, alternatively, that the Cure Amounts should be reduced and/or limited in accordance with the respective alternative arguments below.

## IV.  Arguments as to Reliant

### A.     The Prior Material Breach and Repudiation by Reliant Discharges MPO from Being Responsible to Pay a Termination Fee Under the Electricity Contract.

20.     Reliant's claim of $1,352,745.21 as a termination fee is improper under Texas law because Reliant committed a prior material breach and repudiation as to the relevant locations by ceasing to provide electricity service and declaring a partial termination without MPO's authorization or deletion of any customer locations from the Electricity Contract.

21.     Under Texas contract law, a court's "primary concern is to give effect to [the] written expression of the parties' intent." *In re Perry*, 425 B.R. 323, 347 (Bankr. S.D. Tex. 2010) (citing *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133 (Tex. 1994)).  As such, when unambiguous, a contract's "plain language alone controls, as Texas courts have held that 'the instrument alone will be deemed to express the intention of the parties for it is objective, not subjective, intent that controls.'"  *In re Nguyen-Gassaway*, 408 B.R. 869, 874 (Bankr. S.D. Tex. 2009) (citing *Briercroft Sav. & Loan Ass'n v. Foster Fin. Corp.*, 533 S.W.2d 898, 902 (Tex. Civ. App.—Eastland 1976, writ ref'd n.r.e.)).  A contract is unambiguous if "it can be given a definite or certain meaning as a matter of law."  *In re El Paso Refinery, L.P.*, 244 B.R. 613, 622 (Bankr.

W.D. Tex. 2000) (citing *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex. 1996)).   Further, it is well-established that "where an ambiguity exists in a contract, the contract language will be construed strictly against the party who drafted it since the drafter is responsible for the language used."   *In re Hence*, 358 B.R. 294, 307 (Bankr. S.D. Tex. 2006) (quoting *Gonzalez v. Mission Am. Ins. Co.*, 795 S.W.2d 734, 737 (Tex. 1990)).

22.     The plain and unambiguous language of the Electricity Contract provides that only MPO could authorize a termination as to specific locations by giving thirty days' prior written notice (and, to the extent there is any ambiguity in the language, it should be construed against Reliant as the drafter of the Electricity Contract).   MPO never gave such an authorization or sought to delete locations.   As such, Reliant committed a prior material breach of the Electricity Contract as to the affected locations by accepting an instruction from someone other than MPO—the only other party to the Electricity Contract—to stop providing electricity service to the properties purchased by Boaz.   Reliant knew from the efforts to assign the sold locations to Boaz that the properties had been sold but also knew that MPO was continuing to pay for electricity service as invoiced under the Electricity Contract.   Reliant should not have accepted an instruction from Boaz or ERCOT (or anyone else) to stop providing service.

23.     Reliant's subsequent declaration of termination as to the affected locations and assessment of $1,352,745.21 as a fee was a complete repudiation as to the severable locations. *See Another Attic, Ltd. v. Plains Builders, Inc.*, No. 07-08-0312-CV, 2010 WL 4941694, at *3 (Tex. App.—Amarillo Dec. 6, 2010, no pet.) ("A repudiation occurs when a party absolutely repudiates the obligation, without just excuse, and the other party is damaged by the repudiation.").   Under Texas law, such a breach excuses all further performance or obligations that would otherwise be owed by the other party. *See Mustang Pipeline Co., Inc. v. Driver*

WEIL:\96246632\3\62739.0005

*Pipeline Co., Inc.*, 134 S.W.3d 195, 196 (Tex. 2004) ("It is a fundamental principle of contract law that when one party to a contract commits a material breach of that contract, the other party is discharged or excused from further performance."); *see also Hampton v. Minton*, 785 S.W.2d 854, 857 (Tex. App.—Austin 1990, writ denied) ("In a bilateral contract, where promises have been exchanged for an exchange of performances and the contract is executory on both sides, one party's repudiation of a duty to perform, or a breach of the contract of such materiality indicating an intention to repudiate the contract, excuses or discharges the other party's remaining obligation to perform.").

24.     Reliant's repudiation does not have any impact, however, on the remaining locations MPO continues to use and pay for under the terms of the Electricity Contract because the locations are severable.  Under Texas law, a contract can be "divisible, or severable, when one party's performance consists of more than one distinct and separate item and the price paid by the other party is apportioned to each item."  *Stewart Title Guar. Co. v. Old Republic Nat. Title Ins. Co.*, 83 F.3d 735, 739 (5th Cir. 1996) (citations and editing omitted); *see also In re Cafeteria Operators, L.P.*, 299 B.R. 384, 389-91 (Bankr. N.D. Tex. 2003) (various properties under master sublease divisible for purposes of rejecting under Section 365 of the Bankruptcy Code).  Such a divisible contract can be repudiated in part without affecting the remainder of the agreement.  *Ennis Bus. Forms, Inc. v. Gehrig*, 534 S.W.2d 183, 189 (Tex. Civ. App.—Waco 1976, writ ref'd n.r.e.) ("Accordingly, it is the rule that refusal by one party to perform an independent provision of a divisible contract is not such renunciation or abandonment as will support an action under the principles of anticipatory breach of the whole agreement.").

25.     The Electricity Contract here contemplates each separate location for which service was being provided to be divisible because it gave MPO the right to delete some (but not

WEIL:\96246632\3\62739.0005

all) locations without affecting the right to receive and pay for electricity as to other locations. (*See* Ex. A at ¶ 12; *see also id.* at p. 8 (process to delete locations by email).)  As such, Reliant's improper repudiation and assertion of a termination fee as to the locations sold to Boaz cannot operate to relieve Reliant of its obligation to continue supplying electricity to the rest of the locations or be used to coerce MPO into paying the illegal termination fee.  *See, e.g.*, *Dietz v. Van Nortwick*, 188 S.W.2d 590, 593 (Tex. Civ. App.—Galveston 1945, writ ref'd w.o.m.) ("To hold that a severable contract, partly legal and partly illegal, was not severable so as to permit recovery of the prepayment, proportionate to the lawful part of the contract, would tend to permit the contractee to coerce the contractor to perform the whole contract.").  Rather, due to Reliant's improper acceptance of an instruction from either Boaz or ERCOT to terminate service, it should be required to pursue any damages it has suffered from one or both of those parties.

26.     In sum, Reliant had no authority to shut off electricity service to the locations sold to Boaz without instructions from MPO to do so when MPO was paying all charges assessed by Reliant and had a legal right under the PSA to continue to require Boaz to reimburse it for all such charges.  Reliant fatally impaired MPO's rights by completely repudiating and declaring a termination of the severable locations under the Electricity Contract.  As a result of Reliant's improper repudiation, MPO was discharged and excused from any further performance as to the affected locations.  The $1,352,745.21 fee assessed by Reliant is not valid and should be denied.

**B.     In the Alternative, Reliant Failed to Establish the Termination Fee is Properly Calculated or Due Pursuant to the Terms of the Electricity Contract.**

27.     Even if the termination declared by Reliant were proper, Reliant fails to establish it met the conditions required to recover the $1,352,745.21 amount now asserted in the Reliant Cure Objection.  The Electricity Contract provides that any termination payment is to be

WEIL:\96246632\3\62739.0005

calculated "in the same manner as the Cancellation Fee,[6] using only the Benchmark Quantities[7] for the deleted Customer Locations" and that the amount must be billed in a "subsequent Retail Invoice." (*See* Ex. A at ¶ 12.)  Reliant failed to support its calculation of the $1,352,745.21 in the Reliant Cure Objection or show that the termination fee was properly billed in a subsequent Retail Invoice after Reliant stopped providing service.  Reliant appears to have simply declared in its April 21, 2017 proof of claim that it is entitled to $1,352,745.21 and provided no supporting proof whatsoever.  Such a declaration is not sufficient.

28.     Section 365 of the Bankruptcy Code places the initial burden of proof on the non-debtor party moving to recover.  *See In re Patriot Place, Ltd.*, 486 B.R. 773, 795 (Bankr. W.D. Tex. 2013) (citing *In re F.W. Rest. Assocs., Inc.*, 190 B.R. 143, 147 (Bankr. D. Conn. 1995) ("Under a strict Section 365(b)(1) analysis, the City bears the evidentiary burden of establishing the Debtor's default under the Concession Agreement.")); *In re Eagle Bus Mfg., Inc.*, 148 B.R. 481, 482 (Bankr. S.D. Tex. 1992) ("The landlord, here the Port Authority, bears the burden of proving its right to payment for 'all elements of compensation and damages for pecuniary

---

[6] "'Cancellation Fee' means (i) where Customer is Non-Defaulting Party, the <u>positive</u> difference, if any, obtained by <u>subtracting</u> (a) the present value of this Agreement had it not been terminated using the Benchmark Quantity applicable to the Customer Locations for the remaining period of the Term <u>from</u> (b) the present value of a replacement contract using the Benchmark Quantity applicable to the Customer Locations and market prices that are reasonably expected to be available in the market for the remaining period of the Term; and (ii) where Reliant is Non-Defaulting Party, the <u>positive</u> difference, if any, obtained by <u>subtracting</u> (a) the present value of a replacement contract <u>from</u> (b) the present value of this Agreement had it not been terminated, calculated in the same manner as provided in item (i), in each case <u>plus</u> Non-Defaulting Party's reasonable costs associated with the valuation and replacement contract." (*See* Ex. A at pp. 3-4.)

[7] "'Benchmark Quantity' means Customer's expected monthly kWh electricity consumption for the Term. Customer's expected consumption may be set out on Exhibit A.  If Customer's expected consumption is not set out on Exhibit A, Benchmark Quantity will be determined by reference to Customer Information and the 12 months of electricity consumption by Customer before Effective Date, or for new facilities, Customer Information and electricity consumption of comparable facilities, each as may be adjusted in accordance with this Agreement."  (*See* Ex. A at p. 3.)

WEIL:\96246632\3\62739.0005

loss.'").[8]  Reliant failed to demonstrate in the first instance that it is entitled to the $1,352,745.21 amount even if its declaration of a partial termination was possible under the Electricity Contract and Texas law.  As such, the Reliant Cure Objection should be denied.

## V.  Arguments as to Boaz

### A.  MPO's Indemnification Obligation for the KBEC is Limited to the Lowest Cost Response and No Indemnification Exists for Boaz's Own Conduct.

29.     Under Texas law, the plain language of the May 2016 PSA limits MPO's obligation to provide indemnification to Boaz for the KBEC to the "Lowest Cost Response." (*See* Ex. C at § 11.2(d).)  The Lowest Cost Response is defined in great detail in the contract but, in essence, is fairly characterized as the lowest cost necessary to remediate the property back into compliance with the applicable environmental laws.  (*See id.* at p. 6 (definitions).)

30.     Section 11.2(d) addresses all indemnification by MPO as it pertains to the KBEC and contains two subparts which describe the indemnification as covering: (i) "any breach by [MPO] of Section 10.6"[9] and (ii) "the Known Bronte Environmental Condition" itself.  However, *both* subparts are then immediately confined by the following limitation:

> "… *provided*, *however*, nothing in this <u>Section 11.2(d)</u> requires (or shall be deemed to require) Seller's response to address the Known Bronte Environmental Condition to more (or anything other) than the Lowest Cost Response …."

(emphasis in original) (referred to hereinafter as the "**Provided However Limitation**").

---

[8] *See also In re Diamond Mfg. Co., Inc.*, 164 B.R. 189, 199 (Bankr. S.D. Ga. 1994) (noting that, under Section 365, the non-bankrupt party "has the initial burden of showing defaults and that those defaults have been properly noticed to the lessee the bankrupt party. … However, if the proof does not establish any default in an executory contract or unexpired lease, the elements of § 365(b)(1) are not required to be proven by the debtor.") (editing omitted) (citing *In re Rachels Industries, Inc.*, 109 B.R. 797 (Bankr. W.D. Tenn. 1990)).

[9] Section 10.6 of the May 2016 PSA provides a post-closing obligation of MPO to perform the Lowest Cost Response necessary to obtain a No Further Action Document from the Railroad Commission of Texas, which will show no further actions are required to "protect human health, safety or the environment."

31.     Boaz appears to take the position that the word "Seller's *response*" to the KBEC in the Provided However Limitation means the cap on the indemnity to the Lowest Cost Response applies only to MPO's remediation of the environmental condition under Section 10.6 (i.e., only the first subpart of the indemnity) and does not act to also limit the second subpart. (*See* Ex. F at 4.)  In essence, Boaz contends the second subpart's reference to the KBEC is not limited in any manner and should be construed to require indemnification of any cost or expense Boaz could argue to be related in any way to the SWD5 Well blowout.  But that defies common usage of the English language since the second subpart of the indemnity (Section 11.2(d)(ii)) and the Provided However Limitation expressly refer to the exact same thing: the "Known Bronte Environmental Condition" as a whole.  If the words "Seller's response" was somehow meant to apply only to MPO's obligations under Section 10.6, then it would state as much.  But the plain language of the Provided However Limitation is not so narrow.  Rather, it applies to *anything* in Section 11.2(d); specifically including the KBEC and Section 10.6.  Boaz's extremely narrow reading of the Provided However Limitation is erroneous.

32.     Further, reading the plain language of the Provided However Limitation in Section 11.2(d) to mean what it says—that MPO's responsibility for the KBEC itself is limited to the Lowest Cost Response needed to obtain a No Further Action Document—harmonizes with the other provisions of the contract when read as a whole, as it must be.  *See In re Perry*, 425 B.R. 323, 348 (Bankr. S.D. Tex. 2010) ("The contract must be considered as a whole" and "[m]oreover, each part of the contract should be given effect.") (citation omitted).  In particular, Section 4.3(d) of the May 2016 PSA addresses the survival of matters after closing and states that the *entire* indemnity provided in Section 11.2(d) (not just one or the other of its subparts) shall have no force or effect once a No Further Action Document is obtained.  That directly

WEIL:\96246632\3\62739.0005

corresponds with the Provided However Limitation making clear that all indemnification available under Section 11.2(d) is limited to the Lowest Cost Response needed to get the No Further Action Document.  It makes no sense to interpret one subpart of Section 11.2(d) as being immune from the Provided However Limitation.  Indeed, to suggest as much would result in nonsensical results here.  For example, Boaz claims the indemnity provided in the second subpart (Section 11.2(d)(ii) in particular) encompasses Boaz's defense costs in the Coke County Litigation but, if that were true, then the indemnity could cease in the middle of such a litigation once a No Further Action Document is obtained without regard to whether Boaz is still incurring defense costs.  Logically, the entire indemnification provided in both parts of Section 11.2(d) is, as stated, limited to the Lowest Cost Response.

33.     Further, Boaz's argument that a plain reading of the Provided However Limitation is contrary to the intent of the parties or will end up creating a meaningless "nullity" (*see* Ex. F at 4) is not accurate (and, in fact, as shown above, is the opposite when it comes to nullifying express provisions of the contract).  Although perhaps not stated as clear as it could be, what Boaz appeared to try and articulate in its November 16, 2016 letter demanding indemnification is that Boaz would not have entered into the May 2016 PSA if there was no indemnification by MPO for instances where a third party sought to hold Boaz liable for actions or events that occurred pre-closing during MPO's ownership of the SWD5 Well.  (*See id.*)  Yet, Boaz ignores that such indemnification is expressly provided in another provision of the contract.  Section 11.2(c) of the May 2016 PSA states that MPO would indemnify all losses related to the "Retained Liabilities," which are specifically defined to include any:

> "… Third Party property damage (but not including costs of response
> pursuant to Environmental Laws with respect to releases into the

WEIL:\96246632\3\62739.0005

> environmental at or originating from the Properties[10]), in each case to the
> extent, *related to the ownership or operation of the Properties and arising
> from events occurring prior to the Closing* ...."

(*See* Ex. C at 11 (emphasis added).)  As a result, if Boaz had mistakenly been named in the Coke

County Litigation as the owner of the SWD5 Well during the time of the blowout in September

2014, then indemnification would be provided under Section 11.2(c) (although the alleged

$76,341.74 amount would still be subject to the mitigation points addressed below).  But that is

not the allegation in the Coke County Litigation as to Boaz.

34.     Rather, Boaz was named a defendant in the Coke County Litigation due to an

incorrect allegation regarding Boaz's own conduct.  Indeed, the Original Petition contains only

one substantive allegation as to Boaz Energy II LLC (defined in the pleading as "Energy II") at

all, which states in full:

> "Memorial Production and/or Memorial Resource since have transferred
> interests in SWD5 (amongst other assets) to Energy II, under terms and
> conditions that *on information and belief may have transferred pre-
> existing liabilities related to the well*, including liabilities associated with
> the blowout in September 2014."

(*See* Ex. E at ¶ 57 (emphasis added).)  As a result, the sole allegation upon which Boaz is named

as a defendant in the suit is the speculation that Boaz *assumed by contract* all pre-existing

liabilities for the SWD5 Well blowout.  Such speculation is incorrect due to the Retained

Liabilities provision of the May 2016 PSA, but also not one subject to indemnification.  There is

no indemnification for Boaz's own act of choosing to enter into the May 2016 PSA.  As a result,

there is no indemnification provided to Boaz for the Coke County Litigation under Section

---

[10] The parenthetical language of exclusion in the relevant part of the "Retained Liabilities" definition
quoted above—i.e., "but not including costs of response pursuant to Environmental Laws with respect to
releases into the environmental at or originating from the Properties"—further harmonizes and confirms
that the Provided However Limitation in Section 11.2(d) applies to the entire indemnification related to
the KBEC since the Retained Liabilities indemnification picks up where that limitation would exclude,
but limited to pre-closing acts and events.

WEIL:\96246632\3\62739.0005

11.2(c) or 11.2(d).   Boaz itself bears the burden and costs of defending against the incorrect allegation made in the Coke County Litigation (which it easily could have done already).

35.     In reality, Boaz should have extricated itself from the Coke County Litigation at the outset by demonstrating the incorrect allegation to the Coke County plaintiffs to either obtain a voluntary dismissal from them or otherwise move for an immediate motion for summary judgment.  Boaz chose instead to rack up defense costs and try to foist its responsibility to defend against that allegation onto MPO.  That was improper and is not supported by the contract or Texas law.  The Boaz Cure Objection should be denied in full.

**B.     In the Alternative, the Boaz Cure Objection Should be Denied Due to Boaz's Failure to Substantiate and/or Mitigate Damages.**

36.     Even if Boaz were able to prevail with its non-standard interpretation of the May 2016 PSA's indemnification provision, the amount of defense costs that Boaz seeks as a cure amount should still be limited and/or denied due to a failure to meet its burden of proof in the first instance and a failure to mitigate damages otherwise.  The Boaz Cure Objection seeks $76,341.74 as the "total amount arising from the cost of defending" the Coke County Litigation.  Yet Boaz did not include any proof (such as invoices of attorneys' fees describing the tasks completed) or other substantiation of the amounts whatsoever.  Further, very little has occurred in the Coke County Litigation due to the bankruptcy of two defendants in that suit and, to MPO's awareness, virtually nothing has been done by the plaintiffs in regard to Boaz specifically.  It is thus difficult to fathom how Boaz legitimately incurred $76,341.74 in defense costs (of which $47,253.74 was apparently billed from March 7, 2017 to June 1, 2017) during the stay period.

37.     To the extent Boaz continues with its Cure Objection in this matter, MPO will be requesting detailed discovery of the alleged costs incurred and objects to a recovery of any amounts not properly substantiated.  Further, given the circumstances, MPO believes the amount

sought to be recovered by the Boaz Cure Objection is subject to reduction or denial for a failure to mitigate damages. Under Texas law, the doctrine of mitigation of damages "prevents a party from recovering for damages resulting from a breach of contract that could be avoided by reasonable efforts on the part of the plaintiff." *Great Am. Ins. Co. v. N. Austin Mun. Util. Dist. No. 1*, 908 S.W.2d 415, 426 (Tex. 1995). Amounts that a party should have avoided or recovered through mitigation are typically offset against the damages. *See Carrizales v. State Farm Lloyds*, 518 F.3d 343, 350 (5th Cir. 2008).

38.     As noted previously, the Coke County Litigation has been subject to a stay for much of its existence. The $76,341.74 allegedly incurred by Boaz is thus unreasonable or was not actually necessary to defend Boaz in that suit. Further, given Boaz was not the owner of the SWD5 Well at the time the blowout occurred, obtaining the dismissal of Boaz from the Coke County Litigation—either by voluntary stipulation or summary adjudication—should have already occurred (or at least been attempted). Any amounts unreasonably incurred as a result of that failure should be denied. Indeed, this Court has previously denied the recovery of attorneys' fees for analogous reasons. *See, e.g.*, *In re Easley*, No. 10-32981-H3-13, 2012 WL 567031, at *2 (Bankr. S.D. Tex. Feb. 21, 2012) (denying attorneys' fees for failure to mitigate litigation efforts in the bankruptcy).

39.     Separately, to the extent Boaz has insurance coverage that would be expected to cover and/or reimburse its defense costs in the Coke County Litigation—particularly since the allegation is Boaz expressly assumed liability in a contract related to the property at issue (a matter often covered in oil and gas insurance contracts)—then MPO requests the $76,341.74 be denied or appropriately reduced for Boaz's failure to mitigate by seeking insurance coverage and/or reimbursement of its defense costs through its own insurance carrier. The May 2016 PSA

19

provided that Boaz was to obtain certain insurance before closing (*see* Ex. C at § 6.2(c)) and the indemnification provisions state that any losses ultimately owed are "net" of any insurance proceeds or other amounts that could reasonably be expected to be recovered from third parties. (*See id.* at § 11.7.)  If Boaz failed to obtain insurance coverage for its property (or failed to seek insurance coverage for its involvement in the Coke County Litigation), then Boaz failed to mitigate the amounts it seeks to recover from MPO now in the Boaz Cure Objection.  Those amounts should be denied and/or reduced accordingly.

### C.   In the Further Alternative, the Boaz Cure Objection Should be Setoff Due to Losses Incurred by MPO in Relation to the Reliant Cure Objection.

40.   In Texas there is a common law right of "setoff" (sometimes phrased "offset") by which obligations owed between two parties may extinguish the lesser amount due between them.  *See Trueheart v. Braselton*, 875 S.W.2d 412, 415 (Tex. App.—Corpus Christi 1994, no writ).  To the extent any of the $76,341.74 asserted in the Boaz Cure Objection is valid, MPO asserts that it should be setoff by the indemnity that Boaz owes under the May 2016 PSA in relation to the Reliant Cure Objection previously addressed herein.

41.   As set forth above, the May 2016 PSA required Boaz to assume and pay all charges for contracts related to the properties that were sold to Boaz.  In particular, the following provisions (although there are others) of the May 2016 PSA are highly relevant:

> Section 2.1(d) – "… Buyer shall purchase, pay for, and accept, all of Seller's right and title to, and interest in … all agreements and contracts to which Seller is a party or in which Seller otherwise holds an interest and … that primarily relate to the assets and properties [sold to Buyer] or the operations with respect thereto …. (all such contracts and agreements, the '***Applicable Contracts***')"

> Section 2.4 – "… Buyer shall assume and hereby agrees to fulfill, perform, pay and discharge … all obligations and Liabilities, whether known or unknown … associated with, the Properties … whether such obligations and Liabilities are deemed to have arisen or accrued or are attributable to

20

periods prior to, on or after the Effective Time (all such obligations and Liabilities, the '*Assumed Liabilities*')."

Section 5.4 – Buyer will "use commercially reasonable efforts to … consummate and make effective the transactions contemplated by this Agreement, including … (b) cooperation in seeking and obtaining any such actions, consents, approvals, or waivers; and (c) the execution of any additional instruments necessary to consummate the transactions contemplated hereby."

(*See* Ex. C at pp. 16, 19, and 32.)

42.     The Electricity Contract with Reliant is an "Applicable Contract" under Section 2.1(d) as well as an "Assumed Liability" under Section 2.4.  Boaz had a duty to cooperate and assume the obligations of the Electricity Contract as it pertained to the sold locations to which the Electricity Contract applied.  In August 2016 MPO thus sought for Boaz to fulfill that duty by obtaining Reliant's consent to assign the Electricity Contract and presenting Boaz with agreements for execution.  (*See* Ex. D.)  Boaz breached its duty, but at least continued to reimburse MPO for all electricity charges related to the properties until approximately February 2017 (and only stopped, perhaps not coincidentally, right around the time Debtors began their bankruptcy proceeding).  As a result, Boaz now has an obligation to indemnify MPO for all losses—including attorneys' fees and litigation expenses—related to the Electricity Contract as it pertains to the sold locations.  In particular, Section 11.1 of the May 2016 PSA states that:

… Buyer and its successors and assigns shall be responsible for, shall pay, and will DEFEND, INDEMNIFY and HOLD HARMLESS Seller … from and against any and all [Liabilities][11] arising out of, resulting from, based on, associated with, or relating to: (a) any breach by Buyer of Buyer's

---

[11] Liabilities are defined in Section 11.1 as including: "… any and all obligations, claims, causes of actions, payments, charges, interest assessments, judgments, assessments, liabilities, losses, damages, supplemental environmental projects, penalties, fines, costs and expenses (including any fees of attorneys, experts, consultants, accountants and other professional representatives, and legal or other expenses incurred in connection therewith) and including liabilities, costs, losses and damages for personal injury, illness or death, property damage, contracts claims, torts, investigations, remediation, cleanup, monitoring, reporting or other response to or correction of environmental conditions, or noncompliance with or liability under Laws or otherwise …." (*See* Ex. C at p. 50.)

WEIL:\96246632\3\62739.0005

representations, warranties or covenants set forth in this Agreement; and
(b) the Assumed Liabilities.

(*See* Ex. C at pp. 50-51.)

43.     As such, on June 2, 2017, the day after the Reliant Cure Objection was filed, MPO made a formal written request to Boaz for indemnification in regard to the Reliant Cure Objection (*see* Letter from R. Stillwell to Boaz, dated June 2, 2017, attached hereto as <u>Exhibit G</u>) and gave Boaz a "reasonable opportunity to pay, settle or contest the claim at [Boaz's] expense." (*See* Ex. C at § 11.4.)   In follow-up email communications, however, Boaz declined to take control of the Reliant Cure Objection despite being specifically informed MPO would then begin incurring legal expenses to deal with the claim that would increase the amount subject to indemnification.   (*See* Email Communications, dated July 20, 2017, attached hereto as <u>Exhibit H</u>.)   MPO has incurred, and expects to continue incurring, legal expenses and costs related to defending against the Reliant Cure Objection that Boaz is obligated to indemnify.  Any amount of the Boaz Cure Objection (i.e, the $76,341.74) that is ultimately found properly owed to Boaz, if any, is therefore subject to setoff against the amount Boaz currently owes and/or will further owe to MPO[12] as a result of its obligation to indemnify as to the Reliant Cure Objection. In all likelihood the amount of the setoff will—due simply to the expense in attorneys' fees involved in contesting the Reliant Cure Objection—entirely surpass the $76,341.74 sought to be recovered in the Boaz Cure Objection.  As a result, even if the Boaz Cure Objection is valid there should still be no recovery by Boaz due to the indemnification it owes MPO for the Reliant Cure Objection..

---

[12] The amount owed will include: (a) the legal expenses and costs already incurred by MPO in dealing with the Reliant Cure Objection, which is currently liquidated, as well as amounts to be liquidated for (b) the future amount of legal expenses and costs incurred in dealing with the Reliant Cure Objection plus (c) any portion of the $1,352,745.21 termination fee ultimately found properly owed, if any, to Reliant.

WEIL:\96246632\3\62739.0005

## VI.  **Attorneys' Fees and Costs**

44.     Pursuant to Section 11.1 of the May 2016 PSA, MPO seeks to recover from Boaz "any fees of attorneys, experts, consultants, accountants and other professional representatives, and legal or other expenses incurred in connection therewith" related to the Reliant Cure Objection, as well as any other "Liabilities" as defined in the May 2016 PSA.

45.     Pursuant to Chapter 38 of the Texas Civil Practice and Remedies Code and principles of equity, MPO seeks to recover from Boaz all of MPO's attorneys' fees and costs incurred in regard to the Boaz Cure Objection.

46.     MPO further seeks to recover from Reliant and/or Boaz all costs allowable under the Bankruptcy Code, principles of equity, or any other applicable rules and statutes.

WEIL:\96246632\3\62739.0005

WHEREFORE the Reorganized Debtors respectfully request that the Cure Objections be denied or, solely in the alternative, reduced and/or limited as set forth above, and such other and further relief be granted to the Reorganized Debtors as the Court may deem just and appropriate.

/s/ Alfredo R. Pérez
WEIL, GOTSHAL & MANGES LLP
Alfredo R. Pérez (15776275)
700 Louisiana Street, Suite 1700
Houston, Texas  77002
Telephone: (713) 546-5000
Facsimile:  (713) 224-9511

-and-

WEIL, GOTSHAL & MANGES LLP
Paul R. Genender (00790758)
200 Crescent Court, Suite 300
Dallas, Texas 75201
Telephone: (214) 746-7000
Facsimile: (214) 746-7700

*Attorneys for the Reorganized Debtors*

**<u>Certificate of Service</u>**

I hereby certify that on August 29, 2017, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.


/s/ *Alfredo R. Pérez*

WEIL, GOTSHAL & MANGES LLP
Alfredo R. Pérez (15776275)
700 Louisiana Street, Suite 1700
Houston, Texas  77002
Telephone: (713) 546-5000
Facsimile:  (713) 224-9511